# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| Liberty One Funding Trust and Liberty Two Funding Trust,<br><br>Plaintiffs,<br><br>v.<br><br>Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Jay Grimm, Jr., Robert Krakovitz, Moshe Malka, Leon Malnik, Barry Septimus, and Phyllis Sifen<br><br>Defendants. | Civil Action No.: 1:23-cv-05483-MLB<br><br>**DEFENDANTS' ANSWER TO PLAINTIFFS' AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED** |

## DEFENDANTS' ANSWER TO PLAINTIFFS' AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendants Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Dean Flock, Jay Grimm, Jr., Robert Krakovitz, Moshe Malka, Leon Malnik, Barry Septimus, and Phyllis Sifen (collectively, "Defendants") by and through their undersigned counsel, hereby files their Answer, Affirmative Defenses, and Counterclaims in response to the Amended Complaint filed by Plaintiffs Liberty One Funding Trust and Liberty Two Funding Trust (collectively "Liberty" or "Plaintiffs"), showing the Court the following.

# ANSWER

1. On October 10, 2023, Bruce Achenbach[1], and Defendants Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Jay Grimm, Jr., Robert Krakovitz, Moshe Malk, Leon Malnik, Barry Septimus, and Phyllis Sifen (hereinafter "Defendants") initiated an arbitration against Plaintiffs Liberty One Funding Trust and Liberty Two Funding Trust (together, "Liberty" or "Plaintiffs") before the American Arbitration Association (AAA) in Atlanta, Georgia. Ex. A. Plaintiffs move to stay that arbitration and for a declaration that (1) Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen may not pursue arbitration against Plaintiffs because they have not entered into an arbitration agreement; and (2) the arbitration claims of Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus, the latest of which accrued in April 2016, are time-barred and may not be pursued under the GAC, O.C.G.A. § 9-9-5.

**ANSWER:** Defendants admit that on October 10, 2023, Bruce Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow,

[1] Bruce Achenbach passed away on August 12, 2023, prior to his purported initiation of the arbitration. Plaintiffs are informed that his brother, Defendant Brian Achenbach, will "pursue the claims in the AAA," though no amended complaint has been filed in the arbitration.

Jay Grimm, Jr., Robert Krakovitz, Moshe Malk, Leon Malnik, Barry Septimus, and Phyllis Sifen initiated an arbitration against Liberty One Funding Trust and Liberty Two Funding Trust as well as Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo Delaware Trust Company, N.A. ("WFDTC") (together, "Wells Fargo") before the American Arbitration Association (AAA) in Atlanta, Georgia. Defendants also admit that Bruce Achenbach passed away on August 12, 2023, and that his brother, Brian Achenbach, will pursue the AAA claims. The remaining allegations in this paragraph are denied. By way of further response, paragraph 1 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

2. In the 2004 to 2005 time period, Liberty provided non-recourse premium financing for individuals seeking to procure life insurance policies. Specifically, Liberty entered into "Financing Agreements" with individuals and with LLCs they established, pursuant to which the individuals paid no money of their own, and Liberty paid all premiums and other charges to obtain and maintain life insurance policies. When the insureds passed away, the financing balances became due, and, as set forth in the Financing Agreements, were settled from a portion of the death benefits paid by the insurance companies.

**ANSWER:** Admitted in part, denied in part. Defendants admit that the Insureds paid nothing for the premiums on the life insurance policies. Because of this, it is undisputed that Liberty procured or caused the policies to be procured, which it did with the aid of its agent, Wells Fargo. *See* O.C.G.A. § 33-24-3(e) (1995). In reality, Liberty's purported "non-recourse premium financing" was a fraudulent and illegal human life wagering scheme whereby Wells Fargo, acting for the benefit of and along with Liberty, procured stranger-originated life insurance policies ("STOLI") on the lives of the Insureds, using the Liberty Financing Agreements and its maze of defined terms and provisions to conceal the truth. Although a small proportion of the life insurance policies' death benefits from the insurance company were paid to the Insureds' families, this was merely the financial inducement that Wells Fargo and Liberty used to carry out their illegal wagers. The remaining allegations of this paragraph are denied. Specifically, Defendants deny that the Insureds' beneficiaries received the full amounts due to them under the Financing Agreements' terms. In fact, Defendants are entitled to the full death benefits of the life insurance policies taken out as a part of the Liberty programs along with applicable prejudgment interest because the life insurance policies and Liberty Financing Agreements are void *ab initio* human life wagers that lack insurable interest. *See* Counterclaims *infra* at ¶¶ 141–85. And, even if it was found that these transactions were not human life wagers that lack insurable interest, Liberty and

Wells Fargo received and retained death benefits far in excess of what they were entitled to receive under the Liberty Financing Agreements, both as a matter of Georgia insurable interest law and under the terms of those agreements. Thus, the beneficiaries did not receive the full amounts due to them after application of the Liberty Financing Agreements' terms. The remaining allegations of this paragraph are denied. By way of further response, paragraph 2 of the Amended Complaint states legal conclusions, which do not require any response. The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

3. Defendants Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus are the purported heirs of six individuals who obtained funding for life insurance policies from Liberty (the "Insureds"). The Insureds passed away between October 2010 and April 2016, shortly after which these Defendants collectively received over $1.6 million in death benefits, the full amounts due under the Financing Agreements.

**ANSWER:** Admitted in part, denied in part. Defendants admit that Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus are heirs of six individuals

(Walter Achenbach, Dana Belser, Angelo Costanza, Stanley Darrow, Victor Malka, and Helen Wilkenfeld) who obtained funding for life insurance policies from Liberty. Upon information and belief, Walter Achenbach, Dana Belser, Angelo Costanza, Stanley Darrow, Victor Malka, and Helen Wilkenfeld passed away between October 2010 and April 2016. Liberty's purported "non-recourse premium financing" was a fraudulent and illegal human life wagering scheme whereby Wells Fargo, acting for the benefit of and along with Liberty, procured stranger-originated life insurance policies ("STOLI") on the lives of the Insureds, using the Liberty Financing Agreements and its maze of defined terms and provisions to conceal the truth. Although a small proportion of the life insurance policies' death benefits from the insurance company were paid to the Insureds' families, this was merely the financial inducement that Wells Fargo and Liberty used to carry out their illegal wagers. The remaining allegations of this paragraph are denied. Specifically, Defendants deny that the Insureds' beneficiaries received the full amounts due to them under the Financing Agreements' terms. In fact, Defendants are entitled to the full death benefits of the life insurance policies taken out as a part of the Liberty programs along with applicable prejudgment interest because the life insurance policies and Liberty Financing Agreements are void *ab initio* human life wagers that lack insurable interest. *See* Counterclaims infra at ¶¶ 141–85. And, even if it was found that these transactions were not human life wagers that lack insurable interest,

Liberty and Wells Fargo received and retained death benefits far in excess of what they were entitled to receive under the Liberty Financing Agreements, both as a matter of Georgia insurable interest law and under the terms of those agreements. Thus, the beneficiaries did not receive the full amounts due to them after application of the Liberty Financing Agreements' terms. The remaining allegations of this paragraph are denied. By way of further response, paragraph 3 of the Amended Complaint states legal conclusions, which do not require any response. The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

4. The Financing Agreements and incorporated paperwork set forth the amount of the death benefit that would likely be provided to the beneficiaries based on the year of death of the Insureds. Each year, the Insureds received letters providing an estimate of the insurance payout if the Insureds were to pass away that year. Yet from when they entered into the agreements in 2004 or 2005 to their passing, none of the Insureds complained or raised concerns about those amounts. Nor did Defendants raise any concerns during the seven or more years since they received the $1.6 million, until shortly before or at the time of filing the arbitration.

**ANSWER:** Denied. The Financing Agreements and incorporated paperwork were unnecessarily complex and did not accurately reflect the amount of the death benefit that beneficiaries should have received. By way of further response, paragraph 4 of the Amended Complaint refers to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. To the extent a response is required as to the remaining allegations in this paragraph, Defendants lack information necessary to determine the allegations veracity, and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

5. The claims here are a belated after-the-fact attempt to squeeze more money out of Liberty. The three claims asserted by Defendants in the arbitration and the statute of limitations for each are: Illegal Wagering and Lack of Insurable Interest (at most, six years under Georgia law); Breach of Contract and Indemnification, and Breach of Implied Covenant of Good Faith and Fair Dealing (six years under Georgia law from the date the insurance benefits became due); and Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § § 1962(c) and 1962(d) (four years under federal law). None would be timely if asserted in court, and Defendants should not be able to escape the time bar by slipping their untimely claims into arbitration.

**ANSWER:** Denied. Paragraph 5 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

6. Section 5 of the GAC authorizes this Court to impose the statute of limitations as a bar to Defendants' purported claims in arbitration: "If a claim sought to be arbitrated would be barred by limitation of time had the claim sought to be arbitrated been asserted in court, a party may apply to the court to stay arbitration or to vacate the award, as provided in this part." O.C.G.A. § 9-9-5(a).

**ANSWER:** Denied. Paragraph 6 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

7. Section 6 of the GAC provides that a party may apply to stay arbitration on the grounds that "[n]o valid agreement to submit to arbitration was made." O.C.G.A. § 9-9-6(b)(1).

**ANSWER:** Denied. Paragraph 7of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

8. Plaintiffs seek a stay of arbitration pursuant to the GAC and a declaratory judgment that Defendants' claims are time-barred or not subject to an agreement to arbitrate.

**ANSWER:** Denied. Paragraph 8 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

## STATEMENT OF JURISDICTION AND VENUE/IDENTITY OF THE PARTIES

9. Plaintiff Liberty One Funding Trust ("Liberty One") is a Delaware statutory trust authorized to do business in the State of Georgia, with the principal address of 400 Northridge Road, Suite 600, Atlanta, Georgia 30350. Wells Fargo Bank, N.A., out of its Atlanta office at 400 Northridge Road, Suite 600, acted as Georgia Trustee of Liberty One.

**ANSWER:** Admitted in part, denied in part. Defendants admit only that Plaintiff Liberty One Funding Trust ("Liberty One") is a Delaware statutory trust authorized to do business in the State of Georgia and that Wells Fargo Bank, N.A. acted as Georgia Trustee of Liberty One. The remaining allegations of this paragraph are denied. By way of further response, Defendants lack information necessary to determine the veracity of the remaining allegations in this paragraph and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

10. Plaintiff Liberty Two Funding Trust ("Liberty Two") is a Delaware statutory trust authorized to do business in the State of Georgia, with the principal address of 400 Northridge Road, Suite 600, Atlanta, Georgia 30350. Wells Fargo Bank, N.A., out of its Atlanta office at 400 Northridge Road, Suite 600, acted as Georgia Trustee of Liberty Two.

**ANSWER:** Admitted in part, denied in part. Defendants admit only that Plaintiff Liberty Two Funding Trust ("Liberty Two") is a Delaware statutory trust authorized to do business in the State of Georgia and that Wells Fargo Bank, N.A. acted as Georgia Trustee of Liberty One. The remaining allegations of this paragraph are denied. By way of further response, Defendants lack information necessary to determine the veracity of the remaining allegations in this paragraph and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

11. Liberty One entered into Financing Agreements with Dana Belser, whose heir Nancy Belser is a Defendant; Angelo Costanza, whose heir Andrew Costanza is a Defendant; Stanley Darrow, whose heirs Andrew Darrow, David Darrow, and Jonathan Darrow are Defendants; and Helen Wilkenfeld, whose heir Barry Septimus is a Defendant. *See* Exs. B-E (the "Liberty One Financing Agreements").

| **Defendant** | **Heir of** | **Date of Financing Agreement** | **Date of Death (appx)** | **Date of Payment of Net Death Benefit to Defendants** | **Amount of Net Death Benefit Payment to Defendants** |
|---|---|---|---|---|---|
| Nancy Belser | Dana Belser | 11/22/2004 | 10/8/2010 | 12/18/10 | $271,239.49 |
| Andrew Costanza | Angelo Costanza | 12/7/2004 | 12/22/2011 | 3/18/12 | $260,961.30 |
| Andrew Darrow, David Darrow, Jonathan Darrow | Stanley Darrow | 9/20/2004 | 6/24/2014 | 9/18/14 | $288,355.61 |
| Barry Septimus | Helen Wilkenfeld | 12/3/2004 | 3/14/2011 | 4/18/11 | $292,670.00 |

**ANSWER:** Admitted in part, denied in part. Defendants admit that Liberty One entered into Financing Agreements with Dana Belser, whose heir Nancy Belser is a Defendant; Angelo Costanza, whose heir Andrew Costanza is a Defendant; Stanley Darrow, whose heirs Andrew Darrow, David Darrow, and Jonathan Darrow are Defendants; and Helen Wilkenfeld, whose heir Barry Septimus is a Defendant. Defendants also admit the aforementioned dates of death, except for Stanley Darrow, who upon information and belief, passed away on 6/22/2014. By way of further response, the remaining allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. To the extent a response is required as to the remaining allegations in this paragraph,

Defendants lack information necessary to determine the allegations veracity, and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

12. The Liberty One Financing Agreements, Section 7.11(b) provide for personal jurisdiction in this Court over Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, and Barry Septimus, as heirs of Dana Belser, Angelo Costanza, Stanley Darrow, and Helen Wilkenfeld, who agreed "to submit to the personal jurisdiction of the federal and state courts sitting in Fulton County, Georgia, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief)."[2]

**ANSWER:** Denied. Paragraph 12 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

---

[2] The Financing Agreements are binding upon the Defendants as heirs of the Insureds. *See Ralph* v. *Ward*, 109 Ga. 363, 366 (1899) (ruling that an agreement shall bind one's heirs and privies). Indeed, the Defendants purport to assert claims in arbitration arising from the Financing Agreements.

13. The Liberty One Financing Agreements state they are to be governed under the law of the State of Georgia, including "***all rights and remedies being governed by said law***." *Id*. § 7.12 (emphasis added).

**ANSWER:** Denied. Paragraph 13 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

14. Liberty Two entered into Financing Agreements with Walter Achenbach, whose heir Brian Achenbach is a Defendant, and Victor Malka, whose heir Moshe Malka is a Defendant. *See* Exs. F-G (the "Liberty Two Financing Agreements").

| **Defendant** | **Heir of** | **Date of Financing Agreement** | **Date of Death** | **Date of Payment of Net Death Benefit to Defendants** | **Amount of Net Death Benefit to Defendants** |
|---|---|---|---|---|---|
| Brian Achenbach | Walter Achenbach | 6/7/2005 | 4/6/2016 | 6/18/16 | $275,278.95 |
| Moshe Malka | Victor Malka | 4/27/2005 | 12/13/2013 | 5/18/14 | $224,982.85 |

**ANSWER:** Admitted in part, denied in part. Defendants admit that Liberty Two entered into Financing Agreements with Walter Achenbach, whose heir Brian

Achenbach is a Defendant, and Victor Malka, whose heir Moshe Malka is a Defendant. Defendants also admit the aforementioned dates of death, except for Victor Malka, who upon information and belief, passed away on 10/12/2013. By way of further response, the remaining allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. To the extent a response is required as to the remaining allegations in this paragraph, Defendants lack information necessary to determine the allegations veracity, and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

15. The Liberty Two Financing Agreements, Section 8.11(b), provide for personal jurisdiction in this Court over Brian Achenbach and Moshe Malka, as heirs of Walter Achenbach and Victor Malka, who agreed "to submit to the personal jurisdiction of the federal and state courts sitting in Fulton County, Georgia, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief)."

