# EXHIBIT D

**LIBERTY PREMIUM FINANCE PROGRAM**

**FINANCING AGREEMENT**

**AMONG**

**LIBERTY ONE FUNDING TRUST,**

**HELEN WILKENFELD 2004, LLC,**

**HELEN WILKENFELD**

**AND**

**WELLS FARGO BANK, N.A.,**

**AS SECURITIES INTERMEDIARY**

# FINANCING AGREEMENT

Table of Contents

LLC CONTRACT

Incorporation of Terms and Conditions
Designation of Terms and Conditions
Execution Page
Exhibit 1. Description of Each Policy and Instructions for Payment of Premiums

TERMS AND CONDITIONS

Article I. Advances, Interest and Payment Terms ..........
Article II. Conditions Precedent ..........
Article III. Representations and Warranties of the LLC and the Insured ..........
Article IV. Representations and Warranties of the Funding Trust ..........
Article V. Covenants of the LLC and the Insured ..........
Article VI. Events of Default and Events of Acceleration ..........
Article VII. General Provisions ..........
Article VIII. Defined Terms ..........

APPENDIX

A. Closing Package
B. LIBOR Formula
C. Representation Required by Treasury Regulations Section 1.7872-15(d)(2)
D. Payment Formula

**LIBERTY PREMIUM FINANCE PROGRAM FINANCING AGREEMENT**, dated as of **December 3, 2004**, among Liberty One Funding Trust, a Delaware statutory trust authorized to do business in the State of Georgia, with principal address at 400 Northridge Road, Suite 600, Atlanta, Georgia 30350 (the "Funding Trust"), the Georgia limited liability company designated below doing business at 400 Northridge Road, Suite 600, Atlanta, Georgia 30350 (the "LLC"), the Insured designated below (the "Insured") and Wells Fargo Bank, N.A., a national banking association, in its capacity as securities intermediary ("Wells Fargo Bank").

The Funding Trust, the LLC and the Insured agree to the Funding Trust's providing financing to the LLC subject to the Terms and Conditions attached hereto, which are incorporated herein and made a part of this Agreement in their entirety. Capitalized terms used herein have the respective meanings specified in the Terms and Conditions attached hereto. Each Policy is described in Exhibit 1 hereto.

| | |
|---|---|
| Insured: | **Helen Wilkenfeld**, a resident of **Florida** |
| LLC: | **Helen Wilkenfeld 2004, LLC** |
| Monthly Payment Election: | Yes [ X ], No [ ] |
| Initial Advance for Premiums for the **11.3** months following **September 13, 2004**: | **$ 456,751.25** |
| Monthly Advances: | |
| For Premiums payable on **August 18, 2005** and monthly thereafter until age 100: | **$ 43,030.95** plus the amount of Premium Increases to the extent provided in this Agreement |
| For Monthly Payments payable on **September 18, 2005** and monthly thereafter until the earlier of **December 18, 2010** or the death of the Insured: | **$ 2,047.64** less the amount of any Premium Increases for which Advances are made |
| LLC securities account to be maintained at Wells Fargo Bank, N.A. in the name of the Funding Trust, as secured party (the "LLC Account"): | Account No. [redacted] |

Notices:

LLC
**Helen Wilkenfeld 2004, LLC**
c/o Wells Fargo Bank, N.A., as Manager
400 Northridge Road, Suite 600
Atlanta, Georgia 30350
Attention: Corporate Trust Services

With a copy to:
Potter Anderson & Corroon LLP
1313 North Market Street, Sixth Floor
Wilmington, DE 19801
Attn: Scott E. Waxman

Insured
**Helen Wilkenfeld**
[redacted]
**Boca Raton, FL 33434**

With a copy to:
**Marc Faivish**
[redacted]
**Cedarhurst, NY 11516**

Wells Fargo Bank
Wells Fargo Bank, N.A.
400 Northridge Road, Suite 600
Atlanta, Georgia 30350
Attention: Corporate Trust Services

With a copy to:
Potter Anderson & Corroon LLP
1313 North Market Street, Sixth Floor
Wilmington, DE 19801
Attn: Scott E. Waxman

Monthly Payments and the Net Death Benefit due and payable to the LLC hereunder shall be paid to the following account unless another account is subsequently designated in writing by the LLC:

Bank: Wells Fargo Bank, National Association
ABA: 121000248
Account No.: [redacted]
Bnf: Corporate Trust - Delaware
Reference: **Helen Wilkenfeld 2004, LLC** – Unpledged Account.

This Agreement shall not become effective until it is executed below by the Insured, executed in Georgia by the LLC and Wells Fargo Bank as evidenced by their signatures below, and accepted and executed in Georgia by the Funding Trust as evidenced by its signature below.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the respective dates specified below with the effect from the date specified on the first page of this Agreement.

LIBERTY ONE FUNDING TRUST
By: Wells Fargo Bank, N.A.,
not in its individual capacity,
but solely as Georgia Trustee

By:____________________
Name: EDWARD L. TRUITT, JR.
Title: VICE PRESIDENT
Date: 12/9/04
Place of execution: Atlanta, Georgia

**Helen Wilkenfeld 2004, LLC**
By: Wells Fargo Bank, N.A.,
not in its individual capacity,
but solely as Manager

By:____________________
Name: EDWARD L. TRUITT, JR.
Title: VICE PRESIDENT
Date: 12/9/04
Place of execution: Atlanta, Georgia

**Helen Wilkenfeld** ____________________

12/06/04
Date:

WELLS FARGO BANK, N.A.,
in its capacity as securities intermediary

By:____________________
Name: EDWARD L. TRUITT, JR.
Title: VICE PRESIDENT
Date: 12/9/04
Place of execution: Atlanta, Georgia

# EXHIBIT 1

Description of Each Policy

| Insurer | Date of Policy | Policy Number | Initial Monthly Premium | Death Benefit |
|---|---|---|---|---|
| **New York Life Insurance & Annuity Corp.** | | **62 920 430** | **$43,030.95** | **$6,000,000.00** |

Instructions for Payment of Premiums:

| | |
|---|---|
| Bank Name: | Bank of America |
| Bank Address: | Dallas, TX |
| ABA Routing No.: | 1110-0001-2 |
| Name of Account: | New York Life Insurance and Annuity Corporation |
| Account Number: | [redacted] |

# TERMS AND CONDITIONS FOR LIBERTY PREMIUM FINANCE PROGRAM FINANCING AGREEMENT AMONG LIBERTY ONE FUNDING TRUST, THE LLC AND THE INSURED

By entering into this Liberty Premium Finance Program Financing Agreement, the LLC has requested that the Funding Trust provide advances ("Advances") in the principal amounts designated in the LLC Contract and such other amounts as are provided in this Agreement. To secure the obligations of the LLC for Advances and otherwise under this Agreement, the LLC is granting the Funding Trust a pledge of each Policy and any related account and the proceeds thereof. Capitalized terms used herein without definition shall have the respective meanings assigned to such terms in Article VIII.

This Agreement shall be effective on the date of the LLC Contract except that Section 1.01 shall become effective as indicated in clause (1) below, and the entire Agreement is subject to termination as indicated in clause (2) below:

(1) If the Funding Trust, in its sole discretion, elects to advance the First-Year Premium, the date of such Advance shall be the "Interim Date", and Section 1.01(b) shall become effective on the Interim Date. If the Funding Trust, in its sole discretion, elects to consummate the transactions contemplated by the Long-Term SPIA Documents and the Funding Trust has advanced the First-Year Premium, the date that the transactions contemplated by the Long-Term SPIA Documents are consummated shall be the "Financing Date," and the entire Section 1.01 hereof shall become effective on the Financing Date.

(2) If the Policy is not issued within seven (7) calendar days of execution of the LLC Contract, the Funding Trust at its election may deliver written notice to the LLC and the Insured that this Agreement shall terminate unless the LLC and the Insured agree to any changes to this Agreement (including the LLC Contract and the Payment Formula) specified in the notice by executing a copy of the notice and returning it to the Funding Trust in the manner specified in the notice.

## ARTICLE I. ADVANCES, INTEREST AND PAYMENT TERMS

SECTION 1.01. Advances. (a) Except as otherwise provided below, the Funding Trust shall cause to be made to the LLC, and the LLC shall borrow, Advances for the purpose of funding Premiums, Monthly Payments and, at the Funding Trust's election with the consent of the Secured Party, expenses of the LLC.

(b) If elected by the Funding Trust, on the Interim Date the Funding Trust shall make an initial Advance for the First-Year Premium directly to the Insurer. If the Financing Date has not occurred by the Business Day prior to the last Business Day during the Policy Refund Period, the Funding Trust with the consent of the Secured Party shall demand payment from the LLC of an amount equal to the First-Year Premium Balance, the LLC shall pay to the Funding Trust an amount equal to the First-Year Premium Balance by the next Business Day, and the Funding Trust shall notify the LLC that this Agreement is terminated and

shall release any Collateral. If the First-Year Premium Balance is not paid by noon of such Business Day, the Secured Party may surrender the Policy to the Insurer, and apply the First-Year Premium returned by the Insurer to the payment of the First-Year Premium Balance. If the Secured Party does not demand payment of the First-Year Premium Balance and the Financing Date does not occur by the thirtieth (30th) day following the Advance Date, the Maturity Date shall occur. If the Death Date occurs following the Interim Date and prior to the Financing Date, the Maturity Date shall occur on the first to occur of (i) the fifth (5th) Business Day after the Secured Party receives the Death Benefit for all the Policies with respect to the Insured or (ii) the thirtieth (30th) day (or if such day is not a Business Day, the next-following Business Day) after the first payment of a Death Benefit by an Insurer. In the case of any Maturity Date determined pursuant to this Section, the LLC shall pay the Total Amount Due pursuant to the provisions of this Agreement.

