**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Liberty One Funding Trust and
Liberty Two Funding Trust,

Plaintiffs, Case No. 1:23-cv-5483-MLB

v.

Brian Achenbach, et al.,

Defendants.

________________________________

Wells Fargo Bank, N.A. and Wells
Fargo Delaware Trust Company,
N.A.,

Plaintiffs,

v.

Bruce Achenbach, et al.,

Defendants.

________________________________/

**OPINION & ORDER**

This case arises from a life insurance financing program allegedly operated by Plaintiffs Liberty One Funding Trust and Liberty Two

Funding Trust ("Liberty") and Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo"). Defendants are the "heirs" of individuals who participated in the program. Plaintiffs sued Defendants, seeking—among other things—to stay a related arbitration Defendants brought against Plaintiffs challenging the validity of the program and how Plaintiffs operated it. (Dkt. 32.) Defendants answered and asserted counterclaims raising the same issues they brought in the arbitration proceeding. (Dkt. 37.) Plaintiffs now seek to dismiss those counterclaims. (Dkts. 46; 47.) Defendants oppose. (Dkt. 56.)

## I. Background

### A. Plaintiffs' Life Insurance Financing Program

Defendants contend Liberty and Wells Fargo operated a program to "originate and procure hundreds" of what they call "stranger-oriented life insurance policies" on "senior citizens throughout the country." (Dkt. 37 at 49 ¶¶ 1–3.)[1] This program "ostensibly provided a means by which

[1] As discussed in more detail below, this litigation is consolidated, combining a case Liberty brought against Defendants and a case Wells Fargo brought against them. Because Defendants' allegations are the same against both sets of Plaintiffs, the Court cites only the counterclaims against Liberty in discussing the factual background unless otherwise necessary.

senior citizens could obtain life insurance through long-term, non-recourse premium financing." (Dkt. 37 at 62 ¶ 42.) Liberty and Wells Fargo promoted the program "as straightforward life insurance premium financing, where the premiums would be borrowed; the principal and interest on a 'loan' would be paid with the policy proceeds; and whatever policy proceeds were left over would be paid to the families of the senior citizen insureds." (Dkt. 37 at 63 ¶ 44.) All this "was a ruse." (Dkt. 37 at 62 ¶ 42.) "In reality," the program "existed as a means for Liberty, with the aid and assistance of its agent Wells Fargo," to procure life insurance policies on strangers "where Liberty was guaranteed over 90% of each policy's death benefit prior to each policy's creation." (*Id.*)

To successfully operate the scheme, Liberty and Wells Fargo targeted senior citizens and misrepresented the nature of the program and the accompanying loan agreements. (Dkt. 37 at 62–63 ¶ 43.) Specifically, Liberty and Wells Fargo "sought out seniors" of "advanced age" who did not even need life insurance and induced them to join the program "with the promise of financial compensation." (Dkt. 37 at 66 ¶¶ 57–58.) Liberty and Wells Fargo told these seniors that "in exchange for allowing large life insurance policies to be procured on their lives at no

cost to them, the seniors would receive financial compensation of 'between 5% to 15% of a policy's face amount,' which would come in the form of an 'upfront advance' or a 'periodic advance' and/or a portion of the policy's death benefit (paid to beneficiaries that are designated by the Insureds) when they died." (Dkt. 37 at 67 ¶ 59.) Liberty also informed the insureds that, when they passed away, their life insurance policy proceeds would be used to repay policy premium advances and periodic payments Liberty made to the insureds along with interest, "with any remaining proceeds of the policy being retained by" the insureds. (Dkt. 37 at 69 ¶ 67.)

If a senior agreed to participate in the program, Liberty "would obtain a HIPAA release from the senior . . . and collect their medical records so that Liberty could prepare a life expectancy or mortality study," allowing Liberty to "predict when the senior . . . would die." (Dkt. 37 at 70 ¶ 69.) Liberty did this to "gauge how valuable its wager on the life of that senior [] might be and the extent" of the risk Liberty was taking that the senior might "live too long." (Dkt. 37 at 70 ¶ 70.) Liberty used these life expectancy reports to make decisions about whether to obtain a policy on the proposed insured, the amount of coverage it would

obtain, from which insurance carrier it would obtain coverage, the terms and conditions of coverage, and the manner and amount in which it would make premium payments on the policy. (Dkt. 37 at 70 ¶ 71.)

The main risk to Liberty in these transactions "was that an insured would not die and that Liberty would need to continue to pay premiums to keep the policies in force until the inevitable happened." (Dkt. 37 at 64 ¶ 47.) To offset this risk, Liberty bought "massive" annuities on the lives of each insured, with each annuity "producing monthly payments to Liberty that were tens of thousands of dollars in excess of the ongoing cost to fund the premiums on each respective policy." (Dkt. 37 at 64 ¶ 48.) By doing this, Liberty "not only had a financial interest in the immediate deaths of the insureds," but also "guaranteed that it could never suffer a loss because the ongoing policy premiums were funded" by the annuities, which gave Liberty "monthly profits even if the insureds survived." (Dkt. 37 at 64 ¶ 49.) Liberty intentionally concealed from the insureds and their families the details about these annuities through a "maze of defined contractual terms." (Dkt. 37 at 65 ¶¶ 50–51.) Indeed, Liberty only "vaguely informed the Insureds (all while hiding the real details) that Liberty would be purchasing 'single premium immediate

annuities' . . . on their lives and that '[t]he cash flow generated from the [annuities] will fund the policy premiums and periodic payments to the [Insureds], if elected," under related financing agreements. (Dkt. 37 at 69 ¶ 69.) Liberty also concealed the fact that, although it was making excess monthly profits from the annuities, "the full cost" of the annuities "was actually being charged to the insureds and their families under" the program. (Dkt. 37 at 65 ¶ 51.) Indeed, had an insured "died at the moment a policy on their life was made, . . . Liberty and Wells Fargo would have computed the so-called Total Amount Due by that [i]nsured under the terms of their supposed 'loan' by secretly including the full cost of the [annuity] in the 'loan' balance." (Dkt. 37 at 65 ¶ 51.) Finally, Liberty and Wells Fargo "charged other inflated and undisclosed fees and interest in the amount of hundreds of thousands of dollars under each supposed 'loan' agreement." (Dkt. 37 at 65 ¶ 52.)

