**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Brian Achenbach, George Wilson, as the Personal Representative of Bruce Achenbach's Estate and the Trustee of the Jay Achenbach Marital Trust, Doris Vohn Belser Murphy, Nancy Belser, Andrew A. Costanza, James A. Costanza, Nicholas Costanza, Theodore Shepard, Andrew Darrow, David Darrow, Jonathan Darrow, Dean R. Flock, Judy Lynn Cook, Janice Charlaine Campbell, Deborah Gail Flock, Jay Grimm, Jr., Robert Krakovitz, M.D., Moshe Malka, Leon Malnik, Barry Septimus, Phyllis Sifen Turner, Burr Phillips, Kent Davis, Gabe Irving, Sydney Phillips Atkinson, Garry Dienes, Christina Samson, Mallory Samson, Marilyn Birk Wodlinger, Kevin M. Wodlinger, Michael H. Wodlinger, Stephen R. Wodlinger, Mark L. Wodlinger, II, Chehalis Hegner, John Hegner, Jodie Rasch, Jeffrey Levey, Beth Sackstein, Richard Lane, Brian Schehr, as trustee of the Robert J. Schehr Protector Trust, Stephen Crerie, Bradley Huss, as Trustee of the Crerie Family Survivors Trust, Patricia Anderson Tomberlin, Daniel Kent Tomberlin, Michael Rooney, Patrick Rooney, Robbi Rooney, Moshe Mark Feldman, Sara Reichman, Leah Schachter, Fern Portnoy, Arthur Gillis, Lora A. Gillis, Martha Jane Eblen, as Collector of Roberta S. Eblen's Estate, Paul F. Eblen, Cheryl DeCinces Carter, Ronald Bedinghaus, Daniel Bedinghaus, Roger Bedinghaus, Janet Terry, Gerald Bedinghaus, James B. Wirkowski, John C. Wirkowski, Paul Selby, Milton Neumann, Aaron Benjamin Neumann, Jeffrey Cotter as Trustee of the GST Trust Art X Helen B Greeley Family Trust, James Romano, Donna

**Case No. 1:23-cv-5483-MLB**

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Koonce, Richard Dudley, and John Dudley,

Plaintiffs,

v.

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Defendants.

---

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Counterclaimants,

v.

Brian Achenbach, George Wilson, as the Personal Representative of Bruce Achenbach's Estate and the Trustee of the Jay Achenbach Marital Trust, Doris Vohn Belser Murphy, Nancy Belser, Andrew A. Costanza, James A. Costanza, Nicholas Costanza, Theodore Shepard, Andrew Darrow, David Darrow, Jonathan Darrow, Dean R. Flock, Judy Lynn Cook, Janice Charlaine Campbell, Deborah Gail Flock, Jay Grimm, Jr., Robert Krakovitz, M.D., Moshe Malka, Leon Malnik, Barry Septimus, Phyllis Sifen Turner, Burr Phillips, Kent Davis, Gabe Irving, Sydney Phillips Atkinson, Garry Dienes, Christina Samson, Mallory Samson, Marilyn Birk Wodlinger, Kevin M. Wodlinger, Michael H. Wodlinger, Stephen R. Wodlinger, Mark L. Wodlinger, II, Chehalis Hegner, John Hegner, Jodie Rasch, Jeffrey Levey, Beth Sackstein, Richard Lane, Brian Schehr, as trustee of the Robert J. Schehr Protector Trust, Stephen Crerie, Bradley Huss,

as Trustee of the Crerie Family Survivors Trust, Patricia Anderson Tomberlin, Daniel Kent Tomberlin, Michael Rooney, Patrick Rooney, Robbi Rooney, Moshe Mark Feldman, Sara Reichman, Leah Schachter, Fern Portnoy, Arthur Gillis, Lora A. Gillis, Martha Jane Eblen, as Collector of Roberta S. Eblen's Estate, Paul F. Eblen, Cheryl DeCinces Carter, Ronald Bedinghaus, Daniel Bedinghaus, Roger Bedinghaus, Janet Terry, Gerald Bedinghaus, James B. Wirkowski, John C. Wirkowski, Paul Selby, Milton Neumann, Aaron Benjamin Neumann, Jeffrey Cotter as Trustee of the GST Trust Art X Helen B Greeley Family Trust, James Romano, Donna Koonce, Richard Dudley, and John Dudley,

Counterclaim-Defendants.

## PRELIMINARY STATEMENT

1. This case involves an illegal human life wagering scheme through which Liberty One Funding Trust, Liberty Two Funding Trust (together, "Liberty"), Wells Fargo Bank, N.A. ("Wells Fargo Bank"), and Wells Fargo Delaware Trust Company, N.A. (together with Wells Fargo Bank, "Wells Fargo") (Liberty and Wells Fargo collectively, "Defendants") worked hand-in-hand with an enterprise detailed below to originate and procure hundreds of illegal, multi-million dollar life insurance policies on senior citizens throughout the country. These policies lacked any valid insurable interest at their inception, and are what has become known as Stranger-Originated Life Insurance ("STOLI").

2. This particular dispute involves life insurance policies (the "Policies") on the lives of 34 senior citizens (the "Insureds"), with each having been made to appear that it was payable to the Plaintiffs herein, as the named beneficiaries of Georgia trusts, but where, in reality, each Policy was procured or caused to be procured by Defendants, for the benefit of Liberty at the inception of each of each Policy, even though Liberty lacked any valid insurable interest in the lives of any of the Insureds.

3. Defendants' STOLI scheme operated as the Liberty Premium Financing Program (the "Program"), which Defendants attempted to pass off as a valid life insurance premium financing program that was covered by a thin veneer designed to conceal Defendants' illegal human life wagers.

**PARTIES AND STATEMENT OF JURISDICTION**

4. As detailed *infra*, Plaintiffs, also referred to herein as the "Trust Beneficiaries," are the beneficiaries of Georgia trusts created in the names of the deceased Insureds ("Irrevocable Trusts"). These Irrevocable Trusts were created on boilerplate forms and identified the Plaintiffs as beneficiaries. There were some instances where the Irrevocable Trusts named other secondary trusts as beneficiaries—in those instances the Insureds' family members were the beneficiaries of the secondary trusts. The Irrevocable Trusts were utilized as a part of Program to allow Liberty and Wells Fargo, acting on behalf of Liberty's beneficial

owner, to procure and pay for multi-million dollar life insurance policies on the lives of the Insureds, to use the Trust Beneficiaries to make it appear that the Policies had insurable interest, but in reality, to make Liberty the actual beneficiary of the Policies' death benefits before the Policies were made. As detailed below, Plaintiffs bring these claims as the Trust Beneficiaries of the Irrevocable Trusts:

i) **Insured: Walter Achenbach**. A Policy was taken out on Walter Achenbach's life through the Program. In connection with the Policy taken out on Walter Achenbach's life, the Achenbach Family Georgia Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Achenbach Family Limited Partnership. Brian Achenbach, Bruce Achenbach, and Jay Achenbach are/were the General and Limited Partners of the Achenbach Family Limited Partnership. Bruce Achenbach and Jay Achenbach have passed away. Previously, Bruce Achenbach was the Personal Representative of the Estate of Jay Achenbach. The Estate of Jay Achenbach passed to the Jay Achenbach Marital Trust. George Wilson is the Personal Representative of Bruce Achenbach's Estate and the Trustee of the Jay Achenbach Marital Trust, a Florida estate and trust. Therefore, Brian Achenbach and George Wilson, as the

Personal Representative of Bruce Achenbach's Estate and the Trustee of the Jay Achenbach Marital Trust, are the proper Plaintiffs in connection with the Policy taken out on Walter Achenbach's life. George Wilson is a resident of Florida. Brian Achenbach is a resident of California. At the time of his death, Walter Achenbach was also a resident of Florida.

ii) **Insured: Dana Belser**. A Policy was taken out on Dana Belser's life through the Program. In connection with the Policy taken out on Dana Belser's life, the Dana C. Belser 2004 Family Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Dana C. Belser Irrevocable Trust. Doris Vohn Belser Murphy is the trustee and a beneficiary of the Dana C. Belser Irrevocable Trust and Nancy Belser is a beneficiary of the Dana C. Belser Irrevocable Trust. Therefore, the proper Plaintiffs in connection with the Policy taken out on Dana Belser's life are Doris Vohn Belser Murphy and Nancy Belser. Doris Vohn Belser Murphy is a resident of Maryland. Nancy Belser is a resident of Tennessee. At the time of his death, Dana Belser was a resident of Maryland.

iii) **Insured: Angelo A. Costanza**. A Policy was taken out on Angelo A. Costanza's life through the Program. In connection with the Policy taken out on Angelo A. Costanza's life, the Angelo Costanza 2004 Insurance Irrevocable Trust was created. The beneficiaries of that Irrevocable Trust were Andrew A. Costanza, James A. Costanza, Nicholas Costanza, and Theodore Shepard. Therefore, the proper Plaintiffs in connection with the Policy taken out on Angelo A. Costanza's life are Andrew A. Costanza, James A. Costanza, Nicholas Costanza, and Theodore Shepard. Andrew A. Costanza, James A. Costanza, and Theodore Shepard are residents of New York. Nicholas Costanza is a resident of Florida. At the time of his death, Angelo A. Costanza was also a resident of New York.

iv) **Insured: Stanley Darrow**. A Policy was taken out on Stanley Darrow's life through the Program. In connection with the Policy taken out on Stanley Darrow's life, the Stanley Darrow 2004 Insurance Irrevocable Trust was created. The beneficiaries of that Irrevocable Trust were Andrew Darrow, David Darrow, and Jonathan Darrow. Therefore, the proper Plaintiffs in connection with the Policy taken out on Stanley

Darrow's life are Andrew Darrow, David Darrow, and Jonathan Darrow. Andrew Darrow is a resident of South Carolina, David Darrow is a resident of Virginia, and Jonathan Darrow is a resident of California. At the time of his death, Stanley Darrow was a resident of New York.

v) **Insured: Henry Flock**. A Policy was taken out on Henry Flock's life through the Program. In connection with the Policy taken out on Henry Flock's life, the Flock Irrevocable Living Trust was created. The beneficiaries of that Irrevocable Trust were Dean R. Flock, Judy Lynn Cook, Janice Charlaine Campbell, and Deborah Gail Flock. Therefore, the proper Plaintiffs in connection with the Policy taken out on Henry Flock's life are Dean R. Flock, Judy Lynn Cook, Janice Charlaine Campbell, and Deborah Gail Flock. Dean R. Flock is a resident of Oregon. Judy Lynn Cook, Janice Charlaine Campbell, and Deborah Gail Flock are residents of Alberta, Canada. At the time of his death, Henry Flock was also a resident of Alberta, Canada.

vi) **Insured: Jay Grimm, Sr**. On information and belief, a Policy was taken out on Jay Grimm, Sr.'s life through the Program. On

information and belief, in connection with the Policy taken out on Jay Grimm, Sr.'s life, an Irrevocable Trust was created in the name of Jay Grimm, Sr. On information and belief, the beneficiary of that Irrevocable Trust was Jay Grimm, Jr. Therefore, the proper Plaintiff in connection with the Policy taken out on Jay Grimm, Sr.'s life is Jay Grimm, Jr. Jay Grimm, Jr. is a resident of New York. At the time of his death, Jay Grimm, Sr., was also a resident of New York.

vii) **Insured: Sylvia Hankin**. On information and belief, a Policy was taken out on Sylvia Hankin's life through the Program. On information and belief, in connection with the Policy taken out on Sylvia Hankin's life, an Irrevocable Trust was created in the name of Sylvia Hankin. On information and belief, the beneficiary of that Irrevocable Trust was Robert Krakovitz, M.D. Therefore, the proper Plaintiff in connection with the Policy taken out on Sylvia Hankin's life is Robert Krakovitz, M.D. Dr. Krakovitz is a resident of Colorado. At the time of her death, Sylvia Hankin was a resident of Florida.

viii) **Insured: Victor Malka**. A Policy was taken out on Victor Malka's life through the Program. In connection with the Policy

taken out on Victor Malka's life, the Victor Malka 2005 Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Victor Malka 2005 Family Trust. And, on information and belief, Moshe Malka is a beneficiary of the Victor Malka 2005 Family Trust. Therefore, Moshe Malka is the proper Plaintiff in connection with the Policy taken out on Victor Malka's life. Moshe Malka is a resident of New Jersey. At the time of his death, Victor Malka was a resident of New York.

ix) **Insured: Abraham Malnik**. On information and belief, a Policy was taken out on Abraham Malnik's life through the Program. On information and belief, in connection with the Policy taken out on Abraham Malnik's life, an Irrevocable Trust was created in the name of Abraham Malnik. On information and belief, the beneficiary of that Irrevocable Trust was Leon Malnik. Therefore, the proper Plaintiff in connection with the Policy taken out on Abraham Malnik's life is Leon Malnik. Leon Malnik is a resident of Maryland. At the time of his death, Abraham Malnik was a resident of Florida.

x) **Insured: Helen Wilkenfeld**. A Policy was taken out on Helen Wilkenfeld's life through the Program. In connection with the Policy taken out on Helen Wilkenfeld's life, the HSW Family Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Helen Wilkenfeld Family Trust. On information and belief, Barry Septimus is the trustee and beneficiary of the Helen Wilkenfeld Family Trust. Therefore, the proper Plaintiff in connection with the Policy taken out on Helen Wilkenfeld's life is Barry Septimus. Barry Septimus is a resident of New York. At the time of her death, Helen Wilkenfeld was a resident of Florida.

xi) **Insured: Paul Sifen**. On information and belief, a Policy was taken out on Paul Sifen's life through the Program. On information and belief, in connection with the Policy taken out on Paul Sifen's life, an Irrevocable Trust was created in the name of Paul Sifen. On information and belief, the beneficiary of that Irrevocable Trust was Phyllis Sifen Turner. Therefore, the proper Plaintiff in connection with the Policy taken out on Paul Sifen's life is Phyllis Sifen Turner. Phyllis Sifen Turner is

a resident of Florida. At the time of his death, Paul Sifen was also a resident of Florida.