**ANSWER:** Denied. Paragraph 15 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any

characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

16. The Liberty Two Financing Agreements state they are to be governed under the law of the State of Georgia, including "***all rights and remedies being governed by said law***." *Id*. § 8.12 (emphasis added).

**ANSWER:** Denied. Paragraph 16 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

17. The Liberty One Financing Agreements and Liberty Two Financing Agreements also supply venue in this Court. O.C.G.A. § 9-9-4(b)(1) provides that "[v]enue for applications to the court shall lie: (1) [i]n the county where the agreement provides for the arbitration hearing to be held." The Liberty One Financing Agreements and Liberty Two Financing Agreements specify that the arbitration hearing will be held in Atlanta, Georgia. Exs. B-E §7.11(b), Exs. F-G § 8.11(b).

**ANSWER:** Denied. Paragraph 17 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the

allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

18. Defendants all have initiated an arbitration proceeding against Liberty. *See Achenbach et al*. v. *Liberty One Funding Trust et al*., AAA Case No. 1-23-0004-4523 (initiated October 10, 2023) ("*Achenbach* Arbitration") (Demand attached as Exhibit A).

**ANSWER:** Admitted.

19. Plaintiffs seek to stay the arbitration claims of Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen, with whom they have not entered into an arbitration agreement. Because the *Achenbach* Arbitration designates Atlanta, Georgia as the place of arbitration, venue here is appropriate, and this Court has subject matter jurisdiction over these claims under 28 U.S. Code § 1332.[3]

**ANSWER:** Defendants admit only that the *Achenbach* Arbitration designates Atlanta, Georgia, as the place of arbitration. The remaining allegations of this paragraph are denied. By way of further response, paragraph 19 of the Amended Complaint states legal conclusions, which do not require any response. The

[3] The is not the first time that Defendants' counsel has asserted purported claims on behalf of a putative claimant in respect of an insured who had no contractual basis for any claim against Liberty.

allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

20. Plaintiffs seek to stay the arbitration claims of Defendants Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus and for a declaration that the claims are untimely under GAC Section 5. Plaintiffs filed their claims in the Georgia State-wide Business Court which had subject matter jurisdiction over these claims. *See Cantor Colburn LLP* v. *Gs-Cleantech Corp.*, 874 S.E.2d 859, 867 (Ga. Ct. App. 2022). Defendants removed the case to this Court pursuant to, *inter alia*, 28 U.S. Code § 1332 which provides this Court with subject matter over these claims.

**ANSWER: :** Denied. Paragraph 20 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

## FACTUAL BACKGROUND

***The Liberty Premium Finance Program***

21. The Liberty premium finance programs allowed individuals to obtain life insurance on their own lives using non-recourse financing provided by Liberty.

**ANSWER:** Denied. As detailed in Defendants' counterclaims, Liberty and Wells Fargo procured the life insurance policies through the Liberty programs, which were human life wagering schemes that procured, for Liberty's immediate benefit, life insurance policies that lacked insurable interest. Furthermore, the financing in these transactions were provided by Credit Suisse Group AG and its related affiliates, including Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse"). The allegations in this paragraph otherwise refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

22. Through these programs, the Insureds, who were all high net worth individuals (or purported to be such), knowingly entered into financing agreements ("Financing Agreements") for which they were required to — and certified they did — obtain advice from independent legal and financial advisors about the transaction.

**ANSWER:** Denied. The Insureds did not "knowingly" enter into these transactions because Liberty and Wells Fargo deliberately made the Liberty programs unnecessarily complex and did not accurately advertise the program. As further detailed in Defendants' counterclaims, Liberty and Wells Fargo actively concealed (and continue to conceal) material information from the Insureds and their families, and although Liberty and Wells Fargo promoted the programs as valid life

insurance premium financing, this was a complete ruse to conceal Liberty and Wells Fargo's illegal STOLI scheme. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. As to the remaining allegations in this paragraph, Defendants lack information necessary to determine the allegations veracity, and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

23. The Insureds and their beneficiaries (Defendants here) invested zero dollars and collectively received north of $1.6 million. In exchange, the Insureds agreed that Liberty would be repaid, out of the proceeds of the insurance policies after the Insureds' passing, in respect of the funds advanced by them and certain costs with accrued interest.

**ANSWER:** Admitted in part, denied in part. Defendants admit that the Insureds paid nothing for the premiums on the life insurance policies. Because of this, it is undisputed that Liberty procured or caused the policies to be procured, which it did with the aid of its agent, Wells Fargo. *See* O.C.G.A. § 33-24-3(e) (1995). The remaining allegations of this paragraph are denied. The Insureds did not knowingly enter into these transactions because Liberty and Wells Fargo deliberately made the Liberty programs unnecessarily complex and did not accurately advertise the program. As further detailed in Defendants' counterclaims,

Liberty and Wells Fargo actively concealed (and continue to conceal) material information from the Insureds and their families, and although Liberty and Wells Fargo promoted the programs as valid life insurance premium financing, this was a complete ruse to conceal Liberty and Wells Fargo's illegal STOLI scheme. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. As to the remaining allegations in this paragraph, Defendants lack information necessary to determine the allegations veracity, and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

24. The Financing Agreements set forth explicit formulas for calculating the amounts due to Liberty, affording Liberty modest rates of return on its substantial investments. The balance of the insurance policies' proceeds were paid to the Defendants. To ensure that the Insureds understood the arrangements, Liberty provided them with non-guaranteed projections of the amounts their heirs would receive, depending upon how long the Insureds lived. In all cases, Liberty received no more than they were due pursuant to the formulas in the financing agreements. The Insureds and Defendants received all of the benefits of the bargains they made when they contracted with Liberty.

**ANSWER:** Denied. Liberty and Wells Fargo hid, and continue to hide, their true rates of return on the transactions. Similarly, the Insureds did not understand the true nature of the program because Liberty and Wells Fargo made the Liberty programs unnecessarily complex, did not accurately advertise the program, and otherwise concealed (and continues to conceal) material information. By way of further response, paragraph 24 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. The remaining allegations of this paragraph are denied.

25. Now, despite having received what they were promised and having invested no money of their own, after waiting between seven and thirteen years, Defendants have abruptly pursued claims in arbitration, arguing that Liberty should not receive the stipulated amounts agreed to in the Financing Agreements or even a return of the premiums that Liberty advanced in these financing transactions.

**ANSWER:** Defendants admit only that the Insureds invested no money of their own and that Liberty, with the assistance of Wells Fargo, procured the policies and made the death benefits payable to Liberty prior to when each policy was made. The remaining allegations of this paragraph are denied. By way of further response, the allegations in this paragraph refer to written documents, which speak for

themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

***The Achenbach Arbitration***

26. Defendants have initiated an arbitration proceeding against Liberty. *See Achenbach et al*. v. *Liberty One Funding Trust et al*., AAA Case No. 1-23-00044523 (initiated October 10, 2023) ("*Achenbach* Arbitration") (Demand attached as Exhibit A).

**ANSWER:** Admitted.

27. Defendants have asserted claims for (1) under Georgia law, Illegal Wagering and Lack of Insurable Interest (first cause of action); (2) under Georgia law, Breach of Contract and Indemnification, and Breach of Implied Covenant of Good Faith and Fair Dealing (second cause of action); and (3) under federal law, Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § § 1962(c) and 1962(d) ("RICO") (third cause of action).

**ANSWER:** The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

28. In the *Achenbach* Arbitration, Defendants seek:

i) the full face amount of the Insureds' life insurance policies, disregarding Liberty's payment of premiums and costs, and disregarding the formulas set forth in the Financing Agreements;

ii) treble damages under RICO;

iii) attorneys' fees and costs;

iv) interest, including pre-judgment interest.

**ANSWER:** The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

29. Liberty has not participated in the *Achenbach* Arbitration with respect to Defendants. Liberty has filed this action in lieu of answering the Statement of Claim in the *Achenbach* Arbitration as respects Defendants.

**ANSWER:** Denied. Paragraph 29 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

30. As set forth more specifically below, Liberty would be prejudiced by being forced to arbitrate the stale claims Defendants seek to pursue. The Insureds, all of whom are deceased, entered into the Financing Agreements almost two decades ago, in 2004 and 2005. The Liberty programs are no longer accepting new participants, and none of the individuals who facilitated the transactions with the

Insureds are available to Liberty or under its control. Defendants' counsel in a prior arbitration has highlighted the lack of individuals with knowledge of the underlying events in prior arbitrations involving the Liberty program in arguing the claims and defenses and, upon information and belief, is likely to do so again in the *Achenbach* Arbitration. The Insureds passed away seven to thirteen years ago, and it is uncertain and unlikely that their email accounts and files are fully preserved and searchable. The loss of records over time is illustrated by the fact that the Defendants' counsel cannot even determine from Defendants' files who did or did not enter into transactions with Liberty. Thus, information and documents needed to support Liberty's defenses are no longer available.

**ANSWER:** Defendants admit only that, upon information and belief, the Liberty Financing Agreements were signed nearly two decades ago, in 2004 and 2005. Upon information and belief, the Insureds passed away between 2007 and 2022. The remaining allegations of this paragraph are denied. In prior arbitration proceedings before the AAA, both Liberty and Wells Fargo, through Credit Suisse, produced extensive records relating to the Liberty programs as well as similar purported premium finance programs. To the extent Defendants' counsel cannot make determinations regarding these transactions, it is because the records are in Wells Fargo, Liberty, and Credit Suisse's possession. Similarly, Liberty alleges that the individuals who facilitated the transactions with the Insureds are not available to

Liberty or under its control, but that does not preclude Liberty, or other parties to the litigation, from seeking appropriate discovery from such individuals. Defendants lack information necessary to determine the veracity of the remaining allegations in this paragraph and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

31. Defendants allege that the Financing Agreements should be declared void because the insurance policies here lacked insurable interest. The assessment of insurable interest is made at the time of a transaction, O.C.G.A. § 33-24-3, which here were all consummated in 2004 and 2005. The *Achenbach* complaint asserts that the assessment of insurable interest depends on the intent of the contracting parties. *See* Ex. A ¶ 72 ("The real thing to be ascertained in any given instance is, **what was the actual object of the parties** . . . ." (emphasis added) (quoting *Exchange Bank of Macon* v. *Loh*, 31 S.E. 459, 462 (Ga. 1898))); *id.* ¶ 74 ("[Liberty] **knew or should have known** that the Program and Financing Agreements they created violated applicable insurable interest laws and generated Policies that were mere human life wagers. To be sure, [Liberty] and [its] principals and agents engaged legal advisors to opine on the validity of the Program and whether it complied with insurable interest laws. Based on that advice, [Liberty was] aware that the existence of a valid insurable interest was based, at best, on a hyper-technical legal analysis that expressly did *not* consider the details of or express any opinion on the annuities used

in connection with the Financing Agreements." (emphasis added)). Thus Defendants' insurable interest claim seeks to put squarely at issue the knowledge and intent of the parties to contracts formed nearly twenty years ago, a claim which Defendants let lie without challenge while Liberty was making insurance premium payments that Defendants would have it forfeit.

**ANSWER:** Defendants admit that the Financing Agreements should be declared void because the insurance policies here lacked insurable interest and that the assessment of insurable interest is made at the time of a transaction under O.C.G.A. § 33-24-3. Defendants also admit that the transactions were consummated in 2004 and 2005. The remaining allegations in this paragraph are denied. By way of further response, paragraph 31 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

32. The Financing Agreements at issue here were negotiated nearly twenty years ago, and the individuals who negotiated them are either deceased or outside of Liberty's control, meaning that much extrinsic evidence as to the meaning of any ambiguous terms will be unavailable. In the Statement of Claim filed in the arbitration, Defendants allege: "[Liberty] breached and committed defaults (and plan

to continue breaching and committing defaults) under the terms of the Financing Agreements as explained in detail above, including by receiving and retaining death benefits far in excess of what they were contractually entitled to receive." Ex. A. ¶ 84. Defendants were aware of the amounts of death benefits they received between seven and thirteen years ago (depending on the Defendant), and nothing has changed in the interim that would shed any further light on the claim. Defendants have no justification for waiting several years or more than a decade to bring these claims.

**ANSWER:** Defendants admit that, upon information and belief, the Financing Agreements at issue here were negotiated nearly twenty years ago. The remaining allegations in this paragraph are denied. Liberty alleges that the individuals who negotiated the Financing Agreements are no longer under its control. As a preliminary matter, the Financing Agreements were boilerplate documents that were not negotiated. Nevertheless, nothing precludes Liberty, or other parties to the litigation, from seeking appropriate discovery from individuals who were involved at the time the transactions were entered into. Liberty and Wells Fargo operated a fraudulent scheme that concealed (and continues to conceal) material information from Defendants. Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim. By way of further response, paragraph 32 of the Amended

Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

33. The Breach of Implied Covenant of Good Faith and Fair Dealing claim seeks to put at issue the state of mind of Liberty, actions of Liberty, and communications to and actions of the Insureds, all of whom are deceased. Specifically, Defendants allege that: Liberty "convinced elderly individuals to execute Financing Agreements ostensibly designed to provide legitimate premium financing for life insurance when, in fact, the transactions were secretly driven by another component altogether, which was a massively oversized annuity that was charged to the loan but whose excess payments were used by [Liberty] to line Liberty's pockets. . . . [Liberty] also charged the Insureds other excessive and undisclosed fees. In so doing, [Liberty] did not operate in good faith." Ex. A ¶ 92.

**ANSWER:** Defendants admit only that the Insureds are deceased. The remaining allegations in this paragraph are denied. By way of further response, paragraph 33 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

34. The RICO claim similarly seeks to put at issue the state of mind of Liberty and communications to the Insureds. Specifically, Defendants allege that: "[Liberty] conducted and participated in the conduct of the Enterprise's affairs by **knowingly** devising and participating in a scheme whereby, with the **intent** to defraud Insureds and their families and to enhance income, the Enterprise (i) deceived insureds about the terms and conditions of the Financing Agreements; [and] (ii) charged Insureds and their families for annuities that **they were unaware of** . . . . [Liberty] committed a pattern of racketeering acts or caused a pattern of racketeering acts . . .by means of, *inter alia*, **concealing** the true terms of the Financing Agreements, **making intentional misrepresentations** regarding the Program, and arbitrarily abusing the discretion given to them under the terms of the Financing Agreements." Ex. A ¶¶ 109-10 (emphasis added).

**ANSWER:** Denied. Paragraph 34 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied.

35. In defense, Liberty is likely to assert counter-claims arising from certain Insureds' misrepresentations about their qualifications for the program and other material contract terms. Due to Defendants' long delay in asserting claims, however,

evidence substantiating the Insureds' states of mind and program eligibility (including satisfaction of financial thresholds) is unlikely to be obtainable from their heirs so many years following the Insureds' deaths.

**ANSWER:** Denied. Defendants did not delay in asserting claims. Liberty and Wells Fargo operated a fraudulent scheme that concealed (and continues to conceal) material information from Defendants. Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim. By way of further response, paragraph 35 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, Defendants lack information necessary to determine the veracity of the remaining allegations in this paragraph and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

36. Liberty would also be prejudiced by Defendants' claims for pre-judgment interest, spanning a period of seven to thirteen years during which they sat on their claims, at a statutory rate that far exceeds what a market investment would have returned.