(c) Advances for monthly Premiums shall be made directly to the Insurer with respect to each Policy on each Advance Date after the Financing Date or on such other date as the Funding Trust shall determine to be desirable to pay the Premiums. Advances for monthly Premiums shall be made on each Advance Date beginning on the Advance Date for the first monthly Premium specified in the LLC Contract until and including the last Advance Date immediately before the Policy anniversary occurring after the Insured reaches age 100 (as determined under the Policy). If a Premium Increase occurs, the Funding Trust shall increase the Advance for Premiums by the amount of the Premium Increase to the extent that the Premium Increase does not exceed the Monthly Payment, and such Monthly Payment shall be reduced by the amount of such Premium Increase. To the extent that the Premium Increase exceeds the Monthly Payment, the Funding Trust may advance the amount of such excess at its election with the consent of the Secured Party. Advances in the form of Monthly Payments, if any, shall be made to the LLC by wire transfer or electronic funds transfer to the account designated by the LLC in the LLC Contract on each Advance Date beginning on the first Advance Date and ending on the last Advance Date specified in the LLC Contract. If the Funding Trust does not have Available Funds sufficient to make in full both any Advance relating to the Premiums and any Monthly Payments and any Other Advances relating to the Other Premiums and the Other Monthly Payments, the Funding Trust shall only be obligated to make Advances to the extent of Available Funds (1) first, for the Premiums and Other Premiums, pro rata based on the respective amounts of the Premiums and the Other Premiums, and (2) then, the Monthly Payments and Other Monthly Payments, pro rata based on the respective amounts of the Monthly Payments and Other Monthly Payments.

(d) The Funding Trust, at its election with the consent of the Secured Party, may make Advances to fund expenses of the LLC.

SECTION 1.02. Interest. (a) Interest shall accrue on the aggregate principal amount of each Advance outstanding hereunder from time to time on each day from the date of such Advance to the date on which such Advance is paid in full, at a simple rate per annum equal to the higher of (1) LIBOR with respect to such Advance and the Interest Period in which such day occurs plus (i) unless clause (ii) applies, 1.75%, or (ii) for so long as any Event of Default or Event of Acceleration has occurred and is continuing, 3.75%, and (2) the Applicable Federal Rate with respect to such Advance and the Interest Period in which such day occurs. Notwithstanding anything to the contrary contained herein, in no event shall the interest rate or

rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The LLC and the Funding Trust, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then the LLC shall be liable only for the payment of such maximum as allowed by law, and any payment received from the LLC in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the amounts due hereunder to the extent of such excess or, at the option of the LLC, shall be returned to the LLC. Accrued and unpaid interest shall be payable at the end of each Interest Period at the option of the LLC (i) in cash or (ii) by the making of an Advance of principal under this Agreement to pay such accrued interest, provided, however, that all interest payable at the Maturity Date shall be payable in cash. Any failure of the LLC to pay accrued interest in cash at the end of any Interest Period shall not be an Event of Default, but shall be deemed to be a request for an Advance of principal of like amount and such Advance shall be used to pay such accrued interest. The LLC and the Insured acknowledge that the amount of the Financing Balance at the end of each Interest Period shall be readily ascertainable with certainty and shall therefore be a liquidated amount. On any date, the aggregate principal amount of all Advances plus the aggregate amount of accrued and unpaid interest shall be defined as the "Financing Balance" as of such date.

(b) For so long as the Financing Balance remains outstanding, the Funding Trust shall, as soon as possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, (i) calculate LIBOR for the related Interest Period and use the Applicable Federal Rate to make the calculations set forth above in respect of each Interest Period, (ii) determine the amount of interest payable for the related Interest Period and (iii) communicate such rates and amounts to the LLC. The Funding Trust shall specify to the LLC the quotations and basis upon which such calculations are based. Such determinations by the Funding Trust shall (in the absence of manifest error) be final and binding upon the parties hereto and their permitted assigns.

(c) The Funding Trust may perform its obligations under subsection (b) hereof directly or through an agent.

(d) The Funding Trust shall not be liable to the LLC in connection with the performance of its obligations under subsection (b) hereof in the absence of willful misconduct or gross negligence.

SECTION 1.03. Payment. (a) On the Maturity Date, the LLC shall pay to the Funding Trust the Total Amount Due to the extent it is not paid from the Death Benefit as of such date as described below. For the avoidance of doubt, if a Maturity Date Payment is due, the Total Amount Due shall be the sum of the Financing Balance plus the Maturity Date Payment. On any Advance Date, the LLC may prepay the Total Amount Due in full but not in part.

(b) No later than (i) the fifth (5th) Business Day after the Secured Party receives the Death Benefit for all Policies from all Insurers or (ii) the thirtieth (30th) day (or if such day is not a Business Day, the next-following Business Day) after the first payment of a Death Benefit by an Insurer, the Funding Trust shall, or shall cause the Secured Party to, pay to the LLC the lesser of (I) the Net Death Benefit and (II) the excess of the aggregate amount of the Death Benefits paid over the Total Amount Due to the LLC. If payment is made on the date specified in clause (ii) of the preceding sentence, within five (5) Business Days after any further Death Benefit is paid by an Insurer, the Funding Trust shall, or shall cause the Secured Party to, pay to the LLC any amount by which such payment exceeds any remaining unpaid amount of the Total Amount Due, to the extent that all payments to the LLC pursuant to this subsection (b) do not exceed the Net Death Benefit. If no Insurer pays any Death Benefit to the Secured Party, the Funding Trust shall not be liable to the LLC for the Net Death Benefit. The Secured Party shall retain the portion of the Death Benefit not paid to the LLC as provided above, and such amount retained by the Secured Party shall reduce the Total Amount Due.

SECTION 1.04. Replacement of Policy. The occurrence at any time of any of the following constitutes a "Replacement or Prepayment Event": (1) any Insurer becomes insolvent, is placed under rehabilitation or in liquidation, or an order is issued appointing a conservator, liquidator, rehabilitator, receiver or ancillary receiver as to all or any part of its assets; (2) any Policy is not in full force and effect; or (3) the rating of the Insurer issuing any Policy declines to "BBB" by S&P or the equivalent by Moody's. If a Replacement or Prepayment Event shall occur and be continuing, the Secured Party may, within sixty (60) days after the date of the occurrence of such Replacement or Prepayment Event, give written notice to the LLC stating that a Replacement or Prepayment Event has occurred. Within sixty (60) days after receipt of such notice, the LLC at its election may (1) at its expense replace each affected Policy with a Policy on terms and conditions reasonably satisfactory to the Secured Party or (2) prepay the new Total Amount Due, or any applicable ratable portion thereof with respect to each affected Policy, if the LLC has more than one Policy with respect to the Insured. If the LLC elects not to take either of the actions set forth in the immediately preceding sentence within the period specified, an Event of Default will occur under Section 6.01(2), provided that the Funding Trust's rights during the continuance thereof shall not, notwithstanding anything set forth in Section 6.03 to the contrary, include any right to specific performance. If the LLC replaces any affected Policy, the LLC and the Insured, at their expense, shall take such actions and execute such documents as may be reasonably necessary to permit the replacement and assignment of the replacement Policy pursuant to this Section 1.04. In respect of any replacement Policy, such new Policy shall be treated as an original Policy subject to the terms of this Agreement and the other Financing Documents, and the corresponding original Policy and all proceeds thereof shall be released from the pledge to the Funding Trust and its assigns, if any. The Funding Trust shall not have any obligation to make Advances or pay the Net Death Benefit with respect to any Policy that has been replaced, but instead shall make Advances and pay the Net Death Benefit with respect to the corresponding new Policy only.

SECTION 1.05. Certain Tax Matters. For all United States Federal tax purposes, it is the intent of the parties to this Agreement and all of their affiliates and beneficial owners, including the Insured, that (1) this Agreement be treated as a "split-dollar life insurance arrangement" under Treasury Regulations Section 1.61-22(b)(1), and (2) all payments made by or on behalf of the Funding Trust to the LLC pursuant to this Agreement shall be treated as "split-dollar" loans

pursuant to Treasury Regulations Section 1.7872-15(a)(2) in which the Funding Trust is treated as the lender and the LLC is treated as the borrower. The parties to this Agreement and their affiliates and beneficial owners, including the Insured, agree not to take any position for United States Federal tax purposes that is inconsistent with this intent unless required to do so by law. Pursuant to Treasury Regulations Section 1.7872-15(d)(2), the parties to this Agreement hereby represent that a reasonable person would expect that the Death Benefit will equal or exceed the Total Amount Due, and the Funding Trust, the LLC and the Insured shall make the representation in the manner required by Treasury Regulations Section 1.7872-15(d)(2)(ii) in the form attached hereto as Appendix C.

SECTION 1.06. Pledge of Collateral. The LLC hereby assigns, grants, pledges and delivers a security interest in and lien on the Collateral to the Funding Trust to secure the obligations of the LLC under this Agreement. The LLC Account is a securities account within the meaning of Section 8-501 of the GAUCC and the Funding Trust, as secured party, is the entitlement holder with respect to the LLC Account. Notwithstanding anything to the contrary set forth herein, Wells Fargo Bank's jurisdiction with respect to the LLC Account for purposes of the GAUCC is, and will continue to be for so long as the security interest created by this Financing Agreement shall be in effect, the State of Georgia. The Funding Trust may pledge, collaterally assign or grant a security interest in the right, title and interest of the Funding Trust in and to this Agreement and the other Financing Documents and its lien on the Collateral. The Funding Trust shall remain liable for all of its obligations under this Agreement, and the Secured Party shall not be liable for any obligation of the Funding Trust whether under this Agreement or otherwise. After all amounts due hereunder are repaid in accordance with this Agreement, the Funding Trust shall notify the LLC that this Agreement is terminated and shall release any Collateral. The LLC and the Insured acknowledge receipt of notice that, if the Interim Date occurs, the Funding Trust shall have pledged its rights under this Agreement and the other Financing Documents and its lien on the Collateral to Wells Fargo Bank, N.A., as trustee or custodian, and that such trustee or custodian will on such date be the Secured Party.