### B. Trust, LLC, and Financing Agreements Related to the Program

If Liberty decided a senior was a suitable candidate for the program, Liberty would provide him or her "non-negotiable boilerplate documents," which "created multiple entities in Georgia," including an irrevocable trust in the name of the insured. (Dkt. 37 at 71 ¶ 75.)

Insureds "had no ability to negotiate or edit the terms of the trust agreements, . . . and no ability to select the trustee." (Dkt. 37 at 72 ¶ 76.) Rather, "in every case, Wells Fargo [] was the trustee." (*Id.*) The trust agreements identified the insureds' family members as beneficiaries. (Dkt. 37 at 72 ¶ 77.)

The purpose of each irrevocable trust was to own a member interest in an LLC created in the respective senior's name. (Dkt. 37 at 72 ¶ 78.) "In turn, the boilerplate Liberty trust agreements . . . directed the trustee, Wells Fargo [], to become the 'Manager' of" each respective LLC. (Dkt. 37 at 72 ¶ 79.) Each LLC then applied for a life insurance policy on the senior as proposed owners and beneficiaries. (Dkt. 73 ¶ 82.) But, because Liberty controlled who was designated trustee and manager of each LLC, Liberty also controlled "the entirety of each transaction and . . . each" life insurance policy. (Dkt. 37 at 73 ¶ 84.) So, while Wells Fargo was technically the trustee over trusts that in name benefitted the insureds' and their families, its "true master . . . was Liberty," as Liberty both "dictated" Wells Fargo's "roles in connection" with the newly created entities, and "paid Wells Fargo [] for its services." (Dkt. 37 at 73–74 ¶¶ 85–86.) Once Liberty established these businesses and named Wells

Fargo trustee and manager of each respective trust and LLC, Liberty had Wells Fargo "enter into assignments purportedly by and between" the trusts and LLCs through which the LLCs "assigned all of their rights, title, and interest" in the policies and death benefits to Liberty. (Dkt. 37 at 74–75 ¶ 89.)

Along with all the documents the seniors had to sign to create the trusts and LLCs, Liberty and Wells Fargo also had each insured sign a "complex, boilerplate" financing agreement, "each of which was non-negotiable and contained an arbitration provision." (Dkt. 37 at 75 ¶ 91.) These agreements provided that Liberty would give the LLCs financing in the form of "[a]dvances" on the life insurance policies "for the purpose of funding" premiums, monthly payments, and (at Wells Fargo's discretion) "expenses of the LLC." (Dkt. 37 at 76 ¶ 94.) The agreements contained terms and formulas related to these payments that in reality "were illusory and allowed Liberty and Wells Fargo to secretly charge" the insureds and LLCs "undisclosed amounts that lined the pockets of Liberty with millions of dollars . . . without letting the" insureds "understand what was happening." (Dkt. 37 at 76–77 ¶ 96.) In fact, it was these "illusory" terms that allowed Liberty and Wells Fargo to

purchase the secret annuities and charge the insureds for those annuities "plus other exorbitant and undisclosed fees." (Dkt. 37 at 77 ¶ 97.) In other words, Liberty and Wells Fargo used the financing agreements to secretly charge the insureds for the costs of the annuities, all while Liberty was pocketing the profits instead of using the annuities to pay the premium costs and periodic payments to the insureds as promised. (Dkt. 37 at 7 ¶ 98.) Then, "when each Insured passed away, Liberty and Wells Fargo would . . . reduce the life insurance death benefit paid to each Insured's family by deducting the cost of such annuities," even though "Liberty had been keeping the excess annuity payments all along." (Dkt. 37 at 77 ¶ 98.)

### C. Defendants' Role, Related Arbitration, and This Litigation

Defendants "are the individual heirs and/or representatives of the estates of deceased" insureds who entered financing agreements and other transactional documents with Liberty and Wells Fargo as part of the life insurance financing program. (Dkt. 37 at 51 ¶ 10.) With respect to each insured: (1) the insured set up a Georgia LLC in his or her name; (2) the insured and LLC entered into financing agreements with Liberty and Wells Fargo; (3) Liberty and Wells Fargo procured and financed a

life insurance policy on each insured's life; and (4) Liberty secretly purchased an annuity on each insured, intentionally concealed the details of the annuity from the insured and his or her family, and fraudulently charged each insured for the costs of the annuity while pocketing the profits. (Dkt. 37 at 82–83 ¶ 120.) Upon the death of each insured, the insurer for each life insurance policy paid the death benefits to the LLC formed in the insured's name. (Dkt. 37 at 83 ¶ 121.) Wells Fargo then distributed the proceeds to Liberty. (*Id.*)

Defendants initiated arbitration against Liberty and Wells Fargo in October 2023, claiming, among other things, that the program constitutes an illegal life-wagering scheme. (Dkt. 56 at 5.) In response, Liberty and Wells Fargo filed separate lawsuits in the Georgia State-Wide Business Court and moved to stay arbitration. (Dkt. 1.) Defendants removed both cases to this Court and the Court consolidated them. (Dkts. 1; 40); *Wells Fargo Bank, N.A. v. Bruce Achenbach, et al.*, No. 1:23-cv-5825 (N.D. Ga.), Dkts. 1, 27. Defendants answered each complaint and filed counterclaims. (Dkt. 37); *Wells Fargo*, No. 1:23-cv-5825, Dkt. 16. Liberty and Wells Fargo now separately move to dismiss Defendants' counterclaims. (Dkts. 46; 47.) Defendants oppose. (Dkt. 56.)