xii) **Insured: Harry Phillips**. On information and belief, a Policy was taken out on Harry Phillips' life through the Program. On information and belief, in connection with the Policy taken out on Harry Phillips' life, an Irrevocable Trust was created in the name of Harry Phillips. On information and belief, the beneficiaries of that Irrevocable Trust were Burr Phillips, Kent Davis, Gabe Irving, and Sydney Phillips Atkinson. Therefore, the proper Plaintiffs in connection with the Policy taken out on Harry Phillips' life are Burr Phillips, Kent Davis, Gabe Irving, and Sydney Phillips Atkinson. Burr Phillips is a resident of New Mexico, Kent Davis is a resident of Tennessee, Gabe Irving is a resident of Texas, and Sydney Phillips Atkinson is a resident of North Carolina. At the time of his death, Harry Phillips was a resident of Texas.

xiii) **Insured: Milton Dienes**. A Policy was taken out on Milton Dienes' life through the Program. In connection with the Policy taken out on Milton Dienes' life, the Milton Dienes 2004 Insurance Irrevocable Trust was created. The beneficiary of that

Irrevocable Trust was the Garry Dienes Revocable Living Trust. Garry Dienes is the trustee and beneficiary of the Garry Dienes Revocable Living Trust. Therefore, Garry Dienes is the proper Plaintiff in connection with the Policy taken out on Milton Dienes' life. Garry Dienes is a resident of Pennsylvania. At the time of his death, Milton Dienes was also a resident of Pennsylvania.

xiv) **Insured: Helen Samson**. A Policy was taken out on Helen Samson's life through the Program. In connection with the Policy taken out on Helen Samson's life, the Samson Family Georgia Irrevocable Trust was created. The beneficiaries of that Irrevocable Trust were Christina Samson and Mallory Samson. Therefore, the proper Plaintiffs in connection with the Policy taken out on Helen Samson's life are Christina Samson and Mallory Samson. Christina Samson is a resident of Washington D.C., and Mallory Samson is a resident of Florida. At the time of her death, Helen Samson was also a resident of Florida.

xv) **Insured: Mark Wodlinger**. A Policy was taken out on Mark Wodlinger's life through the Program. In connection with the Policy taken out on Mark Wodlinger's life, the Wodlinger

Georgia Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was Marilyn Birk Wodlinger. Marilyn Birk Wodlinger has assigned a portion of her claims to Mark Wodlinger's sons, Kevin M. Wodlinger, Michael H. Wodlinger, Stephen R. Wodlinger, and Mark L. Wodlinger, II. Therefore, the proper Plaintiffs in connection with the Policy taken out on Mark Wodlinger's life are Marilyn Birk Wodlinger, Kevin M. Wodlinger, Michael H. Wodlinger, Stephen R. Wodlinger, and Mark L. Wodlinger, II. Marilyn Birk Wodlinger is a resident of Florida, Kevin M. Wodlinger is a resident of California, Michael H. Wodlinger is a resident of Colorado, Stephen R. Wodlinger is a resident of Colorado, and Mark L. Wodlinger, II is a resident of Florida. At the time of his death, Mark Wodlinger was also a resident of Florida.

xvi) **Insured: Richard Hegner**. A Policy was taken out on Richard Hegner's life through the Program. In connection with the Policy taken out on Richard Hegner's life, the Richard Hegner Irrevocable Trust was created. The beneficiaries of that Irrevocable Trust were Chehalis Hegner and John Hegner. Therefore, the proper Plaintiffs in connection with the Policy

taken out on Richard Hegner's life are Chehalis Hegner and John Hegner. Chehalis Hegner and John Hegner are residents of Illinois. At the time of his death, Richard Hegner was a resident of Florida.

xvii) **Insured: Herbert Gaynor**. A Policy was taken out on Herbert Gaynor's life through the Program. In connection with the Policy taken out on Herbert Gaynor's life, the Herbert Gaynor Family Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Frances L. Gaynor Revocable Trust. Jodie Rasch, Jeffrey Levey, and Beth Sackstein are the trustees and beneficiaries of the Frances L. Gaynor Revocable Trust. Therefore, the proper Plaintiffs in connection with the Policy taken out on Herbert Gaynor's life are Jodie Rasch, Jeffrey Levey, and Beth Sackstein. Jodie Rasch is a resident of Maryland, Jeffrey Levey is a resident of Florida, and Beth Sackstein is a resident of Florida. At the time of his death, Herbert Gaynor was also a resident of Florida.

xviii) **Insured: Betty Lane**. A Policy was taken out on Betty Lane's life through the Program. In connection with the Policy taken out on Betty Lane's life, the Lane Family Georgia Irrevocable

Trust was created. The beneficiary of that Irrevocable Trust was the Betty Lane Irrevocable Trust. Richard Lane is the trustee and beneficiary of the Betty Lane Irrevocable Trust. Therefore, the proper Plaintiff in connection with the Policy taken out on Betty Lane's life is Richard Lane. Richard Lane is a resident of Indiana. At the time of her death, Betty Lane was also a resident of Indiana.

xix) **Insured: Robert Schehr**. A Policy was taken out on Robert Schehr's life through the Program. In connection with the Policy taken out on Robert Schehr's life, the Robert J. Schehr Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Robert J. Schehr Protector Trust. Brian Schehr is the trustee of the Robert J. Schehr Protector Trust. Therefore, Brian Schehr, as trustee of the Robert J. Schehr Protector Trust, is the proper Plaintiff in connection with the Policy taken out on Robert Schehr's life. Brian Schehr is a resident of Florida. At the time of his death, Robert Schehr was also a resident of Florida.

xx) **Insured: Frank Crerie**. A Policy was taken out on Frank Crerie's life through the Program. In connection with the Policy

taken out on Frank Crerie's life, the Frank Crerie Family Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the Crerie Family Survivors Trust, an Arizona trust. Stephen Crerie is a beneficiary of and Bradley Huss is the trustee of the Crerie Family Survivors Trust. Therefore, Stephen Crerie and Bradley Huss, as trustee of the Crerie Family Survivors Trust, are the proper Plaintiffs in connection with the Policy taken out on Frank Crerie's life. Stephen Crerie and Bradley Huss are residents of Arizona. At the time of his death, Frank Crerie was also a resident of Arizona.

xxi) **Insured: James Donald Tomberlin**. A Policy was taken out on James Donald Tomberlin's life through the Program. In connection with the Policy taken out on James Donald Tomberlin's life, the Tomberlin Family Georgia Irrevocable Trust was created. On information and belief, the beneficiaries of that Irrevocable Trust were Patricia Anderson Tomberlin and Daniel Kent Tomberlin. Therefore, the proper Plaintiffs in connection with the Policy taken out on James Donald Tomberlin's life are Patricia Anderson Tomberlin and Daniel

Kent Tomberlin. Patricia Anderson Tomberlin and Daniel Kent Tomberlin are residents of North Carolina. At the time of his death, James Donald Tomberlin was also a resident of North Carolina.

xxii) **Insured: Gilbert Rooney**. A Policy was taken out on Gilbert Rooney's life through the Program. In connection with the Policy taken out on Gilbert Rooney's life, the Gib R. Rooney Irrevocable Trust was created. On information and belief, the beneficiary of that Irrevocable Trust was the Gib R. Rooney 2005 Irrevocable Trust, and the beneficiaries of that trust were Michael Rooney, Patrick Rooney, and Robbi Rooney. Therefore, the proper Plaintiffs in connection with the Policy taken out on Gilbert Rooney's life are Michael Rooney, Patrick Rooney, and Robbi Rooney. Michael Rooney is a resident of Alabama, Patrick Rooney is a resident of Michigan, and Robbi Rooney is a resident of Michigan. At the time of his death, Gilbert Rooney was also a resident of Michigan.

xxiii) **Insured: Louis Feldman**. On information and belief, a Policy was taken out on Louis Feldman's life through the Program. On information and belief, in connection with the Policy taken out

on Louis Feldman's life, an Irrevocable Trust was created in the name of Louis Feldman. On information and belief, the beneficiaries of that Irrevocable Trust were Moshe Mark Feldman, Sara Reichman, and Leah Schachter. Therefore, the proper Plaintiffs in connection with the Policy taken out on Louis Feldman's life are Moshe Mark Feldman, Sara Reichman, and Leah Schachter. Moshe Mark Feldman is a resident of Israel, Sara Reichman is a resident of New York, and Leah Schachter is a resident of California. At the time of his death, Louis Feldman was also a resident of California.

xxiv) **Insured: Leah Bethill-Betensky**. A Policy was taken out on Leah Bethill-Betensky's life through the Program. In connection with the Policy taken out on Leah Bethill-Betensky's life, the Leah Bethill-Betensky Irrevocable Trust was created. On information and belief, the beneficiaries of that Irrevocable Trust were the Leah Bethill-Betensky Liberty Trust and Fern Portnoy. Fern Portnoy is also the beneficiary of the Leah Bethill-Betensky Liberty Trust. Therefore, the proper Plaintiff in connection with the Policy taken out on Leah Bethill-Betensky's life is Fern Portnoy. Fern Portnoy is a

resident of Florida. At the time of her death, Leah Bethill-Betensky was a resident of Massachusetts.

xxv) **Insured: James Gillis**. A Policy was taken out on James Gillis' life through the Program. In connection with the Policy taken out on James Gillis' life, the James Gillis Family Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was the James A. Gillis Charitable Trust. Arthur Gillis and Lora A. Gillis are beneficiaries of the James A. Gillis Charitable Trust as descendants per stirpes of John Gillis. Therefore, Arthur Gillis and Lora A. Gillis are proper Plaintiffs in connection with the Policy taken out on James Gillis' life. Arthur Gillis is a resident of Massachusetts. Lora A. Gillis is a resident of South Carolina. At the time of his death, James Gillis was a resident of Florida.

xxvi) **Insured: Joseph P. Eblen**. A Policy was taken out on Joseph P. Eblen's life through the Program. In connection with the Policy taken out on Joseph P. Eblen's life, the J. Eblen Family Georgia Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was Roberta S. Eblen, who is deceased. Martha Jane Eblen is the Collector of the Estate of Roberta S.

Eblen, a North Carolina estate, and Paul F. Eblen is an heir of Roberta S. Eblen. Therefore, Martha Jane Eblen, as Collector of Roberta S. Eblen's Estate, and Paul F. Eblen are proper Plaintiffs in connection with the Policy taken out on Joseph P. Eblen's life. Martha Jane Eblen is a resident of North Carolina. Paul F. Eblen is a resident of North Carolina. At the time of his death, Joseph P. Eblen was also a resident of North Carolina.

xxvii) **Insured: Camillus Theodore DeCinces**. On information and belief, a Policy was taken out on Camillus Theodore DeCinces' life through the Program. On information and belief, in connection with the Policy taken out on Camillus Theodore DeCinces' life, an Irrevocable Trust was created in the name of Camillus Theodore DeCinces. On information and belief, the beneficiary of that Irrevocable Trust was Cheryl DeCinces Carter. Therefore, the proper Plaintiff in connection with the Policy taken out on Camillus Theodore DeCinces' life is Cheryl DeCinces Carter. Cheryl DeCinces Carter is a resident of California. At the time of his death, Camillus Theodore DeCinces was also a resident of California.

xxviii) **Insured: Rosemary Bedinghaus**. A Policy was taken out on Rosemary Bedinghaus' life through the Program. In connection with the Policy taken out on Rosemary Bedinghaus' life, the Bedinghaus Family Georgia Irrevocable Trust was created. The beneficiaries of that Irrevocable Trust were Ronald Bedinghaus, Daniel Bedinghaus, Roger Bedinghaus, Janet Terry, and Gerald Bedinghaus. Therefore, the proper Plaintiffs in connection with the Policy taken out on Rosemary Bedinghaus' life are Ronald Bedinghaus, Daniel Bedinghaus, Roger Bedinghaus, Janet Terry, and Gerald Bedinghaus. Ronald Bedinghaus is a resident of Kentucky, Daniel Bedinghaus is a resident of Kentucky, Roger Bedinghaus is a resident of Ohio, Janet Terry is a resident of Florida, and Gerald Bedinghaus is a resident of Kentucky. At the time of her death, Rosemary Bedinghaus was also a resident of Florida.

xxix) **Insured: Edward Wirkowski**. A Policy was taken out on Edward Wirkowski's life through the Program. In connection with the Policy taken out on Edward Wirkowski's life, the Wirkowski Family Georgia Irrevocable Trust was created. The beneficiaries of that Irrevocable Trust were James B.

Wirkowski and John C. Wirkowski. Therefore, the proper Plaintiffs in connection with the Policy taken out on Edward Wirkowski's life are James B. Wirkowski and John C. Wirkowski. James B. Wirkowski is a resident of New Jersey. John C. Wirkowski is a resident of Indiana. At the time of his death, Edward Wirkowski was a resident of Florida.

xxx) **Insured: Ann Selby**. A Policy was taken out on Ann Selby's life through the Program. In connection with the Policy taken out on Ann Selby's life, the Selby Family Georgia Irrevocable Trust was created. The beneficiary of that Irrevocable Trust was Paul Selby. Therefore, the proper Plaintiff in connection with the Policy taken out on Ann Selby's life is Paul Selby. Paul Selby is a resident of Florida. At the time of her death, Ann Selby was also a resident of Florida.

xxxi) **Insured: Julius Neumann**. A Policy was taken out on Julius Neumann's life through the Program. In connection with the Policy taken out on Julius Neumann's life, the Julius Neumann Irrevocable Trust was created. On information and belief, Aaron Benjamin Neumann and Milton Neumann were beneficiaries of that Irrevocable Trust. Therefore, Aaron

Benjamin Neumann and Milton Neumann are proper Plaintiffs in connection with the Policy taken out on Julius Neumann's life. Aaron Benjamin Neumann and Milton Neumann are residents of New York. At the time of his death, Julius Neumann was also a resident of New York.

xxxii) **Insured: Helen Greeley**. A Policy was taken out on Helen Greeley's life through the Program. In connection with the Policy taken out on Helen Greeley's life, the Helen B. Greeley Irrevocable Trust dated November 17, 2004 was created. The beneficiary of that Irrevocable Trust was the Helen B. Greeley Irrevocable Trust dated November 26, 2014. The GST Trust Art X Helen B Greeley Family Trust is the surviving trust of the Helen B. Greeley Irrevocable Trust dated November 26, 2014. Jeffrey Cotter is a trustee of the GST Trust Art X Helen B Greeley Family Trust. Therefore, Jeffrey Cotter, as a trustee of the GST Trust Art X Helen B Greeley Family Trust, is a proper Plaintiff in connection with the Policy taken out on Helen Greeley's life. Jeffrey Cotter is a resident of Florida. At the time of her death, Helen Greeley was also a resident of Florida.

xxxiii) **Insured: Samuel Romano**. A Policy was taken out on Samuel Romano's life through the Program. In connection with the Policy taken out on Samuel Romano's life, the Romano Family Georgia Irrevocable Trust was created. On information and belief, the beneficiaries of that Irrevocable Trust were James Romano and Donna Koonce. Therefore, the proper Plaintiffs in connection with the Policy taken out on Samuel Romano's life are James Romano and Donna Koonce. James Romano is a resident of Illinois. Donna Koonce is a resident of Florida. At the time of his death, Samuel Romano was a resident of Florida.

xxxiv) **Insured: Alfred Dudley**. On information and belief, a Policy was taken out on Alfred Dudley's life through the Program. On information and belief, in connection with the Policy taken out on Alfred Dudley's life, an Irrevocable Trust was created in the name of Alfred Dudley. On information and belief, the beneficiaries of that Irrevocable Trust were Richard Dudley and John Dudley. Therefore, the proper Plaintiffs in connection with the Policy taken out on Alfred Dudley's life are Richard Dudley and John Dudley. Richard Dudley is a resident of

Connecticut. John Dudley is a resident of Rhode Island. At the time of his death, Alfred Dudley was a resident of Florida.