**ANSWER:** Denied. Defendants did not sit on their claims. Liberty and Wells Fargo operated a fraudulent scheme that concealed (and continues to conceal) material information from Defendants. Defendants only became aware of their claim

through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim. Furthermore, Liberty and Wells Fargo hid, and continue to hide, their true rates of return on the transactions, but it is extremely likely that the true rates of return greatly exceed any statutory prejudgment interest rate. By way of further response, paragraph 36 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

***Relevant Provisions of the Financing Agreements***

37. The Liberty One Financing Agreements, Exs. B-E, Section 7.11(b) provide that the parties ***may*** arbitrate claims, but do not require arbitration of all disputes:

> **(b) All Disputes shall in the first instance be discussed amicably between the parties with a view to resolving such Dispute, commencing upon one party giving other parties written notice of such Dispute. In the event that such Dispute is not resolved within thirty (3) days after such notice (or such longer period as the parties may agree in writing with respect to any such Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Rules by a panel of three arbitrators sitting in Atlanta, Georgia. One arbitrator shall be nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator**

> **shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Fulton County, Georgia, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this Section 7.11 and, to the fullest extent permitted by law, waive any objection which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in an inconvenient forum.**

**ANSWER:** Defendants admit that the Financing Agreements' arbitration provision states that arbitration is optional, not mandatory. Defendants thus understand that Liberty and Wells Fargo agree that Defendants can elect, at Defendants' option, to continue with their claims in arbitration or proceed with their claims in this Court. By way of further response, paragraph 37 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

38. The Liberty One Financing Agreements state they are to be governed under the law of the State of Georgia, including "***all rights and remedies being governed by said law***." *Id.* § 7.12 (emphasis added).

> **SECTION 7.12. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the local law of the State of Georgia (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said law.**

**ANSWER:** The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

39. The Liberty Two Financing Agreements, Ex. F-G, Section 8.11(b) provide that the parties ***may*** arbitrate claims, but do not require arbitration of all disputes:

> (b) **All Disputes shall in the first instance be discussed amicably between the parties with a view to resolving such Dispute, commencing upon one party giving other parties written notice of such Dispute. In the event that such Dispute is not resolved within thirty (30) days after such notice (or such longer period as the parties may agree in writing with respect to any such Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Rules by a panel of three arbitrators sitting in Atlanta, Georgia. One arbitrator shall be nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Fulton County, Georgia, for the sole purpose of enforcing this**

> **Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this Section 7.11 and, to the fullest extent permitted by law, waive any objection which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in an inconvenient forum.**

**ANSWER:** Defendants admit that the Financing Agreements' arbitration provision states that arbitration is optional, not mandatory. Defendants thus understand that Liberty and Wells Fargo agree that Defendants can elect, at Defendants' option, to continue with their claims in arbitration or proceed with their claims in this Court. By way of further response, paragraph 39 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

40. The Liberty Two Financing Agreements state they are to be governed under the law of the State of Georgia, including "***all rights and remedies being governed by said law***." *Id.* § 8.12 (emphasis added).

> **SECTION 8.12. Governing Law. This Agreement shall be governed by, and construed in accordance with, the local law of the State of Georgia (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said law.**

**ANSWER:** The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

41. The Liberty One and Liberty Two Financing Agreements provide that a party shall indemnify the other for its "reasonable costs and expenses, including, without limitation, fees and disbursement of counsel" incurred by the other party in enforcing the agreements against the defaulting party. *See* Exs. B-E § 7.01, Exs. F-G § 8.01.

**ANSWER:** The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

## COUNT I - PETITION FOR STAY OF ARBITRATION

**(Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen)**

42. Plaintiffs repeat and re-allege paragraphs 1 through 41 as if set forth herein.

**ANSWER:** Defendants incorporate by reference paragraphs 1-41 as if set forth herein at length.

43. Plaintiffs have entered into no agreement with Defendants Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen and have not agreed to arbitration with them.

**ANSWER:** Denied. Defendants lack information necessary to determine the allegations veracity, and, therefore, they are denied. Any remaining allegations in this paragraph are denied.

44. Plaintiffs have not participated in the *Achenbach* arbitration as to Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen.

**ANSWER:** Denied. Paragraph 44 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

45. This Court should stay the arbitration as to these Defendants. *AT&T Technologies* v. *Communications Workers of America*, 475 U.S. 643, 649 (1986) ("[T]he question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.") (citations omitted); O.C.G.A. § 9-9-6(b)(1) ("[A] party who has not participated in the arbitration . . . may apply to stay arbitration on the grounds that . . . [n]o valid agreement to submit to arbitration was made . . . .").

**ANSWER:** Denied. Paragraph 45 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

**COUNT II - PETITION FOR STAY OF ARBITRATION (O.C.G.A. § 9-9-5)**

**(Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus)**

46. Plaintiffs repeat and re-allege paragraphs 1 through 45 as if set forth herein.

**ANSWER:** Defendants incorporate by reference paragraphs 1-45 as if set forth herein at length.

47. The Liberty One and Liberty Two Financing Agreements make clear that the "local law of the State of Georgia" governs the agreements, and the agreements are therefore subject to the Georgia Arbitration Code and not the Federal Arbitration Act.

**ANSWER:** Denied. The interpretation and enforceability of the Liberty Financing Agreements' arbitration provisions are governed by the Federal Arbitration Act ("FAA"). By way of further response, paragraph 47 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

48. The Liberty One and Liberty Two Financing Agreements further make clear that Georgia law governs all rights and "remedies," the latter of which includes

statutes of limitations. *See Hunter* v. *Johnson*, 376 S.E.2d 371, 372 (Ga. 1989) (holding that, under Georgia law, statutes of limitation are procedural because they "look only to the remedy"). The intent of these choice of law provisions is clear: Georgia law is to cover both substantive causes of action in any dispute and procedural issues that address the scope of remedies, such as the statute of limitations.

**ANSWER:** Denied. Paragraph 48 of the Amended Complaint states legal conclusions, which do not require any response. By way of further response, the allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

49. In the *Achenbach* Arbitration, Defendants have asserted claims for (1) under Georgia law Illegal Wagering and Lack of Insurable Interest (first cause of action); (2) under Georgia law, Breach of Contract and Indemnification, and Breach of Implied Covenant of Good Faith And Fair Dealing (second cause of action); and (3) Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § § 1962(c) and 1962(d) (third cause of action).

**ANSWER:** The allegations in this paragraph refer to written documents, which speak for themselves. Defendants refer to the documents for their true and

correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

50. Defendants Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus seek to arbitrate claims against Liberty that accrued between December 2010 and June 2016, when they received the payments of death benefits on life insurance policies procured through the Liberty programs. Defendants sat on their claims for more than seven years. In that time, evidence relevant to the claims and defenses in the case likely has been irretrievably lost.

**ANSWER:** Denied. Liberty and Wells Fargo received the payments of death benefits on life insurance policies procured through the Liberty programs. Defendants did not sit on their claims. Liberty and Wells Fargo operated a fraudulent scheme that concealed (and continues to conceal) material information from Defendants. Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim. Furthermore, nothing precludes Liberty, or other parties to the litigation, from seeking appropriate discovery. By way of further response, paragraph 50 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph refer to written documents, which

speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

51. Under Georgia law, while there is not a specific statute of limitations for Illegal Wagering and Lack of Insurable Interest (O.C.G.A. § 33-24-3(i)), the statute of limitations for simple written contracts generally is six years and for other actions on contracts is four years. *See General Electric Credit Corp.* v. *Home Indemnity Co.*, 309 S.E.2d 152, 156 (Ga. Ct. App. 1983) ("The public policy of this state as expressed by the legislature is that actions on contracts shall be brought within six years." (citing O.C.G.A. § 9-3-24)); O.C.G.A. § 9-3-26.

**ANSWER:** Admitted that there is no specific statute of limitations under Georgia law for claims arising from illegal wagering and lack of insurable interest. The statute of limitations for simple contract claims has no bearing on Defendants' wagering and insurable interest claims, and the remainder of paragraph 51 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

52. Under Georgia law, the statutes of limitations for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing are six years from the time the contractual payment becomes due and payable. *See Jackson*

*National Life Insurance Co.* v. *Crum*, 2023 WL 6442932, at *10 (N.D. Ga. July 20, 2023); O.C.G.A. § 9-3-24.

**ANSWER:** Denied. Paragraph 52 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

53. Under federal law, the statute of limitations for claims under RICO is four years from when the plaintiff discovers or should have discovered the injury. *See Youngblood-West* v. *Aflac Inc.*, 796 F. App'x 985, 991 (11th Cir. 2019). Here, Defendants could and should have "discovered" any injury when they received the payments of the net death benefits. Indeed, there are no facts that have been learned since that time that were needed to bring the claims in the *Achenbach* Arbitration. And the Statement of Claim in the *Achenbach* Arbitration cites and relies on no facts that were learned after the date of the payment of the net death benefits.

**ANSWER:** Denied. Liberty and Wells Fargo operated a fraudulent scheme that concealed (and continues to conceal) material information from Defendants. Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim. By way of further response, paragraph 53 of the Amended Complaint states legal conclusions, which do not require any response. Additionally, the allegations in this paragraph

refer to written documents, which speak for themselves. Defendants refer to the documents for their true and correct contents, and any characterizations contrary thereto are denied. Any remaining allegations in this paragraph are denied.

54. Thus, the applicable statutes of limitations on Defendants' purported claims expired, at the latest, in June 2022. Any claims Defendants might bring against Liberty in a court of law are, therefore, time-barred.

**ANSWER:** Denied. Paragraph 54 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

55. Plaintiffs have not participated in the *Achenbach* arbitration as to Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus.

**ANSWER:** Denied. Paragraph 55 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

56. Plaintiffs would suffer prejudice if they were forced to arbitrate Defendants' stale claims without the evidence needed to litigate the claims and defenses.

**ANSWER:** Denied. In prior arbitration proceedings before the AAA, both Liberty and Wells Fargo, through Credit Suisse, produced extensive records relating

to the Liberty programs as well as similar purported premium finance programs. Likewise, Liberty can seek appropriate discovery to litigate the claims and defenses. By way of further response, paragraph 56 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

57. This Court is authorized to and should exercise its discretion to impose the statute of limitations as a bar to Defendants' untimely claims in arbitration in accordance with O.C.G.A. § 9-9-5(a) ("If a claim sought to be arbitrated would be barred by limitation of time had the claim sought to be arbitrated been asserted in court, a party may apply to the court to stay arbitration . . . ."), and may stay the arbitration pursuant to §§ 9-9-5(a) and 9-9-6(b)(3) ("[A] party who has not participated in the arbitration . . . may apply to stay arbitration on the grounds that . . . . [t]he arbitration is barred by limitation of time.").

**ANSWER:** Denied. Paragraph 57 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

## COUNT III - DECLARATORY JUDGMENT
## (All Defendants)

58. Plaintiffs repeat and re-allege paragraphs 1 through 57 as if set forth herein.

**ANSWER:** Defendants incorporate by reference paragraphs 1-57 as if set forth herein at length.

59. This dispute presents the Court with an actual controversy that creates uncertainty and insecurity with respect to the rights, status, and other legal relations between the parties because Defendants have asserted claims against Liberty that are time-barred.

**ANSWER:** Denied. Paragraph 59 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

60. Plaintiffs are entitled to a Declaratory Judgment that they have entered into no agreement to arbitrate the claims of Defendants Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen pursuant to O.C.G.A. § 9-4-2 and / or 28 U.S.C. § 2201(a) *et seq*.

**ANSWER:** Denied. Paragraph 60 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

61. Plaintiffs are entitled to a Declaratory Judgment that Defendants Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus's claims in arbitration are time-barred pursuant to O.C.G.A. § 9-4-2.

**ANSWER:** Denied. Paragraph 61 of the Amended Complaint states legal conclusions, which do not require any response. Any remaining allegations in this paragraph are denied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i) Stay the *Achenbach* Arbitration pursuant to O.C.G.A. §§ 9-9-5 and 9-9-6 with respect to Defendants;

ii) Declare that Plaintiffs have entered into no agreement to arbitrate the claims of Defendants Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen;

iii) Declare that Defendants Brian Achenbach, Nancy Belser, Andrew Costanza, Andrew Darrow, David Darrow, Jonathan Darrow, Moshe Malka, and Barry Septimus's claims are time-barred pursuant to O.C.G.A. § 9-9-5;

iv) Award Plaintiffs' attorneys' fees and disbursements pursuant to the Financing Agreements, Exs. B-E § 7.01, Exs. F-G § 8.01 (a party shall indemnify the other for its "reasonable costs and expenses, including, without limitation, fees and disbursement of counsel" incurred by the other party in enforcing the agreements against the defaulting party);

v) Provide such further relief as this Court may deem just and proper.

**ANSWER TO PRAYER FOR RELIEF:** The prayer for relief does not contain any factual allegations to which a response is required. To the extent a response is required, Defendants denies that Liberty is entitled to any relief whatsoever, as requested by the Amended Complaint or otherwise.

## DEFENDANTS' AFFIRMATIVE DEFENSES

i. Liberty fails to state a claim upon which relief may be granted.

ii. Some or all of the requested relief is barred by the optional arbitration provision.

iii. Some or all of the requested relief is barred by ratification, estoppel, and/or waiver.

iv. Some or all of Liberty's requested relief is barred by breaches of the Financing Agreements, including, without limitation, that Wells Fargo and Liberty defaulted under the terms of the Financing Agreements by receiving and retaining death benefits far in excess of what they were legally and contractually entitled to receive.

v. Some or all of the requested relief is barred by unclean hands and/or *in pari delicto*.

vi. Some or all of the requested relief is barred by unjust enrichment.

vii. Some or all of the requested relief is barred by illegality.

viii. Some or all of the requested relief is barred by Liberty and Wells Fargo's fraudulent inducement.

ix. Some or all of the requested relief is barred by Liberty and Wells Fargo's fraud.

x. Some or all of the requested relief is barred by the lack of jurisdiction.

**DEFENDANTS' COUNTERCLAIMS**

1. This case involves an illegal human life wagering scheme through which Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A. (collectively, "Plaintiffs") worked hand-in-hand with an enterprise detailed below to originate and procure hundreds of illegal, multi-million dollar life insurance policies on senior citizens throughout the country. These policies lacked any valid insurable interest at their inception, and are what has become known as Stranger-Originated Life Insurance ("STOLI").

2. This particular dispute involves life insurance policies (the "Policies") on the lives of 10 senior citizens (the "Insureds"), with each having been procured or caused to be procured by Plaintiffs, for the benefit of Liberty at the inception of each of the Policies, even though Liberty lacked any valid insurable interest in the lives of any of the Insureds.

3. Plaintiffs' STOLI scheme operated as the Liberty Premium Financing Program (the "Program"), which Plaintiffs attempted to pass off as a valid life insurance premium financing program, but which was in reality a thin veneer to conceal Plaintiffs' illegal human life wagers.

4. Defendants commenced this dispute by filing a Demand for Arbitration with the American Arbitration Association ("AAA") on October 10, 2023, wherein

Defendants in this case are the "Claimants" and the Plaintiffs in this case are the "Respondents" (the "AAA Arbitration").

5. Having been found liable for insurable interest violations in prior arbitration proceedings before the AAA, and hoping to avoid a repeat of that in the present AAA Arbitration, Plaintiffs (Respondents in arbitration) commenced their own Georgia state court actions against Defendants (Claimants in arbitration) by filing complaints against Defendants (the "Georgia State Court Actions" and the "Georgia Complaints").

6. Defendants removed the Georgia State Court Actions to this Court on November 30, 2023, and December 18, 2023, respectively.

7. In the Georgia Complaints, Liberty and Wells Fargo have taken the position that the parties are not required to arbitrate their disputes, that arbitration is merely optional, and that if arbitration is to occur, it is subject to Georgia's Arbitration Act, not the Federal Arbitration Act.