SECTION 1.07. Investments. The Secured Party shall invest funds on deposit in the LLC Account in the Service Class Shares of the Wells Fargo 100% Treasury Money Market Fund, or if such money market fund is no longer available, in such other money market fund as shall be mutually agreed by the Secured Party and the LLC. Neither the Secured Party nor Wells Fargo Bank shall bear any responsibility or liability for any losses resulting from investment or reinvestment of any funds in accordance with this Section.

SECTION 1.08. Total Amount Due. The Payment Formula attached hereto as Appendix D sets forth the agreement of the parties with respect to calculations for determining the Total Amount Due, the Financing Balance and the Maturity Date Payment. Within thirty (30) days of each anniversary of the date of this Agreement, the Funding Trust shall provide to the LLC a statement setting forth what the Total Amount Due would have been if the Death Date had occurred on the date of such anniversary.

**ARTICLE II.**
**CONDITIONS PRECEDENT**

SECTION 2.01. Interim Date Conditions. Section 1.01(b) hereof shall become effective if the Funding Trust in its sole discretion makes a determination to advance to the LLC by payment to the Insurer the First-Year Premium. Without derogating from the Funding Trust's discretion, the Funding Trust will not make such Advance unless each of the following conditions precedent has been satisfied or waived by the Funding Trust:

(1) The Funding Trust has received a complete Closing Package; and

(2) As of the Interim Date, the representations and warranties of the LLC and the Insured in this Agreement and the other Financing Documents delivered to such date shall be accurate and complete in all material respects as if made on such date.

SECTION 2.02. Financing Date Conditions. The obligation of the Funding Trust under Section 1.01 to make any Advance in addition to the initial Advance for the First-Year Premium shall become effective if the Funding Trust has advanced the First-Year Premium and each of the following conditions precedent has been satisfied or waived by the Funding Trust:

(1) The transactions contemplated by the Long-Term SPIA Documents shall have been consummated on terms and conditions satisfactory to the Funding Trust in its sole discretion;

(2) As of the Financing Date, the representations and warranties of the LLC and the Insured in this Agreement and the other Financing Documents shall be accurate and complete in all material respects as if made on such date; and

(3) Execution and delivery by the LLC and the Insured of the bring-down certificate described in Item (16) of the Closing Package.

SECTION 2.03. Termination. If the LLC does not deliver a complete Closing Package within thirty (30) calendar days after the date of this Agreement, or if the Interim Date does not occur within thirty (30) calendar days after the delivery to the Funding Trust of a complete Closing Package by the LLC, the Funding Trust shall not have any other obligation to the LLC or the Insured under this Agreement. The Funding Trust shall have no duty or obligation to cause the Interim Date or the Financing Date to occur.

**ARTICLE III.**
**REPRESENTATIONS AND WARRANTIES OF THE LLC AND THE INSURED**

SECTION 3.01. LLC. The LLC represents and warrants to the Funding Trust, as of the date hereof, the Interim Date and the Financing Date, or on the dates otherwise specified below, as follows:

(a) Organization. The LLC is duly organized and validly existing under the laws of the State of Georgia, is authorized to do business in the State of Georgia, and has all

necessary right, title, power and authority to enter into this Agreement and the other Financing Documents to which the LLC is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the LLC of this Agreement and the other Financing Documents to which the LLC is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all required action, corporate or otherwise, on the part of the LLC.

(b) Execution. This Agreement has been, and as of the Interim Date the other Financing Documents to which the LLC is a party have been, duly executed and delivered by the LLC, and (assuming due authorization, execution and delivery by the Funding Trust) this Agreement and such other Financing Documents constitute or as of the Interim Date will constitute legal, valid and binding obligations of the LLC, enforceable against the LLC in accordance with their terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application (regardless of whether such principles are considered in a proceeding in equity or at law)).

(c) No Conflict. The execution and performance by the LLC of this Agreement and the other Financing Documents to which it is a party do not and will not (1) violate, conflict with or result in the breach of any provision of its constitutive documents, (2) conflict with or cause a violation by the LLC of any Law or Governmental Order applicable to it or to any of its assets, properties or business or (3) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment or acceleration pursuant to any Contract to which the LLC is a party.

(d) Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the LLC that has not been obtained or is not in full force and effect, and no registration, declaration, or filing with any Governmental Authority is required to be given or made by the LLC to or with, any Governmental Authority that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

(e) No Event of Default; Compliance and Litigation. No Event of Default, or event which with notice or passage of time would become an Event of Default, has occurred and is continuing. The LLC is not in violation of any Law or Governmental Order applicable to it or any of its properties or assets. No judicial, administrative or arbitral proceeding is pending or, to the best knowledge of the LLC, threatened against the LLC.

(f) Policy. (i) On the Interim Date and the Financing Date, the LLC has or will have full, complete and absolute title to and ownership of, and is or will be the sole and duly designated beneficiary under, each Policy and all rights thereunder free and clear of any Encumbrances, options, purchase rights or commitments of any kind except as otherwise

contemplated by the Financing Documents. Under the terms of each Policy, the LLC has or will have the sole and absolute right to (1) change the beneficiary of such Policy, (2) elect settlement options available under such Policy, (3) assign, transfer, sell or surrender such Policy, (4) borrow against such Policy, (5) pledge or assign such Policy as collateral, (6) apply for and maintain waiver of premium or conversion of such Policy, (7) exercise any right regarding nonforfeiture, amendment or voting, (8) be notified about any and all matters relating to such Policy as to which the owner and beneficiary thereof should be notified, and (9) receive all proceeds and other amounts now or in the future due and payable under such Policy, including all death benefits, surrender value, dividends, options, benefits or advantages claimed from such Policy. On the Interim Date and the Financing Date, no Person other than the LLC will have any interest in or claim to any Policy other than as expressly provided in this Agreement. On the date of the Policy's issuance, the LLC and the member of the LLC had or will have an insurable interest in the life of the Insured under applicable Georgia law.

(ii) After the first Premium is paid with respect to each Policy and for so long as Premiums with respect to such Policy continue to be paid, such Policy will be in full force and effect and constitute the legal, valid and binding obligation of the applicable Insurer, enforceable in accordance with its terms, subject to the terms of the collateral assignment of such Policy given by the LLC to the Funding Trust.

(iii) The copies of each Policy, financial information, policy information, premium schedules, in-force illustrations and the other documentation included or to be included in the Closing Package are or will be true and correct copies of each Policy and such other documentation, and no amendments or other modifications have been made to any of the foregoing that are not or will not be included in the Closing Package, nor is the LLC aware of any material documentation in connection with the negotiation, purchase and administration of each Policy a copy of which is not or will not be included in the Closing Package.

(iv) All of the material information provided by the LLC or which the LLC caused to be provided by any Person to the Funding Trust or any insurer, reinsurer, insurance agent or medical underwriters in connection with the issuance of any Policy, this Agreement or any other Financing Document is complete and accurate in all material respects as of the date when delivered, including the information contained in the Closing Package.

(v) Other than this Agreement, each Policy and the other agreements in the Closing Package to which it is a party, the LLC is not a party to any Contract. The copies of the certificate of organization and operating agreement for the LLC included in the Closing Package are true and correct copies, and no amendments or other modifications have been made thereto that are not included in the Closing Package.

(g) Independent Decision. The Manager and/or Special Manager of the LLC have read and understand, and the LLC has signed or caused to be signed by the appropriate Persons (other than the Funding Trust), each document in the Closing Package. The Manager and/or Special Manager of the LLC have consulted with and received advice from attorneys, accountants and tax or other financial advisors of their choosing, have considered other options for financing the Policy, and have satisfied themselves that entering into this Agreement and the other Financing Documents and consummating the transactions contemplated by this Agreement

and the other Financing Documents is in the best interest of the LLC. The LLC acknowledges that it has had this Agreement and the other Financing Documents for an amount of time sufficient to thoroughly analyze, discuss and receive advice from any professionals or anyone else of its choosing.

(h) No Competency Proceedings. The Insured is not now, nor has ever been, the subject of any mental health or mental competency proceedings or any other proceedings or hearings with respect to which the Insured's competency or capacity to contract is or was an issue, nor is any such proceeding, hearing, appointment or service pending, threatened or contemplated.

(i) No Illness. The Insured does not have a catastrophic or life-threatening illness or condition that has not been disclosed previously in the Policy application materials or in the Closing Package.

SECTION 3.02. Insured. The Insured hereby represents and warrants to the Funding Trust, as of the date hereof, the Interim Date and the Financing Date, as follows:

(a) Residence. The Insured is an individual residing in the state designated in the LLC Contract.

(b) Execution. This Agreement and the other Financing Documents to which the Insured is a party have been duly executed and delivered by the Insured, and (assuming due authorization, execution and delivery by the Funding Trust and the LLC, as applicable) this Agreement and such other Financing Documents constitute legal, valid and binding obligations of the Insured, enforceable against the Insured in accordance with their terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application (regardless of whether such principles are considered in a proceeding in equity or at law)).

(c) No Conflict. The execution, delivery and performance by the Insured of this Agreement and the other Financing Documents to which it is a party do not and will not (1) to the knowledge of the Insured, conflict with or cause a violation by the Insured of (A) any Law or Governmental Order of the Insured's state of residence applicable to the Insured or to any of the Insured's assets, properties or business or (B) to the knowledge of the Insured, any other Law or Governmental Order applicable to the Insured or to any of the Insured's assets, properties or business or (2) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment or acceleration pursuant to any Contract to which the Insured is a party.

(d) Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the Insured that has not been obtained or is not in full force and effect, and no registration, declaration, or filing with any Governmental Authority is required to be given or made by the Insured to or with, any Governmental Authority

that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

(e) No Event of Default. No Event of Default described in clause (1), (3) or (5) of Section 6.01 with respect to the Insured, or event which with notice or passage of time would become such an Event of Default, has occurred and is continuing.