## II. Standard of Review

A court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This so-called "plausibility standard" is not a probability requirement. *Id.* Even if a plaintiff will probably not recover, a complaint may still survive a motion to dismiss for failure to state a claim, and a court reviewing such a motion should bear in mind that it is testing the sufficiency of the complaint, not the merits of the case. *Twombly*, 550 U.S. at 556.

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or

factual challenge to the complaint." *McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *Id.* (citation omitted). When a party challenges the "existence of subject matter jurisdiction based upon an extrinsic document, . . . the Court may consider evidence beyond the allegations of the complaint." *Mullinax v. United Mktg. Grp., LLC*, 2011 WL 4085933, at *8 (N.D. Ga. Sept. 13, 2011) (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

## III. Discussion

Defendants raise six counterclaims against Liberty and Wells Fargo. They seek (1) a declaration that they do not have to arbitrate their claims and instead may litigate them (Dkt. 37 ¶¶ 125–132); (2) a declaration that if they must arbitrate, the arbitration is governed by the Federal Arbitration Act (FAA) rather than the Georgia Arbitration Code (GAC) (Dkt. 37 ¶¶ 133–140); (3) to void the subject life insurance policies ab initio as illegal life wagers (Dkt. 37 ¶¶ 141–162); (4) to void the subject

financing agreements ab initio as life wagers (Dkt. 37 ¶¶ 163–185); (5) to recover for breach of the financing agreements because Plaintiffs "receiv[ed] and retain[ed] death benefits far in excess of what they were contractually entitled to receive" (Dkt. 37 ¶¶ 186–206); and (6) to recover damages on the grounds Liberty and Wells Fargo violated the federal RICO Act (Dkt. 37 ¶¶ 207–233). They raise an additional claim for breach of trust against Wells Fargo. *Wells Fargo Bank, N.A.*, No. 23-cv-5825, Dkt. 16 at 97–101 ¶¶ 207–226.[2] Liberty and Wells Fargo separately move to dismiss. (Dkts. 46; 47.) Wells Fargo, however, "joins and incorporates the arguments made by Liberty in its" motion to dismiss. (Dkt. 47-1 at 9.)

### A. Contractual Standing

Wells Fargo contends Defendants lack contractual standing to bring their counterclaims related to the financing agreements because they did not sign those agreements and have not been appointed

---

[2] Defendants' counterclaims against Liberty and Wells Fargo are identical aside from the additional breach of trust claim against Wells Fargo. Accordingly, when referencing Defendants' counterclaims (aside from the breach of trust claim), the Court cites only Defendants' answer and counterclaims against Liberty.

representatives of the insureds' estates. (Dkt. 47-1 at 18–21.) According to Wells Fargo, Defendants "could only bring their claims, if at all, *on behalf of* the actual signatory, the [i]nsured." (Dkt. 47-1 at 18 (emphasis in original).) Defendants say they have standing as beneficiaries of the trusts that (through the LLCs) applied for the policies and ultimately claimed and collected the policies' death benefits. (Dkt. 56 at 53.) Defendants argue that, because they are the ones entitled to receive the policies' death benefits, they have standing as to "their claim for breach of trust, . . . their insurable interest and wagering claims, and . . . their RICO claims." (Dkt. 56 at 53.)

The Court concludes Defendants lack contractual standing to bring claims that Liberty and Wells Fargo breached the financing agreements or that the agreements are invalid. Defendants are not parties to the financing agreements. Those agreements are between Liberty, the insureds, and their respective LLCs. Defendants admit as much. (Dkt. 56 at 26–28.) Nor are Defendants beneficiaries to those agreements. Indeed, the agreements expressly preclude assignment and disclaim any third-party beneficiaries. (Dkt. 37-4 at 24.) So, Defendants could only bring claims for breach of those agreements on behalf of the insureds'

estates. *See Archer Western Contractors, Ltd. v. Estate of Pitts*, 735 S.E.2d 772, 778 (Ga. 2012) (third party to contract can only enforce contractual promises made directly for his or her benefit). Under the pertinent law where each insured lived, only judicially recognized personal representatives are authorized to prosecute and settle claims in favor of or against an estate. *See Platt v. Griffith*, 858 S.E.2d 413, 415 (Va. 2021) (Virginia); *De La Riva v. Chavez*, 303 So. 3d 955, 959 (Fla. Dist. Ct. App. 2020) (Florida); *Stallsworth v. Stallsworth*, 138 A.D.3d 1102, 1103 (N.Y. App. Div. 2016) (New York); *Rosebrock v. E. Shore Emergency Physicians, LLC*, 108 A.3d 423, 429 (Md. Ct. App. 2015) (Maryland); *Memar v. Styblo*, 667 S.E.2d 388, 390 (Ga. Ct. App. 2008) (Georgia). Aside from one conclusory statement that Defendants are the "heirs and/or representatives" of the insureds' estates (Dkt. 37 at 51 ¶ 10), Defendants do not plausibly allege they are the *legal* representatives or administrators of any of those estates. Nor do they claim to have any other legal authority to bring claims on behalf of the estates. In fact, Defendants brought their counterclaims only in their individual capacities. So, their status as "heirs" of the insureds doesn't matter.

They lack contractual standing to sue for breach of the financing agreements or to challenge those agreements as void.