5. Defendant Liberty One Funding Trust is a Delaware statutory trust.

6. Defendant Liberty Two Funding Trust is a Delaware statutory trust.

7. The sole beneficial owner of Liberty is Horizon Trade & Finance (Ireland), Ltd., an Irish company.

8. The financing for Liberty and the Program was provided by Credit Suisse Group AG and its related affiliates, including Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse"), and Credit Suisse has a direct financial interest in the outcome of this litigation.

9. Wells Fargo Bank is a national banking association organized and existing under federal law with its main office located in Sioux Falls, South Dakota.

10. Wells Fargo Delaware Trust Company, N.A. is a national banking association organized and existing under federal law with its main office located in Wilmington, Delaware.

11. Wells Fargo Bank was intimately involved in these transactions and, among other things, served as Georgia Trustee of Liberty One Funding Trust and Liberty Two Funding Trust; as Trustee of Liberty One SPIA Trust and Liberty Two SPIA Trust; as Trustee of the Irrevocable Trusts formed in the names of the Insureds;

as Manager of the Georgia LLCs created in the name of each insured; and as Securities Intermediary of the Policies.

12. Wells Fargo Delaware Trust Company served as Statutory Trustee of Liberty One Funding Trust and Liberty Two Funding Trust and as Trustee of Liberty One Master Trust and Liberty Two Master Trust.

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 as well as under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiffs and the Defendants.

14. Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, and Wells Fargo Delaware Trust Company previously consented to personal jurisdiction in Georgia concerning this dispute, and Georgia's long arm statute is otherwise satisfied. Ga. Code Ann. § 9-10-91(1), (3).

15. Venue is appropriate in this Court because a substantial part of the acts giving rise to the claims set forth herein occurred in this district.

## FACTS

### Using Life Insurance To Wager On Human Life Is Repugnant to Georgia's Decisional Law, Statutes, and Public Policy

16. "Using life insurance policies to 'wager' on human lives is not a new practice," but it is one that has been condemned as a matter of public policy and has been outlawed by case law and statutes for well over a century. *Jackson Nat'l Life*

*Ins. Co. v. Crum*, 880 S.E.2d 205, 207 (Ga. 2022) (explaining that such wagering became popular in 18th century England, and "[d]isapproval of these human-life wagers goes back almost as far").

17. In Georgia and elsewhere, the common law prohibition against human-life wagers was codified to require that any person procuring or causing a policy to be procured on the life of another person must have an insurable interest in the life of the person being insured. *Id.* at 208–09.

18. As explained by the Georgia Supreme Court, the purpose of Georgia's insurable interest requirement is to uphold Georgia's public policy against "wagering on human lives." *Id.* at 208 (quoting *Wood v. N.Y. Life Ins. Co.*, 336 S.E.2d 806, 809–10 (Ga. 1985)).

19. "In other words, in the life insurance context, [Georgia] law generally relies on the insurable interest to distinguish between valid life insurance policies and illegal wagering contracts." *Id.*

20. At the time of the relevant transactions, Georgia's insurable interest statute defined the limited circumstances under which a person could have an insurable interest in the life of another person, as follows: "An insurable interest, with reference to personal insurance, is an interest based upon a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of another person *and* consequent loss by reason of such person's death or

disability or a substantial interest engendered by love and affection in the case of individuals closely related by blood or by law." O.C.G.A. § 33-24-3(a) (emphasis added).

21. Thus, to claim an insurable interest in the life of another, one must typically be able to establish that they "reasonably expect to be better off financially if the life continues, *and* worse off if it ends." *Crum*, 880 S.E.2d at 209 (emphasis added).

22. The time at which an insurable interest is measured is "the time the contract of [life] insurance becomes effective." *Id.* (citing O.C.G.A. § 33-24-3(h) (2016)).

23. Indeed, "[a]ny personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i) (2016).

24. Because applicable law precludes one from using a life insurance policy to create a human life wager, courts are required to look beyond the form of the transaction to determine what actually occurred. *See*, *e.g.*, *Crum*, 880 S.E.2d at 209 (explaining that where a third party "procured or caused to be procured" a policy on the life of another, said policy is void and that courts must look to the substance of

the transaction, not merely its form); *Exchange Bank of Macon v. Loh*, 31 S.E. 459, 462, 466–67 (Ga. 1898) (holding "the form in which the transaction is clothed is utterly immaterial . . . The real thing to be ascertained in any given instance is, what was the actual object of the parties," and life insurance transactions must be bona fide, and not merely a cover for obtaining wagering or merely speculative insurance, and a device to evade the law).

25. Wherever a third party lacking insurable interest has "procured or caused to be procured" a policy on the life of another and the "benefits under the contract are payable to" the third party, whether directly or indirectly, that policy is a void *ab initio* illegal wager. *Crum*, 880 S.E.2d at 209–211.

26. As detailed below, the Policies violated Georgia's insurable interest statute, O.C.G.A. § 33-24-3, and used the Trust Beneficiaries to create the false appearance of an insurable interest, because Liberty procured or caused the Policies to be procured; because at inception of each Policy, over 90% of the benefits under each Policy were "payable" to Liberty, even though the transactions made it appear that the Policy death benefits would be paid to the Trust Beneficiaries; because Liberty lacked any valid insurable interest in the lives of the Insureds, including because Liberty was better off financially if the Insureds died at the moment each Policy was made, and Liberty would never have been worse off if an Insured died; and because Liberty concealed its human life wagering by dressing up its STOLI

transactions to look like legitimate premium financing and by using the Insureds and the Trust Beneficiaries as instrumentalities to procure the Policies for Liberty's immediate benefit.

27. Although human life wagering through life insurance has been a scourge for centuries, and although a variety of STOLI schemes flooded the life insurance market in the mid-2000s (and have since been routinely struck down by courts around the country), the STOLI program operated by Liberty and Wells Fargo was especially egregious because it not only feigned compliance with Georgia law, but it involved a well-documented preexisting agreement whereby, *before each Policy was made*, Liberty was the actual beneficiary and was guaranteed well over 90% of each Policy's death benefit.

28. While such a preexisting agreement is not necessary to find, as a matter of law, that a policy lacked insurable interest, the existence of such an agreement leaves absolutely no doubt that a transaction was STOLI and that the subject policy and all related transaction documents are void *ab initio*.

29. Indeed, in 1911, the United States Supreme Court described this sort of wagering scheme—where a policy was "taken out for the purpose of allowing a stranger association to pay the premiums and receive the greater part of the benefit, and having been assigned to it at once"—as the "strongest" and most obvious type

of human life wager, and one that is universally condemned and void. *Grigsby v. Russell*, 222 U.S. 149, 156 (1911).

30. Nonetheless, this is precisely the type of STOLI scheme Liberty and Wells Fargo perpetuated, and on a massive scale. Liberty and Wells Fargo not only procured the Policies at issue here without insurable interest, but they repeated this over a hundred times on the lives of senior citizens from around the country. And, when these seniors and the Insureds at issue here passed away, Liberty and Wells Fargo cashed-in on their wagers by collecting millions of dollars of STOLI life insurance proceeds, including under the Policies, to the direct financial detriment of the Trust Beneficiaries.

31. Because the Policies are void *ab initio* for lack of insurable interest, and because Liberty and Wells Fargo received illegal wagering proceeds from the Policies, Liberty and Wells Fargo should be deemed to be holding those proceeds in constructive trust for Plaintiffs, who as the Trust Beneficiaries, are the rightful recipients of such proceeds. *Loh*, 31 S.E. at 464 (the common law raises a constructive trust over proceeds received from a life insurance policy deemed to have been a wagering contract).

32. Accordingly, and in addition to the other claims and relief set forth below, Plaintiffs are entitled to the entire death benefit under each of the Policies

that are at issue in this case, less any amounts previously received, plus prejudgment interest from the date Defendants received such proceeds.

**<u>The STOLI Program</u>**

33. Liberty One Funding Trust and Liberty Two Funding Trust are shell entities owned and run by an Irish company called Horizon Trade and Finance (Ireland), Ltd. ("Horizon"), and whose only business is procuring life insurance policies on the lives of strangers.

34. Horizon also owns two so-called Master Trusts and two SPIA Trusts, both created specifically for the Program.

35. Wells Fargo Bank is the Trustee of the Funding Trusts and SPIA Trusts, and Wells Fargo Delaware Trust Company is the Statutory Trustee of the Funding Trusts and Trustee of the Master Trusts.

36. Horizon itself is owned by an entity called Horizon Life Solutions ("HLS"), which in turn also owns (or owned) Park Venture Advisors LLC ("PVA"), a New York-based entity now infamous for its ties to STOLI schemes throughout the U.S. in the mid-2000s. *See, e.g.*, *PHL Var. Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059 (Del. 2011) (outlining the illegality of a notorious PVA-related STOLI scheme).

37. Finally, Credit Suisse was responsible for providing funding to Liberty so that Liberty could procure the Policies and well over a hundred others like them, for Liberty's benefit at inception.

38. While the Program ostensibly provided a means by which senior citizens could obtain life insurance through long-term, non-recourse premium financing, this was a ruse. In reality, the Program, through its "maze of related entities," existed as a means for Liberty, with the aid and assistance of its agent Wells Fargo, to do exactly what has been outlawed in Georgia for over a hundred years—procure, for its own benefit, life insurance policies on the lives of strangers where Liberty was guaranteed over 90% of each policy's death benefit even prior to each policy's creation. *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1335–36 (11th Cir. 2009) (describing the Program as "a complicated insurance investment mechanism . . . in which [the Insured] ultimately retained very little financial interest in the policy that nominally was intended to insure his [or her] life [and] [t]he various entities that comprised the program worked together to finance a high-value life insurance policy . . . [and] [i]n exchange, the [Liberty] entities reserved for themselves the vast majority of the expected payout of the policy") (quoting *Am. Gen. Life Ins. Co. v. Schoenthal Family, L.L.C.*, 248 F.R.D. 298, 301 (N.D. Ga. 2008)).

39. Liberty and Wells Fargo accomplished their objectives by employing a large number of agents across the country, and the mechanism used to further their STOLI scheme and racketeering activities was consistent and included, but was not limited to, targeting potential senior citizen insureds (including the Insureds here) and misrepresenting, to those insureds, the nature of the Program and the accompanying "loan" agreements, and thereafter improperly charging principal, interest, and other costs and fees to the ultimate detriment of the Trust Beneficiaries.

40. The Program was deliberately and unnecessarily complex, and was not at all what Liberty and Wells Fargo advertised and described it to be. The Program was promoted as straightforward life insurance premium financing, where the premiums would be borrowed; the principal and interest on a "loan" would be paid with the policy proceeds; and whatever policy proceeds were left over would be paid to family members of the senior citizen insureds, who would be designated as beneficiaries of the Irrevocable Trusts (i.e., the Trust Beneficiaries) created as part of the Program.

41. In reality, however, there was no life insurance premium financing. Instead, Liberty used the cover of fake loans to purchase for itself a direct interest in each policy such that, before any policy contract was made for the hundreds of policies Liberty procured (including the contracts for the Policies at issue here), Liberty was the actual beneficiary and owner of over 90% of each policy's death

benefit. In this way, Liberty had a financial interest in the early deaths of hundreds of insureds (including the Insureds here) and thus lacked any possible insurable interest in their lives.

42. For their part, the insureds' family members designated as beneficiaries of the Irrevocable Trusts created as part of the Program (including the Trust Beneficiaries here) were given only a small fraction of the Policies' death benefits, and those amounts were nothing more than the financial inducement Liberty and Wells Fargo used to lure and entice seniors to permit Liberty and Wells Fargo to procure the Policies in the first place.

43. The main risk to Liberty in these transactions was that an insured would not die and that Liberty would need to continue to pay premiums to keep the policies in force until the inevitable happened. This is known in the industry as "longevity risk."

44. In order to offset its longevity risk, Liberty hedged its bet by purchasing massive SPIAs on the lives of each insured, with each SPIA producing monthly payments to Liberty that were tens of thousands of dollars in excess of the ongoing cost to fund the premiums on each respective policy.

45. In this way, Liberty not only had a financial interest in the immediate deaths of the insureds because Liberty would always receive well over 90% of each policy's death benefit, whether an insured died immediately or years later, but

Liberty guaranteed that it could never suffer a loss because the ongoing policy premiums were funded by the SPIAs, and the SPIAs gave Liberty monthly profits even if the insureds survived.

46. As detailed below, however, Liberty and Wells Fargo *intentionally concealed* from the Insureds and the Trust Beneficiaries the details about these SPIAs, including the cost and amount of each SPIA, the amount of monthly payments each SPIA generated, and the fact that there was excess monthly cash that Liberty pocketed for itself.