8. In turn, because claims in arbitrations subject to the Federal Arbitration Act and controlled by Georgia law are *not* subject to statutes of limitations or other time-bars, Liberty and Wells Fargo, through the Georgia Complaints, seek a declaration that the Georgia Arbitration Act controls any optional arbitration and they requests a court order, pursuant to a particular section of the Georgia Arbitration Act, directing the arbitrators in the AAA Arbitration to impose specific statutes of

limitations in connection with each of the claims asserted by Defendants (Claimants in arbitration) in the AAA Arbitration.

9. While reserving their rights with respect to arbitration, Defendants (Claimants in arbitration) hereby assert counterclaims and seek declaratory relief and damages against Plaintiffs.

## PARTIES AND STATEMENT OF JURISDICTION

10. Defendants are the individual heirs and/or representatives of the estates of deceased Insureds who, as part of the Liberty Program, were induced to become parties to various so-called financing agreements and other related transactional documents used by Liberty and Wells Fargo, acting on behalf of Liberty's beneficial owner, to procure and pay for multi-million dollar life insurance policies on the lives of the Insureds, as follows:

i) Bruce Achenbach was the son and heir and beneficiary of Walter Achenbach and a resident of Florida. Bruce Achenbach passed away on August 12, 2023. Brian Achenbach, the sole surviving heir of Walter and Bruce Achenbach, brings the claims relating to the policy procured on Walter Achenbach. At the time of his death, Walter Achenbach was also a resident of Florida. As explained more fully below, a Policy was taken out on Walter Achenbach's life through the Program.

ii) Nancy Belser is the daughter and heir and beneficiary of Dana Belser. Nancy Belser is a resident of Tennessee. At the time of her death, Dana Belser was a resident of Maryland. As explained more fully below, a Policy was taken out on Dana Belser's life through the Program.

iii) Andrew Costanza is the son and heir and beneficiary of Angelo Costanza. Andrew Costanza is a resident of New York. At the time of his death, Angelo Costanza was also a resident of New York. As explained more fully below, a Policy was taken out on Angelo Costanza's life through the Program.

iv) Andrew Darrow, David Darrow, and Jonathon Darrow are the sons and heirs and beneficiaries of Stanley Darrow. Andrew Darrow is a resident of California, David Darrow is a resident of Virginia, and Jonathon Darrow is a resident of California. At the time of his death, Stanley Darrow was a resident of Maryland. As explained more fully below, a Policy was taken out on Stanley Darrow's life through the Program.

v) Jay Grimm, Jr., is the son and heir and beneficiary of Jay Grimm, Sr. Jay Grimm, Jr. is a resident of New York. At the time of his death, Jay Grimm, Sr., was also a resident of New York. On

information and belief, and as explained more fully below, a Policy was taken out on Jay Grimm, Sr.'s, life through the Program.

vi) Robert Krakovitz, M.D., is the son and heir and beneficiary of Sylvia Hankin. Dr. Krakovitz is a resident of Colorado. At the time of her death, Ms. Hankin was a resident of Florida. On information and belief, and as explained more fully below, a Policy was taken out on Ms. Hankin's life through the Program.

vii) Moshe Malka is the son and heir and beneficiary of Victor Malka. Moshe Malka is a resident of New Jersey. At the time of his death, Victor Malka was a resident of New York. As explained more fully below, a Policy was taken out on Victor Malka's life through the Program.

viii) Leon Malnik is the son and heir and beneficiary of Abraham Malnik. Leon Malnik is a resident of Maryland. At the time of his death, Abraham Malnik was also a resident of Maryland. On information and belief, and as explained more fully below, a Policy was taken out on Abraham Malnik's life through the Program.

ix) Barry Septimus is the son and heir and beneficiary of Helen Wilkenfeld. Mr. Septimus is a resident of New York. At the time of her death, Ms. Wilkenfeld was a resident of Florida. As explained more fully below, a Policy was taken out on Ms. Wilkenfeld's life through the Program.

x) Phyllis Sifen is the daughter and heir and beneficiary of Paul Sifen. Ms. Sifen is a resident of Florida. At the time of his death, Ms. Sifen was also a resident of Florida. On information and belief, and as explained more fully below, a Policy was taken out on Mr. Sifen's life through the Program.

11. Plaintiff Liberty One Funding Trust is a Delaware statutory trust.

12. Plaintiff Liberty Two Funding Trust is a Delaware statutory trust.

13. The sole beneficial owner of Liberty is Horizon Trade & Finance (Ireland), Ltd., an Irish company.

14. The financing for Liberty and the Program was provided by Credit Suisse Group AG and its related affiliates, including Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse"), and Credit Suisse has a direct financial interest in the outcome of this litigation.

15. Wells Fargo Bank was intimately involved in these transactions and, among other things, served as Georgia Trustee of Liberty One Funding Trust and

Liberty Two Funding Trust; as Trustee of Liberty One SPIA Trust and Liberty Two SPIA Trust; as Trustee of the Irrevocable Trusts formed in the names of the Insureds; as Manager of the Georgia LLCs created in the name of each insured; and as Securities Intermediary.

16. Wells Fargo Delaware Trust Company served as Statutory Trustee of Liberty One Funding Trust and Liberty Two Funding Trust and as Trustee of Liberty One Master Trust and Liberty Two Master Trust.

17. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiffs and the Defendants.

18. By commencing the Georgia State Court Actions, and under the terms of the Financing Agreements which provide for personal jurisdiction over Plaintiffs in Georgia, Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, and Wells Fargo Delaware Trust Company, have invoked the jurisdiction of courts located in Georgia and have consented to personal jurisdiction in Georgia.

19. Venue is appropriate in this Court because a substantial part of the acts giving rise to the counterclaims set forth herein occurred in this district, and because the parties, through the Financing Agreements, consented to jurisdiction and venue in federal court located in Fulton County, Georgia.

# FACTS

## Using Life Insurance To Wager On Human Life Is Repugnant to Georgia's Decisional Law, Statutes, and Public Policy

20. "Using life insurance policies to 'wager' on human lives is not a new practice," but it is one that has been condemned as a matter of public policy and outlawed by case law and statutes for well over a century. *Jackson Nat'l Life Ins. Co. v. Crum*, 880 S.E.2d 205, 207 (Ga. 2022) (explaining that such wagering became popular in 18th century England, and "[d]isapproval of these human-life wagers goes back almost as far.").

21. In Georgia and elsewhere, the common law prohibition against human-life wagers was codified to require that any person procuring or causing a policy to be procured on the life of another person must have an insurable interest in the life of the person being insured. *Id*. at 208–09.

22. As explained by the Georgia Supreme Court, the purpose of Georgia's insurable interest requirement is to uphold Georgia's public policy against "wagering on human lives." *Id*. at 208 (quoting *Wood v. N.Y. Life Ins. Co.*, 336 S.E.2d 806, 809–10 (Ga. 1985)).

23. "In other words, in the life insurance context, [Georgia] law generally relies on the insurable interest to distinguish between valid life insurance policies and illegal wagering contracts." *Id.*

24. At the time of the relevant transactions, Georgia's insurable interest statute defined the limited circumstances under which a person could have an insurable interest in the life of another person, as follows: "An insurable interest, with reference to personal insurance, is an interest based upon a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of another person *and* consequent loss by reason of such person's death or disability or a substantial interest engendered by love and affection in the case of individuals closely related by blood or by law." O.C.G.A. § 33-24-3(a) (emphasis added).

25. Thus, to claim an insurable interest in the life of another, one must typically be able to establish that they "reasonably expect to be better off financially if the life continues, *and* worse off if it ends." *Crum*, 880 S.E.2d at 209 (emphasis added).

26. The time at which an insurable interest is measured is "the time the contract of [life] insurance becomes effective." *Id.* (citing O.C.G.A. § 33-24-3(h) (2016))

27. Indeed, "[a]ny personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a

person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i) (2016).

28. Because applicable law precludes one from using a life insurance policy to create a human life wager, courts are required to look beyond the form of the transaction to determine what actually occurred. *See*, *e.g.*, *Crum*, 880 S.E.2d at 209 (explaining that where a third party "procured or caused to be procured" a policy on the life of another, said policy is void and that courts must look to the substance of the transaction, not merely its form); *Exchange Bank of Macon v. Loh*, 31 S.E. 459, 462, 466–67 (Ga. 1898) (holding "the form in which the transaction is clothed is utterly immaterial . . . The real thing to be ascertained in any given instance is, what was the actual object of the parties," and life insurance transactions must be bona fide, and not merely a cover for obtaining wagering or merely speculative insurance, and a device to evade the law).

29. Wherever a third party lacking insurable interest has "procured or caused to be procured" a policy on the life of another and the "benefits under the contract are payable to" the third party, whether directly or indirectly, that policy is a void *ab initio* illegal wager. *Crum*, 880 S.E.2d at 209-211.

30. As detailed below, the Policies violated Georgia's insurable interest statute, O.C.G.A. § 33-24-3, because Liberty procured or caused the Policies to be procured; because at inception of each Policy, over 90% of the benefits under each

Policy were "payable" to Liberty; because Liberty lacked any valid insurable interest in the lives of the Insureds, including because Liberty was better off financially if the Insureds died at the moment each Policy was made, and Liberty would never have been worse off if an Insured died; and because Liberty concealed its human life wagering by dressing up its STOLI transactions to look like legitimate premium financing and by using the Insureds as instrumentalities to procure the Policies for Liberty's immediate benefit.

31. Although human life wagering through life insurance has been a scourge for centuries, and although a variety of STOLI schemes flooded the life insurance market in the mid-2000s (and have since been routinely struck down by courts around the country), the STOLI program operated by Liberty and Wells Fargo was especially egregious because it not only feigned compliance with Georgia law, but it involved a well-documented preexisting agreement whereby, *before each Policy was made*, Liberty was the actual beneficiary and was guaranteed well over 90% of each Policy's death benefit.

32. While such a preexisting agreement is not necessary to find, as a matter of law, that a policy lacked insurable interest, the existence of such an agreement leaves absolutely no doubt that a transaction was STOLI and that the subject policy and all related transaction documents are void *ab initio*.

33. Indeed, in 1911, the United States Supreme Court described this sort of wagering scheme—where a policy was "taken out for the purpose of allowing a stranger association to pay the premiums and receive the greater part of the benefit, and having been assigned to it at once"—as the "strongest" and most obvious type of human life wager, and one that is universally condemned and void. *Grigsby v. Russell*, 222 U.S. 149, 156 (1911).

34. Nonetheless, this is precisely the type of STOLI scheme Liberty and Wells Fargo perpetuated, and on a massive scale. Liberty and Wells Fargo not only procured the Policies at issue here without insurable interest, but they repeated this over a hundred times on the lives of senior citizens from around the country. And, when these seniors and the Insureds at issue here passed away, Liberty and Wells Fargo cashed in on their wagers by collecting millions of dollars of STOLI life insurance proceeds, including under the Policies.

35. Because the Policies are void *ab initio* for lack of insurable interest, and because Liberty and Wells Fargo received illegal wagering proceeds from the Policies, Liberty and Wells Fargo are deemed to have been holding those proceeds in constructive trust for Defendants. *Loh*, 31 S.E. at 464 (the common law raises a constructive trust over proceeds received from a life insurance policy deemed to have been a wagering contract). Yet, to date, Liberty and Wells Fargo refuse to distribute those amounts to Defendants.

36. Accordingly, and in addition to the other claims and relief set forth below, Defendants are entitled to the entire death benefit under each of the Policies that are at issue in this case, plus prejudgment interest from the date Plaintiffs received such proceeds.

**The STOLI Program**

37. Liberty One Funding Trust and Liberty Two Funding Trust are shell entities owned and run by an Irish company called Horizon Trade and Finance (Ireland), Ltd. ("Horizon"), and whose only business is procuring life insurance policies on the lives of strangers.

38. Horizon also owns two so-called Master Trusts and two SPIA Trusts, both created specifically for the Program.

39. Wells Fargo Bank is the Trustee of the Funding Trusts and SPIA Trusts, and Wells Fargo Delaware Trust Company is the Statutory Trustee of the Funding Trusts and Trustee of the Master Trusts.

40. Horizon itself is owned by an entity called Horizon Life Solutions ("HLS"), which in turn also owns (or owned) Park Venture Advisors LLC ("PVA"), a New York-based entity now infamous for its ties to STOLI schemes throughout the U.S. in the mid-2000s. *See, e.g.*, *PHL Var. Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059 (Del. 2011) (holding notorious PVA-related scheme illegal).

41. Finally, Credit Suisse was responsible for providing the actual financing for the Program and other Program-related activities.

42. While the Program ostensibly provided a means by which senior citizens could obtain life insurance through long-term, non-recourse premium financing, this was a ruse. In reality, the Program, through its "maze of related entities," existed as a means for Liberty, with the aid and assistance of its agent Wells Fargo, to do exactly what has been outlawed in Georgia for over a hundred years—procure, for its own benefit, life insurance policies on the lives of strangers where Liberty was guaranteed over 90% of each policy's death benefit prior to each policy's creation. *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1335–36 (11th Cir. 2009) (describing the Program as "a complicated insurance investment mechanism . . . in which [the Insured] ultimately retained very little financial interest in the policy that nominally was intended to insure his [or her] life [and] [t]he various entities that comprised the program worked together to finance a high-value life insurance policy . . . [and] [i]n exchange, the [Liberty] entities reserved for themselves the vast majority of the expected payout of the policy.") (quoting *Am. Gen. Life Ins. Co. v. Schoenthal Family, L.L.C.*, 248 F.R.D. 298, 301 (N.D. Ga. 2008)).

43. Liberty and Wells Fargo accomplished their objectives by employing a large number of agents across the country, and the mechanism used to further their

STOLI scheme and racketeering activities was consistent and included, but was not limited to, targeting potential senior citizen insureds (including the Insureds here) and misrepresenting, to those insureds, the nature of the Program and the accompanying "loan" agreements, and thereafter improperly charging principal, interest, and other costs and fees to those Insureds and their families.

44. The Program was deliberately and unnecessarily complex, and was not at all what Liberty and Wells Fargo advertised and described it to be. The Program was promoted as straightforward life insurance premium financing, where the premiums would be borrowed; the principal and interest on a "loan" would be paid with the policy proceeds; and whatever policy proceeds were left over would be paid to the families of the senior citizen insureds.

45. In reality, however, the Program operated so that, before any policy contract was made for the hundreds of policies Liberty procured (including the contracts for the Policies at issue here), Liberty was the actual beneficiary and owner of over 90% of each policy's death benefit. In this way, Liberty had a financial interest in the early deaths of hundreds of insureds (including the Insureds here) and thus lacked any possible insurable interest in their lives.

46. For their part, the insureds and their families were entitled to only a small fraction of the Policies' death benefits, and those amounts were nothing more

than the financial inducement Liberty and Wells Fargo used to lure and entice seniors to permit Liberty and Wells Fargo to procure the Policies in the first place.

47. The main risk to Liberty in these transactions was that an insured would not die and that Liberty would need to continue to pay premiums to keep the policies in force until the inevitable happened. This is known in the industry as "longevity risk."

48. In order to offset its longevity risk, Liberty hedged its bet by purchasing massive SPIAs on the lives of each insured, with each SPIA producing monthly payments to Liberty that were tens of thousands of dollars in excess of the ongoing cost to fund the premiums on each respective policy.

49. In this way, Liberty not only had a financial interest in the immediate deaths of the insureds because Liberty would always receive well over 90% of each policy's death benefit, whether an Insured died immediately or years later, but Liberty guaranteed that it could never suffer a loss because the ongoing policy premiums were funded by the SPIAs, and the SPIAs gave Liberty monthly profits even if the insureds survived.