(f) Policy. The Insured does not have any knowledge that any representation made by the LLC in Section 3.01(f)(i) to (iii) is false or misleading. All of the material information provided by the Insured or which the Insured caused to be provided by any Person to the Funding Trust or any insurer, reinsurer, insurance agent or medical underwriters in connection with the issuance of any Policy, this Agreement or any other Financing Document is complete and accurate in all material respects as of the date when delivered, including the information contained in the Closing Package.

(g) Independent Decision. The Insured has read, understands, and has signed or caused to be signed by the appropriate Persons (other than the Funding Trust) each document in the Closing Package. The Insured has sought and obtained his or her own tax, accounting, financial and legal advice with respect to this Agreement and any obligations that the Insured will incur or undertake thereunder, and is relying solely upon his or her own tax, accounting, financial, legal and other advisers in his or her decision to enter into this Agreement and any related transactions. The Insured has considered other alternatives for financing the Policy, and has satisfied himself or herself that entering into this Agreement and the other Financing Documents and consummating the transactions contemplated by this Agreement and the other Financing Documents is in his or her best interest. The Insured acknowledges that he or she has had this Agreement and the other Financing Documents for an amount of time sufficient to thoroughly analyze, discuss and receive advice from any professionals or anyone else of his or her choosing.

(h) No Competency Proceedings. The Insured is not now, nor has ever been, the subject of any mental health or mental competency proceedings or any other proceedings or hearings with respect to which the Insured's competency or capacity to contract is or was an issue, nor is any such proceeding, hearing, appointment or service pending, threatened or contemplated.

(i) No Illness. To the Insured's knowledge, the Insured does not have a catastrophic or life-threatening illness or condition that has not been disclosed previously in the Policy application materials or in the Closing Package.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE FUNDING TRUST

The Funding Trust hereby represents and warrants to the LLC and the Insured, as of the date hereof, the Interim Date and the Financing Date, as follows:

SECTION 4.01. Funding Trust. The Funding Trust is a Delaware statutory trust which is duly organized, validly existing and in good standing under the laws of the State of Delaware and is authorized to do business in the State of Georgia. It has all necessary power and authority to enter into this Agreement and any Financing Document to which it is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Funding Trust of this Agreement and any Financing Document to which it is a party, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all required action on the part of the Funding Trust.

SECTION 4.02. Execution. This Agreement and any Financing Document to which the Funding Trust is a party have been duly executed and delivered by the Funding Trust, and (assuming due authorization, execution and delivery by the other parties thereto) this Agreement and such Financing Documents constitute legal, valid and binding obligations of the Funding Trust, enforceable against the Funding Trust in accordance with their terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

SECTION 4.03. No Conflict. The execution, delivery and performance of this Agreement and any Financing Document to which it is a party by the Funding Trust do not and will not (1) violate, conflict with or result in the breach of any provision of its constitutive documents, (2) conflict with or violate any Law or Governmental Order applicable to it or to any of its respective assets, properties or businesses or (3) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of any Contract to which the Funding Trust is a party.

SECTION 4.04. Consents. No authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority is required to be obtained by the Funding Trust that has not been obtained or is not in full force and effect, and no registration, declaration, or filing with any Governmental Authority, domestic or foreign, is required to be given or made by the Funding Trust, or any of its affiliates to, or to be made by the Funding Trust, or any of its affiliates with, any Governmental Authority that has not been given or made or the applicable waiting period for which has not expired or terminated, each in connection with the execution and delivery of this Agreement and the other Financing Documents and the consummation of the transactions contemplated hereby and thereby.

## ARTICLE V.
## COVENANTS OF THE LLC AND THE INSURED

SECTION 5.01. Covenants of LLC. For so long as any amounts remain owing by the LLC to the Funding Trust under this Agreement, the LLC hereby covenants and agrees as follows:

(a) Subject to the Funding Trust complying with its obligations under Section 7.01, the LLC shall take such further action and/or execute and deliver all further assurances, documents and/or instruments as may be reasonably requested by the Funding Trust in order to (1) effect and protect the collateral assignment of each Policy to the Funding Trust and its assigns, (2) permit the purchase of each SPIA and its pledge to the Secured Party, (3) notify the Funding Trust upon having knowledge of the Insured's death, (4) effect, administer or enforce the transactions contemplated by this Agreement and the other Financing Documents to which the LLC is a party, (5) execute any documents requested by the Funding Trust to submit to the Insurer for payment of the Death Benefit, and (6) authorize the provision and/or delivery of medical, financial, personal and other information and documentation about the Insured to the Funding Trust, any affiliate of the Funding Trust, any of their assigns, or any Insurer from any physician, hospital, medical provider, insurance company or other Person with respect to the Insured.

(b) The LLC agrees to notify the Funding Trust in writing of any change of (1) the LLC's address, telephone number or other contact information or (2) the Insured's address, telephone number or other contact information. The LLC acknowledges that the Funding Trust will be verifying the LLC's and the Insured's current addresses, contact information and other relevant information by sending the LLC correspondence with a prepaid return response from time to time. The LLC covenants and agrees that it shall accurately complete and manually execute each such response and return the same to the Funding Trust and/or its designees in a timely manner.

(c) If the LLC receives proceeds derived or to be derived from any Policy other than from the Secured Party, it shall (1) hold such proceeds for the benefit of the Funding Trust and its assigns, (2) immediately notify the Secured Party of such receipt, (3) immediately transfer, convey and pay over such proceeds to the Secured Party and (4) take any and all actions reasonably requested by the Secured Party, at the expense of the Funding Trust, in order to change the payment instructions with respect to such Policy such that proceeds therefrom are payable directly to the Funding Trust or any person designated in writing by the Funding Trust.

(d) The LLC shall remain duly organized, validly existing and in good standing under the law of the State of Georgia, shall keep its principal place of business in the State of Georgia, and shall not change its form of organization, amend its certificate of organization or operating agreement or permit an Encumbrance to any Policy or the other LLC Assets (except as contemplated by this Agreement) without the consent of the Secured Party.

SECTION 5.02. Covenants of Insured. For so long as any amounts remain owing by the LLC to the Funding Trust under this Agreement, the Insured hereby covenants and agrees as follows:

(a) Subject to the Funding Trust complying with its obligations under Section 7.01, the Insured shall take such further action and/or execute and deliver all further assurances, documents and/or instruments as may be reasonably requested by the Funding Trust to effectuate the purpose of this Agreement and the other Financing Documents, including to (1) permit the purchase of each SPIA and its pledge to the Secured Party, and (2) authorize the provision and/or delivery of (i) medical information and documentation about the Insured and (ii) during the contestability period for any Policy, financial, personal and other information and documentation with respect to the Insured, to the Funding Trust, any affiliate of the Funding Trust, any of their assigns, or any Insurer from any physician, hospital, medical provider, insurance company or other Person.

(b) The Insured agrees to notify the Funding Trust in writing of any change of his or her address, telephone number or other contact information. The Insured understands that the Funding Trust will be verifying his or her current address, contact information and other relevant information by sending the Insured correspondence with a prepaid return response from time to time. The Insured covenants and agrees that he or she shall accurately complete and manually execute each such response and return the same to the Funding Trust and/or its designees in a timely manner.

## ARTICLE VI.
## EVENTS OF DEFAULT AND EVENTS OF ACCELERATION

SECTION 6.01. Events of Default. The occurrence at any time of any of the following events constitutes an "Event of Default":

(1) Failure by the LLC or the Insured to perform in any material respect any of its obligations (other than Section 1.04) under this Agreement or any Financing Document to which either is a party if such failure is not remedied on or prior to the thirtieth (30th) day after written notice of such failure is given to the LLC and the Insured by the Funding Trust;

(2) Failure by the LLC to elect to replace any Policy or prepay any applicable portion of the Total Amount Due within sixty (60) days of its receipt of notice of the occurrence of a Replacement or Prepayment Event as set forth in Section 1.04;

(3) A representation or warranty by the LLC or the Insured under this Agreement or any Financing Document to which either is a party is incorrect or misleading in any material respect when made or deemed to be made;

(4) The LLC is dissolved or liquidated, is unable to pay its debts as they mature, makes an assignment for the benefit of creditors, is adjudicated a bankrupt or insolvent, seeks appointment of, or is subject of an order appointing, a trustee, conservator, liquidator or receiver as to all or part of its assets, commences, approves or consents to, or is the debtor in, any case or proceeding under any

bankruptcy, reorganization or similar law and, in the case of an involuntary case or proceeding, such case or proceeding is not dismissed thirty (30) days following its commencement, or is the subject of an order for relief in an involuntary case under federal bankruptcy law; or

(5) The Insured commits suicide, as determined by the Insurer, within two (2) years of the issuance of the Policy.

SECTION 6.02. Event of Acceleration. If at any time Available Funds are not sufficient to pay the Premiums due for each Policy covered by this Agreement and any Other Financing Agreements, the occurrence of such event shall constitute an "Event of Acceleration."

SECTION 6.03. Remedies. If any Event of Default or Event of Acceleration shall occur and be continuing, then automatically in the case of an Event of Default described in clause (4) of Section 6.01 and otherwise at the election of the Secured Party, the Total Amount Due shall become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by the LLC. Upon the occurrence and during the continuance of an Event of Default or Event of Acceleration, the Funding Trust shall not have any obligation to make any additional Advances hereunder, but may, at the election of the Funding Trust with the consent of the Secured Party, continue to make Advances of the Monthly Payments or of the Premiums. Upon the occurrence and during the continuance of an Event of Default or Event of Acceleration, in addition to any other rights under this Agreement and any other Financing Documents or otherwise available at law or in equity, the Funding Trust and its assigns shall have all the rights and remedies of a secured party on default under the law of the State of Georgia and other applicable law to enforce the assignments and security interests contained in the Financing Documents, including the right, subject to compliance with any mandatory requirements under applicable law, to sell or apply any rights and other interests assigned or pledged in the Financing Documents at public or private sale.