In arguing otherwise, Defendants say—without citing legal authority—that since they are the "proper recipients of the policies' death benefits," they have standing to bring claims for breach of trust, that the insurance policies and financing agreements are void for lack of insurable interest or life-wagering, and for violations of RICO. (Dkt. 60 at 53.) Tellingly, they say nothing about their ability to bring their breach of contract claim over the financing agreements. In any event, Defendants seek to enforce or invalidate agreements to which they were never parties or beneficiaries. They cannot do so under ordinary contract law. Those claims fail.

Wells Fargo does not argue Defendants lack standing to challenge the insurance policies as non-signatories or that their status as non-signatories to the financing agreements otherwise prevents their breach of trust and RICO claims. The Court thus declines to dismiss those claims

simply because Defendants were not parties to the financing agreements.[3]

### B. Mandatory Arbitration

Liberty says the Court should dismiss Defendants' counterclaim seeking a declaration that arbitration is not mandatory under the financing agreements because "the plain language" of the agreements "mandates arbitration of substantive disputes." (Dkt. 46 at 19.) Defendants say they are not bound by the arbitration clauses because they were not parties to the agreements. (Dkt. 56 at 26–28.)[4]

---

[3] For similar reasons, the Court rejects Wells Fargo's argument that all Defendants' claims against it should be dismissed because Wells Fargo either was not a party to the financing agreements or only signed those agreements as "securities intermediary." (Dkt. 47-1 at 16–17.) For the reasons discussed above, while Defendants' claims related to the breach or validity of those agreements fail, Defendants' challenge to the validity of the related insurance policies survives. Because Defendants claim Wells Fargo had a direct hand in procuring and maintaining the allegedly void insurance policies (and thus owe Defendants any proceeds Wells Fargo received from those policies), the insurance-policy-related claims against Wells Fargo survive.

[4] As just discussed, Wells Fargo argues that because Defendants are not signatories or beneficiaries to the financing agreements, they lack standing to assert their counterclaims. (Dkt. 47-1 at 23.) But it says nothing about whether Defendants are bound to arbitrate.

"Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit." *Chemence, Inc. v. Quinn*, 2012 WL 12873615, at *4 (N.D. Ga. Oct. 15, 2012) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). "When deciding whether the parties agreed to arbitrate on a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The Court applies Georgia law because each financing agreement contains a provision stating it "shall be governed by, and construed in accordance with, the local law of the State of Georgia . . . all rights and remedies being governed by said law." (Dkt. 37-4 at 25.) Under Georgia law, a party seeking to compel arbitration bears the burden of establishing the existence of a valid agreement by a preponderance of the evidence. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016).

The contracts at issue here that contain arbitration clauses are the financing agreements. As already explained, none of the Defendants are signatories or beneficiaries to those agreements. And the arbitration

clauses apply only to disputes "between the parties." (Dkt. 37 ¶ 37.) Absent any actual agreement between Liberty and Defendants to arbitrate, Liberty cannot use the language of the financing agreements to compel arbitration of Defendants' counterclaims.[5]

Having failed to show any agreements to arbitrate between it and Defendants, Liberty counters that Defendants are still required to arbitrate because (1) they "are asserting their purported claims in their capacities as heirs to the insureds who allegedly entered into" financing agreements with Liberty, and (2) they initiated arbitration proceedings and "received the benefits thereof." (Dkt. 59 at 5–6.) Defendants say the financing agreements do not bind any of the insureds' "heirs," and they initiated arbitration only because they thought "Plaintiffs would claim that arbitration is mandatory, and thus sought to avoid the cost and delay of arguing this issue." (Dkt. 56 at 28–29.) According to Defendants, upon Liberty's concession in its complaint and motion to stay the arbitration that "disputes may be resolved by arbitration or in court,"

[5] Because the Court concludes Defendants are not bound by the arbitration clauses, it does not address the parties' dispute over whether the word "may" in the clauses renders arbitration permissive rather than mandatory. (Dkts. 46 at 20–23; 56 at 27–28.)

Defendants "suspended the Arbitration and have since made clear their preference to litigate their claims before this Court." (Dkt. 56 at 29–30 (internal quotation marks and emphasis omitted) (quoting Dkt. 1-2 at 16).)

First, the Court agrees with Defendants that Liberty cannot enforce the arbitration clauses over their counterclaims simply because they bring their claims as the insureds' "heirs." As just explained, the financing agreements expressly disclaim any third-party beneficiaries, so Defendants had no interest in those agreements, even as the heirs of the insureds. Indeed, that's the exact reason they cannot pursue their claims arising from those agreements. So, the arbitration clauses cannot bind them as heirs.

Liberty's cases do not change the equation. It cites two very old Georgia cases to argue that, under state law, when a party enters a contract, that contract binds the party's "heirs and privies." (Dkt. 59 at 5 n.5.) One of those cases did not involve a contract at all, but a judgment against the administrator of a deceased's estate that bound the deceased's heirs. *See Milner v. Allgood*, 191 S.E. 132, 133 (Ga. 1937). The other case said that an agreement to divide land among tenants in

common binds the tenants' "heirs and privies," who by operation of law would likely inherit that property. *See Ralph v. Ward*, 34 S.E. 610, 611 (Ga. 1899). Defendants did not have any similar interest in the loan provided by the financing agreements. And neither case involved a contract that expressly disclaimed third-party beneficiaries.