47. Worse still, Liberty and Wells Fargo *intentionally concealed* from the Insureds and the Trust Beneficiaries the fact that although Liberty was making excess monthly profits from the SPIAs, the full cost of the SPIAs was actually being deducted from the amounts that were supposedly payable to the Trust Beneficiaries through each of the respective Policies.

48. On top of this, Liberty, with the assistance of its agent Wells Fargo, also misrepresented and vastly understated to the Trust Beneficiaries the amounts that they were entitled to receive through each Policy, misrepresented and vastly overstated the amounts that Liberty was entitled to receive, and fraudulently deceived the Trust Beneficiaries into accepting much smaller payments, including by fraudulently reducing the amounts payable to the Trust Beneficiaries through

various undisclosed fees and interest that amounted to hundreds of thousands of dollars in each transaction.

**Liberty, Wells Fargo, and Their Cohorts and Agents Lure Seniors into the Program and Have Them Sign Liberty's Boilerplate, Non-negotiable Program Documents, Using The Trust Beneficiaries To Create The False Appearance of Insurable Interest**

49. The only things Liberty and Wells Fargo needed to carry out their scheme were warm-bodied senior citizens to sign the form Program documents.

50. Liberty and Wells Fargo found these seniors by hiring local insurance producers and brokers throughout the United States who were appointed as so-called "Approved Third Party Originators."

51. Working on behalf of Liberty and Wells Fargo, these Approved Third Party Originators would locate senior citizens (with whom Liberty and Wells Fargo had no prior relationship and in whom they possessed no insurable interest) to serve as potential Insureds on whose lives they could procure and finance large life insurance policies for Liberty's and Wells Fargo's benefit through the Program.

52. Unlike any normal life insurance transaction, and contrary to any legitimate premium financing program, Liberty and Wells Fargo exclusively targeted seniors who were *not* in need of life insurance, who were *not* even shopping for life insurance, and who did *not* want to pay for or have any liability to pay for life insurance.

53. As an example, one of Liberty's Approved Third Party Originators was Amy Holmwood. Ms. Holmwood, along with her business HK Ventures, and her husband Ed Leisher, promoted the Liberty Program to countless insureds, including 15 of the Insureds in this case. Ms. Holmwood would only market the Program to clients who had "underutilized insurance capacity" and did not want or need a large life insurance policy. **Exhibit A**, Holmwood Dep., at 34:13–22, 36:15-37:5, 37:25–38:13. She advocated for the Program as a risk-free, non-recourse program. *Id.* at 33:5–34:22.

54. The Program not only sought out seniors who did not want or need life insurance, but it was promoted by inducing those individuals with the promise of financial compensation.

55. Specifically, in exchange for allowing large life insurance policies to be procured on their lives at no cost to them, the seniors would receive financial compensation of "between 5% to 15% of a policy's face amount," which would come in the form of an "upfront advance" or a "periodic advance." The Insureds were also induced by the promise that a small portion of each Policy's death benefit would be paid to their families when they died.

56. Liberty and Wells Fargo made these representations and promises through written Program marketing materials (the "Program Materials") distributed

to the Approved Third Party Originators by telephone, facsimile, email, regular mail, and other common carriers.

57. In turn, and on behalf of Liberty and Wells Fargo, the Approved Third Party Originators would transmit these Program Materials as well as other information about the Program to the Insureds by telephone, facsimile, email, regular mail, and other common carriers. On behalf of Liberty and Wells Fargo, the Approved Third Party Originators would use the Program Materials to solicit seniors with whom they had existing relationships.

58. Liberty and Wells Fargo also used the Program Materials to describe the Program to the Insureds prior to the Insureds signing Liberty's alleged "loan" agreements (the "Financing Agreements"). Liberty and Wells Fargo even had the Insureds sign the Program Materials.

59. For example, on or about October 2004, Liberty and Wells Fargo caused a set of Program Materials to be sent to Helen Wilkenfeld, which falsely described the Program as legitimate premium financing, in order to induce Ms. Wilkenfeld to participate in the Program and sign the Financing Agreement. **Exhibit B**, The Liberty Premium Finance Program. Liberty and Wells Fargo then had Ms. Wilkenfeld sign the Program Materials and transmit the materials back to Liberty and Wells Fargo. *Id*. at 17.

60. When advertising the Program to the Insureds and soliciting the Insureds to participate, Liberty and Wells Fargo claimed that the Program "provides financing for the payment of life insurance premiums for eligible participants . . . purchasing insurance on the life of eligible individuals," that the Program "requires no cash outlay or collateral commitment from the Participant," that the "Policy owner furnishes *only* the policy as collateral," and that there is "[n]o 'out-of pocket' payment." *Id.* at 4, 8, 11.

61. Insureds were induced with the promise of financial compensation and were told, through written disclosures, that their families (i.e., the Trust Beneficiaries in this case) would receive "a net death benefit at the maturity of the policy after taking into account the Program financing costs," including what Liberty and Wells Fargo described as a so-called "Maturity Date Payment." *Id.* at 5.

62. Liberty also vaguely informed the Insureds (all the while hiding the real details) that Liberty would be purchasing "single premium immediate annuities" (the "SPIAs") on their lives and that "[t]he cash flows generated from the SPIAs will fund the policy premiums and periodic payments to the [Insureds], if elected, under the Financing Agreement, the payments under the Notes, and the management fees payable to the Program manager." *Id.* at 14. Indeed, Ms. Holmwood confirmed that she did not inform the Insureds/Trust Beneficiaries the details of the SPIAs. **Exhibit A** at 41:13–43:7, 94:18–96:24.

63. Liberty also informed the Insureds that when they passed away and a life insurance death benefit was paid, "the policy proceeds will be used to repay" what Liberty described as "advances for policy premiums and any periodic payments made to the [Insured] under the Financing Agreement, together with interest thereon and an additional Maturity Date Payment, each to [Liberty], with any remaining proceeds of the policy being retained by the [Insured]." **Exhibit B** at 14.

64. In this way, Liberty promoted the Program as a legitimate premium financing program whereby money would be borrowed to pay premiums on a life insurance policy on the life of each Insured. *Id.* at 4 (defining "Liberty Premium Financing" as "[f]inancing premiums with the life insurance policy as the collateral provided by the [Insureds]").

65. Unlike a legitimate life insurance premium financing lender, however, if a senior citizen agreed to participate in the Program, Liberty would obtain a HIPAA release from the senior Insured and collect their medical records so that Liberty could prepare a life expectancy or mortality study for Liberty to predict when the senior Insured would die.

66. Liberty's purpose in predicting when each Insured would die had nothing to do with valid premium financing lending, and everything to do with Liberty attempting to gauge how valuable its wager on the life of that senior citizen

Insured might be and the extent of the longevity risk Liberty was taking on (i.e., the risk that the senior would live too long).

67. Indeed, using these life expectancy reports, Liberty would decide whether it even wanted to obtain a policy on that proposed insured, the amount of coverage that would be obtained, the insurance carrier from which coverage would be obtained, the terms and conditions of that coverage, and the manner and amount in which premium payments would be made on any Policy.

68. To be clear, valid premium financing lenders are not interested in the medical records of an insured who may want to actually borrow, at their own expense and risk, money to finance a life insurance policy. Nor do valid premium financing lenders conduct pre-policy life expectancy studies on such a proposed insured, nor do valid premium financing lenders decide the type of policy to be financed, the carrier, the terms of coverage, or the amount of coverage and the cost of premiums.

69. Here, however, all of these key decisions were made by Liberty, not the Insureds or their family members.

70. Courts around the country have universally recognized that transactions like this—where self-described premium finance lenders obtain life expectancy reports, induce insureds with promises of free insurance and financial compensation, and make all of the key decisions about whether to apply for a policy and under what terms—are obvious STOLI schemes. *See, e.g.*, *PHL Variable Ins. Co. v. Price Dawe*

*2006 Ins. Trust*, 28 A.3d 1059, 1068 n.25 (Del. 2011) (holding that STOLI policies are void *ab initio* and a "fraud on the court").

71. Assuming Liberty was satisfied that any particular senior was a suitable candidate for the Program and Liberty was interested in procuring (for Liberty's true benefit) and paying for a policy on that senior insured's life, Liberty would provide the senior, as the proposed insured, with non-negotiable boilerplate documents that the insureds were told to sign, and which created multiple entities in Georgia, including: an Irrevocable Trust in the Insured's name; and (ii) a limited liability company (the "LLC") in the Insured's name. **Exhibit C**, Wilkenfeld Irrevocable Trust Agreement; **Exhibit D**, Wilkenfeld LLC Operating Agreement.

72. This standard transaction occurred with all of the Insureds at issue here. The Insureds had no ability to negotiate or edit the terms of the trust agreements for the Irrevocable Trusts, and no ability to select the trustee. Indeed, although the Insureds were identified as the grantors of the Irrevocable Trusts, Liberty dictated all of the terms of these trust agreements, and Liberty dictated that, in every case, Wells Fargo Bank was the trustee. **Exhibit C** at 8.

73. The trust agreements for the Irrevocable Trusts identified the Trust Beneficiaries as beneficiaries. *Id.* at 2. But this was a sham to cover the fact that, before any Policies were made, Liberty had purchased the right to receive approximately 95% of each Policy's death benefit, making Liberty the true

beneficiary of each Policy at inception, and to thus cover-up the fact that Liberty and Wells Fargo were wagering on the lives of the Insureds.

74. To that end, by outward appearances, the purported purpose of the Irrevocable Trusts was "to own the limited liability company member interest" in an LLC in the respective Insureds' name (e.g., the "The Helen Wilkenfeld 2004, LLC"). *Id*.

75. In turn, the boilerplate Liberty trust agreements for the Irrevocable Trusts directed the trustee, Wells Fargo Bank, to become the "Manager" of the LLC in each respective Insureds' name. *Id.*

76. To form the LLC (of which the Irrevocable Trust would own the member interest and Wells Fargo Bank would be the Manager), each prospective Insured signed a boilerplate Liberty document called an Operating Agreement. **Exhibit D** at 2.

77. As with the Irrevocable Trust agreements, the Insureds had no ability to negotiate or edit the Operating Agreements, and it was Liberty who dictated that Wells Fargo Bank would be the Manager of each LLC.

78. By outward appearances, the purpose of the LLCs was to have these entities—acting through Wells Fargo Bank—apply for the Policies as the proposed owners and beneficiaries.

79. Accordingly, because the sole members/owners of each LLC were the Irrevocable Trusts, and because the Trust Beneficiaries of the Irrevocable Trusts were family members of the Insureds, this layered LLC and trust structure created the outward (yet false) appearance that the Policies themselves were being procured by the Insureds for the actual benefit of each Insureds' loved ones—the Trust Beneficiaries—such that the proceeds of each Policy would pass through the respective LLC to the respective Irrevocable Trust, and then to the Plaintiffs herein, as the Trust Beneficiaries.

80. In fact, as part of each transaction, Liberty and Wells Fargo obtained a boilerplate insurable interest opinion letter from their lawyers which concluded that the appearance of a legitimate insurable interest could only exist in each Policy if family members of the insureds were named as the beneficiaries of the Irrevocable Trusts. Accordingly, in each transaction—including the ones at issue here—Liberty and Wells Fargo used the legitimate insurable interest possessed by the beneficiaries of each Irrevocable Trust to create the false appearance that the transactions were lawful. **Exhibit E**, Opinion Letter, at 5–8.

81. More specifically, Liberty and Wells Fargo's lawyers concluded that if Liberty and Wells Fargo could make it appear that the Policies were payable to the Irrevocable Trusts with the Insured's "family members" as the Trust Beneficiaries, one might be led to believe that the Policies were being procured for the benefit of

the Irrevocable Trusts and, thus, the Trust Beneficiaries, and one might then conclude these transactions were supported by a true insurable interest. *Id.*

82. But all of this was a complete ruse that not only used the Insureds as instrumentalities, but which used the very Trust Beneficiaries who are the Plaintiffs in this case to create the false appearance of insurable interest at the time each Policy was incepted. Indeed, although the LLCs were the named owners and beneficiaries of the Policies at their inception, and the sole member of each LLC was an Irrevocable Trust in the respective Insured's name with the Insureds' family members (i.e., the Trust Beneficiaries) identified as the beneficiaries of the Irrevocable Trusts, the LLCs and the Irrevocable Trusts were never intended to be—and never really were—the actual owners or beneficiaries of the Policies.

83. Rather, by dictating that Wells Fargo Bank must be the trustee of each of the Irrevocable Trusts and Manager of each of the LLCs, Liberty had complete control over the entirety of each transaction and control over each Policy. And, through Wells Fargo Bank, ***the benefits of each Policy were actually payable to Liberty before any insurance contract was even made***.

84. Wells Fargo Bank's true master in these transactions was Liberty (and Liberty's principals), because Liberty not only dictated Wells Fargo Bank's roles in connection with the Irrevocable Trusts and the LLCs, but Liberty paid Wells Fargo Bank for its services and Liberty installed Wells Fargo Bank and Wells Fargo

Delaware Trust Company in multiple conflicting capacities which directly served Liberty's interests.

85. Specifically, Wells Fargo Bank was also the Georgia Trustee of the Liberty One Funding Trust and Liberty Two Funding Trust (meaning that Wells Fargo Bank was the trustee of Liberty itself) and Trustee of the SPIA Trusts, and Wells Fargo Delaware Trust Company was the Statutory Trustee of the Funding Trusts and Trustee of the Master Trusts.

86. This allowed Liberty to use these Wells Fargo entities to control the Irrevocable Trusts and the LLCs for and on behalf of Liberty, and to operate the Program in whatever manner Liberty wanted.

87. For example, although the Program made it appear on paper that the LLCs were the owners and beneficiaries of the Policies, that the owner of the LLCs was the Irrevocable Trusts, and thus that the death benefit of any Policy would flow through to the Trust Beneficiaries as the beneficiaries of the Irrevocable Trusts, this was a fiction because, behind the scenes, Liberty used Wells Fargo to give Liberty ownership and control of the Policies and their death benefits—before any Policy contract was made—by having Wells Fargo enter into assignments purportedly by and between the Irrevocable Trusts (acting through Wells Fargo, as their trustee) and the LLCs (acting through Wells Fargo, as their Manager), through which the LLCs—

acting through Wells Fargo—assigned all of their rights, title, and interests in the Policies and the Policies' death benefits to Liberty.