50. As detailed below, however, Liberty and Wells Fargo *intentionally concealed* from the insureds and their families the details about these SPIAs, including the cost and amount of each SPIA, the amount of monthly payments each

SPIA generated, and the fact that there was excess monthly cash that Liberty pocketed for itself.

51. Worse still, Liberty and Wells Fargo *intentionally concealed* the fact that although Liberty was making excess monthly profits from the SPIAs, the full cost of the SPIAs was actually being charged to the insureds and their families under Liberty and Wells Fargo's supposed life insurance premium financing Program. Indeed, as detailed below, it is undisputed that had an Insured died at the moment a policy on their life was made—which is the operative moment under Georgia's insurable interest statute—Liberty and Wells Fargo would have computed the so-called Total Amount Due by that Insured under the terms of their supposed "loan" by secretly including the full cost of the SPIA in the "loan" balance, and by hiding what was happening through a maze of defined contractual terms.

52. On top of this, Liberty, with the assistance of its agent Wells Fargo, also charged other inflated and undisclosed fees and interest in the amount of hundreds of thousands of dollars under each supposed "loan" agreement.

53. The net result was simple: Liberty and Wells Fargo created a human life wagering scheme that would result in windfall profits to Liberty if an insured died immediately, but which hedged their longevity risk and still secretly guaranteed huge profits even if an insured did not cooperate and die soon enough.

**Liberty, Wells Fargo, and Their Cohorts and Agents Lure Seniors into the Program and Have Them Sign Liberty's Boilerplate, Non-negotiable Program Documents**

54. The only things Liberty and Wells Fargo needed to carry out their scheme were warm-bodied senior citizens to sign the form Program documents.

55. Liberty and Wells Fargo found these seniors by hiring local insurance producers and brokers throughout the United States who were appointed as so-called "Approved Third Party Originators."

56. Working on behalf of Liberty and Wells Fargo, these Approved Third Party Originators would locate senior citizens (with whom Liberty and Wells Fargo had no prior relationship and in whom they possessed no insurable interest) to serve as potential Insureds on whose lives they could procure and finance large life insurance policies for Liberty's and Wells Fargo's benefit through the Program.

57. Unlike any normal life insurance transaction, and contrary to any legitimate premium financing program, Liberty and Wells Fargo exclusively targeted seniors who were *not* in need of life insurance, who were *not* even shopping for life insurance, and who did *not* want to pay for or have any liability to pay for life insurance.

58. The Program not only sought out seniors who did not want or need life insurance, but it targeted "individuals of advanced age" and was promoted by inducing those individuals with the promise of financial compensation.

59. Specifically, in exchange for allowing large life insurance policies to be procured on their lives at no cost to them, the seniors would receive financial compensation of "between 5% to 15% of a policy's face amount," which would come in the form of an "upfront advance" or a "periodic advance" and/or a portion of the policy's death benefit (paid to beneficiaries that are designated by the Insureds) when they died.

60. Liberty and Wells Fargo made these representations and promises through written Program marketing materials (the "Program Materials") distributed to the Approved Third Party Originators by telephone, facsimile, email, regular mail, and other common carriers.

61. In turn, and on behalf of Liberty and Wells Fargo, the Approved Third Party Originators would transmit these Program Materials as well as other information about the Program to the Insureds by telephone, facsimile, email, regular mail, and other common carriers. On behalf of Liberty and Wells Fargo, the Approved Third Party Originators would use the Program Materials to solicit seniors with whom they had existing relationships.

62. Liberty and Wells Fargo also used the Program Materials to describe the Program to the Insureds prior to the Insureds signing Liberty's alleged "loan" agreements (the "Financing Agreements"). Liberty and Wells Fargo even had the Insureds sign the Program Materials.

63. For example, on or about October 2004, Liberty and Wells Fargo caused a set of Program Materials to be sent to Helen Wilkenfeld, which falsely described the Program as legitimate premium financing, in order to induce Ms. Wilkenfeld to participate in the Program and sign the Financing Agreement. **Exhibit A**, The Liberty Premium Finance Program. Liberty and Wells Fargo then had Ms. Wilkenfeld sign the Program Materials and transmit the materials back to Liberty and Wells Fargo. *Id*. at 17.[4]

64. When advertising the Program to the Insureds and soliciting the Insureds to participate, Liberty and Wells Fargo claimed that the Program "provides financing for the payment of life insurance premiums for eligible participants . . . purchasing insurance on the life of eligible individuals," that the Program "requires no cash outlay or collateral commitment from the Participant," that "Policy owner furnishes only the policy as collateral," and that there is "[n]o 'out-of pocket' payment." *Id.* at 4, 8, 11.

65. Insureds were induced with the promise of financial compensation and were told, through written disclosures, that their families would receive "a net death benefit at the maturity of the policy after taking into account the Program financing

[4] Barry Septimus is the son and heir and beneficiary of Ms. Wilkenfeld and is the Defendant/Claimant with regard to the Policy and transaction on her life.

costs," including what Liberty and Wells Fargo described as a so-called "Maturity Date Payment." *Id*. at 5.

66. Liberty also vaguely informed the Insureds (all the while hiding the real details) that Liberty would be purchasing "single premium immediate annuities" (the "SPIAs") on their lives and that "[t]he cash flows generated from the SPIAs will fund the policy premiums and periodic payments to the [Insureds], if elected, under the Financing Agreement, the payments under the Notes, and the management fees payable to the Program manager." *Id.* at 14.

67. Liberty also informed the Insureds that when they passed away and a life insurance death benefit was paid, "the policy proceeds will be used to repay" what Liberty described as "advances for policy premiums and any periodic payments made to the [Insured] under the Financing Agreement, together with interest thereon and an additional Maturity Date Payment, each to [Liberty], with any remaining proceeds of the policy being retained by the [Insured]." *Id.*

68. In this way, Liberty promoted the Program as a legitimate premium financing program whereby money would be borrowed to pay premiums on a life insurance policy on the life of each Insured. *Id.* at 4 (defining "Liberty Premium Financing" as "[f]inancing premiums with the life insurance policy as the collateral provided by the [Insureds]").

69. Unlike a legitimate life insurance premium financing lender, however, if a senior citizen agreed to participate in the Program, Liberty would obtain a HIPAA release from the senior Insured and collect their medical records so that Liberty could prepare a life expectancy or mortality study for Liberty to predict when the senior Insured would die.

70. Liberty's purpose in predicting when each Insured would die had nothing to do with valid premium financing lending, and everything to do with Liberty attempting to gauge how valuable its wager on the life of that senior citizen Insured might be and the extent of the longevity risk Liberty was taking on (i.e., the risk that the senior would live too long).

71. Indeed, using these life expectancy reports, Liberty would decide whether it even wanted to obtain a policy on that proposed insured, the amount of coverage that would be obtained, the insurance carrier from which coverage would be obtained, the terms and conditions of that coverage, and the manner and amount in which premium payments would be made on any policy.

72. To be clear, valid premium financing lenders are not interested in the medical records of an insured who may want to actually borrow, at their own expense and risk, money to finance a life insurance policy. Nor do valid premium financing lenders conduct pre-policy life expectancy studies on such a proposed insured, nor

do valid premium financing lenders decide the type of policy to be financed, the carrier, the terms of coverage, or the amount of coverage and the cost of premiums.

73. Here, however, all of these key decisions were made by Liberty, not the Insureds or their family members.

74. Courts around the country have universally recognized that transactions like this—where self-described premium finance lenders obtain life expectancy reports, induce insureds with promises of free insurance and financial compensation, and make all of the key decisions about whether to apply for a policy and under what terms—are obvious STOLI schemes. *See, e.g.*, *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, , 1068 n.25 (Del. 2011) (holding that STOLI policies are void *ab initio* and a "fraud on the court").

75. Assuming Liberty was satisfied that any particular senior was a suitable candidate for the Program and Liberty was interested in procuring (for its benefit) and paying for a policy on that senior insured's life, Liberty would provide the senior, as the proposed insured, with non-negotiable boilerplate documents that the insureds were told to sign, and which created multiple entities in Georgia, including: (i) an Irrevocable Trust in the Insured's name; and (ii) a limited liability company (the "LLCs") in the Insured's name. **Exhibit B**, Wilkenfeld Irrevocable Trust Agreement; **Exhibit C**, Wilkenfeld LLC Operating Agreement.

76. This standard transaction occurred with all of the Insureds at issue here. The Insureds had no ability to negotiate or edit the terms of the trust agreements for the Irrevocable Trusts, and no ability to select the trustee. Although the Insureds were identified as the grantors, Liberty dictated all of the terms of these trust agreements, and Liberty dictated that, in every case, Wells Fargo Bank was the trustee. **Exhibit B** at 8.

77. The trust agreements for the Irrevocable Trusts identified the Insureds' family members (the Defendants herein) as beneficiaries. *Id*. As detailed below, however, this was a sham to cover the fact that, before any Policies were made, Liberty was the actual beneficiary of the Policies through a series of behind-the-scenes transactions.

78. The purpose of the Irrevocable Trusts was "to own the limited liability company member interest" in an LLC in the respective Insureds' name (e.g., the "The Helen Wilkenfeld 2004, LLC"). *Id.* at 2.

79. In turn, the boilerplate Liberty trust agreements for the Irrevocable Trusts directed the trustee, Wells Fargo Bank, to become the "Manager" of the LLC in the respective Insureds' name. *Id.*

80. To form the LLC (of which the Irrevocable Trust would own the member interest and Wells Fargo Bank would be the Manager), each prospective

Insured signed a boilerplate Liberty document called an Operating Agreement. **Exhibit C** at 2.

81. As with the Irrevocable Trust agreements, the Insureds had no ability to negotiate or edit the Operating Agreements, and it was Liberty who dictated that Wells Fargo Bank would be the Manager of each LLC.

82. At least one purpose of the LLCs was to have these entities—acting through Wells Fargo Bank and for the benefit of Liberty—apply for the Policies as the proposed owners and beneficiaries.

83. However, while the LLCs were the named owners and beneficiaries of the Policies at their inception, and the owner of each LLC was an Irrevocable Trust in the respective Insured's name, the LLCs and the Irrevocable Trusts were never intended to be—and never really were—the actual owners or beneficiaries of the Policies.

84. Rather, by dictating that Wells Fargo Bank must be the trustee of each of the Irrevocable Trusts and Manager of each of the LLCs, Liberty had complete control over the entirety of each transaction and control over each Policy. And, through Wells Fargo Bank, ***the benefits of each Policy were actually payable to Liberty before any insurance contract was even made***.

85. Wells Fargo Bank, N.A.'s true master in these transactions was Liberty (and Liberty's principals), because Liberty not only dictated Wells Fargo Bank's

roles in connection with the Irrevocable Trusts and the LLCs, but Liberty paid Wells Fargo Bank for its services and Liberty installed Wells Fargo Bank and Wells Fargo Delaware Trust Company in multiple conflicting capacities which directly served Liberty's interests.

86. Specifically, Wells Fargo Bank was also the Georgia Trustee of the Liberty One Funding Trust and Liberty Two Funding Trust (meaning that Wells Fargo Bank was the trustee of Liberty itself) and Trustee of the SPIA Trusts, and Wells Fargo Delaware Trust Company was the Statutory Trustee of the Funding Trusts and Trustee of the Master Trusts.

87. This allowed Liberty to use these Wells Fargo entities to control the Irrevocable Trusts and the LLCs for and on behalf of Liberty, and to operate the Program in whatever manner Liberty wanted.

88. For example, although the Program made it appear on paper that the LLCs were the owners and beneficiaries of the Policies, that the owner of the LLCs was the Irrevocable Trusts, and thus that the death benefit of any Policy would flow through to the beneficiaries of the Irrevocable Trusts (which were the Insureds' family members and the Defendants herein), this was a complete fiction.

89. Indeed, behind the scenes, ***Liberty used Wells Fargo to give Liberty ownership and control of the Policies and their death benefits—before any Policy contract was made***—by having Wells Fargo enter into assignments purportedly by

and between the Irrevocable Trusts (acting through Wells Fargo, as their trustee) and the LLCs (acting through Wells Fargo, as their Manager), through which the LLCs—acting through Wells Fargo—assigned all of their rights, title, and interests in the Policies and the Policies' death benefits to Liberty.

90. The purpose of these assignments was not to benefit the Insureds or their heirs and beneficiaries, but rather to ensure that Liberty had exclusive control over each of the Policies from inception and would, therefore, receive the vast majority of the death benefits of the Policies whenever the Insureds passed away.

91. As a key part of the Program, Liberty and Wells Fargo had the Insureds sign a complex, boilerplate Financing Agreement, each of which was non-negotiable and contained an arbitration provision. *See*, *e.g.*, **Exhibit D**, Wilkenfeld Financing Agreement §§ 7.11 ("Dispute Resolution"), 8.01 ("Definitions" at Rules).

92. The Financing Agreements were transmitted to and from Liberty and Wells Fargo and the Insureds by telephone, facsimile, email, regular mail, and other common carriers.

93. The Financing Agreements were composed of three parts: (i) an "LLC Contract" that contained information specific to each Insured, such as the Insured's name and state of residence, as well as financial details particular to each Insured, such as the amounts that would be paid for initial and ongoing life insurance premiums; (ii) "Terms and Conditions," which were incorporated into each LLC

Contract and which were standard and non-negotiable; and (iii) any relevant appendices or schedules.

94. The Financing Agreements provided, as part of their Terms and Conditions, that Liberty would provide financing in the form of "Advances," as follows:

> Except as otherwise provided below, the Funding Trust shall cause to be made to the LLC, and the LLC shall borrow, Advances for the purpose of funding Premiums, Monthly Payments and, at the Funding Trust's election with the consent of the Secured Party, expenses of the LLC.

**Exhibit D** at § 1.01(a).

95. In the LLC Contract portion of the Financing Agreements, Liberty and Wells Fargo set forth the financial figures that would ostensibly apply for each, concerning the following items: (i) the "Initial Advance for Premiums"; (ii) Monthly Premiums; and (iii) any financial inducement paid to the Insured. For example, below are the figures shown in the LLC Contract of a Financing Agreement for a $6 million life insurance policy on the life of Helen Wilkenfeld:

| | |
|---|---|
| Initial Advance for Premiums: | $456,751.25 |
| Monthly Premiums: | $43,030.95 |
| Monthly Payments: | $2,047.64 |

96. Contrary to any appearance of legitimacy, and in conjunction with a complex "Payment Formula," these terms were illusory and allowed Liberty and Wells Fargo to secretly charge the Insureds and the LLCs, as Borrowers, undisclosed

amounts that lined the pockets of Liberty with millions of dollars in connection with each deal without letting the Insureds/Borrowers understand what was happening.

97. Indeed, Liberty and Wells Fargo used the Payment Formula and these illusory terms to take advantage of the Insureds/Borrowers by purchasing oversized SPIAs on each Insureds' life and by charging the Insureds/Borrowers for those annuities plus other exorbitant and undisclosed fees.

98. Specifically, unbeknownst to the Insureds or their families, these SPIA generated monthly income significantly in excess of the cost of premiums to maintain the life insurance Policy on each Insured's life. Notably, however, the cost of these large annuities was secretly charged to each Insured through the Financing Agreements. Yet, the Insureds and Borrowers were not given the full benefit of the annuities they were required to pay for. Rather, the excess monies generated by the annuities were kept by Liberty. And when each Insured passed away, Liberty and Wells Fargo would then reduce the life insurance death benefit paid to each Insured's family by deducting the cost of such annuities, even though what was really happening was concealed from the Insureds/Borrowers and Liberty had been keeping the excess annuity payments all along.