## ARTICLE VII.
## GENERAL PROVISIONS

SECTION 7.01. Expenses. Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses unless, at any time after the Financing Date, the Funding Trust elects in its sole discretion to pay the costs and expenses of any other party hereto, *provided*, *however*, that any party that is in default in the performance or observance of its duties and obligations hereunder shall indemnify the other party hereto for the reasonable costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred by such other party in enforcing this Agreement against such defaulting party. This Section 7.01 shall survive the payments of all other amounts due hereunder.

SECTION 7.02. Confidentiality. (a) The Funding Trust agrees (1) not to use or disclose Consumer Information except as necessary, in the opinion of the Funding Trust, to secure funding for its obligations under this Agreement or the other Financing Documents or to effect,

administer or enforce the transactions contemplated by this Agreement, the other Financing Documents, the SPIA Documents, and any other agreements entered into in connection therewith, including, without limitation, the sale or exercise of rights under any Policy or SPIA, and (2) to keep Consumer Information confidential and limit access to such information to those Persons who, in the Funding Trust's reasonable discretion, require access to such information to effect, administer or enforce the transactions contemplated by this Agreement, the other Financing Documents, the SPIA Documents, and any other agreements entered into in connection therewith, including, without limitation, the sale or the exercise of rights under any Policy.

(b) Each of the LLC and the Insured agrees not to use or disclose any Financing Documents or SPIA Documents or any information or data related thereto except to its counsel, financial advisors, internal and external auditors and accountants advising the LLC or the Insured with respect to the transaction contemplated thereby or to the members of the LLC or family members of the Insured, in each case, provided that the third party agrees to no use or disclosure thereof, except on the same terms and subject to the same limitations.

(c) Nothing in this Section 7.02 shall prohibit disclosure of information that is required by any Law or regulation, or in response to legal process or to the extent that it may otherwise have become publicly available without the fault of the person proposing to disclose. In addition, notwithstanding anything herein to the contrary, in accordance with section 1.6011-4(b)(3)(iii) of the United States Treasury Regulations, the parties (and each employee, representative, or other agent of any party) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to the parties relating to such tax treatment and tax structure.

SECTION 7.03. Survival of Representations and Warranties. The representations and warranties of the LLC and the Insured contained in Article III hereof, and the representations and warranties of the Funding Trust contained in Article IV, shall survive the Financing Date.

SECTION 7.04. Notices. All notices, requests, claims, demands and other communications required or permitted to be given hereunder shall be in writing, shall be given to the LLC, Insured, Funding Trust and Secured Party and shall be delivered by hand or telecopied or sent by reputable overnight courier service and shall be deemed given when so delivered by hand or telecopied (with proof of transmission), or one (1) Business Day after being sent by reputable overnight domestic courier service and five (5) Business Days after being sent by reputable overnight international courier service. All such notices, requests, claims, demands and other communications shall be addressed as set forth in the LLC Contract with respect to the LLC and the Insured, and otherwise as set forth below, or pursuant to such other instructions as may be designated in writing to the other party in accordance with this Section 7.04.

Funding Trust

Liberty One Funding Trust
c/o Wells Fargo Bank, N.A., as Georgia Trustee
400 Northridge Road, Suite 600
Atlanta, Georgia 30350
Attention: Corporate Trust Services
Phone: 678-795-8132
Fax: 770-992-4720

With copies to:

Potter Anderson & Corroon LLP
1313 North Market Street, Sixth Floor
Wilmington, DE 19801
Attn: Scott E. Waxman
Fax: 302-778-6114

Secured Party

Wells Fargo Bank, N.A.
919 N. Market Street, Suite 700
Wilmington, DE 19801
Attention: Corporate Trust Administration
Fax: 302-575-2006

With a copy to:

Potter Anderson & Corroon LLP
1313 North Market Street, Sixth Floor
Wilmington, DE 19801
Attn: Scott E. Waxman
Fax: 302-778-6114

SECTION 7.05. Severability. The provisions of this Agreement shall be severable. If any provision hereof is held to be invalid, void or otherwise unenforceable, the remaining provisions shall remain in full force and effect to the fullest extent permitted by law.

SECTION 7.06. Entire Agreement. This Agreement and the other Financing Documents to which the Insured or LLC are parties constitute the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Funding Trust, the LLC and the Insured with respect to the subject matter hereof.

SECTION 7.07. Assignment. The LLC and the Insured may not assign this Agreement, or any of their rights, duties or obligations hereunder, without the prior written consent of the Secured Party. The Funding Trust may assign or pledge its rights and obligations under this Agreement and the other Financing Documents to any Person from time to time in its sole

discretion, including without limitation as provided in Section 1.06; provided that the Funding Trust shall remain liable to the Insured and the LLC for all of its obligations under this Agreement and the other Financing Documents.

SECTION 7.08. Third Party Beneficiaries. Except as otherwise expressly provided herein to the contrary, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and the Secured Party, and their permitted assigns, and nothing herein is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 7.09. Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 7.10. Amendments. No amendment, waiver, modification or supplement of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Funding Trust and the LLC, provided that no amendment, waiver, modification or supplement of any provision of this Agreement that affects the rights or obligations of the Insured hereunder shall in any event be effective until approved in writing by the Insured and then any such amendment, waiver, modification, supplement or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 7.11. Dispute Resolution. (a) All controversies or disputes arising out of or in connection with this Agreement ("Disputes") shall be resolved pursuant to this Section 7.11.

(b) All Disputes shall in the first instance be discussed amicably between the parties with a view to resolving such Dispute, commencing upon one party giving other parties written notice of such Dispute. In the event that such Dispute is not resolved within thirty (30) days after such notice (or such longer period as the parties may agree in writing with respect to any such Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Rules by a panel of three arbitrators sitting in Atlanta, Georgia. One arbitrator shall be nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties, and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Fulton County, Georgia, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this Section 7.11 and, to the fullest extent permitted by law, waive

any objection which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in an inconvenient forum.

(c) In any arbitral proceeding arising under this Agreement, the parties agree that they will engage in cooperative discovery, to be supervised by the arbitral tribunal. In its discretion, the tribunal may order the exchange of documents in the custody or control of parties to this Agreement, and may order a limited number of party depositions of one (1) day's duration each if requested by the opposing party and if the tribunal finds that such depositions would contribute to the efficient development of evidence.

SECTION 7.12. Governing Law. This Agreement shall be governed by, and construed in accordance with, the local law of the State of Georgia (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said law.

SECTION 7.13. Limitation on Insured Liability. The Insured shall be liable for damages for any misrepresentation made by him or her in Section 3.02, and for any default by him or her in the performance of any of his or her obligations under Article V and Section 7.01 but otherwise shall have no liability hereunder, including, without limitation, no liability for the payment of the Total Amount Due.

SECTION 7.14. Limitation on Liability of Trustees and Manager. In no event shall the trustees of the Funding Trust be liable to any Person for the representations and obligations of the Funding Trust under any Financing Document. In no event shall the manager of the LLC be liable to any Person for the representations and obligations of the LLC under any Financing Document.

## ARTICLE VIII.
## DEFINED TERMS

SECTION 8.01. Definitions. Terms used in this Agreement shall be as defined in this Section 8.01. Whenever the word "Other" is inserted before a defined term, it refers to such term as used in other financing agreements which have terms and conditions substantially similar to the Terms and Conditions of this Agreement.

"**Advance**" has the meaning set forth in the preamble to the Terms and Conditions.

"**Advance Date**" means the 18th day of each month, or, if such date is not a Business Day, the next succeeding Business Day.

"**Agreement**" means this Liberty Premium Finance Program Financing Agreement, consisting of the LLC Contract and the Terms and Conditions, and including all the exhibits and appendices thereto.

"**Applicable Federal Rate**" means for any Interest Period the short-term federal rate for monthly compounding as determined by the Funding Trust in accordance with Section

1274(d)(1) of the Internal Revenue Code of 1986, as amended, and the revenue ruling publishing such rate for the calendar month which includes the first day of such Interest Period.

**"Available Funds"** means payments received on behalf of the Funding Trust or its affiliates or their collateral assignees from the SPIAs purchased under the SPIA Documents or the Other SPIAs purchased under the Other SPIA Documents and in connection with Other Financing Agreements, after any Secured Party Fees have been paid from such payments.

**"Business Day"** means a day of the year other than a Saturday or Sunday on which (i) commercial banks in New York City or Atlanta, Georgia are not authorized or required to be closed and (ii) dealings in dollar deposits are carried on in the London interbank market.

**"Closing Package"** means, collectively, the agreements, instruments, certificates, reports and documents included in Appendix A to this Agreement.

**"Collateral"** means the Policy and any and all additions, renewals and supplementary contracts issued in connection therewith, the LLC Account, and all funds, financial assets, securities entitlements and other property from time to time credited thereto and the proceeds of any of the foregoing

**"Consumer Information"** means non-public medical, financial and personal information about the LLC and the Insured (including the identity of the LLC or the Insured, or the identity of a family member or friend thereof).

**"Contract"** means any contract, agreement, lease, sublease, license, note, bond, mortgage or indenture, permit, franchise, insurance policy or other instrument, whether written or oral.

**"Death Benefit"** means the amount paid by any Insurer upon the death of the Insured under the terms of any Policy.

**"Death Date"** means the date on which the Insured dies.

**"Dispute"** has the meaning specified in Section 7.11 hereof.

**"Encumbrance"** means any security interest, pledge, mortgage, lien (including, without limitation, environmental and tax liens), charge, encumbrance, adverse claim, preferential arrangement or restriction of any kind, including, without limitation, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

**"Event of Acceleration"** means the event specified as such in Section 6.02 hereof.

**"Event of Default"** means any event specified as such in Section 6.01 hereof.

**"Financing Balance"** has the meaning set forth in Section 1.02 hereof.

**"Financing Date"** has the meaning set forth in the preamble hereof.

"**Financing Documents**" means this Agreement and all agreements and other instruments required to be executed in the Closing Package, as any of the foregoing may be amended from time to time.

"**First Interim Date**" means the first to occur of the Interim Date or any Other Interim Date.