Liberty also cites *Lankford v. Orkin Exterminating Co.*, 597 S.E.2d 470 (Ga. Ct. App. 2004), for the proposition that family members who are non-signatories to a contract still might be bound by an arbitration clause in that contract. (Dkt. 59 at 6.) But in *Lankford*, the court explained the non-signatory family member ratified the contract by accepting the contract's benefits. 597 S.E.2d at 229–30. Liberty does not argue Defendants ratified the financing agreements. Nor do Defendants allege they received any benefit from those agreements. The whole crux of Defendants' claim is that they were harmed by the agreements because they received less money from life insurance proceeds than they otherwise would have. Liberty's final case, *Akpele v. Pacific Life Ins. Co.*, 646 F. App'x 908 (11th Cir. 2016), also does not help it. In *Akpele*, the court held a widow was bound by an arbitration clause in her deceased husband's client agreement because she "admitted that she was a third-

party beneficiary." *Id.* at 913. As *Akpele* explains, "non-signatories to an agreement are bound by arbitration clauses in only limited circumstances," including "[t]hird-party beneficiary status." *Id.* at 912. Once again, Defendants are not third-party beneficiaries to the financing agreements.

Next, Liberty's contention that Defendants must arbitrate because they have already initiated arbitration rests on two arguments: (1) Defendants "waived" any right to litigate their counterclaims by bringing and participating in arbitration, and (2) Defendants' initiation of arbitration was a separate "agreement to send the issues here to arbitration." (Dkts. 46 at 25–26; 59 at 4 n.3.) As for the first argument, Liberty relies on *Atlantic Station, LLC v. Vratsinas Construction Co.*, 705 S.E.2d 191, 194 (Ga. Ct. App. 2010), to contend a party "waives its right to litigation by taking action inconsistent with that right and participating in arbitration." But the Georgia Court of Appeals has treated such a waiver in a fact-specific manner. For example, in *Atlantic Station*, the court found the party opposing arbitration waived its right to do so by "actively" participating in the arbitration process for 18 months (including by conducting discovery) before seeking a stay of the

proceedings. *Id.* at 193–95. Here, although Defendants initiated arbitration, Liberty does not claim they have taken any steps to move that arbitration forward, including by acting to secure a panel or conduct discovery. In fact, Liberty says in its complaint that it "has not participated in the *Achenbach* Arbitration with respect to Defendants" and "filed this action in lieu of answering the Statement of Claim in the *Achenbach* Arbitration as respects Defendants." (Dkt. 1-1 ¶ 29.)

This case appears more akin to *Salinas v. Atlanta Gas Light Co.*, 819 S.E.2d 903 (Ga. Ct. App. 2018). In that case, the plaintiff initiated an arbitration proceeding against two defendants after they moved to compel arbitration under a contract between the plaintiff and one of the defendants. *Id.* at 481. After that defendant obtained summary judgment in the arbitration proceeding, the plaintiff withdrew from the proceeding on the ground that the other defendant was not a party to the arbitration clause in the contract. *Id.* at 481–82. The plaintiff filed a new lawsuit against the remaining defendant. *Id.* at 481–82. That defendant moved to dismiss the plaintiff's case and compel arbitration, arguing that the plaintiff "waived his right to litigate the dispute . . . in court by participating in arbitration for many months." *Id.* at 485. The

Georgia Court of Appeals rejected that argument, holding arbitration was not mandatory because the remaining defendant was not a party to the arbitration agreement and that, once it became clear the plaintiff did not have to arbitrate against the remaining defendant, he withdrew from the arbitration proceeding. *Id.* at 486–87.

So too, here. Defendants initiated arbitration under the belief it was mandatory. Upon Liberty's filing suit and asserting that the financing agreements "each contain a clause providing that disputes may be resolved by arbitration or in court," Defendants asserted their counterclaims and evidenced an intent to litigate. (Dkt. 1-1 at 16.) In other words, when Defendants believed arbitration was no longer necessary, it ceased participating in arbitration—well before anything even happened in that proceeding.

In attacking Defendants' intent (and confusion), Liberty says "the arbitration clauses make clear that some disputes (*e.g.*, procedural disputes about the statutes of limitations) may be heard in court," but "they do not mean that all disputes may be heard in court." (Dkt. 59 at 7.) But that's not how Liberty framed the issue in its complaint. There, Liberty alleged the financing agreements "provide that the parties ***may***

arbitrate claims, but do not require arbitration of all disputes." (Dkt. 1-1 ¶¶ 37, 39 (emphasis in original).) Liberty made no distinction in the complaint between "substantive" claims and "procedural" claims. In any event, regardless of what Liberty meant by those unequivocal statements, Defendants could have reasonably believed Liberty felt arbitration was not required and decided to abandon arbitration before the proceedings went too far.

Finally, Liberty argues in a footnote that by initiating arbitration, Defendants entered a separate, binding agreement to arbitrate their counterclaims. (Dkt. 59 at 4 n.3.) As an initial matter, the Court could simply disregard Liberty's argument given that it does not "'ordinarily consider arguments raised in passing in one footnote rather than the body of the brief,'" and because Liberty raised this argument for the first time in its reply brief. *Hix v. Acrisure Holdings, Inc.*, 2022 WL 2803633, at *2 n.3 (N.D. Ga. July 18, 2022). In any event, Liberty cites no authority for the proposition that initiating arbitration creates a binding agreement with the opposing party to arbitrate—particularly where, as here, that opposing party expressly declines to participate in the arbitration. In arguing otherwise, Liberty cites *Gvozdenovic v. United*

*Air Lines, Inc.*, 933 F.2d 1100 (2d Cir. 1991), for the proposition that an "agreement to arbitrate may be implied from a party's conduct where the party 'manifested a clear intent to arbitrate the dispute.'" (Dkt. 59 at 4 n.3.) In *Gvozdenovic*, however, the court found such an intent where the parties "active[ly] and voluntar[ily] participat[ed] in the arbitration." 933 F.2d at 1105. The same is not true here.