88. The purpose of these assignments was not to benefit the Insureds or the Trust Beneficiaries, but rather to ensure that Liberty had exclusive control over each of the Policies from inception and would, therefore, receive the vast majority of the death benefits of the Policies whenever the Insureds passed away, to the direct detriment of the Trust Beneficiaries.

89. Even though Liberty was guaranteed more than 90% of each Policy's death benefit regardless of when the Insureds passed away, Liberty realized its largest profit the sooner the Insureds died. **Exhibit A** at 112:19–114:14.

90. To further conceal its wagering scheme, Liberty and Wells Fargo had the Insureds sign a complex, boilerplate Financing Agreement, each of which was non-negotiable. *See*, *e.g.*, **Exhibit F**, Wilkenfeld Financing Agreement.

91. The Financing Agreements were transmitted to and from Liberty and Wells Fargo and the Insureds by telephone, facsimile, email, regular mail, and other common carriers.

92. The Financing Agreements were composed of three parts: (i) an "LLC Contract" that contained information specific to each Insured, such as the Insured's name and state of residence, as well as financial details particular to each Insured, such as the amounts that would be paid for initial and ongoing life insurance

premiums; (ii) "Terms and Conditions," which were incorporated into each LLC Contract and which were identical and non-negotiable; and (iii) any relevant appendices or schedules.

93. The Financing Agreements provided, as part of their Terms and Conditions, that Liberty would ostensibly provide financing in the form of "Advances," as follows:

> Except as otherwise provided below, the Funding Trust shall cause to be made to the LLC, and the LLC shall borrow, Advances for the purpose of funding Premiums, Monthly Payments and, at the Funding Trust's election with the consent of the Secured Party, expenses of the LLC.

**Exhibit F** § 1.01(a).

94. In the LLC Contract portion of the Financing Agreements, Liberty and Wells Fargo set forth the financial figures that would ostensibly apply for each, concerning the following items: (i) the "Initial Advance for Premiums"; (ii) Monthly Premiums; and (iii) any financial inducement paid to the Insured. For example, below are the figures shown in the LLC Contract of a Financing Agreement for a $6 million life insurance policy on the life of Helen Wilkenfeld:

| | |
|---|---|
| Initial Advance for Premiums: | $456,751.25 |
| Monthly Premiums: | $43,030.95 |
| Monthly Payments: | $2,047.64 |

95. By outward appearances, the Financing Agreements looked like true loans. But by operation, they were the opposite: purchase agreements whereby

Liberty, in exchange for paying all of the Policy premiums, obtained—before each Policy was made—the right to approximately 95% of each Policies' death benefit.

96. The fact that the Financing Agreements were not loans, but were instead purchases of the interests in each Policy by Liberty, is illustrated by the terms of the Financing Agreement with regard to Insured Helen Wilkenfeld, which was effective as of December 3, 2004.

97. That Financing Agreement purported to provide financing for a $6 million Policy on Ms. Wilkenfeld's life.

98. Through the Financing Agreement, which was effective prior to the date the $6 million Policy on Ms. Wilkenfeld's life was made, had Ms. Wilkenfeld passed away immediately upon the Policy being made, Liberty guaranteed itself $5,701,375 of the $6 million death benefit—which was over 95% of the death benefit.

99. In the case of Ms. Wilkenfeld, $5,244,624 of the $5,701,375 that would have been paid to Liberty had she passed away immediately upon the Policy becoming effective was attributed to a so-called Maturity Date Payment, which was vaguely defined in the Financing Agreement.

100. To justify its receipt of this amount, Liberty and Wells Fargo falsely represented to the Insureds in pre-Financing Agreement disclosures (i.e., in a footnote in the Program Materials) that such a Maturity Date Payment was the

amount due to Liberty so that Liberty could recover its "costs of the Program, such as the purchase of the SPIAs." In the case of Ms. Wilkenfeld, this information was falsely represented to her on October 25, 2004. **Exhibit B** at 19 n.1–7. An Appendix identifying by bates label a non-exhaustive list of the materially false pre-Financing Agreement disclosures is attached as **Appendix 1** and includes the dates on which false representations were made to each of the at-issue Insureds.

101. But until discovery in this matter, Liberty and Wells Fargo concealed from Plaintiffs the details about the SPIAs, including specifically how much they cost to begin with and the amount of monthly income they paid to Liberty.

102. Indeed, although the Insureds each signed applications for SPIAs, the Insureds signed these applications in blank, before any of the details were filled out. In all cases, the details of the SPIAs—including the initial premium required to purchase them—were added to the SPIA applications by individuals other than the Insureds after the Insureds signed these applications in blank.

103. For example, in the case of Ms. Wilkenfeld, Liberty and Wells Fargo have produced multiple copies of SPIA applications, each with Ms. Wilkenfeld's same undated signature, but each with varying degrees of information. In one such copy, the amount of the premium for the SPIA (i.e., the cost of the SPIA) is left blank. **Exhibit G** at 599. In a subsequent copy, however, someone other than Ms. Wilkenfeld typed information onto the SPIA application indicating that the premium

was $4,515,000. **Exhibit H** at 1023. An Appendix identifying by bates label a non-exhaustive list of the materially incomplete SPIA applications signed by the Insureds is attached as **Appendix 2**.

104. However, even the completed SPIA applications (which were not provided to the Insureds) did not indicate the amount of monthly payments that each SPIA would generate (which payments were vastly in excess of the life insurance premiums that were being hedged). Thus, for example, the completed SPIA application concerning Ms. Wilkenfeld did not indicate the amount of the annuity payments, and merely stated that monthly payments (in undisclosed amounts) would be made. **Exhibit H** at 1023.

105. Liberty and Wells Fargo concealed this information from the Insureds and from the Trust Beneficiaries, and only first revealed this information to the Trust Beneficiaries during discovery in this case.

106. Indeed, prior to commencing this lawsuit, counsel for the Trust Beneficiaries asked Liberty and Wells Fargo to turn over this information, but they refused. Liberty and Wells Fargo finally turned over this information during discovery in this case, which has revealed that Liberty and Wells Fargo purchased massive SPIAs on the lives of each Insured, with each SPIA secretly generating for Liberty far more than the monthly premium payments on each life insurance Policy.

107. For example, it was revealed during discovery that Liberty not only purchased a SPIA on Ms. Wilkenfeld's life for an upfront premium of $4,515,000, but that this SPIA generated monthly payments to Liberty of $74,458.45, beginning on August 13, 2006, until Ms. Wilkenfeld passed. **Exhibit I**.

108. This monthly SPIA payment amount was well in excess of the monthly premiums on the $6 million Policy Liberty and Wells Fargo procured on Ms. Wilkenfeld's life, which premiums were roughly $43,000. As with all of the Insureds, the SPIA on Ms. Wilkenfeld's life thus generated monthly profits to Liberty, which Liberty and Wells Fargo did not disclose to the Insureds or to the Trust Beneficiaries—for many years while the Insureds were still alive, and after they passed.

109. To that end, during the life of each Insureds, Liberty and Wells Fargo (as Liberty's trustee) provided Wells Fargo (as Manager of the LLCs) with an annual statement (the "Annual Statements") of the purported Total Amount Due to Liberty out of each Policies' death benefit.

110. As one example, an Annual Statement, dated July 9, 2009, was sent by Wells Fargo to itself—presumably because Wells Fargo was purportedly acting on behalf of multiple opposing parties in these transactions—and reported to the LLC created in connection with the Wilkenfeld transaction that if Ms. Wilkenfeld were to pass away on December 3, 2008, the "Total Amount Due" to Liberty out of the

$6 million Policy on her life was $5,692,000. **Exhibit J**. Additional Annual Statements, dated March 10, 2010 and February 8, 2011, repeated this same information. **Exhibit K; Exhibit L**.

111. As detailed below, these Annual Statements and all the others like them sent in connection with each of the Insureds were materially false and omitted material information. An Appendix listing by bates number a non-exhaustive list of the annual statements, calculation letters, and instruction letters communicated in connection with each Insured is attached as **Appendix 3** and includes the date on which false representations were made to each of the at-issue Insureds.

112. After each Insured passed, Wells Fargo, as the Manager of the LLC created in connection with each Policy, submitted a claim for the death benefit of the respective Policy.

113. For example, after Ms. Wilkenfeld passed, Wells Fargo, as the Manager of the LLC created in connection with the Wilkenfeld transaction, submitted a claim for the death benefit of the $6 million Policy Liberty and Wells Fargo had procured on her life.

114. On April 11, 2011, Wells Fargo received a death benefit check in the amount of $6,066,871.95.

115. However, without any disclosure to the Trust Beneficiaries of the Irrevocable Trust associated with Ms. Wilkenfeld, on April 28, 2011, Credit Suisse,

as the purported Calculation Agent, informed Liberty and Wells Fargo (with Wells Fargo acting in various capacities, including as Manager of the LLC related to Ms. Wilkenfeld) that the Total Amount Due to Liberty from the $6 million Policy on Ms. Wilkenfeld's life was $5,735,030.95, with a Net Death Benefit payable to the respective Trust Beneficiaries of only $308,000 (a "Post-Death Claim Communication"). **Exhibit M** at 1532–34.

116. Then, through "instruction letters" dated May 3 and May 12, 2011, Wells Fargo (acting in various capacities for Liberty), along with Horizon and Credit Suisse, instructed itself (in various purported capacities, including as Trustee of the Irrevocable Trust associated with Ms. Wilkenfeld) to transfer $5,735,030.95 of the Policy's death benefit to Liberty (a "Post-Death Claim Communication"). **Exhibit N** at 1494–99; **Exhibit O** at 1500–07.

117. The communications described above were made by and to Wells Fargo, acting for Liberty, but also to Wells Fargo in its capacity as Trustee of the Irrevocable Trusts. All communications to Wells Fargo in its capacity as Trustee of the Irrevocable Trust were, therefore, communications made to the Trust Beneficiaries, including because Wells Fargo had a fiduciary duty to disclose those communications to the Trust Beneficiaries. *See Harris v. Birnbaum*, 62 S.E.2d 204, 207 (Ga. Ct. App. 1950) (quoting *Morris v. Johnstone*, 158 S.E. 308, 309 (Ga. 1931)) ("Where persons sustain toward another a relation of trust and confidence, their

silence when they ought to speak, or their failure to disclose what they ought to disclose, is as much a fraud in law as an actual affirmative false representation.”).

118. The representations made in the Annual Statements and in the Post-Death Claim Communications to the Trust Beneficiaries were knowingly false and materially incomplete inasmuch as they omitted key information that Liberty and Wells Fargo knew yet concealed. More specifically, Liberty and Wells Fargo, for itself and on behalf of Liberty, falsely represented to the Trust Beneficiaries that: (i) the Total Amount Due to Liberty had actually been calculated, when in fact it had not and was instead the equivalent of a pre-set percentage of each Policy’s death benefit that would be paid to Liberty regardless of Liberty’s costs and regardless of when the respective Insured died; (ii) the Total Amount Due was accurate, when in fact it was massively inflated because it secretly included charging the Trust Beneficiaries, through the Irrevocable Trusts and in turn through the LLCs, for the full cost of the massive and oversized SPIAs Liberty had purchased on each Insureds’ life, without informing the Trust Beneficiaries that this had occurred, how much the SPIAs had cost, or how much the SPIAs had generated each month; (iii) the Total Amount Due was accurate, when in fact it was massively inflated because it secretly included phantom expenses that amounted to hundreds of thousands of dollars in each transaction and that Liberty and Wells Fargo used to further enrich themselves; and (iv) that the small payouts made to the LLCs, and thus to the

Irrevocable Trusts and the Trust Beneficiaries, were proper and warranted when, in fact, these amounts were intentionally and vastly understated because they had the effect of fraudulently charging the Trust Beneficiaries the cost of the SPIAs, fraudulently depriving the Trust Beneficiaries of the excess payments Liberty had secretly received from the SPIAs, and fraudulently charging the Trust Beneficiaries for unjustified, false expenses.

119. As beneficiaries of Georgia trusts, the Trust Beneficiaries were entitled as a matter of the plain terms of the Irrevocable Trust agreements, and as a matter of Georgia law, to rely on Wells Fargo to honor its fiduciary duties to each Trust Beneficiary, and to rely upon the information being provided by Wells Fargo, including in the Annual Statements and in the Post-Death Claim Communications.

120. The Trust Beneficiaries did, in fact, reasonably rely on Wells Fargo to provide them with accurate, complete information, and the Trust Beneficiaries were directly harmed by Defendants' false representations and material omissions, including that the Trust Beneficiaries were tricked into permitting Wells Fargo, as Manager of the LLCs, to pay to Liberty the exorbitant Total Amounts Due and provide the Trust Beneficiaries with the small and vastly understated net death benefit payments.

121. Thus, for example, the Trust Beneficiaries associated with Ms. Wilkenfeld were misled by Liberty and Wells Fargo to allow Liberty to take for itself $5,735,030.95 out of the $6 million policy on Ms. Wilkenfeld's life.

122. Similarly, as detailed in the documents identified in the appendices hereto, the remaining Trust Beneficiaries were misled by Liberty and Wells Fargo to allow Liberty to take for itself exorbitant amounts from the Policies.

## ALLEGATIONS SPECIFIC TO THE NAMED PLAINTIFFS

123. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

124. The standard transaction described above was carried out with regard to all of the Insureds and Trust Beneficiaries.

125. In all cases, the Insureds described herein were solicited by Liberty and Wells Fargo, using materials Liberty and Wells Fargo caused to travel through interstate mails or wires, which described the Program as a legitimate non-recourse premium financing arrangement.

126. With regard to each Insured, (i) a Georgia LLC was formed in their name; (ii) the Insured and the LLC created in their name signed a Financing Agreement with Liberty and Wells Fargo Bank; (iii) a Policy on the Insured's life was procured with its benefits ostensibly payable to each respective LLC, and to the

respective Trust Beneficiaries; and (iv) a SPIA with concealed costs and benefits was secretly purchased on each Insureds' life.

127. Each Insured has passed away and, following their deaths, the death benefit of a Policy on each of their lives was paid to the LLCs formed in the Insureds' names, these proceeds were then obtained and distributed by Wells Fargo to Liberty, to the direct financial detriment of the Trust Beneficiaries with Liberty having received illegal human life wagering proceeds, to which the Trust Beneficiaries are entitled.