99. By way of example, the Financing Agreement with regard to Insured Helen Wilkenfeld was effective as of December 3, 2004.

100. That Financing Agreement purported to provide financing for a $6 million Policy on Ms. Wilkenfeld's life.

101. Through the Financing Agreement, which was effective prior to the date the $6 million Policy on Ms. Wilkenfeld's life was made, had Ms. Wilkenfeld passed away immediately upon the Policy being made, Liberty guaranteed itself $5,701,375 of the $6 million death benefit—which was over 95% of the death benefit.

102. In the case of Ms. Wilkenfeld, $5,244,624 of the $5,701,375 that would have been paid to Liberty had she passed away immediately upon the Policy becoming effective was attributed to a so-called Maturity Date Payment, which was vaguely defined in the Financing Agreement.

103. To justify its receipt of this amount, Liberty and Wells Fargo represented to the Insureds in pre-Financing Agreement disclosures that such a Maturity Date Payment was the amount due to Liberty so that Liberty could recover its "costs of the Program, such as the purchase of the SPIAs." **Exhibit A** at 19 n.1-7.

104. Even now, however, Liberty and Wells Fargo are continuing to conceal from Defendants the details about the SPIAs, including how much they cost to begin with and the amount of monthly income they paid to Liberty.

105. But as discovery will reveal, Liberty and Wells Fargo purchased massive SPIAs on the lives of each Insured. Thus, for example, the SPIA they purchased on Ms. Wilkenfeld's life generated monthly payments to Liberty that were well in excess of the monthly premiums on the $6 million Policy they procured, which premiums were roughly $43,000. As with all of the Insureds, the SPIA on Ms. Wilkenfeld's life thus generated monthly profits to Liberty, which Liberty and Wells Fargo did not disclose (and still will not disclose).

106. Yet, by Liberty and Wells Fargo's own admission, through the so-called Maturity Date Payment, they were charging the Insureds for the SPIAs Liberty purchased on their lives, without ever disclosing to the Insureds the details of those SPIA (including what they cost and what they generated), the fact that the SPIAs generated massive amounts of excess profits to Liberty, and the fact that Liberty pocketed those excess profits.

107. Moreover, had Ms. Wilkenfeld passed away immediately upon the making of the $6 million Policy on her life, Liberty would have reaped a massive windfall profit. This is undeniably true for several reasons.

108. First, as noted, Liberty guaranteed itself $5,701,375 of the $6 million death benefit from the Policy on Ms. Wilkenfeld's life. However, at the moment that Policy was made, Liberty's total investment into the transaction, including the

amount it paid for the SPIA, was far less than $5,701,375, meaning Liberty would have turned a quick profit had she died right away.

109. Second, had Ms. Wilkenfeld passed away immediately, the total amount of premium that Liberty would have paid towards that Policy would have been $465,751.25, which was the initial premium amount Liberty paid and which would have kept the Policy in force for slightly more than 11 months. But under the terms of the Policy, had Ms. Wilkenfeld passed away immediately, all (or nearly all) of that initial $465,751.25 premium payment would have been refunded to Liberty because that premium payment would have pre-paid for coverage beyond the date of Ms. Wilkenfeld's death. As a result, Liberty's day-one profit on an immediate death would have increased because Liberty's out of pocket costs would have been reduced when it received a refund of the premiums it paid towards the Policy.

110. Third, as discovery will reveal, some number of the SPIAs had premium refund provisions, including so-called "free look" periods such that, had an Insured passed away at the moment a Policy on their life became effective, Liberty would have received a refund of its full cost of the SPIA on that Insured's life. As a result, Liberty's profits would have exponentially increased from an immediate death because its actual out of pocket costs would have been further reduced when it received a refund of the full cost of the SPIA it purchased on Ms. Wilkenfeld's life.

111. Yet, despite the fact that Liberty would have received refunds of the Policy premiums and SPIA premiums, Liberty still would have taken $5,701,375 of the $6 million death benefit, and thus made a huge windfall profit on Ms. Wilkenfeld's immediate death.

112. Indeed, it is undisputed that had Ms. Wilkenfeld (or any Insured) passed away at the moment the Policy on their life became effective, over 90% of the Policy's death benefit would have been ultimately paid to Liberty, regardless of the amount of any premiums Liberty had paid towards the Policy, and regardless of any premium refund Liberty would have received under each Policy and SPIA.

113. As a result, there is no factual dispute that Liberty had financial interest in each Insureds' immediate death.

114. It is also undisputed that, despite any amounts Liberty paid in premiums for the Policies or the SPIAs, and regardless of whether Liberty would have received any refunds in connection with the Policy and/or SPIA premiums, Liberty would never have suffered a loss—and in fact never suffered a loss—from any Insureds' death.

115. For these and other reasons, Liberty lacked any valid insurable interest in the Insureds' lives.

116. Further, Liberty and Wells Fargo knew or should have known that the Program and Financing Agreements they created violated applicable insurable

interest laws and generated Policies that were mere human life wagers. To be sure, Liberty and Wells Fargo and their principals and agents engaged legal advisors to opine on the validity of the Program and whether it complied with insurable interest laws. Based on that advice, Liberty and Wells Fargo were aware of Georgia's insurable interest laws and the consequences of getting caught, including expressly that the Insureds' loved ones would have valid claims to the proceeds of the Policies.

## ALLEGATIONS SPECIFIC TO THE NAMED DEFENDANTS

117. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

118. The standard transaction described above was carried out with regard to all of the Insureds, as will be further supported by documents that are in Liberty and Wells Fargo's possession and are presently unavailable to Defendants.

119. In all cases, the Insureds described herein were solicited by Liberty and Wells Fargo, using materials Liberty and Wells Fargo caused to travel through interstate mails or wires, which described the Program as a legitimate non-recourse premium financing arrangement.

120. With regard to each Insured, (i) a Georgia LLC was formed in their name; (ii) the Insured and the LLC created in their name signed a Financing Agreement with Liberty and Wells Fargo Bank; (iii) a Policy on the Insured's life

was procured and financed; and (iv) a SPIA with concealed costs and benefits was secretly purchased for which the Insured was fraudulently charged.

121. Each Insured has passed away and, following their deaths, the death benefit of a Policy on each of their lives was paid to the Georgia LLCs formed in the Insureds' names, these proceeds were then obtained and distributed by Wells Fargo to Liberty, and Liberty is improperly retaining illegal human life wagering proceeds, to which the Defendants are entitled.

122. Defendants only became aware of their claims against Plaintiffs after their counsel uncovered facts—that Plaintiffs had fraudulently concealed from Defendants—in connection with prior arbitrations related to other insureds. Absent these prior arbitrations, Defendants would remain in the dark about their claims.

123. On April 27, 2023, and again on June 1, 2023, Defendants advised Liberty that they intended to pursue the recovery of these proceeds. Defendants simultaneously requested certain basic information from Liberty, including copies of the Policies, the SPIAs, and information about the amount of the death benefits paid on the Policies, the amounts paid to the Insureds' families, and the amounts of the so-called "Maturity Date Payments."

124. Liberty and Wells Fargo refused—and continue to refuse—to provide these details and, therefore, continue to conceal from Defendants material facts about these transactions and about Plaintiffs' fraud and other misconduct.

## FIRST CAUSE OF ACTION
## DECLARATION THAT ARBITRATION IS NOT MANDATORY UNDER THE FINANCING AGREEMENTS AND THAT DEFENDANTS MAY ELECT TO PROCEED IN COURT OR IN ARBITRATION

125. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

126. The Financing Agreements contain an arbitration provision that pertains to "[a]ll controversies or disputes arising out of or in connection with [the Financing] Agreement[s]" and provides, in relevant part, that in the event a Dispute between the parties is not resolved amicably, "any party may submit such Dispute to be finally settled by arbitration" administered under the rules of the American Arbitration Association ("AAA").

127. At the time Defendants gave notice of their dispute to Liberty and when they filed the Arbitration, Defendants understood that Liberty and Wells Fargo interpreted this arbitration provision as mandatory and that if Defendants had commenced suit in court, Liberty and Wells Fargo would have moved to compel arbitration.

128. As such, Defendants initiated this dispute by filing their Demand for Arbitration with the AAA on October 10, 2023, wherein Defendants in this case are the "Claimants" and the Plaintiffs in this case are the "Respondents."

129. However, on October 31, 2023, Liberty filed an action against Defendants in state court in Georgia, asserting that the arbitration provision in the

Financing Agreements does *not* mandate arbitration, and that arbitration is merely optional because, under Liberty's interpretation, the provision merely states "that the parties ***may*** arbitrate claims, but do not require arbitration of all disputes." Liberty Georgia Complaint, ¶¶ 37, 39 (emphasis in original).

130. On December 1, 2023, Wells Fargo filed its own action against Defendants in state court in Georgia, also asserting that the arbitration provision in the Financing Agreements does *not* mandate arbitration, and that arbitration is merely optional because, under Wells Fargo's interpretation, the provision merely states "that the parties ***may elect*** to arbitrate disputes, but does not require that arbitration be the exclusive forum for such resolution." Wells Fargo Georgia Complaint, ¶ 29 (emphasis added).

131. Defendants agree that arbitration is optional, not mandatory. Defendants thus understand that Defendants can elect, at Defendants' option, to continue with their claims in arbitration or proceed with their claims in this Court.

132. To the extent, however, that Liberty and Wells Fargo disagree and take the position—contrary to their now-biding judicial admissions that the Financing Agreements' arbitration provision is optional and does not require arbitration—that Defendants must proceed in court only, there is a justiciable controversy between the parties as to the meaning and scope of the Financing Agreements' arbitration provisions, and Defendants thus request a declaration from this Court, based on the

parties' mutual understanding that arbitration is optional and not mandatory, that Defendants have the option to proceed with their claims in arbitration or before this Court.

## SECOND CAUSE OF ACTION
## DECLARATORY JUDGMENT THAT ARBITRATION UNDER THE FINANCING AGREEMENTS IS CONTROLLED BY THE FEDERAL ARBITRATION ACT

133. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

134. In the Georgia Complaints filed by Liberty and Wells Fargo, they contend that arbitration under the Financing Agreements is controlled by the Georgia Arbitration Code ("GAC"), not the Federal Arbitration Act ("FAA").

135. Liberty and Wells Fargo seek to utilize Section 5 of the GAC, which, in some circumstances and only in actions controlled by the GAC, permits a court to decide whether the arbitrators can apply a statute of limitations to claims brought in arbitration.

136. There is no analogous provision in the FAA. Thus, in arbitrations controlled by the FAA and subject to Georgia law, arbitrators are prohibited from applying any statute of limitations, which in any event only apply in "actions" pending in court. *See* O.C.G.A. § 9-3-3 (providing that Georgia's statutes of limitations "shall apply equally to all courts" and making no mention of such statutes being applicable in arbitration); *Nixon v. Nixon*, 26 S.E. 2d 711 (Ga. 1943) (holding

the word "suits," now replaced with the word "actions," refers only to legal proceedings in court).

137. Because of this, Liberty and Wells Fargo, through their Georgia Complaints, seek a declaration that the GAC controls, not the FAA. Further, they seek a declaration as to what statutes of limitations could potentially apply to the claims in the AAA Action, and they then request that this Court "exercise its discretion" under Section 5 of the GAC and enter an order directing the AAA arbitrators to impose those purported limitations periods.

138. It is undisputed that the Financing Agreements make no reference to the GAC. Moreover, contrary to the allegations made by Liberty and Wells Fargo in their Georgia Complaints, the GAC does not apply merely because, in a separate section of the Financing Agreements, the parties included a Georgia choice of law provision. *See*, *e.g.*, *Gulfstream Aero. Corp. v. Oceltip Aviation 1 PTY LTD*, 31 F.4th 1323, 1330 (11th Cir. 2022) (rejecting argument that parties' choice of Georgia law was also an election to apply the Georgia Arbitration Code, as opposed to the FAA); *id*. at 1325 ("Long story, short: if you want certain rules to apply to the handling of your arbitration, the contract must say so clearly and unmistakably. Otherwise, the Federal Arbitration Act ('FAA') will apply.").

139. Accordingly, there is a justiciable controversy between the parties as to whether the Financing Agreements' arbitration provisions are subject to the FAA or

the GAC, and whether, if the GAC applies, the arbitrators in the AAA Action would be permitted to impose any time limitations on the claims in that action.

140. Defendants thus request a declaration from this Court that the Financing Agreements' arbitration provisions are subject to the FAA, not the GAC. Alternatively, in the event this Court declares that the Financing Agreements' arbitration provisions are subject to the GAC, Defendants request a declaration that no statute of limitations applies or can be applied by the arbitrators in the AAA Action.

**<u>THIRD CAUSE OF ACTION</u>**
**THE POLICIES ARE VOID *AB INITIO* WAGERS AND DEFENDANTS ARE ENTITLED TO RECOVER ALL POLICY PROCEEDS**

141. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

142. Under applicable law, "[a]ny personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i).

143. As explained by the Georgia Supreme Court, the purpose of Georgia's insurable interest requirement is to uphold Georgia's public policy against "wagering on human lives." *Crum*, 880 S.E.2d at 208-09.

144. The plain language of the insurable interest statute requires courts to scrutinize transactions and look beyond the mere form of each transaction to determine who "procured or caused" a policy "to be procured." O.C.G.A. § 33-24-3(i). Likewise, the statute's plain language provides that where a third party with no insurable interest is the one who procured or caused a policy to be procured, the policy is a human life wager unless "the benefits under the contract [were] payable to the individual insured" or someone else with valid insurable interest "at the time when the contract was made." *Id*. This, too, requires courts to look beyond the form of the transaction and determine, in substance, to whom a policy's benefits were actually "payable" at the moment the policy was made. *See*, *e.g.*, *Crum*, 880 S.E.2d at 209 (providing that courts must determine who "procured or caused to be procured" a policy on the life of another, especially when a third party was involved when the policy was procured); *Loh*, 31 S.E. at 459, 462, 466–67 (holding "the form in which the transaction is clothed is utterly immaterial []. The real thing to be ascertained in any given instance is, what was the actual object of the parties," and life insurance transactions must be bona fide, and not merely a cover for obtaining wagering or merely speculative insurance, and a device to evade the law.).

145. The Policies were human life wagers in violation of Georgia's insurable interest laws, thus rendering the Policies void *ab initio*.

146. To be sure, Liberty and Wells Fargo used the Insureds and the Irrevocable Trusts and LLCs to procure or cause the Policies to be procured, with the Policies' benefits being payable at inception to Liberty. The facts on this are undisputed.

147. First, procurement of a policy is not merely signing a life insurance application or consenting to the issuance of a policy. Indeed, Georgia's insurance code has a separate requirement that (with exceptions not relevant here) an insured must consent to the making of a policy on their life. O.C.G.A. § 33-24-6. Thus, procurement for purposes of the separate insurable interest requirement turns on who paid the premium and bore the expense of the policy. *Union Fraternal League v. Walton*, 34 S.E. 317, 320 (Ga. 1899) ("The true rule . . . is that one may insure his life, and make the . . . policy payable to whom he pleases, *provided the contract is not made at the expense* and for the benefit of the person designated as the beneficiary, as a cover for a mere wagering contract") (emphasis added); *Rylander v. Allen*, 53 S.E. 1032, 1034, 1037 (Ga. 1906) (procurement turns on who paid premium).

148. Second, in the Georgia Complaints, Liberty and Wells Fargo admit that the Insureds "paid no money of their own, and Liberty paid all premium and other charges to obtain and maintain life insurance policies." Liberty and Wells Fargo thus

procured the Policies because Liberty paid the premiums and the Insureds bore no expense or liability in connection with the Policies.