"**First-Year Premium**" means the premiums required to be paid for any Policy to keep such Policy in force for twelve months following the date of inception of such Policy.

"**First-Year Premium Balance**" means the amount of the First-Year Premium, plus interest accrued thereon from the Advance Date to the date of payment, at a rate determined pursuant to Section 1.02 hereof.

"**Funding Trust**" has the meaning specified in the preamble to the LLC Contract.

"**GAUCC**" means the Georgia Uniform Commercial Code, as in effect on the date of the LLC Contract.

"**Governmental Authority**" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or administrative ruling or award entered by or with any Governmental Authority.

"**Insured**" means the insured designated in the LLC Contract.

"**Insurer**" means each life insurer designated in the LLC Contract.

"**Interest Period**" has the meaning specified in Appendix B.

"**Interim Date**" has the meaning specified in the preamble hereof.

"**Interim SPIA Documents**" means the documents executed and delivered in connection with the interim financing of the purchase of the SPIAs.

"**Law**" means any federal, national, supranational, state, provincial or local statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including, without limitation, common law).

"**LIBOR**" has the meaning specified in Appendix B.

"**LIBOR Determination Date**" has the meaning specified in Appendix B.

"**LLC**" has the meaning set forth in the LLC Contract.

**"LLC Account"** has the meaning set forth in the LLC Contract.

**"LLC Assets"** means all the assets of the LLC including, without limitation, all Policies, cash, accounts, chattel paper, general intangibles, documents, instruments and other assets and property, and all replacements, proceeds and products of the foregoing, wherever located, whether now or hereafter acquired.

**"LLC Contract"** means the Liberty Premium Finance Program Financing Agreement exclusive of the Terms and Conditions.

**"Long-Term SPIA Documents"** means the documents executed and delivered in connection with the long-term financing of the purchase of the SPIAs and the Other SPIAs.

**"Maturity Date"** means the first to occur of (1) the fifth (5th) Business Day after the Secured Party has received the Death Benefit for all of the Policies with respect to the Insured, (2) the thirtieth (30th) day (or if such day is not a Business Day, the next-following Business Day) after the first payment of a Death Benefit by an Insurer, (3) the date of acceleration of the Total Amount Due pursuant to Section 6.03 hereof, (4) the date specified in Section 1.01(b) hereof or (5) the sixtieth (60th) day after the Death Date if a Death Benefit has not been received for any Policy.

**"Maturity Date Payment"** means an amount calculated based on the Payment Formula to compensate the Funding Trust and its affiliates for certain losses that may be incurred by the Funding Trust and its affiliates if the Insured dies prior to his or her life expectancy or if payment is accelerated pursuant to Section 6.03 hereof.

**"Monthly Payment"** means the amount, if any, specified in the LLC Contract (subject to reduction pursuant to Section 1.01 of this Agreement).

**"Moody's"** means Moody's Investors Service, Inc. or its successor.

**"Net Death Benefit"** means an amount equal to the Death Benefit paid by all of the Insurers under the Policies less the Total Amount Due.

**"Payment Formula"** has the meaning specified in Section 1.08 hereof.

**"Person"** means any individual, partnership (whether general or limited), corporation (including a business trust), joint stock company, limited liability company, trust, estate, association, custodian, nominee, joint venture or other entity, or a government or any political subdivision or agency thereof.

**"Policy"** means each universal life insurance policy designated in the LLC Contract and not replaced or removed pursuant to this Agreement, and any applications, riders, endorsements, supplements, amendments and other documents that modify or otherwise affect the terms and conditions of such policy, and any proceeds thereof.

"**Policy Refund Period**" means the shortest period of time during which any of the Policies for an Insured may be surrendered and the Insurer will return the First-Year Premium.

"**Premium**" means the monthly premium for any Policy.

"**Premium Increase**" means the amount by which the level Premium needed to maintain the Death Benefit under a Policy at the same amount as on the Financing Date for the remainder of the life of the Insured shall have increased during the term of such Policy.

"**Reference Banks**" has the meaning specified in Appendix B.

"**Reference Dealers**" has the meaning specified in Appendix B.

"**Replacement or Prepayment Event**" means any event specified in Section 1.04 hereof.

"**Rules**" means the Commercial Arbitration Rules of the American Arbitration Association.

"**Secured Party**" means (1) initially, and if the pledge referred to in clause (2) is not in effect, the Funding Trust, and (2) beginning on the Interim Date, as a result of the pledge referred to in Section 1.06 and for so long as such pledge is in effect, Wells Fargo Bank, N.A., as trustee or custodian, and its successors and assigns (to the exclusion of the Funding Trust while such pledge is in effect).

"**Secured Party Fees**" means any fees or expenses paid to the Secured Party as defined in clause (2) of the definition, and any affiliates of such Secured Party, acting as a bank, securities intermediary, manager, trustee, custodian or indenture trustee, or in any similar capacity, in connection with any transactions contemplated by the Financing Documents or the SPIA Documents.

"**SPIA**" means each single premium immediate annuity over the life of the Insured purchased by the Funding Trust or an affiliate thereof and any applications, riders, endorsements, supplements, amendments and all other documents that modify or otherwise affect the terms and conditions thereof.

"**SPIA Documents**" means the Interim SPIA Documents and the Long-Term SPIA Documents.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or its successors.

"**Terms and Conditions**" means the Terms and Conditions incorporated into the LLC Contract.

"**Total Amount Due**" means (1) if payment of the Advances is due after the death of the Insured, the amount determined on the Death Date by the procedures set forth in the

Payment Formula and (2) if payment of the Advances is due or the Advances are prepaid prior to the death of the Insured, the amount determined pursuant to clause (1) as if the Insured had died and the Death Benefit had been received on the date when such payment becomes due.

**"Wells Fargo Bank"** means Wells Fargo Bank, N.A., a national banking association in its capacity as securities intermediary with respect to the LLC Account.

## APPENDIX A

Closing Package

The LLC shall have delivered to the Funding Trust the following:

(1) Authorization for Release and Use of Medical and/or Insurance Information Form from the Insured;

(2) Irrevocable and Durable Limited Power of Attorney signed by the Insured permitting the Funding Trust to review and receive copies of all records protected by the federal Health Insurance Portability and Accountability Act of 1996;

(3) Insured's Consent Form;

(4) Authorization and Direction to Provide Death Certificate Form from Insured;

(5) Acknowledgment and Agreement of the LLC and the Insured with Respect to Certain Financial Matters;

(6) A statement from the Insured's accountant and/or financial advisor certifying that the Insured's net worth is not less than $5 million;

(7) A copy of the Insured's driver's license or other proof of the Insured's age and sex reasonably satisfactory to the Funding Trust, in either case certified by the Insured;

(8) Power of attorney signed by LLC permitting the Funding Trust or its designee to submit documents to the Insurer for payment of the Death Benefit;

(9) The certificate of organization and the operating agreement of the LLC including any modifications or supplements thereto;

(10) The original, or a copy certified by the Insured, the LLC or the agent of record on the Policy, of each Policy and related financial information, policy information and premium schedules;

(11) An acknowledgment for each Policy from each applicable Insurer that the LLC is the sole recorded owner of and duly designated beneficiary under such Policy;

(12) A collateral assignment by the LLC of each Policy in form and substance reasonably satisfactory to the Funding Trust;

(13) Written acknowledgment from each applicable Insurer of the collateral assignment of each Policy by the LLC to the Funding Trust;

(14) A collateral assignment by the Funding Trust, acknowledged by the LLC if requested by any Insurer, pursuant to which the Funding Trust collaterally assigns its lien on each Policy directly or indirectly to the Secured Party;

(15) Sales illustration for each Policy, in form reasonably satisfactory to the Funding Trust, generated by each applicable Insurer;

(16) An opinion of counsel to the Insured and the LLC in a form reasonably acceptable to the Funding Trust;

(17) A bring-down certificate of the Insured and the LLC stating that the representations and warranties made by them in this Agreement and the other Financing Documents are accurate and complete in all material respects as of the Interim Date or the Financing Date, as applicable; and

(18) Completed SPIA application forms reasonably acceptable to the Funding Trust and signed by the Insured.

## APPENDIX B

LIBOR Formula

With respect to each Interest Period, "**LIBOR**" will be determined by the Funding Trust in accordance with the following provisions:

(i) LIBOR for any Interest Period shall equal the offered rate, as determined by the Funding Trust, for Dollar deposits of one month, or twelve months, with respect to the initial Advance, that appears on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, as of 11:00 a.m. (London time) on the applicable LIBOR Determination Date.

(ii) If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (or such other page as may replace such Telerate Page 3750 for the purpose of displaying comparable rates), as reported by Bloomberg Financial Markets Commodities News, the Funding Trust shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for Dollar deposits of one month, or twelve months, with respect to the initial Advance (except that in the case where such Interest Period shall commence on a day that is not a Business Day, for a term of one month, or twelve months, with respect to the initial Advance, commencing on the next following Business Day) by reference to requests for quotations as of approximately 11:00 a.m. (London time) on such LIBOR Determination Date made by the Funding Trust to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean. If, on any LIBOR Determination Date, fewer than two Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Funding Trust (after consultation with the Funding Trust) are quoting on the relevant LIBOR Determination Date for Dollar deposits for the term of such Interest Period (except that in the case where such Interest Period shall commence on a day that is not a Business Day, for a term of one month, or twelve months, with respect to the initial Advance, commencing on the next following Business Day), to the principal London offices of leading banks in the London interbank market.

(iii) Except for the first Interest Period, in respect of any Interest Period of other than one month, LIBOR shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with clauses (i) and (ii) above, one of which shall be determined as if the maturity of the Dollar deposits referred to therein were the period of time for which rates are available next shorter than the Interest Period and the other of which shall be determined as if the such maturity were the period of time for which rates are available next longer than the Interest Period; *provided* that, if an Interest Period is less than or equal to seven days, then LIBOR shall be determined by reference to a rate

calculated in accordance with clauses (i) and (ii) above as if the maturity of the Dollar deposits referred to therein were a period of time equal to seven days.