To summarize, the Court declines to find at this stage that Defendants are bound by the arbitration clauses in the financing agreements, as they were not parties to those agreements. Nor does the Court conclude they waived their right to litigate by initiating arbitration because they promptly abandoned the arbitration and evidenced their intent to litigate once they believed arbitration was not required. Nor did their initiation of arbitration constitute a separate, binding agreement to arbitrate. Accordingly, the Court declines to dismiss Defendants' first counterclaim on the ground they are bound to arbitrate their substantive disputes.[6]

[6] Because the Court determines at this stage that Defendants are not required to arbitrate their claims, it does not address: (1) Liberty's argument that the GAC rather than the FAA would govern arbitration (Dkt. 37 ¶¶ 133–140); (2) Liberty's argument that the Court cannot

### C. "Stranger" Defendants

Liberty says the Court should dismiss the counterclaims of Defendants Jay Grimm Jr., Robertr Krakovitz, Leon Malnik, and Phyllis Sifen because they are "strangers" to Liberty, as it "has found no indication" it had any financing agreements with them or the insured "purportedly affiliated with them." (Dkt. 46 at 31.) Defendants say regardless of whether Liberty had financing agreements with any insured related to those Defendants, Liberty does not deny it procured life insurance policies for insureds affiliated with these Defendants. (Dkt. 56 at 37.) According to Defendants, it is the insurance policies—not the financing agreements—that matter to their claims regarding the validity of those policies and Liberty's and Wells Fargo's purported violations of RICO. (*Id.*) Defendants are right.

The Court already concluded Defendants cannot maintain their claims related to the financing agreements because none of them were

decide the merits of Defendants' counterclaims (Dkt. 46 at 19–20); or (3) Defendants' argument that their claims fall outside the bounds of the arbitration agreements (Dkt. 56 at 30–32). The Court also declines at this point to dismiss Defendants' counterclaim requesting a declaration that the FAA governs arbitration of these disputes.

parties to those agreements. But Defendants' claims regarding the insurance policies are different. As alleged beneficiaries of those polices, they are entitled to challenge them as illegal and void. *See, e.g.*, *Loney v. Primerica Life Ins. Co.*, 499 S.E.2d 385, 386–87 (Ga. Ct. App. 1998) (beneficiary of life insurance policy could bring breach of contract and fraud claims against insurer related to enforcement and procurement of policy). Taking Defendants' allegations as true, as the Court must at this stage, each of the four Defendants identified by Liberty are the beneficiaries of life insurance policies taken out on their relatives' lives by Liberty and Wells Fargo. (Dkt. 37 at 51–54 ¶ 10.) And each insured related to those Defendants created a Georgia LLC in their respective name that later obtained life insurance on them (all directed by Liberty and Wells Fargo). (Dkt. 37 at 82 ¶ 120.) So, as beneficiaries, they can challenge the validity of those policies. If discovery establishes these Defendants were *not* the beneficiaries of any pertinent life insurance policies, their claims likely will not survive summary judgment. But at this stage, those claims move forward.

### D. Statute of Limitations

Liberty and Wells Fargo say Defendants' surviving counterclaims are time-barred. (Dkts. 46 at 21; 47-1 at 19–23.) Defendants say there is no statute of limitations on their claims that the insurance policies are void ab initio and that their breach of trust and RICO claims are timely because Plaintiffs' intentional concealment tolled the limitations periods. (Dkt. 56 at 39–43, 47–56.)

"'[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred' because '[a] statute of limitations bar is an affirmative defense, and . . . [the party asserting the claim is] not required to negate an affirmative defense'" at the pleading stage. *Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815 (11th Cir. 2013) (citation omitted).[7] "At the motion-to-dismiss stage, a [claim] may be dismissed on the basis of a statute-of-limitations defense 'only if it appears beyond a doubt that [the party raising the claim] can prove no set of facts that

[7] The Court recognizes *Lindley* is unpublished and not binding. The Court cites it nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

toll the statute.'" *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (citation omitted).

### 1. Validity of Insurance Policies

Defendants allege the insurance policies are void ab initio because they are life-wagering contracts that lack an insurable interest. (Dkt. 37 at 89 ¶ 145.) In Georgia, as Liberty admits, "there is not a specific statute of limitations for an insurable interest claim." (Dkt. 46 at 33.) Liberty argues, however, that the timeliness of Defendants' insurable interest claim should be governed by Georgia's statute of limitations dealing with simple breach of contract. (*Id.*) Defendants say because insurable interest claims arise from Georgia's public policy against life wagers, there is no time bar at all. (Dkt. 56 at 32.) The Court agrees with Defendants.

Defendants do not seek to hold Plaintiffs liable for breach of the insurance policies. Rather, they argue those policies were void at the time they were made because they violate Georgia's public policy against life wagers. So, the Court does not buy Liberty's argument that the breach-of-contract limitations period should apply. Nor does it cite any authority suggesting as much. Instead, as Liberty acknowledges, it

appears there is no statute of limitations for insurable interest claims in Georgia. The Court thus declines to dismiss the insurable interest claim on timeliness grounds.

### 2. Breach of Trust

Wells Fargo says Defendants' breach of trust claim against it is time-barred because Defendants raised it more than two years after they "receive[d] a written report that adequately disclose[d] the existence of the claim." (Dkt. 47-1 at 19.) According to Wells Fargo, it sent each of Defendants' insured relatives an annual report in the form of a benefits letters "that adequately disclosed the financial status of their policies, including the amounts of their projected net benefit payouts." (*Id.*) Defendants say the benefits letters do not constitute reports for purposes of the statute of limitations and that the Court instead should apply Georgia's six-year statute of limitations, which runs from the time the beneficiary "discovered, or reasonably should have discovered, the subject of such claim." (Dkt. 56 at 48.)