128. The Trust Beneficiaries only became aware of their claims against Defendants after their counsel uncovered facts—that Defendants had fraudulently concealed from Plaintiffs—in connection with prior arbitrations related to other insureds. Absent these prior arbitrations, Plaintiffs would remain in the dark about their claims.

129. On April 27, 2023, and again on June 1, 2023, Plaintiffs advised Liberty that they intended to pursue the recovery of these proceeds. Plaintiffs simultaneously requested certain basic information from Liberty, including copies of the Policies, the SPIAs, and information about the amount of the death benefits paid on the Policies, the amounts paid to the Insureds' families, and the amounts of the so-called "Maturity Date Payments."

130. Liberty and Wells Fargo refused—until discovery in this action—to provide these details and, therefore, further concealed from Plaintiffs material facts about these transactions and about Defendants' fraud and other misconduct.

## FIRST CAUSE OF ACTION

## THE POLICIES ARE VOID *AB INITIO* WAGERS AND PLAINTIFFS ARE ENTITLED TO RECOVER POLICY PROCEEDS

131. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

132. Under applicable law, "[a]ny personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i).

133. As explained by the Georgia Supreme Court, the purpose of Georgia's insurable interest requirement is to uphold Georgia's public policy against "wagering on human lives." *Crum*, 880 S.E.2d at 208–09.

134. The plain language of the insurable interest statute requires courts to scrutinize transactions and look beyond the mere form of each transaction to determine who "procured" the Policy in question or "caused [the Policy in question] to be procured." O.C.G.A. § 33-24-3(i). Likewise, the statute's plain language provides that where a third party with no insurable interest is the one who procured

or caused a policy to be procured, the policy is a human life wager unless "the benefits under the contract [were] payable to the individual insured" or someone else with valid insurable interest "at the time when the contract was made." *Id*. This, too, requires courts to look beyond the form of the transaction and determine, in substance, to whom a policy's benefits were actually "payable" at the moment the policy was made. *See*, *e.g.*, *Crum*, 880 S.E.2d at 209 (providing that courts must determine who "procured or caused to be procured" a policy on the life of another, especially when a third party was involved when the policy was procured); *Loh*, 31 S.E. at 459, 462, 466–67 (holding "the form in which the transaction is clothed is utterly immaterial []. The real thing to be ascertained in any given instance is, what was the actual object of the parties," and life insurance transactions must be bona fide, and not merely a cover for obtaining wagering or merely speculative insurance, and a device to evade the law).

135. The Policies were human life wagers in violation of Georgia's insurable interest laws, thus rendering the Policies void *ab initio*.

136. To be sure, Liberty and Wells Fargo used the Insureds, the Irrevocable Trusts, the Trust Beneficiaries, and LLCs to procure or cause the Policies to be procured, with approximately 95% of the Policies' benefits being payable *at inception to* Liberty. The facts on this are undisputed.

137. First, procurement of a policy is not merely signing a life insurance application or consenting to the issuance of a policy. Indeed, Georgia's insurance code has a separate requirement that (with exceptions not relevant here) an insured must consent to the making of a policy on their life. O.C.G.A. § 33-24-6. Thus, procurement for purposes of the separate insurable interest requirement turns on who paid the premium and bore the expense of the policy. *Union Fraternal League v. Walton*, 34 S.E. 317, 320 (Ga. 1899) ("The true rule . . . is that one may insure his life, and make the . . . policy payable to whom he pleases, *provided the contract is not made at the expense* and for the benefit of the person designated as the beneficiary, as a cover for a mere wagering contract") (emphasis added); *Rylander v. Allen*, 53 S.E. 1032, 1034, 1037 (Ga. 1906) (procurement turns on who paid premium).

138. Second, in previously filed Georgia complaints, Liberty and Wells Fargo admitted that the Insureds "paid no money of their own, and Liberty paid all premium and other charges to obtain and maintain life insurance policies."

139. Liberty and Wells Fargo thus procured the Policies because Liberty paid the premiums and the Insureds bore no expense or liability in connection with the Policies.

140. In addition, Liberty and Wells Fargo drove these transactions from start to finish and thus took whatever additional steps might be considered in any further

analysis (if any such further analysis was to be conducted) of who procured the Policies or caused the Policies to be procured.

141. Third, although Liberty and Wells Fargo purport to claim that the Program was a form of valid life insurance premium financing, there is absolutely no factual dispute that, prior to the moment each Policy was created, Liberty, through the Financing Agreements and related transaction documents, was the true owner and beneficiary of approximately 95% of each Policy's death benefit and that such amounts were payable to Liberty prior to and at the moment each Policy was made.

142. Under Georgia law, the operative moment at which insurable interest is measured is "the time the contract of [life] insurance becomes effective." O.C.G.A. § 33-24-3(h) (2016); *Crum*, 880 S.E.2d at 209.

143. Indeed, "[a]ny personal insurance contract procured or caused to be procured upon another individual is void unless the benefits under the contract are payable to the individual insured or such individual's personal representative or to a person having, at the time when the contract was made, an insurable interest in the individual insured." O.C.G.A. § 33-24-3(i) (2016).

144. Because Liberty and Wells Fargo procured or caused the Policies to be procured and the "benefits under the [Policies were] payable to" Liberty when each Policy was made, Liberty and Wells Fargo bear the burden of proving that Liberty

possessed a valid insurable interest in each Insured at the moment each Policy was made. *Turner v. Davidson*, 4 S.E.2d 814, 818 (Ga. 1939) ("*Turner II*").

145. Liberty and Wells Fargo cannot, however, meet their burden as a matter of law and undisputed fact because Liberty did not have "a reasonable expectation of pecuniary advantage through the continued life, health, or bodily safety of" the Insureds, and because Liberty would not have suffered a "consequent loss by reason of such person's death or disability." O.C.G.A. § 33-24-3(a).

146. In short, Liberty was better off financially if each Insured died at the moment insurable interest was measured (i.e., when each Policy was made), and Liberty was never worse off if the Insured died at that time (or at any other time).

147. Thus, Liberty lacked any possible insurable interest in the lives of the Insureds; the Policies lacked insurable interest and were pure wagers on the lives of the Insureds; and the Policies are void *ab initio*.

148. For example, had Ms. Wilkenfeld passed away immediately upon the making of the $6 million Policy on her life, Liberty would have reaped a massive windfall profit. This is undeniably true for several reasons.

149. First, as noted, Liberty guaranteed itself $5,701,375 of the $6 million death benefit from the Policy on Ms. Wilkenfeld's life. However, at the moment that Policy was made, Liberty's total investment into the transaction, including the

amount it paid for the SPIA, was far less than $5,701,375, meaning Liberty would have turned a quick profit had she died quickly.

150. Second, had Ms. Wilkenfeld passed away within the first year, the total amount of premium that Liberty would have paid towards that Policy would have been $465,751.25, which was the initial premium amount Liberty paid and which would have kept the Policy in force for slightly more than 11 months. But under the terms of the Policy, had Ms. Wilkenfeld passed away within the first year, all (or nearly all) of that initial $465,751.25 premium payment would have been refunded to Liberty because that premium payment would have pre-paid for coverage beyond the date of Ms. Wilkenfeld's death. As a result, Liberty's profit on an early death would have increased because Liberty's out of pocket costs would have been reduced when it received a refund of the premiums it paid towards the Policy.

151. Third, as discovery has revealed, the SPIAs had premium refund provisions, including so-called "free look" periods such that, had an Insured passed away soon, Liberty would have received a refund of its cost of the SPIA on that Insured's life. As a result, Liberty's profits would have exponentially increased from a relatively early death because its actual out of pocket costs would have been further reduced when it received a refund of the cost of the SPIA it purchased on Ms. Wilkenfeld's life.

152. Yet, despite the fact that Liberty would have received refunds of the Policy premiums and SPIA premiums, Liberty still would have taken $5,701,375 of the $6 million death benefit, and thus made a huge windfall profit on Ms. Wilkenfeld's quick and early death.

153. Indeed, it is undisputed that had Ms. Wilkenfeld (or any Insured) passed away at the moment the Policy on their life became effective, approximately 95% of the Policy's death benefit would have been ultimately paid to Liberty, regardless of the amount of any premiums Liberty had paid towards the Policy, and regardless of any premium refund Liberty would have received under each Policy and SPIA.

154. As a result, there is no factual dispute that Liberty had financial interest in each Insureds' immediate death.

155. It is also undisputed that, despite any amounts Liberty paid in premiums for the Policies or the SPIAs, and regardless of whether Liberty would have received any refunds in connection with the Policy and/or SPIA premiums, Liberty would never have suffered a loss—and in fact never suffered a loss—from any Insureds' death.

156. For these and other reasons, Liberty lacked any valid insurable interest in the Insureds' lives.

157. Further, Liberty and Wells Fargo knew or should have known that the Program and Financing Agreements they created violated applicable insurable

interest laws and generated Policies that were mere human life wagers. To be sure, Liberty and Wells Fargo and their principals and agents engaged legal advisors to opine on the validity of the Program and whether it complied with insurable interest laws. Based on that advice, Liberty and Wells Fargo were aware of Georgia's insurable interest laws and the consequences of getting caught, including that the Trust Beneficiaries—who themselves were used by Liberty and Wells Fargo to create the false appearance of insurable interest—would have valid claims to the proceeds of the Policies. The opinion letters contained numerous disclaimers and assumptions and, at most, relied solely on analogical reasoning to opine that the Trust *should* have an insurable interest.

158. To create the false appearance of insurable interest, the benefits of the Policies were payable to the LLCs, and in turn to the Trust Beneficiaries. However, Liberty and Wells Fargo operated these transactions as wagers and used the existence of the Trust Beneficiaries, as the Insureds' family members, to hide their human life wagering scheme. Indeed, instead of paying the Policies proceeds to the Insureds' family members (i.e. the Trust Beneficiaries), Wells Fargo collected and paid nearly the entirety of the proceeds to Liberty, thus effecting wagers on the lives of the Insureds and directly depriving the Trust Beneficiaries of amounts they were and are lawfully entitled to. *Turner v. Davidson*, 188 S.E. 828, 830–31 (Ga. 1936) ("*Turner I*") ("It is contrary to public interest and against public policy to allow

anyone to retain the proceeds of a policy of insurance, though voluntarily paid by the insurance company, where the insurance was effected for his benefit upon the life of another in which he had no insurable interest . . . as this would encourage speculation upon the chances of human life"); *Turner II*, 4 S.E. 2d at 817–18 (Ga. 1939) (holding that, under Georgia common law, when an insurance company pays the proceeds of an illegal wagering policy, a cause of action may be maintained to recover the policy proceeds, and the recipient of the proceeds holds them in trust for the rightful beneficiaries of the insured).

159. Here, the Plaintiffs, as the Trust Beneficiaries, are the rightful beneficiaries of the respective Insureds, having been so designated through the Irrevocable Trusts.

160. Accordingly, when Wells Fargo collected the proceeds of the Policies, which were made payable to the respective LLCs, Wells Fargo should have paid the entirety of those proceeds to the Irrevocable Trusts, and thus to the Trust Beneficiaries. Having failed to do so, Liberty and Wells Fargo are deemed to have been holding those proceeds in constructive trust for the Trust Beneficiaries, as they were lawfully entitled to the proceeds that Wells Fargo, through the LLCs, distributed to Liberty because Liberty lacked an insurable interest and was not lawfully entitled to such proceeds. *Loh*, 31 S.E. at 464 (the common law raises a constructive trust over proceeds received from a life insurance policy deemed to

have been a wagering contract); Couch on Insurance 3d § 41:9 (rev. ed. 2011) (citing *Turner I* for the rule that "[i]f a person to whom the proceeds of a policy are paid lacks an insurable interest and is therefore not entitled to the proceeds, he or she holds them as a trustee for the person lawfully entitled to them").

161. Defendants will likely argue that Liberty had an insurable interest as a premium finance lender.

162. However, there is nothing within Georgia's insurable interest statute that grants an insurable interest to a premium financing lender. Accordingly, as a matter of law, Liberty cannot claim to have had a valid insurable interest by virtue of the Financing Agreements.

163. To be sure, Georgia's insurance code expressly provides that premium finance lenders can merely take a security interest in a life insurance policy, O.C.G.A. § 33-59-2(17), but this does not create an insurable interest in favor of the premium finance lender such that it could simply procure a policy for its own benefit.

164. Moreover, under Georgia's common law, valid lenders can have an insurable interest in a debtor's life, but this interest is restricted to situations where there is an actual, preexisting debt obligation and the intent and purpose of the lender in taking out a policy is merely to indemnify the lender against the risk of loss arising from the preexisting debt. *Chapman v. Lipscomb-Ellis*, 22 S.E.2d 393, 395 (Ga.

1942) ("A creditor has, for the purpose of indemnifying himself against loss, but for no other, an insurable interest in the life of his debtor.").

165. Here, there was never a debt obligation between the Insureds and Liberty, and Liberty thus cannot qualify as a lender who may have had a limited insurable interest in the lives of the Insureds.

166. To be sure, under Georgia law, one claiming an insurable interest as a lender cannot create fictitious debt and use that as an excuse for taking out a policy on the life of the purported debtor. *Morris v. Ga. Loan Sav.*, 34 S.E. 378, 378 (Ga. 1899) ("pretended debt" does not create insurable-interest).

167. Thus, Georgia law is clear that where a purported lender procures life insurance on the life of its debtor, the lender must establish that it was an actual lender in good faith and that its "purpose in taking" the policy was to secure "additional protection" for the repayment of an "existing indebtedness," and not part of "a scheme to furnish a cloak to a purely colorable transaction." *Loh*, 31 S.E. at 467. Indeed, whenever "a contract of life insurance made for the benefit of a creditor is not one having indemnity for its object, we necessarily stamp it as a purely wagering contract." *Id*. at 460.

168. Moreover, the purported lender cannot hide behind the mere form of its transaction, which is "utterly immaterial" as a matter of Georgia law. *Loh*, 31 S.E. at 459 ("[T]he form in which the transaction is clothed is utterly immaterial. The real

thing to be ascertained in any given instance is, what was the actual object of the parties; for by this test alone is the legality of what they did to be determined.”).