149. Third, although Liberty and Wells Fargo purport to claim that the Program was a form of valid life insurance premium financing, there is absolutely no factual dispute that, prior to the moment each Policy was created, Liberty, through the Financing Agreements and related transaction documents, was the true owner and beneficiary of over 90% of each Policy's death benefit and that such amounts were payable to Liberty prior to and at the moment each Policy was made.

150. Under Georgia law, the operative moment at which insurable interest is measured is "the time the contract of [life] insurance becomes effective." O.C.G.A. § 33-24-3(h) (2016); *Crum*, 880 S.E.2d at 209.

151. Indeed, "[a]ny personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i) (2016).

152. Because Liberty and Wells Fargo procured or caused the Policies to be procured and the "benefits under the [Policies were] payable to" Liberty when each Policy was made, Liberty and Wells Fargo bear the burden of proving that Liberty

possessed a valid insurable interest in each Insured at the moment each Policy was made. *Turner v. Davidson*, 4 S.E.2d 814, 818 (Ga. 1939) ("*Turner II*").

153. Liberty and Wells Fargo cannot, however, meet their burden as a matter of law and undisputed fact because Liberty did not have "a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of" the Insureds, and because Liberty would not have suffered a "consequent loss by reason of such person's death or disability." O.C.G.A. § 33-24-3(a).

154. In short, Liberty was better off financially if each Insured died at the moment insurable interest was measured (i.e., when each Policy was made), and Liberty was never worse off if the Insured died at that time (or at any other time).

155. Thus, Liberty lacked any possible insurable interest in the lives of the Insureds; the Policies lacked insurable interest and were pure wagers on the lives of the Insureds; and the Policies are void *ab initio*.

156. Because Liberty and Wells Fargo nonetheless received wagering proceeds from the Policies, Liberty and Wells Fargo owe those amounts to Defendants, along with prejudgment interest. *Turner v. Davidson*, 188 S.E. 828, 830–31 (Ga. 1936) ("*Turner I*") ("It is contrary to public interest and against public policy to allow anyone to retain the proceeds of a policy of insurance, though voluntarily paid by the insurance company, where the insurance was effected for his benefit upon the life of another in which he had no insurable interest . . . as this

would encourage speculation upon the chances of human life"); *Turner II*, 4 S.E. 2d at 817–18 (Ga. 1939) (holding that, under Georgia common law, when an insurance company pays the proceeds of an illegal wagering policy, the estate of the insured may maintain a cause of action to recover the policy proceeds, and the recipient of the proceeds holds them in trust for the rightful beneficiaries of the insured).

157. Indeed, Liberty and Wells Fargo are deemed to have been holding those proceeds in constructive trust for Defendants. *Loh*, 31 S.E. at 464 (the common law raises a constructive trust over proceeds received from a life insurance policy deemed to have been a wagering contract); Couch on Insurance 3d § 41:9 (rev. ed. 2011) (citing *Turner I* for the rule that "[i]f a person to whom the proceeds of a policy are paid lacks an insurable interest and is therefore not entitled to the proceeds, he or she holds them as a trustee for the person lawfully entitled to them.").

158. Whether this claim is pursued by Defendants in this Court or in optional arbitration, there is no specific Georgia statute of limitations that applies to this claim—which Plaintiffs admit in their Georgia Complaints.

159. Moreover, because this claim is one that arises as a result of Georgia's public policy against human life wagers, no time-bar of any sort can be imposed, whether in Court or arbitration.

160. To the extent that any statute of limitations could apply, it would be the 20-year limitations period for "actions for the enforcement of rights accruing to

individuals under statutes or acts of incorporation or by operation of law," O.C.G.A. § 9-3-22, because Defendants' claim to the proceeds of these wagering Policies arises as a matter of Georgia common law and through its insurable interest statute. Defendants' claim is timely under that 20-year statute.

161. In any event, Georgia recognizes tolling doctrines such that, even if Defendants' claim were somehow subject to a shorter limitations period, their claim would still be timely including because Plaintiffs operated a fraudulent scheme that concealed material information from Defendants and, even to this day, Plaintiffs are concealing information necessary to discover their fraud. *See*, *e.g.*, O.C.G.A. § 9-3-96. Indeed, Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim.

162. Accordingly, Defendants are entitled to recover from Liberty and Wells Fargo the full death benefits of the Policies along with applicable interest.

## FOURTH CAUSE OF ACTION
## THE FINANCING AGREEMENTS ARE VOID *AB INITIO* WAGERS AND DEFENDANTS ARE ENTITLED TO RECOVER THE POLICY PROCEEDS IN EXCESS OF THE ACTUAL INDEBTEDNESS IF ANY

163. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

164. For the reasons set forth above, the Financing Agreements were not valid loans but rather were wagering contracts through which Liberty, with the

assistance of its agent Wells Fargo, made the benefits of each Policy payable to itself prior to each Policy being made.

165. Wagering contracts are among those that expressly contravene Georgia public policy and, therefore, "cannot be enforced" as a matter of law. O.C.G.A. § 13-8-2 ("A contract that is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include but are not limited to . . . [w]agering contracts.").

166. Accordingly, the Financing Agreements are themselves void *ab initio* and Liberty and Wells Fargo cannot invoke any provision of those Financing Agreements in support of any defense or counterclaim. As a result, Defendants are entitled to recover from Liberty and Wells Fargo the full death benefits of the Policies along with applicable interest.

167. Moreover, even if the Finance Agreements are not void *ab initio* and are deemed to have constituted valid premium finance agreements used to pay premiums for the Policies, Liberty nonetheless lacked insurable interest and Plaintiffs violated applicable insurable interest law and engaged in illegal human life wagering. Thus, Defendants are still entitled to recover from Liberty and Wells Fargo all, or substantially all, of the death benefits of the Policies along with applicable interest.

168. To that end, there is nothing within Georgia's insurable interest statute that grants an insurable interest to a premium financing lender. Accordingly, as a matter of law, Liberty cannot claim to have had a valid insurable interest by virtue of the Financing Agreements.

169. To be sure, Georgia's insurance code expressly provides that premium finance lenders can merely take a security interest in a life insurance policy, O.C.G.A. § 33-59-2(17), but this does not create an insurable interest in favor of the premium finance lender such that it could simply procure a policy for its own benefit.

170. Under Georgia's common law, valid lenders can have an insurable interest in a debtor's life, but this interest is restricted to situations where there is an actual, preexisting debt obligation and the intent and purpose of the lender in taking out a policy is merely to indemnify the lender against the risk of loss arising from the preexisting debt. *Chapman v. Lipscomb-Ellis*, 22 S.E.2d 393, 395 (Ga. 1942) ("A creditor has, for the purpose of indemnifying himself against loss, but for no other, an insurable interest in the life of his debtor.").

171. Under Georgia law, one claiming an insurable interest as a lender cannot create fictitious debt and use that as an excuse for taking out a policy on the life of the purported debtor. *Morris v. Ga. Loan Sav.*, 34 S.E. 378, 378 (Ga. 1899) ("pretended debt" does not create insurable-interest).

172. Thus, Georgia law is clear that where a purported lender procures life insurance on the life of its debtor, the lender must establish that it was an actual lender in good faith and that its "purpose in taking" the policy was to secure "additional protection" for the repayment of an "existing indebtedness," and not part of "a scheme to furnish a cloak to a purely colorable transaction." *Loh*, 31 S.E. at 467. Indeed, whenever "a contract of life insurance made for the benefit of a creditor is not one having indemnity for its object, we necessarily stamp it as a purely wagering contract." *Id*. at 460.

173. Moreover, the purported lender cannot hide behind the mere form of its transaction, which is "utterly immaterial" as a matter of Georgia law. *Loh*, 31 S.E. at 459 ("[T]he form in which the transaction is clothed is utterly immaterial. . . . The real thing to be ascertained in any given instance is, what was the actual object of the parties; for by this test alone is the legality of what they did to be determined.").

174. Here, Liberty and Wells Fargo's actual objective was to create brand new, multi-million dollar policies for Liberty's benefit. Neither entered these transactions with the intention of merely providing indemnification to Liberty. This is indisputably true for several reasons.

175. First, Liberty and Wells Fargo were strangers to the Insureds, and there was no preexisting lender/creditor relationship between Liberty, Wells Fargo, and the Insureds.

176. Second, the Financing Agreements were not real loans, and they did not create any debt obligation between the Insureds on the one hand, and Liberty on the other. The Insureds were not the borrowers, the LLCs were, and the Insureds were expressly not obligated to pay anything towards the Financing Agreements and pledged no assets as collateral.

177. Third, as detailed above, Liberty was given a preexisting right, through the Financing Agreements, to receive over 90% of each Policy's death benefit at the time each Policy was made, regardless of the amount of any purported "financing" Liberty provided. Thus, Liberty did not merely secure an interest in the Policies up to an amount needed to indemnify Liberty; rather, it secured a preexisting guarantee to nearly the entire death benefit of each Policy with the intention of making a windfall gain if an Insured died immediately.

178. Accordingly, even if the Financing Agreements are not deemed void *ab initio* wagering contracts, Liberty nonetheless lacked insurable interest and Plaintiffs violated applicable insurable interest laws and engaged in illegal human life wagering. Thus, Defendants are still entitled to recover from Liberty and Wells Fargo all, or substantially all, of the death benefits of the Policies along with applicable interest.

179. To that end, even if Liberty is considered a valid lender under the Financing Agreements, then its insurable interest in the life of each Insured was

limited to the amount of any legitimate debt owed by each Insured. *See*, *e.g.*, *Morris v. Ga. Loan, Sav. & Banking Co.*, 34 S.E. 378, 378–80 (Ga. 1899) (holding that where a creditor obtains insurance proceeds in excess of the amount of indebtedness owed by a debtor insured, the transaction is a wager, and "[t]he legal representatives of the debtor will be entitled to the balance"); *Loh*, 31 S.E. 459.

180. As noted, the Insureds owed no debt, and thus Liberty had no insurable interest, even as a lender. But to the extent the Insureds are deemed to have owed a debt to Liberty and Liberty is deemed a valid lender, the amount of any indebtedness owed by the Insureds was much less than the amounts Liberty took from each Policy's death benefit. This is true for several indisputable reasons.

181. First, Liberty received, through and with the assistance of its agent Wells Fargo, excess SPIA payments each month. Instead of using these excess amounts to reduce the amount of purported indebtedness owed by the Insureds, Liberty pocketed this excess cash. By virtue of the excess SPIA payments, the amount Liberty needed to indemnify itself against the risk of loss at the time of each Insureds' death was far lower than the amounts Liberty guaranteed itself, and in fact received, from the Policy's death benefits.

182. Second, Liberty and Wells Fargo computed the so-called "Total Amount Due" under each Financing Agreement to include a series of undisclosed costs which, in each transaction, added hundreds of thousands of dollars to the so-

called indebtedness owed by the Insureds, and thus materially inflated the amounts Liberty needed from each Policy's death benefit to merely indemnify Liberty against the risk of loss.

183. Accordingly, even if Liberty were considered a valid premium finance lender and the Financing Agreements are not void *ab initio*, Liberty and Wells Fargo violated Georgia's insurable interest laws and engaged in illegal human life wagering by setting up these transactions so that Liberty would receive, and in fact did receive, life insurance proceeds from the Policies in amounts that exceeded the amount of indebtedness owed at the time of each Insured's death, and thus exceeded the limited extent of Liberty's insurable interest (assuming it had any such interest at all). *Loh*, 31 S.E. 459 (holding that if the intent of the transaction was merely to use a life insurance policy to secure the repayment of premiums to be paid on the policy, with the surplus of any death benefit being paid to the insured's estate, the transaction is enforceable; if, however, the intent of the transaction was for the lender to procure life insurance so as to obtain a death benefit in excess of any actual indebtedness, the transaction is "a wagering contract" that lacked insurable interest and is unenforceable).

184. Moreover, for the same reasons set forth above in connection with Defendants' Third Cause of Action, this claim is not subject to any time-bar; at most it would be subject to the 20-year statute of limitations at O.C.G.A. § 9-3-22; and in

any event this claim would be subject to tolling based, among other things, on Plaintiffs' fraud and concealment of material facts, O.C.G.A. § 9-3-96. Indeed, Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim.

185. Accordingly, even if Liberty is deemed to have possessed an insurable interest as a lender, Plaintiffs still engaged in wagering and violated Georgia's insurable interest laws, and any proceeds received by Liberty and Wells Fargo in excess of the actual indebtedness owed by any Insured at the time of their death must be paid to the respective Defendant, along with prejudgment interest. *See*, *Turner II*, 4 S.E. 2d at 817-18 (holding that, under Georgia common law, when an insurance company pays the proceeds of an illegal wagering policy, the estate of the insured may maintain a cause of action to recover the policy proceeds, and the recipient of the proceeds holds them in trust for the rightful beneficiaries of the insured).

**FIFTH CAUSE OF ACTION**
**BREACH OF CONTRACT AND INDEMNIFICATION, AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (IN THE ALTERNATIVE TO THE THIRD AND FOURTH CAUSES OF ACTION)**

186. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

187. To the extent the Financing Agreements are valid and not void *ab initio* illegal wagers, each of the Insureds fully performed all of their duties and obligations under the Financing Agreements, and none of the Insureds was ever in default under the Financing Agreements.

188. Moreover, because following the death of each Insured, Liberty and Wells Fargo collected the death benefits from each respective Policy, any duties or obligations owed by the Insureds under the Financing Agreements were satisfied and discharged in full, meaning no Insured was in default or could now be in default under the Financing Agreements.

189. As the authorized representatives of the respective Insureds, the Defendants thus satisfied and discharged in full their duties and obligations (assuming any existed) under the Financing Agreements, and none of the Defendants was or could be in default under such Financing Agreements.

190. In contrast, Liberty and Wells Fargo breached and committed defaults (and plan to continue breaching and committing defaults) under the terms of the Financing Agreements as explained in detail above, including by receiving and retaining death benefits far in excess of what they were contractually entitled to receive. The breached provisions include, but are not limited to, sections 1.01, 1.02, 1.03, 1.08, 2.01, 6.03, 7.01, and 8.01 (including the related Definitions) of the Financing Agreements. **Exhibit D**.

191. Liberty and Wells Fargo have, therefore, caused damage to the Defendants by depriving them of the proper net death benefits of matured Policies.

192. Because of Liberty and Wells Fargo's defaults in their duties and obligations under the Financing Agreements, Liberty and Wells Fargo are contractually obligated to indemnify Defendants for all reasonable costs, fees, and expenses, including attorneys' fees and fees for financial advisors and accountants, incurred by Defendants in order to enforce the terms of the Financing Agreements against these defaulting parties. **Exhibit D** at § 7.01.

193. Accordingly, Defendants are entitled to recover the proper net death benefits of the Policies along with applicable interest, and contractual indemnification "for the reasonable costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants" that have been and will be incurred in order to enforce the terms of the Financing Agreements in light of Liberty and Wells Fargo's material breaches and defaults under those agreements. **Exhibit D** at § 7.01.

194. Furthermore, under Georgia law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and [its] enforcement." *Ameris Bank v. All. Inv. & Mgmt. Co., LLC*, 739 S.E.2d 481, 485–86 (Ga. Ct. App. 2013); *Crooks v. Chapman Co.*, 185 S.E.2d 787, 789 (Ga. Ct. App. 1971) ("Good faith is, if anything, a minimum standard of conduct in any contract.").