(iv) If the Funding Trust is required but is unable to determine a rate in accordance with either of the procedures described in clauses (i) or (ii) above, LIBOR with respect to such Interest Period shall be the arithmetic mean of the offered quotations of the Reference Dealers as of 10:00 a.m. (New York time) on the first day of such Interest Period for negotiable U.S. Dollar certificates of deposit of major U.S. money market banks having a remaining maturity closest to the duration of the Interest Period.

(v) All interest for any Interest Period shall be calculated for the number of days elapsed during such Interest Period, including the first such day but excluding the last, on the basis of a year consisting of 360 days.

For purposes of clauses (i), (iii) and (iv) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point. For the purposes of clause (ii) above, all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one thirty-second of a percentage point.

As used herein:

"**Interest Period**" means, (i) with respect to the initial Advance, the period from and including the Interim Date to but excluding the Advance Date in August 2005, and (ii) with respect to any Advance thereafter, the period from and including each Advance Date to but excluding the next Advance Date.

"**LIBOR Determination Date**" means, (i) with respect to the first Interest Period, the second Business Day prior to the First Interim Date, and (ii) for any Interest Period thereafter, the second Business Day prior to the first day of such Interest Period.

"**Reference Banks**" means four major banks in the London interbank market selected by the Funding Trust.

"**Reference Dealers**" means three major dealers in the secondary market for U.S. Dollar certificates of deposit selected by the Funding Trust.

# APPENDIX C

Representation Required by Treasury Regulations Section 1.7872-15(d)(2)

Liberty One Funding Trust, **Helen Wilkenfeld 2004, LLC**, and **Helen Wilkenfeld** hereby represent, pursuant to Treasury Regulations Section 1.7872-15(d)(2), that the Death Benefit provided under the Liberty Premium Finance Program Financing Agreement dated **December 3, 2004** (the "Agreement") among Liberty One Funding Trust, **Helen Wilkenfeld 2004, LLC** and **Helen Wilkenfeld** is equal to or exceeds the Total Amount Due under that Agreement and that, accordingly a reasonable person would expect that all payments under the split-dollar loan will be made. All capitalized terms not otherwise defined shall have the same meaning as set forth in the Agreement.

Liberty One Funding Trust, By Wells Fargo Bank, N.A., as Trustee

By: ______________________
Name: ______________________
Address: Wells Fargo Bank, N.A.
400 Northridge Road, Suite 600
Atlanta, Georgia 30350
Attention: Corporate Trust Services
Taxpayer I.D. Number: 51-6554935

**HELEN WILKENFELD 2004, LLC**, by: Wells Fargo Bank, N.A., not in its individual capacity, but solely as Manager

By: ______________________
Name: ______________________
Address: Wells Fargo Bank, N.A.
400 Northridge Road, Suite 600
Atlanta, Georgia 30350
Attention: Corporate Trust Services
Taxpayer I.D. Number: ____________

**Helen Wilkenfeld**

______________________
Address: [redacted] Dr [redacted]
**Boca Raton, FL 33434**
Taxpayer I.D. Number: [redacted]

## Appendix D

## Formulas for Calculating Financing Balance, Maturity Date Payment and Total Due

**Terms:**

$_n$ (Period Number)
$P_n$ (Premium For Policy)
$S_n$ (Monthly Payment to LLC. $S_n$ will terminate on the day specified in the LLC Contract)
$M_n$ (The minimum amount owed at maturity by the LLC to the Funding Trust. Note: This amount is provided in the column labeled "$M_n$" in the schedule to this Appendix)
$K_n$ (Available Funds. Used in calculating Maturity Date Payment and Total Due. Note: This amount is provided in the column labeled "$K_n$" in the schedule to this Appendix)

**Variables:**

Applicable Interest Rate: AIR (the maximum of one-month LIBOR plus 175 basis points per annum or the applicable Federal Short Term Rate as described in Section 1274(d)(1) at the beginning of each period (n). AIR is determined using an actual/360 day count convention)

Periodic Advances to LLC: $P_n + S_n$

Financing Balance: $Q_n$

Maturity Date Payment: $B_n$ (Note: Maturity Date Payment due in first 12 months is fixed and provided in the column labeled "$B_n$" in the schedule to this Appendix)

Total Due: $A_n$ (Note: Total Due in the first 12 months is fixed and provided in the column labeled "$A_n$" in the schedule to this Appendix)

**Formulas:**

$Q_n$ = $Q_{n-1} \times (1 + AIR) + P_n + S_n$

- The Financing Balance is the sum of (a) the Financing Balance for the prior interest period including accrued interest, and (b) the Premium For Policy and the Monthly Payment to LLC for the current Interest Period.

$B_n$ = $MAX\ (0, MAX\ (M_n, A_{n-1} - MAX\ ((K_n - (A_{n-1} \times AIR)),0)) - Q_n)$

- For the first 12 Interest Periods, the Maturity Date Payment is as set forth in the schedule to this Appendix. Thereafter, the Maturity Date payment is the higher of zero or the higher of (a) $M_n$ or (b) the Total Due for the prior period, minus the higher of (1) zero or (2) Available Funds, minus an amount equal to the Total Due for the prior Interest Period multiplied by the Applicable Interest Rate, minus the Financing Balance.

If $B_n > 0$ then $A_n = B_n + Q_n$
If $B_n = 0$ then $A_n = MAX\ (M_n, A_{n-1} - MAX\ (K_n - (A_{n-1} \times AIR),0))$

- When the Maturity Date Payment is greater than zero, the Total Due is equal to the Maturity Date Payment plus the Financing Balance.

- When the Maturity Date Payment is equal to zero, the Total Due is equal to the higher of (a) $M_n$ or (b) the Total Due from the prior period, minus the higher of (1) zero or (2) Available Funds minus an amount equal to the Total Due for the prior Interest Period multiplied by the Applicable Interest Rate.

- Total Due in Period n will never be greater than the Total Due in Period n-1

Schedule for Calculations in Appendix D

| n | An | Bn | Mn | Kn |
|---|---|---|---|---|
| 0 | 5,701,375 | 5,244,624 | - | - |
| 1 | 5,701,375 | 5,244,624 | 5,698,000 | - |
| 2 | 5,701,375 | 5,247,237 | 5,698,000 | - |
| 3 | 5,701,375 | 5,245,688 | 5,698,000 | - |
| 4 | 5,701,375 | 5,244,184 | 5,698,000 | - |
| 5 | 5,701,375 | 5,242,625 | 5,698,000 | - |
| 6 | 5,701,375 | 5,241,061 | 5,698,000 | - |
| 7 | 5,701,375 | 5,239,643 | 5,698,000 | - |
| 8 | 5,701,375 | 5,238,069 | 5,698,000 | - |
| 9 | 5,701,375 | 5,236,540 | 5,698,000 | - |
| 10 | 5,701,375 | 5,234,955 | 5,698,000 | - |
| 11 | 5,701,375 | 5,233,415 | 5,698,000 | - |
| 12 | 5,694,144 | 5,181,557 | 5,692,000 | 26,673 |
| 13 | | | 5,692,000 | 24,626 |
| 14 | | | 5,692,000 | 24,626 |
| 15 | | | 5,692,000 | 24,626 |
| 16 | | | 5,692,000 | 24,626 |
| 17 | | | 5,692,000 | 24,626 |
| 18 | | | 5,692,000 | 24,626 |
| 19 | | | 5,692,000 | 24,626 |
| 20 | | | 5,692,000 | 24,626 |
| 21 | | | 5,692,000 | 24,626 |
| 22 | | | 5,692,000 | 24,626 |
| 23 | | | 5,692,000 | 24,626 |
| 24 | | | 5,692,000 | 24,626 |
| 25 | | | 5,692,000 | 24,626 |
| 26 | | | 5,692,000 | 24,626 |
| 27 | | | 5,692,000 | 24,626 |
| 28 | | | 5,692,000 | 24,626 |
| 29 | | | 5,692,000 | 24,626 |
| 30 | | | 5,692,000 | 24,626 |
| 31 | | | 5,692,000 | 24,626 |
| 32 | | | 5,692,000 | 24,626 |
| 33 | | | 5,692,000 | 24,626 |
| 34 | | | 5,692,000 | 24,626 |
| 35 | | | 5,692,000 | 24,626 |
| 36 | | | 5,692,000 | 24,626 |
| 37 | | | 5,692,000 | 24,626 |
| 38 | | | 5,692,000 | 24,626 |
| 39 | | | 5,692,000 | 24,626 |

| n | An | Bn | Mn | Kn |
|---|---|---|---|---|
| 40 | | | 5,692,000 | 24,626 |
| 41 | | | 5,692,000 | 24,626 |
| 42 | | | 5,692,000 | 24,626 |
| 43 | | | 5,692,000 | 24,626 |
| 44 | | | 5,692,000 | 24,626 |
| 45 | | | 5,692,000 | 24,626 |
| 46 | | | 5,692,000 | 24,626 |
| 47 | | | 5,692,000 | 24,626 |
| 48 | | | 5,692,000 | 24,626 |
| 49 | | | 5,692,000 | 24,626 |
| 50 | | | 5,692,000 | 24,626 |
| 51 | | | 5,692,000 | 24,626 |
| 52 | | | 5,692,000 | 24,626 |
| 53 | | | 5,692,000 | 24,626 |
| 54 | | | 5,692,000 | 24,626 |
| 55 | | | 5,692,000 | 24,626 |
| 56 | | | 5,692,000 | 24,626 |
| 57 | | | 5,692,000 | 24,626 |
| 58 | | | 5,692,000 | 24,626 |
| 59 | | | 5,692,000 | 24,626 |
| 60 | | | 5,692,000 | 24,626 |
| 61 | | | 5,692,000 | 24,626 |
| 62 | | | 5,692,000 | 24,626 |
| 63 | | | 5,692,000 | 24,626 |
| 64 | | | 5,692,000 | 24,626 |
| 65 | | | 5,692,000 | 24,626 |
| 66 | | | 5,692,000 | 24,626 |
| 67 | | | 5,692,000 | 24,626 |
| 68 | | | 5,692,000 | 24,626 |
| 69 | | | 5,692,000 | 24,626 |
| 70 | | | 5,692,000 | 24,626 |
| 71 | | | 5,692,000 | 24,626 |
| 72 | | | 5,692,000 | 24,626 |
| 73 | | | 5,692,000 | 24,626 |
| 74 | | | 5,692,000 | 24,626 |
| 75 | | | 5,692,000 | 24,626 |
| 76 | | | 5,692,000 | 24,626 |
| 77 | | | 5,692,000 | 24,626 |
| 78 | | | 5,692,000 | 24,626 |
| 79 | | | 5,692,000 | 24,626 |