Georgia's Trust Code provides for a two-year statute of limitations on breach of trust claims "if a beneficiary has received a written report that adequately discloses the existence of a claim against the trustee for

a breach of trust." O.C.G.A. § 53-12-307(a). If a beneficiary does not receive such a report, he or she can bring a claim "within six years after the beneficiary discovered, or reasonably should have discovered, the subject of such claim." *Id.* An adequate "report" must provide "detailed information" that includes "'the assets, liabilities, receipts, and disbursements of the trust, the acts of the trustee, and the particulars relating to the administration of the trust, including the trust provisions that describe or affect such beneficiary's interest.'" *Hasty v. Castleberry*, 749 S.E.2d 676, 731–32 (Ga. 2013) (quoting O.C.G.A. § 53-12-243(a)).

Wells Fargo says nothing about what the benefits letters it sent the insureds supposedly said aside from "the financial status of their policies" and "the amounts of their projected net benefit payouts." (Dkt. 47-1 at 19.) It does not attach any of the letters. Instead, it cites a provision of the financing agreements requiring Wells Fargo to "provide to the LLC" an annual "statement setting forth what the Total Amount Due would have been if the Death Date had occurred on the date of such anniversary." (Dkt. 47-1 at 20 (citing Dkt. 16-4 at 12).) But even assuming Wells Fargo actually sent these letters—and that their receipt by the LLCs is sufficient to impart knowledge about them upon the

respective trusts' beneficiaries—it does not appear those letters contained the kind of information typically required by an adequate report under the Trust Code. In arguing otherwise, Wells Fargo cites *Wells Fargo Bank, N.A. v. Cook*, 775 S.E.2d 834 (Ga. Ct. App. 2015). But *Cook* seems to cut against Wells Fargo. In *Cook*, the court found sufficient "detailed trust statements" that "identified the Trust, the trustee, the time period covered by each statement, a breakdown of the investment funds in which the Trust was invested, and a description of every transaction and disbursement made by the trustee during the time period designated in each statement." *Id.* at 839. Taking Wells Fargo's word at what the benefits letters said, they are nowhere near as detailed as the reports in *Cook*. And importantly, Wells Fargo does not argue they provided the insureds or Defendants details about the annuities they allegedly purchased on the insureds' lives—the heart of Defendants' claim for breach of trust. Maybe discovery will show otherwise, but Wells Fargo's proffer does not suggest the letters were adequate under the Trust Code.

In any event, the Court would not consider the benefits letters even if Wells Fargo had provided them. At the motion-to-dismiss stage, the

Court looks only to Defendants' counterclaims and accepts their allegations as true. Defendants allege Wells Fargo hid from them (and the insureds) the details of the annuities it purchased on the insureds' lives, the amounts they generated, and that the trust beneficiaries were effectively paying the costs of the annuities. *Wells Fargo Bank, N.A.*, No. 1:23-cv-5825, Dkt. 16 at 98–100 ¶¶ 213–221. All this, while, according to Defendants, Wells Fargo also served as the trustee of separate trusts that held those annuities for the benefit of Liberty. *Id.* Defendants claim Wells Fargo deliberately concealed this information and that they only learned about it when their counsel discovered Wells Fargo's conduct in other litigation. *Id.* at 101 ¶ 225. Looking only at Defendants' allegations—rather than the extrinsic documents Wells Fargo relies upon but does not provide—the Court cannot say Defendants received a report sufficient to trigger the Trust Code's two-year statute of limitations.[8] For now, the Court concludes the six-year limitations period applies.

---

[8] Wells Fargo says the benefits letters are not extrinsic because Defendants attached one of the financing agreements—which contains the provision requiring the benefits letters—to their counterclaims. (Dkt. 55 at 13.) Again, however, that provision does not show that the benefits

Wells Fargo says Defendants' claim for breach of trust is untimely even under the six-year limitations period. (Dkt. 47-1 at 16.) According to Wells Fargo, Defendants knew or should have known about their claim at the time the insureds signed the financing agreements (the latest being in 2005), as those agreements informed the insureds "about the formulas that would be applied in the calculation of the net payout benefits after their death." (Dkt. 47-1 at 21–22.) Wells Fargo emphasizes those agreements also required the insureds to "waive[] the 'potential conflict of interest' with regard to Wells Fargo's alleged role as Trustee while also supposedly acting 'for the benefit of Liberty and its princip[als].'" (Dkt. 47-1 at 22.) Defendants say the waivers "are only one part of the breach of trust claim," and that they "were not only in contravention of Georgia law, but incomplete," leaving out "the true nature of [Wells Fargo's] conflicts of interest." (Dkt. 56 at 52 n.23.) According to Defendants, the waiver is inoperable because Wells Fargo "provided only a partial, and thus materially misleading, list of the roles

letters contained the level of detail required by the Trust Code, or even that Wells Fargo sent the insureds those letters as required. This issue cannot possibly be resolved in Wells Fargo's favor at the motion to dismiss stage.

it was serving for Liberty," and it did not "reveal the details of the annuities, even though it was the trustee" of a trust that held those annuities for Liberty. (*Id.*)

The statute of limitations on a breach of trust claim "may be tolled by a trustee's fraudulent conduct." *Smith v. Suntrust Bank*, 754 S.E.2d 117, 123 (Ga. Ct. App. 2014); *see also* O.C.G.A. § 9-3-96 (if trustee is "guilty of a fraud by which the [beneficiary] has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the [beneficiary's] discovery of the fraud"). To show fraudulent concealment sufficient to toll the statute, the beneficiary must show (1) the trustee committed "actual fraud involving moral turpitude," (2) the fraud "concealed the cause of action" from the beneficiary, and (3) the beneficiary "exercised reasonable diligence to discover his cause of action despite his failure to do so within the applicable statute of limitation." *Smith*, 754 S.E.2d at 123 (internal quotation marks and citation omitted). "'[W]hen a confidential relationship exists, such as between [the trustee and beneficiaries of a trust], the [beneficiary's] duty to investigate is decreased, and the [trustee's] duty to disclose is increased.'" *Id.* (citation omitted). "'In such situations, silence when one

should speak, or failure to disclose what ought to be disclosed, is as much a fraud in law as is an actual false representation.'" *Id.* (citation omitted).