169. Here, Liberty and Wells Fargo’s actual objective was to create brand new, multi-million dollar policies for Liberty’s benefit. Neither entered these transactions with the intention of merely providing indemnification to Liberty. This is indisputably true for several reasons.

170. First, Liberty and Wells Fargo were strangers to the Insureds, and there was no preexisting lender/creditor relationship between Liberty, Wells Fargo, and the Insureds.

171. Second, the Financing Agreements were not real loans, and they did not create any debt obligation between the Insureds on the one hand, and Liberty on the other. The Insureds were not the borrowers, the LLCs were, and the Insureds were expressly not obligated to pay anything towards the Financing Agreements and pledged no assets as collateral.

172. Third, as detailed above, Liberty was given a preexisting right, through the Financing Agreements, to receive over 90% of each Policy’s death benefit at the time each Policy was made, regardless of the amount of any purported “financing” Liberty provided. Thus, Liberty did not merely secure an interest in the Policies up to an amount needed to indemnify Liberty; rather, it secured a preexisting guarantee

to nearly the entire death benefit of each Policy with the intention of making a windfall gain if an Insured died immediately.

173. Accordingly, Liberty lacked insurable interest and Defendants violated applicable insurable interest laws and engaged in illegal human life wagering.

174. However, even if Liberty is considered a valid lender, then its insurable interest in the life of each Insured was limited to the amount of any legitimate debt owed by each Insured, and all excess amounts received by Liberty should have been paid to the Trust Beneficiaries. *See*, *e.g.*, *Morris v. Ga. Loan, Sav. & Banking Co.*, 34 S.E. 378, 378–80 (Ga. 1899) (holding that where a creditor obtains insurance proceeds in excess of the amount of indebtedness owed by a debtor insured, the transaction is a wager, and "[t]he legal representatives of the debtor will be entitled to the balance"); *Loh*, 31 S.E. 459.

175. As noted, the Insureds owed no debt, and thus Liberty had no insurable interest, even as a lender. But to the extent the Insureds are deemed to have owed a debt to Liberty and Liberty is deemed a valid lender, the amount of any indebtedness owed by the Insureds was much less than the amounts Liberty took from each Policy's death benefit. This is true for several indisputable reasons.

176. First, Liberty received, through and with the assistance of its agent Wells Fargo, excess SPIA payments each month. Instead of using these excess amounts to reduce the amount of purported indebtedness owed by the Insureds,

Liberty pocketed this excess cash. By virtue of the excess SPIA payments, the amount Liberty needed to indemnify itself against the risk of loss at the time of each Insureds' death was far lower than the amounts Liberty guaranteed itself, and in fact received, from the Policy's death benefits.

177. Second, Liberty and Wells Fargo computed the so-called "Total Amount Due" under each Financing Agreement to include a series of undisclosed costs which, in each transaction, added hundreds of thousands of dollars to the so-called indebtedness, and thus materially inflated the amounts Liberty needed from each Policy's death benefit to merely indemnify Liberty against the risk of loss.

178. Accordingly, even if Liberty were considered a valid premium finance lender, Liberty and Wells Fargo violated Georgia's insurable interest laws and engaged in illegal human life wagering by setting up these transactions so that Liberty would receive, and in fact did receive, life insurance proceeds from the Policies in amounts that exceeded the amount of indebtedness owed at the time of each Insured's death, and thus exceeded the limited extent of Liberty's insurable interest (assuming it had any such interest at all). *Loh*, 31 S.E. 459 (holding that if the intent of the transaction was merely to use a life insurance policy to secure the repayment of premiums to be paid on the policy, with the surplus of any death benefit being paid to the insured's estate, the transaction is enforceable; if, however, the intent of the transaction was for the lender to procure life insurance so as to obtain a

death benefit in excess of any actual indebtedness, the transaction is "a wagering contract" that lacked insurable interest and is unenforceable).

179. Liberty received such excess amounts with the assistance of Wells Fargo which, acting as the purported Manager of each respective LLCs, submitted claims for the death benefits on the Policies. Such death benefits were then paid to Wells Fargo by the insurance companies and ostensibly distributed by Wells Fargo through each respective LLC. Instead of paying Liberty the amounts it might have been entitled to as indemnification for the amount of any actual debt, Wells Fargo paid Liberty excess amounts, thus directly depriving the Irrevocable Trusts, and in turn the Trust Beneficiaries, of the proper amount of death benefits that should have been distributed to them, rather than Liberty.

180. Accordingly, even if Liberty is deemed to have possessed an insurable interest as a lender, Defendants still engaged in wagering and violated Georgia's insurable interest laws, and any proceeds received by Liberty and Wells Fargo in excess of the actual indebtedness owed by any Insured at the time of their death should have been paid to the respective LLCs and distributed to the respective Trust Beneficiaries, and such amounts are now owed to the respective Trust Beneficiaries, along with prejudgment interest. *See*, *Turner II*, 4 S.E. 2d at 817–18 (holding that, under Georgia common law, when an insurance company pays the proceeds of an illegal wagering policy, a cause of action can be maintained to recover the policy

proceeds, and the recipient of the proceeds holds them in trust for the rightful beneficiaries of the insured).

181. There is no statute of limitations for insurable interest claims in Georgia as the claims arise from Georgia's public policy against life wagers. *See* Opinion at 30–31, *Liberty v. Achenbach*, No. 25-10467 (11th Cir. May 1, 2025), ECF No. 29-1.

182. Accordingly, in connection with Plaintiffs' insurable interest claim, Plaintiffs are entitled to recover from Liberty and Wells Fargo the full death benefits of the Policies, less any amounts previously received, along with applicable interest.

183. Alternatively, if Liberty is deemed a valid lender, the Plaintiffs are entitled to recover the proper amount of death benefits that should have been distributed to them as Trust Beneficiaries plus interest, taking into account the entirety of these transactions, including the excess SPIA payments and the improper costs and fees charged by Liberty and Wells Fargo.

## SECOND CAUSE OF ACTION

### BREACH OF TRUST
### (AGAINST WELLS FARGO BANK, N.A.)

184. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

185. Under Georgia law, the trustee of a trust owes fiduciary and other duties of trust and loyalty to the beneficiaries of the trust. *See*, *e.g.*, O.C.G.A. §§ 53-12-240

("trustee shall administer trust in good faith"); 53-12-241 (trustee owes "duty of prudent administration"); 53-12-246 (trustee owes beneficiaries "duty to avoid conflict of interest" and "shall administer the trust solely in the interest of the beneficiaries").

186. A trustee is prohibited under Georgia law from attempting to disclaim its common law and statutory duties to trust beneficiaries. *See* O.C.G.A. § 53-12-303.

187. "A violation by the trustee of any duty that the trustee owes the beneficiary shall be a breach of trust" which gives the beneficiary "a cause of action to seek . . . damages" and other relief against the trustee, plus interest. O.C.G.A. §§ 53-12-300; 53-12-301; 53-12-302.

188. Here, Wells Fargo Bank was the Trustee of the Irrevocable Trusts in the names of each Insured.

189. As a matter of Georgia's common law and statutes, Wells Fargo Bank owed duties of loyalty and trust to the Trust Beneficiaries, who were the named beneficiaries of each Irrevocable Trust, and, among other things, was legally bound to act for the benefit of those beneficiaries, avoid any possible conflicts of interest, and perform its duties and obligations in good faith.

190. Despite these duties and obligations, Wells Fargo Bank operated not for the benefit of the Trust Beneficiaries of the Irrevocable Trusts, but for the benefit of Liberty and its principals.

191. Among other things, Wells Fargo Bank had conflicts of interest that not only should have prohibited it from serving as Trustee of the Irrevocable Trusts, but which Wells Fargo Bank attempted to disclaim without providing the Insureds or the Trust Beneficiaries accurate or complete information.

192. More specifically, in each Irrevocable Trust agreement, Wells Fargo Bank stated that it was also serving as: (i) the Manager of LLCs formed in each Insureds' name; (ii) trustee of the Liberty One and Liberty Two Funding Trusts—meaning it was the trustee of Liberty itself; (iii) trustee of the SPIA Trusts; (iv) trustee of the Master Trusts; and (v) Indenture Trustee under an indenture agreement.

193. In turn, Wells Fargo Bank purported to have each Insured, as settlor of each Irrevocable Trust, acknowledge and waive what Wells Fargo Bank called merely a "potential conflict of interest" between Wells Fargo Bank acting as Trustee for the Irrevocable Trusts and the various other capacities in which Wells Fargo Bank was serving its true master, Liberty.

194. In addition to the fact that such a disclaimer is invalid as a matter of Georgia law and public policy, Wells Fargo Bank intentionally or recklessly failed

to inform the Insureds or the Trust Beneficiaries of the truth about its conflicts of interest, and about the true details underlying the Liberty Program.

195. Among other things, Wells Fargo Bank claimed it merely had a "potential conflict of interest," even though there was an actual conflict of interest, and without providing the Insureds or the Trust Beneficiaries with any information about the SPIA Trusts, the Master Trusts, or the indentures, let alone what Wells Fargo Bank's roles were in connection with these other entities, or who was the beneficiary of those other entities.

196. As another example, as trustee of the SPIA Trusts, Wells Fargo Bank knew the full and complete details about the SPIAs purchased on each Insureds' life, including the amount and cost of each SPIA, the amount of monthly benefits being paid out on each SPIA, and the amount of excess profits that were being paid to Liberty through the SPIA Trusts.

197. Wells Fargo Bank was also aware that the Insureds and the Trust Beneficiaries of the Irrevocable Trusts did not know the details of the SPIAs—including the cost of each SPIA and the amount of monthly benefits paid by each SPIA—and in fact Wells Fargo Bank, acting at the direction of Liberty, intentionally concealed that information from the Insureds and the Trust Beneficiaries of the Irrevocable Trusts.

198. Moreover, Wells Fargo actively misrepresented to the Trust Beneficiaries the amounts that were payable to them from the Policies, by misrepresenting the "Total Amounts Due" to Liberty. *See supra*, ¶¶ 100–122.

199. Accordingly, and among other things, Wells Fargo Bank abused its position of trust and breached its duty of trust as Trustee of the Irrevocable Trusts by: (i) failing to disclose actual, known conflicts of interest; (ii) concealing material information from the Insureds and the Trust Beneficiaries; (iii) acting, at all times, for the benefit of its true master, Liberty; and (iv) engaging in self-dealing to benefit itself over the interests of the Trust Beneficiaries.

200. Wells Fargo Bank's actions induced the Insureds to execute the Irrevocable Trust agreements, thus giving Wells Fargo Bank the power and authority to take other actions in aid of Liberty's goal of wagering on the lives of the Insureds.

201. Wells Fargo Bank's actions caused actual harm to the Insureds and the Trust Beneficiaries, including by making the Insureds the subject of illegal human life wagering transactions; using the Trust Beneficiaries as a means to create the false appearance that the Policies were supported by a valid insurable interest; misleading the Insureds to believe that these transactions were legal; hiding from the Insureds and the Trust Beneficiaries the fact that Liberty, through Wells Fargo Bank as trustee of the SPIA Trusts, was making secret profits on the Insureds' lives through

the SPIAs; and ultimately withholding from the Trust Beneficiaries the proper amount of the death benefits that should have been paid to the Trust Beneficiaries.

202. Actions for breach of trust against a trustee can be brought "within six years after the beneficiary discovered, or reasonably should have discovered, the subject of such claim" when, as here, the trustee did not provide the beneficiary with "a report which adequately discloses the existence of a claim against the trustee for a breach of trust." O.C.G.A. § 53-12-307(a).

203. Not only has Wells Fargo Bank failed to provide the Plaintiffs with any "report which adequately discloses the existence of a claim against the trustee for a breach of trust," but Wells Fargo Bank continues to this day to conceal information necessary for the Plaintiffs to have discovered the subject of their claim. Indeed, Plaintiffs only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Plaintiffs would still remain in the dark about their claim.

204. Accordingly, Plaintiffs' claim is timely and Plaintiffs are entitled to recover from Wells Fargo Bank damages for breach of trust, including but not limited to the death benefits of the Policies, less any amounts previously received, along with applicable interest, and under O.C.G.A. § 52-12-302, interest, attorney's fees, and expenses of litigation.

## THIRD CAUSE OF ACTION

## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. §§ 1962(c) and 1962(d)

205. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

206. 18 U.S.C § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering."

207. 18 U.S.C § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."

208. Liberty and Wells Fargo have violated the Racketeer Influenced and Corrupt Organizations Act, Title 18 of the United States Code, Section 1962(c) and 1962(d).

209. Liberty and Wells Fargo are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

210. Plaintiffs are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

211. The requisite enterprise (the "Enterprise") consisted of a group of STOLI promoters, producers, financiers, servicers, managers and other participants who helped induce seniors to enter into these transactions, and then financed, serviced, managed, and ultimately profited from these transactions. This Enterprise included Liberty as well as the Approved Third-Party Originators and others who worked directly with the Insureds, as well as Horizon Trade & Finance (Ireland) Limited, which consented to some of the critical transactions happening behind the scenes and is the beneficial owner of the Funding Trusts, the Master Trusts, and the SPIA Trusts. This Enterprise also included Wells Fargo Bank, which served as Georgia Trustee of the Funding Trusts, Trustee of the SPIA Trusts, Trustee of the Irrevocable Trusts, Manager of the LLEs, and as Securities Intermediary as well as Wells Fargo Delaware Trust Company, which served as Statutory Trustee of the Funding Trusts and Trustee of the Master Trusts. The Enterprise also included a long list of Credit Suisse entities such as Credit Suisse Group AG and Credit Suisse AG which had overall responsibility for all Credit Suisse operations, as well as Credit Suisse First Boston, Cayman Island Branch which became a party to the Notices of Borrowing each time a transaction was executed. The Enterprise also included Credit Suisse First Boston International, which entered into interest cap transactions with other members of the enterprise, Liberty One Master Trust and Liberty Two Master Trust, each time a Financing Agreement was consummated. The Enterprise also

included Credit Suisse Securities (USA) LLC which ran an office known as the Life Finance Group in New York and London and, among other things, acted as a "Calculation Agent" and as "Domestic Servicer" and routinely contacted Insureds to see if they had yet died and also calculated the "Total Amount Due" under the Financing Agreements using the fraudulent charges and payment formula. The Enterprise also included Liberty One Trust and Liberty Two Trust which received the annuity payments for which the Insureds were fraudulently charged. The Enterprise also included Credit Suisse Securities (Europe) Limited; Credit Suisse Holdings (USA), Inc.; and others not yet known to Plaintiffs. All of these entities acted in concert to form an Enterprise and to defraud and deceive seniors and their families out of millions of dollars.

212. This Enterprise was and is engaged in, and its activities affect, interstate commerce.

213. Liberty and Wells Fargo were associated with the Enterprise at all times relevant to the events alleged herein.

214. Liberty and Wells Fargo conducted and participated in the conduct of the Enterprise's affairs by knowingly devising and participating in a scheme whereby, with the intent to defraud Insureds and their families and to enhance income, the Enterprise (i) deceived insureds about the terms and conditions of the Financing Agreements; (ii) charged Insureds and their families for annuities that

they were unaware of; (iii) deprived the Insureds and their families of the proper benefits from the annuities they were fraudulently charged for; and (iv) used marketing materials describing the Program as a non-recourse premium finance loan to further the deception and fraud.

215. To implement the scheme and generate profits for themselves, Liberty and Wells Fargo committed a pattern of racketeering acts or caused a pattern of racketeering acts, as described herein, to be committed by means of, *inter alia*, concealing the true terms of the Financing Agreements, making intentional misrepresentations regarding the Program, and arbitrarily abusing the discretion given to them under the terms of the Financing Agreements.

216. Liberty and Wells Fargo engaged in a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), by committing a pattern of acts of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343 in the use of the telephone, facsimile, email, and mails for advancing, furthering, or carrying out the scheme to defraud. *United States v. Bradley*, 644 F.3d 1213, 1238–39 (11th Cir. 2011) ("[Mail and wire fraud] require that a person [] intentionally participates in a scheme or artifice to defraud another of money or property . . . a scheme or artifice to defraud, requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property. A misrepresentation is material if it has a natural tendency to influence"). Among other

things, the terms of the Program materials and Financing Agreements were transmitted to and from Liberty and Wells Fargo and others in the Enterprise to and from the Insureds and Plaintiffs by telephone, facsimile, email, regular mail, and other common carriers, and such transmissions were essential elements, or incident to essential elements, of the unlawful racketeering scheme. These acts of racketeering had the same or similar purposes, results, participants, and scheme, and were not isolated events.

217. Liberty and Wells Fargo also engaged in a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), by committing a pattern of acts in connection with an illegal gambling and human life wagering scheme, in violation of 18 U.S.C. § 1955. To that end, Liberty and Wells Fargo conducted, financed, managed, supervised, directed, and/or owned all or part of an illegal gambling business that was engaged in human life wagering in violation of applicable state law. *See, e.g.*, A.R.S. §§ 13-3301 et seq.; M.C.L. §§ 432.218, 750.301; N.J. Stat. §§ 2C:37-1 et seq. This gambling business involved more than five people and generated daily income to Defendants of well in excess of $2,000 and continued over a course of years.

218. Liberty's and Wells Fargo's pattern of racketeering activity and violations of § 1962(c) began in approximately 2004, was perpetrated in connection with all of the transactions at issue in this case as well as many more, and continues

to this day, as (among other things) each time an Insured dies, Liberty and Wells Fargo improperly reap profits from these transactions as explained herein.

219. Liberty and Wells Fargo acted intentionally and concealed their pattern of racketeering from the Insureds and Plaintiffs. In fact, Plaintiffs have been completely unaware of the size of the annuities taken out on the Insureds' lives or of the fact the Plaintiffs, as Trust Beneficiaries, were charged for those annuities until this case.

220. At all relevant times herein, Liberty and Wells Fargo conspired to violate § 1962(c).

221. Liberty and Wells Fargo's conspiracy to violate § 1962(c) began around 2004 as they, along with other members of the Enterprise, began to solicit Approved Third Party Originators who, in turn, solicited senior citizens along with Liberty and Wells Fargo. Liberty and Wells Fargo's conspiracy continues today as Liberty and Wells Fargo profit from (i) the deaths of Insureds who were tricked into signing Financing Agreements by deception and fraud, and (ii) annuities, which the Insureds and their families were unknowingly charged for, generating amounts greatly in excess of the monthly premium payments.

222. The object of the conspiracy, as discussed above, was to generate multi-million dollar life insurance policies on the lives of elderly insureds, with respect to whom Liberty and Wells Fargo had no insurable interest, while charging those

Insureds for multi-million dollar annuities that secretly generated additional profit from which the Insureds were precluded. Liberty and Wells Fargo, along with other members of the Enterprise, took overt acts to further the conspiracy by soliciting Approved Third Party Originators and Insureds with materials transmitted throughout the country. Liberty and Wells Fargo, along with other members of the Enterprise, took other overt acts to further the conspiracy by applying for annuities, which were charged to the LLCs, and thus in turn to the Trust Beneficiaries, and by receiving and keeping for itself excess annuity payments.

223. Liberty and Wells Fargo agreed to commit the predicate acts, mail fraud, wire fraud, and illegally gambling on the lives of the Insureds, with other members of the Enterprise. Liberty and Wells Fargo intended to commit the predicate acts, in order to further advance the conspiracy by soliciting more senior citizens to sign the deceitful and fraudulent Financing Agreements, and, in turn, collect more profit from the Insureds deaths and the undisclosed annuities through intentional misrepresentations and omissions made to the Trust Beneficiaries during the Insureds' lifetimes through Annual Statements and after the Insureds passed away, through various Post-Death Communications through which the Trust Beneficiaries were deceived into allowing Wells Fargo to pay illegal human life wagering proceeds to Liberty. *See supra*, ¶¶ 100–122.

224. If brought in court (as opposed to arbitration in which no limitations period applies), civil RICO can be brought within four years from when the plaintiff discovers its injury. For the reasons set forth above, this claim is timely based, among other things, on Defendants' fraud and concealment of material facts. Indeed, Plaintiffs only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Plaintiffs would still remain in the dark about their claim.

225. As detailed herein, Defendants and the rest of the Enterprise have actively concealed information necessary for Plaintiffs to have discovered the subject of their claim. Indeed, Plaintiffs only became aware of their claim through information their counsel learned about the Program through prior litigation involving other insureds, and absent that, Plaintiffs would still remain in the dark about their claim.

226. Accordingly, Plaintiffs' claim is timely and as a direct and proximate result of the acts as alleged herein, and Liberty and Wells Fargo's violations of 18 U.S.C §§ 1962(c) and 1962(d), Plaintiffs have suffered substantial injuries.

WHEREFORE, Plaintiffs, individually and collectively, seek an award as follows:

227. In connection with Plaintiffs' First Cause of Action regarding wagering and insurable interest, a finding that the Policies are void *ab initio* and an award to

the respective Plaintiff of full death benefits of such Policies, less any amounts previously received, along with applicable prejudgment interest; or, alternatively, a finding that even if Liberty was a valid lender, it exceeded its limited insurable interest, the excess amounts it received above any indebtedness owed by the Insureds were wagering proceeds, and those amounts along with applicable prejudgment interest are owed to Plaintiffs.

228. In connection with Plaintiffs' Second Cause of Action for breach of trust against Wells Fargo Bank, a finding that Wells Fargo Bank breached its duties to the Insureds and to the beneficiaries of the Irrevocable Trusts and an award of damages for breach of trust, including but not limited to the death benefits of the Policies, less any amounts previously received, along with applicable interest, and under O.C.G.A. § 52-12-302, interest, attorney's fees, and expenses of litigation.

229. In connection with Plaintiffs' Third Cause of Action for RICO violations, a finding of liability against Liberty and Wells Fargo and the trebling of all damages enumerated herein pursuant to 18 U.S.C § 1964(c), plus interest and attorneys' fees.

Respectfully submitted this 14th day of November, 2025.

*<u>/s/ Chase A. Howard</u>*
Chase A. Howard, Esq. (*pro hac vice*)
Michael J. Miller, Esq. (*pro hac vice*)
Gregory J. Star, Esq. (*pro hac vice*)
Alex H. Hayden, Esq. (*pro hac vice*)
Victoria G. Mazzola, Esq. (*pro hac vice*)

Justin K. Risser, Esq. (*pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103 Tel: 215-665-2147
chasehoward@cozen.com
mjmiller@cozen.com
gstar@cozen.com
ahayden@cozen.com
vmazzola@cozen.com
jrisser@cozen.com

*/s/ Danielle Corin Le Jeune*
Danielle Corin Le Jeune, Esq.
Georgia Bar No. 134222
Saskia H. Olczak, Esq.
Georgia Bar No. 686983
COZEN O'CONNOR
1230 Peachtree Street, N.E.
The Promenade, Suite 400
Atlanta, Georgia 30309
(404) 572-2050
DLeJeune@cozen.com
solczak@cozen.com

*Attorneys for Plaintiffs*.

CERTIFICATION: The above-signed counsel hereby certifies that this document was prepared in Times New Roman 14-point font with a 1 inch margins in accordance with LR 5.1, N.D. Ga.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Brian Achenbach, George Wilson, as the Personal Representative of Bruce Achenbach's Estate and the Trustee of the Jay Achenbach Marital Trust, Doris Vohn Belser Murphy, Nancy Belser, Andrew A. Costanza, James A. Costanza, Nicholas Costanza, Theodore Shepard, Andrew Darrow, David Darrow, Jonathan Darrow, Dean R. Flock, Judy Lynn Cook, Janice Charlaine Campbell, Deborah Gail Flock, Jay Grimm, Jr., Robert Krakovitz, M.D., Moshe Malka, Leon Malnik, Barry Septimus, Phyllis Sifen Turner, Burr Phillips, Kent Davis, Gabe Irving, Sydney Phillips Atkinson, Garry Dienes, Christina Samson, Mallory Samson, Marilyn Birk Wodlinger, Kevin M. Wodlinger, Michael H. Wodlinger, Stephen R. Wodlinger, Mark L. Wodlinger, II, Chehalis Hegner, John Hegner, Jodie Rasch, Jeffrey Levey, Beth Sackstein, Richard Lane, Brian Schehr, as trustee of the Robert J. Schehr Protector Trust, Stephen Crerie, Bradley Huss, as Trustee of the Crerie Family Survivors Trust, Patricia Anderson Tomberlin, Daniel Kent Tomberlin, Michael Rooney, Patrick Rooney, Robbi Rooney, Moshe Mark Feldman, Sara Reichman, Leah Schachter, Fern Portnoy, Arthur Gillis, Lora A. Gillis, Martha Jane Eblen, as Collector of Roberta S. Eblen's Estate, Paul F. Eblen, Cheryl DeCinces Carter, Ronald Bedinghaus, Daniel Bedinghaus, Roger Bedinghaus, Janet Terry, Gerald Bedinghaus, James B. Wirkowski, John C. Wirkowski, Paul Selby, Milton Neumann, Aaron Benjamin Neumann, Jeffrey Cotter as Trustee of the GST Trust Art X Helen B Greeley Family Trust, James Romano, Donna

**Case No. 1:23-cv-5483-MLB**

Koonce, Richard Dudley, and John Dudley,

Plaintiffs,

v.

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Defendants.

---

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Counterclaimants,

v.

Brian Achenbach, George Wilson, as the Personal Representative of Bruce Achenbach's Estate and the Trustee of the Jay Achenbach Marital Trust, Doris Vohn Belser Murphy, Nancy Belser, Andrew A. Costanza, James A. Costanza, Nicholas Costanza, Theodore Shepard, Andrew Darrow, David Darrow, Jonathan Darrow, Dean R. Flock, Judy Lynn Cook, Janice Charlaine Campbell, Deborah Gail Flock, Jay Grimm, Jr., Robert Krakovitz, M.D., Moshe Malka, Leon Malnik, Barry Septimus, Phyllis Sifen Turner, Burr Phillips, Kent Davis, Gabe Irving, Sydney Phillips Atkinson, Garry Dienes, Christina Samson, Mallory Samson, Marilyn Birk Wodlinger, Kevin M. Wodlinger, Michael H. Wodlinger, Stephen R. Wodlinger, Mark L. Wodlinger, II, Chehalis Hegner, John Hegner, Jodie Rasch, Jeffrey Levey, Beth Sackstein, Richard Lane, Brian Schehr, as trustee of the Robert J. Schehr Protector Trust, Stephen Crerie, Bradley Huss,

as Trustee of the Crerie Family Survivors Trust, Patricia Anderson Tomberlin, Daniel Kent Tomberlin, Michael Rooney, Patrick Rooney, Robbi Rooney, Moshe Mark Feldman, Sara Reichman, Leah Schachter, Fern Portnoy, Arthur Gillis, Lora A. Gillis, Martha Jane Eblen, as Collector of Roberta S. Eblen's Estate, Paul F. Eblen, Cheryl DeCinces Carter, Ronald Bedinghaus, Daniel Bedinghaus, Roger Bedinghaus, Janet Terry, Gerald Bedinghaus, James B. Wirkowski, John C. Wirkowski, Paul Selby, Milton Neumann, Aaron Benjamin Neumann, Jeffrey Cotter as Trustee of the GST Trust Art X Helen B Greeley Family Trust, James Romano, Donna Koonce, Richard Dudley, and John Dudley,

Counterclaim-Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2025, I served the foregoing **Second Amended Complaint** with the Clerk of Court using the CM/ECF system and via email to the following attorneys of record:

Terry R. Weiss, Esq.
Catherine G. Lucas, Esq.
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-3929
trweiss@duanemorris.com
klucas@duanemorris.com
*Attorneys for Plaintiffs/Counterclaim-Defendants*

Jonathan P. Hersey
K&L Gates LLP
1 Park Plaza
12th Floor
Irvine, CA 92614

Thorn Rosenthal, Esq.
Lauren Perlgut, Esq.
Joel Kurtzberg, Esq.
Margaret Barone, Esq.
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
trosenthal@cahill.com
lperlgut@cahill.com
jkurtzberg@cahill.com
mbarone@cahill.com
*Attorneys for Plaintiffs/Counterclaim-Defendants Liberty One Funding Trust and Liberty Two Funding Trust*

jonathan.hersey@klgates.com
*Attorney for Plaintiffs/Counterclaim-Defendants Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company*

This 14th day of November, 2025.

/s/ Chase A. Howard
Chase A. Howard, Esq.