195. "The concept of good faith [in a breach of contract action] encompasses basic notions of 'fairness and commercial reasonableness.'" *Capital Health Management Group, Inc. v. Hartley*, 689 S.E.2d 107, 111–12 (Ga. Ct. App. 2009). "'Good faith' is a shorthand way of saying substantial compliance with the spirit, and not merely the letter, of a contract." *Fisher v. Toombs County Nursing Home*, 479 S.E.2d 180, 184 (Ga. Ct. App. 1996). It also means that "what is not regulated by the contract should be done in such a way as to show good faith in carrying out what is expressed." *Crosson v. Lancaster*, 427 S.E.2d 864, 866 (Ga. Ct. App. 1993).

196. "The implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself." *Stuart Enterprises Int'l, Inc. v. Peykan, Inc.*, 555 S.E.2d 881, 884 (Ga. Ct. App. 2001). "[T]he 'covenant' [to perform in good faith] is not an independent contract term. It is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*." *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414, 1429 (11th Cir. 1990).

197. Here, as detailed above, Liberty and Wells Fargo convinced elderly individuals to execute Financing Agreements ostensibly designed to provide legitimate premium financing for life insurance when, in fact, the transactions were secretly driven by another component altogether, which was a massively oversized

annuity that was charged to the loan but whose secret excess payments were used by Liberty and Wells Fargo to line Liberty's pockets.

198. Among other things, by using illusory and ambiguous terms, Liberty and Wells Fargo charged the loans for the cost of these annuities while retaining for Liberty's own benefit monthly payments secretly in excess of those necessary to cover monthly premiums on the life insurance policies. Liberty and Wells Fargo and their affiliates also charged the Insureds other excessive and undisclosed fees. In so doing, Liberty and Wells Fargo did not operate in good faith.

199. Moreover, where one party to a contract is given discretion in the performance of its duties, the implied covenant of good faith and fair dealing requires that party to exercise such discretion in good faith. *Rogers v. Farmers & Merchs. Bank*, 545 S.E.2d 51, 53 (2001) ("[W]here the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith."); *Capital Health Mgmt. Group, Inc. v. Hartley*, 689 S.E.2d 107, 112 (Ga. Ct. App. 2009) ("The requirement that a party exercise good faith and honest judgment, even where the contractual language grants the party discretion, arises from the implied duty of good faith and fair dealing imposed upon virtually every contract under Georgia law.").

200. In this context, "[a] decision was not made in good faith if it was made for arbitrary or capricious reasons, was based on an improper pecuniary motive, or

was predicated on dishonesty or illegality. Furthermore, a decision can be so grossly erroneous, as where there is a total absence of any factual evidence to support it, that it creates an inference of bad faith and dishonest judgment." *Capital Health Mgmt. Grp.*, 689 S.E.2d at 112 (internal citations omitted).

201. Here, the Financing Agreements provided Liberty and Wells Fargo with discretion in a number of ways, including with regard to how Liberty made Advances at Liberty's "election" for the "expenses of the LLC" and how it elected "in its sole discretion to pay the costs and expenses of any other party hereto."

202. Among other things, Liberty and Wells Fargo acted in their own best interests and in bad faith by (i) charging as an "Advance" the entire cost of the annuity to the LLC; (ii) never providing full annuity applications to the Insureds; (iii) actively concealing the price and amount of the annuities purchased over the lives of the Insureds; (iv) never disclosing and actively concealing the payments generated by the annuities; (v) never properly applying the annuity payments to offset the Advances for premiums on the life insurance policies insuring the lives of the Insureds; and (vi) loading the Financing Agreements with inflated and undisclosed fees and expenses.

203. Liberty and Wells Fargo have, therefore, breached their implied duty of good faith and caused damage to the Defendants by depriving them of the net death benefits of matured Policies and the benefits of the annuities.

204. Moreover, Liberty and Wells Fargo are in default of their duties and obligations under the Financing Agreements and, therefore, Liberty and Wells Fargo are obligated to indemnify Defendants in connection with all reasonable fees and other costs associated with enforcing the terms of the Financing Agreements. **Exhibit D** at § 7.01.

205. To the extent any statute of limitations applies to this claim it is subject to tolling based, among other things, on Plaintiffs' fraud and concealment of material facts. O.C.G.A. § 9-3-96. Indeed, Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim.

206. Accordingly, Defendants are entitled to recover damages from Liberty and Wells Fargo, including but not limited to the proper net death benefits of the Policies along with applicable interest, and contractual indemnification "for the reasonable costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants" that have been and will be incurred in order to enforce the terms of the Financing Agreements in light of Plaintiffs' material breaches and defaults under those agreements. **Exhibit D** at § 7.01.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C §§ 1962(c) and 1962(d)**

207. Defendants hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

208. 18 U.S.C § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering . . . ."

209. 18 U.S.C § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C § 1962]."

210. Liberty and Wells Fargo have violated the Racketeer Influenced and Corrupt Organizations Act, Title 18 of the United States Code, Section 1962(c) and 1962(d).

211. Liberty and Wells Fargo are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

212. Defendants are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

213. The requisite enterprise (the "Enterprise") consisted of a group of STOLI promoters, producers, financiers, servicers, managers and other participants who helped induce seniors to enter into these transactions, and then financed, serviced, managed, and ultimately profited from these transactions. This Enterprise included Liberty as well as the Approved Third-Party Originators and others who worked directly with the Insureds, as well as Horizon Trade & Finance (Ireland) Limited, which consented to some of the critical transactions happening behind the scenes and is the beneficial owner of the Funding Trusts, the Master Trusts, and the SPIA Trusts. This Enterprise also included Wells Fargo Bank, which served as Georgia Trustee of the Funding Trusts, Trustee of the SPIA Trusts, Trustee of the Irrevocable Trusts, Manager of the LLEs, and as Securities Intermediary as well as Wells Fargo Delaware Trust Company, which served as Statutory Trustee of the Funding Trusts and Trustee of the Master Trusts. The Enterprise also included a long list of Credit Suisse entities such as Credit Suisse Group AG and Credit Suisse AG which had overall responsibility for all Credit Suisse operations, as well as Credit Suisse First Boston, Cayman Island Branch which became a party to the Notices of Borrowing each time a transaction was executed. The Enterprise also included Credit Suisse First Boston International, which entered into interest cap transactions with other members of the enterprise, Liberty One Master Trust and Liberty Two Master Trust, each time a Financing Agreement was consummated. The Enterprise also

included Credit Suisse Securities (USA) LLC which ran an office known as the Life Finance Group in New York and London and, among other things, acted as a "Calculation Agent" and as "Domestic Servicer" and routinely contacted Insureds to see if they had yet died and also calculated the "Total Amount Due" under the Financing Agreements using the fraudulent charges and payment formula. The Enterprise also included Liberty One Trust and Liberty Two Trust which received the annuity payments for which the Insureds were fraudulently charged. The Enterprise also included Credit Suisse Securities (Europe) Limited; Credit Suisse Holdings (USA), Inc.; and others not yet known to Defendants. All of these entities acted in concert to form an Enterprise and to defraud and deceive seniors and their families out of millions of dollars.

214. This Enterprise was and is engaged in, and its activities affect, interstate commerce.

215. Liberty and Wells Fargo were associated with the Enterprise at all times relevant to the events alleged herein.

216. Liberty and Wells Fargo conducted and participated in the conduct of the Enterprise's affairs by knowingly devising and participating in a scheme whereby, with the intent to defraud Insureds and their families and to enhance income, the Enterprise (i) deceived insureds about the terms and conditions of the Financing Agreements; (ii) charged Insureds and their families for annuities that

they were unaware of; (iii) deprived the Insureds and their families of the proper benefits from the annuities they were fraudulently charged for; and (iv) used marketing materials describing the Program as a non-recourse premium finance loan to further the deception and fraud.

217. To implement the scheme and generate profits for themselves, Liberty and Wells Fargo committed a pattern of racketeering acts or caused a pattern of racketeering acts, as described herein, to be committed by means of, *inter alia*, concealing the true terms of the Financing Agreements, making intentional misrepresentations regarding the Program, and arbitrarily abusing the discretion given to them under the terms of the Financing Agreements.

218. Liberty and Wells Fargo engaged in a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), by committing a pattern of acts of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343 in the use of the telephone, facsimile, email, and mails for advancing, furthering, or carrying out the scheme to defraud. *United States v. Bradley*, 644 F.3d 1213, 1238–39 (11th Cir. 2011) ("[Mail and wire fraud] require that a person [] intentionally participates in a scheme or artifice to defraud another of money or property . . . a scheme or artifice to defraud, requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property. A misrepresentation is material if it has a natural tendency to influence . . . ."). Among

other things, the terms of the Program materials and Financing Agreements were transmitted to and from Liberty and Wells Fargo and others in the Enterprise to and from the Insureds and Defendants by telephone, facsimile, email, regular mail, and other common carriers, and such transmissions were essential elements, or incident to essential elements, of the unlawful racketeering scheme. These acts of racketeering had the same or similar purposes, results, participants, and scheme, and were not isolated events.

219. Liberty and Wells Fargo also engaged in a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), by committing a pattern of acts in connection with an illegal gambling and human life wagering scheme, in violation of 18 U.S.C. § 1955. To that end, Liberty and Wells Fargo conducted, financed, managed, supervised, directed, and/or owned all or part of an illegal gambling business that was engaged in human life wagering in violation of applicable state law. This gambling business involved more than five people and generated daily income to Plaintiffs of well in excess of $2,000 and continued over a course of years.

220. Liberty's and Wells Fargo's pattern of racketeering activity and violations of § 1962(c) began in approximately 2005, was perpetrated in connection with all of the transactions at issue in this case as well as many more, and continues to this day, as (among other things) each time an Insured dies, Liberty and Wells Fargo improperly reap profits from these transactions as explained herein.

221. Liberty and Wells Fargo acted intentionally and concealed their pattern of racketeering from the Insureds and Defendants. In fact, Defendants have been completely unaware of the size of the annuities taken out on the Insureds' lives or of the fact the Insureds were charged for those annuities until this arbitration.

222. At all relevant times herein, Liberty and Wells Fargo conspired to violate § 1962(c).

223. Liberty and Wells Fargo's conspiracy to violate § 1962(c) began around 2005 as they, along with other members of the Enterprise, began to solicit Approved Third Party Originators who, in turn, solicited senior citizens along with Liberty and Wells Fargo. Liberty and Wells Fargo's conspiracy continues today as Liberty and Wells Fargo profit from (i) the deaths of Insureds who were tricked into signing Financing Agreements by deception and fraud, and (ii) annuities, which the Insureds and their families were unknowingly charged for, generating amounts greatly in excess of the monthly premium payments.

224. The object of the conspiracy, as discussed above, was to generate multi-million dollar life insurance policies on the lives of elderly insureds, with respect to whom Liberty and Wells Fargo had no insurable interest, while charging those Insureds for multi-million dollar annuities that secretly generated additional profit from which the Insureds were precluded. Liberty and Wells Fargo, along with other members of the Enterprise, took overt acts to further the conspiracy by soliciting

Approved Third Party Originators and Insureds with materials transmitted throughout the country. Liberty and Wells Fargo, along with other members of the Enterprise, took other overt acts to further the conspiracy by applying for annuities, which were charged to the Insureds, and by receiving and keeping for itself excess annuity payments.

225. Liberty and Wells Fargo agreed to commit the predicate acts, mail fraud, wire fraud, and illegally gambling on the lives of the Insureds, with other members of the Enterprise. Liberty and Wells Fargo intended to commit the predicated acts, in order to further advance the conspiracy by soliciting more senior citizens to sign the deceitful and fraudulent Financing Agreements, and, in turn, collect more profit from the Insureds deaths and the undisclosed annuities.

226. If brought in court (as opposed to arbitration in which no limitations period applies), civil RICO can be brought within four years from when the plaintiff discovers its injury. For the reasons set forth above, this claim is timely based, among other things, on Plaintiffs' fraud and concealment of material facts. Indeed, Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim.

227. As detailed herein, Plaintiffs and the rest of the Enterprise have actively concealed information necessary for Defendants to have discovered the subject of

their claim. Indeed, Defendants only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Defendants would still remain in the dark about their claim.

228. Accordingly, Defendants' claim is timely and as a direct and proximate result of the acts as alleged herein, and Liberty and Wells Fargo's violations of 18 U.S.C §§ 1962(c) and 1962(d), Defendants have suffered substantial injuries.

WHEREFORE, Defendants, individually and collectively, seek an award as follows:

229. In connection with Defendants' First and Second Causes of Action for declaratory relief, a declaration that: (i) arbitration is optional under the Financing Agreements' arbitration provision (meaning Defendants have the right to proceed with their claim in AAA or in this Court); (ii) if Defendants opt to pursue their claims in the AAA Arbitration, that arbitration is subject to the Federal Arbitration Act, not the Georgia Arbitration Code; (iii) the arbitrators cannot impose any statute of limitations or other time-bar to the claims brought in arbitration; and (iv) in the event this Court declares that the Financing Agreements' arbitration provision is subject to the Georgia Arbitration Code, no statute of limitations or other time-bar applies or can be applied by the arbitrators in the Arbitration.

230. In connection with Defendants' Third Cause of Action regarding wagering and insurable interest, a finding that the Policies are void *ab initio* and an award to the respective Defendant of full death benefits of such Policies along with applicable prejudgment interest.

231. In connection with Defendants' Fourth Cause of Action regarding wagering and insurable interest, a finding that the Financing Agreements are void *ab initio* and an award to the respective Defendant of full death benefits of such Policies along with applicable prejudgment interest; or, alternatively, a finding that even if Liberty was a valid lender, it exceeded its limited insurable interest, the excess amounts it received above any indebtedness owed by the Insureds were wagering proceeds, and those amounts along with applicable prejudgment interest are owed to Defendants.

232. In connection with Defendants' Fifth Cause of Action regarding Liberty's and Wells Fargo's breaches of the Financing Agreements and their breaches of their duty of good faith and fair dealing (and in the alternative to Defendants' Third and Fourth Causes of Action), an award of damages including but not limited to the proper net death benefits of such Policies to the respective Defendant along with applicable interest and contractual indemnification "for the reasonable costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants" that have been and will be incurred

as a result of Liberty's and Wells Fargo's default in order to enforce the terms of the Financing Agreements;

233. In connection with Defendants' Sixth Cause of Action for RICO violations, a finding of liability against Liberty and Wells Fargo and the trebling of all damages enumerated herein pursuant to 18 U.S.C § 1964(c), plus interest and attorneys' fees.

Respectfully submitted this 2nd day of February, 2024.

*/s/ Chase A. Howard*
Chase A. Howard, Esq. (*pro hac vice*)
Michael J. Miller, Esq. (*pro hac vice*)
Gregory J. Star, Esq. (*pro hac vice*)
Chase A. Howard, Esq. (*pro hac vice*)
Victoria G. Mazzola, Esq. (*pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: 215-665-2147
ChaseHoward@cozen.com
mjmiller@cozen.com
gstar@cozen.com
vmazzola@cozen.com

*/s/ Saskia Olczak*
Saskia H. Olczak, Esq.
Georgia Bar No. 686983
COZEN O'CONNOR
1230 Peachtree Street, N.E.
The Promenade, Suite 400
Atlanta, Georgia 30309
(404) 572-2050
solczak@cozen.com

*Attorneys for Defendants.*

CERTIFICATION: The above-signed counsel hereby certifies that this document was prepared in Times New Roman 14-point font with a 1.5 inch top margin in accordance with LR 5.1B, N.D. Ga.