LF54

| n | An | Bn | Mn | Kn |
|---|---|---|---|---|
| 80 | | | 5,692,000 | 24,626 |
| 81 | | | 5,692,000 | 24,626 |
| 82 | | | 5,692,000 | 24,626 |
| 83 | | | 5,692,000 | 24,626 |
| 84 | | | 5,692,000 | 24,626 |
| 85 | | | 5,692,000 | 24,626 |
| 86 | | | 5,692,000 | 24,626 |
| 87 | | | 5,692,000 | 24,626 |
| 88 | | | 5,692,000 | 24,626 |
| 89 | | | 5,692,000 | 24,626 |
| 90 | | | 5,692,000 | 24,626 |
| 91 | | | 5,692,000 | 24,626 |
| 92 | | | 5,692,000 | 24,626 |
| 93 | | | 5,692,000 | 24,626 |
| 94 | | | 5,692,000 | 24,626 |
| 95 | | | 5,692,000 | 24,626 |
| 96 | | | 5,692,000 | 24,626 |
| 97 | | | 5,692,000 | 24,626 |
| 98 | | | 5,692,000 | 24,626 |
| 99 | | | 5,692,000 | 24,626 |
| 100 | | | 5,692,000 | 24,626 |
| 101 | | | 5,692,000 | 24,626 |
| 102 | | | 5,692,000 | 24,626 |
| 103 | | | 5,692,000 | 24,626 |
| 104 | | | 5,692,000 | 24,626 |
| 105 | | | 5,692,000 | 24,626 |
| 106 | | | 5,692,000 | 24,626 |
| 107 | | | 5,692,000 | 24,626 |
| 108 | | | 5,692,000 | 24,626 |
| 109 | | | 5,692,000 | 24,626 |
| 110 | | | 5,692,000 | 24,626 |
| 111 | | | 5,692,000 | 24,626 |
| 112 | | | 5,692,000 | 24,626 |
| 113 | | | 5,692,000 | 24,626 |
| 114 | | | 5,692,000 | 24,626 |
| 115 | | | 5,692,000 | 24,626 |
| 116 | | | 5,692,000 | 24,626 |
| 117 | | | 5,692,000 | 24,626 |
| 118 | | | 5,692,000 | 24,626 |
| 119 | | | 5,692,000 | 24,626 |

| n | An | Bn | Mn | Kn |
|---|---|---|---|---|
| 120 | | | 5,692,000 | 24,626 |
| 121 | | | 5,692,000 | 24,626 |
| 122 | | | 5,692,000 | 24,626 |
| 123 | | | 5,692,000 | 24,626 |
| 124 | | | 5,692,000 | 24,626 |
| 125 | | | 5,692,000 | 24,626 |
| 126 | | | 5,692,000 | 24,626 |
| 127 | | | 5,692,000 | 24,626 |
| 128 | | | 5,692,000 | 24,626 |
| 129 | | | 5,692,000 | 24,626 |
| 130 | | | 5,692,000 | 24,626 |
| 131 | | | 5,692,000 | 24,626 |
| 132 | | | 5,692,000 | 24,626 |
| 133 | | | 5,692,000 | 24,626 |
| 134 | | | 5,692,000 | 24,626 |
| 135 | | | 5,692,000 | 24,626 |
| 136 | | | 5,692,000 | 24,626 |
| 137 | | | 5,692,000 | 24,626 |
| 138 | | | 5,692,000 | 24,626 |
| 139 | | | 5,692,000 | 24,626 |
| 140 | | | 5,692,000 | 24,626 |
| 141 | | | 5,692,000 | 24,626 |
| 142 | | | 5,692,000 | 24,626 |
| 143 | | | 5,692,000 | 24,626 |
| 144 | | | 5,692,000 | 24,626 |
| 145 | | | 5,692,000 | 24,626 |
| 146 | | | 5,692,000 | 24,626 |
| 147 | | | 5,692,000 | 24,626 |
| 148 | | | 5,692,000 | 24,626 |
| 149 | | | 5,692,000 | 24,626 |
| 150 | | | 5,692,000 | 24,626 |
| 151 | | | 5,692,000 | 24,626 |
| 152 | | | 5,692,000 | 24,626 |
| 153 | | | 5,692,000 | 24,626 |
| 154 | | | 5,692,000 | 24,626 |
| 155 | | | 5,692,000 | 24,626 |
| 156 | | | 5,692,000 | 24,626 |
| 157 | | | 5,692,000 | 24,626 |
| 158 | | | 5,692,000 | 24,626 |
| 159 | | | 5,692,000 | 24,626 |

| n | An | Bn | Mn | Kn |
|---|---|---|---|---|
| 160 | | | 5,692,000 | 24,626 |
| 161 | | | 5,692,000 | 24,626 |
| 162 | | | 5,692,000 | 24,626 |
| 163 | | | 5,692,000 | 24,626 |
| 164 | | | 5,692,000 | 24,626 |
| 165 | | | 5,692,000 | 24,626 |
| 166 | | | 5,692,000 | 24,626 |
| 167 | | | 5,692,000 | 24,626 |
| 168 | | | 5,692,000 | 24,626 |
| 169 | | | 5,692,000 | 24,626 |
| 170 | | | 5,692,000 | 24,626 |
| 171 | | | 5,692,000 | 24,626 |
| 172 | | | 5,692,000 | 24,626 |
| 173 | | | 5,692,000 | 24,626 |
| 174 | | | 5,692,000 | 24,626 |
| 175 | | | 5,692,000 | 24,626 |
| 176 | | | 5,692,000 | 24,626 |
| 177 | | | 5,692,000 | 24,626 |
| 178 | | | 5,692,000 | 24,626 |
| 179 | | | 5,692,000 | 24,626 |
| 180 | | | 5,692,000 | 24,626 |
| 181 | | | 5,692,000 | 24,626 |
| 182 | | | 5,692,000 | 24,626 |
| 183 | | | 5,692,000 | 24,626 |
| 184 | | | 5,692,000 | 24,626 |
| 185 | | | 5,692,000 | 24,626 |
| 186 | | | 5,692,000 | 24,626 |
| 187 | | | 5,692,000 | 24,626 |
| 188 | | | 5,692,000 | 24,626 |
| 189 | | | 5,692,000 | 24,626 |
| 190 | | | 5,692,000 | 24,626 |
| 191 | | | 5,692,000 | 24,626 |
| 192 | | | 5,692,000 | 24,626 |
| 193 | | | 5,692,000 | 24,626 |
| 194 | | | 5,692,000 | 24,626 |
| 195 | | | 5,692,000 | 24,626 |
| 196 | | | 5,692,000 | 24,626 |
| 197 | | | 5,692,000 | 24,626 |
| 198 | | | 5,692,000 | 24,626 |
| 199 | | | 5,692,000 | 24,626 |

| n | An | Bn | Mn | Kn |
|---|---|---|---|---|
| 200 | | | 5,692,000 | 24,626 |
| 201 | | | 5,692,000 | 24,626 |
| 202 | | | 5,692,000 | 24,626 |
| 203 | | | 5,692,000 | 24,626 |
| 204 | | | 5,692,000 | 24,626 |
| 205 | | | 5,692,000 | 24,626 |
| 206 | | | 5,692,000 | 24,626 |
| 207 | | | 5,692,000 | 24,626 |
| 208 | | | 5,692,000 | 24,626 |
| 209 | | | 5,692,000 | 24,626 |
| 210 | | | 5,692,000 | 24,626 |
| 211 | | | 5,692,000 | 24,626 |
| 212 | | | 5,692,000 | 24,626 |
| 213 | | | 5,692,000 | 24,626 |
| 214 | | | 5,692,000 | 24,626 |
| 215 | | | 5,692,000 | 24,626 |
| 216 | | | 5,692,000 | 24,626 |
| 217 | | | 5,692,000 | 24,626 |
| 218 | | | 5,692,000 | 24,626 |
| 219 | | | 5,692,000 | 24,626 |
| 220 | | | 5,692,000 | 24,626 |
| 221 | | | 5,692,000 | 24,626 |
| 222 | | | 5,692,000 | 24,626 |
| 223 | | | 5,692,000 | 24,626 |
| 224 | | | 5,692,000 | 24,626 |
| 225 | | | 5,692,000 | 24,626 |
| 226 | | | 5,692,000 | 24,626 |
| 227 | | | 5,692,000 | 24,626 |
| 228 | | | 5,692,000 | 24,626 |
| 229 | | | 5,692,000 | 24,626 |
| 230 | | | 5,692,000 | 24,626 |
| 231 | | | 5,692,000 | 24,626 |
| 232 | | | 5,692,000 | 24,626 |
| 233 | | | 5,692,000 | 24,626 |
| 234 | | | 5,692,000 | 24,626 |
| 235 | | | 5,692,000 | 24,626 |
| 236 | | | 5,692,000 | 24,626 |
| 237 | | | 5,692,000 | 24,626 |
| 238 | | | 5,692,000 | 24,626 |
| 239 | | | 5,692,000 | 24,626 |
| 240 | | | 5,692,000 | 24,626 |

Client Signature Helen Wickenfeld