It's unclear how Defendants would have known about their claim at the time the insureds signed the financing agreements—even though it may have provided them formulas for the net payout benefits—when Defendants' claim is that those formulas and the net payout number did not include or describe hidden costs related to the annuities or other fees. In any event, contrary to Wells Fargo's characterization, Defendants' allegations about Wells Fargo's intentional concealment are not "vague and unsupported." (Dkt. 47-1 at 22.) As already explained, Defendants' allegations on this front were detailed and described several things Wells Fargo purportedly hid from them and the insureds. Defendants, in fact, concede documents Liberty and Wells Fargo provided to the insureds prior to their signing the financing agreements disclosed they would have to pay for "costs of the Program, such as the purchase of the [annuities]." (Dkt. 37 at 78 ¶ 103.) Defendants contend, however, that Liberty and Wells Fargo concealed the full and true *details* about these annuities, including their costs and their generation of "massive amounts of excess profits." (Dkt. 37 at 79 ¶ 106.) It's these details Defendants say Wells

Fargo should have disclosed to fulfill its duty to act on behalf of the beneficiaries.

Defendants also argue Wells Fargo's attempt to disclaim liability for its "potential" conflicts of interest does not absolve it because, at the time the insureds signed the trust agreements, Wells Fargo knew it had an "actual," not a mere "potential," conflict of interest. *Wells Fargo Bank, N.A.*, No. 23-cv-5825, Dkt. 16 at 99 ¶ 218. Defendants convincingly argue this means Wells Fargo had a duty to disclose its role as trustee for the trust that held the annuities for Liberty. Given Wells Fargo's heightened duty to disclose—and Defendants' lessened burden to investigate—Defendants have sufficiently pled this broad waiver does not bar them from challenging Wells Fargo's alleged breach of trust.

In arguing otherwise, Wells Fargo says Defendants' allegations about concealment are all too vague to meet the more exacting standard for pleading fraud, which requires "specificity." (Dkt. 47-1 at 22.) It suggests Defendants needed to plead "details" about "the dates and contents of the misrepresentations that precluded earlier discovery" of the fraud. (Dkt. 47-1 at 23.) Defendants, however, contend that the fraud was ongoing from the time the insureds signed all the paperwork until

the date their lawyer learned about Plaintiffs' scheme in other litigation. That's enough specificity at this stage to survive dismissal.

Because the Court concludes Defendants pled sufficient facts suggesting Wells Fargo deliberately concealed its alleged breaches of trust—such that Defendants did not reasonably discover (and could not have reasonably discovered) this claim until their counsel learned about it in other litigation—Defendants' claims are not time-barred at this point. Should discovery show Plaintiffs knew or should have known about their breach of trust claims at a time that brings those claims outside the limitations period, Defendants can move for summary judgment on that ground.

### 3. RICO

Liberty says Defendants' RICO claim is time-barred because Defendants brought it more than four years after Liberty paid them the net death benefits from the insureds' life insurance policies. (Dkt. 46 at 35–36.) According to Liberty, because each insured died between 2010 and 2016, Defendants should have been aware of their RICO claims "for over seven years"—well outside the statute's four-year limitations period.

(Dkt. 46 at 35–36.) Defendants say Plaintiffs' alleged fraud tolled the limitations period. (Dkt. 56 at 55–56.)

"The statute of limitations for civil RICO actions is four years," which begins to run "as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 751 (11th Cir. 2000) (internal quotation marks and citation omitted). "[T]o successfully bar [a] federal RICO claim at the motion to dismiss phase, [the movant] must show that it is evident from the face of [the] complaint that [the party bringing the RICO claim] should have discovered the injury sooner." *M3 Accounting Servs., Inc. v. Dean*, 2019 WL 3817464, at *4 (N.D. Ga. Aug. 14, 2019). So, the Court must answer whether it is evident from Defendants' allegations that, more than four years ago: (1) Defendants discovered or reasonably should have discovered Liberty and Wells Fargo as the sources of their alleged injuries (*i.e.*, their receiving less money in insurance proceeds than they were entitled); and (2) Defendants discovered or reasonably should have discovered that Liberty's and Wells Fargo's misrepresentations as to the

hidden annuity costs and other fees were part of a pattern of racketeering activity.

As the Court already explained, Defendants allege they did not know and could not have known about Plaintiffs' purported fraud when they received the death benefits payout because Plaintiffs concealed the fact they deducted the hidden annuity costs and other fees from that payout. Again, Defendants claim they did not learn that information until their lawyer was involved in similar litigation involving other insureds. While it's not clear from their allegations when Defendants' lawyer learned this information, the Court cannot say it is evident from those allegations that Defendants discovered or should have discovered the alleged fraud more than four years ago. It does not matter, as Liberty claims, that Defendants allege Plaintiffs reaped the ill-gotten profits when they paid the death benefits. What matters is when Defendants learned they improperly reaped those profits. Accordingly, the Court declines—at this stage—to dismiss Defendants' RICO claims on limitations grounds.

## IV. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs'

motions to dismiss Defendants' counterclaims (Dkts. 46; 47). The Court **DISMISSES** Defendants' claims related to the financing agreements. Defendants' other claims survive.

**SO ORDERED** this 27th day of January, 2024.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE