**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Brian Achenbach, et al.,

Plaintiffs,

v.

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Defendants.

**Case No. 1:23-cv-5483-MLB**

---

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Counterclaimants,

v.

Brian Achenbach, et al.,

Counterclaim-Defendants.

**PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**


FACTS AND PROCEDURAL HISTORY ....................1

ARGUMENT ....................2

I. Defendants Are Liable On The Trust Beneficiaries' Insurable Interest Claim, Count I, And Their "Standing" Argument Fails....................2

A. Defendants Already Lost The Same "Standing" Argument. ....................5

B. The Trust Beneficiaries Are The Proper Insurable Interest Claimants And The Real Parties In Interest Under Rule 17....................6

C. There Is No Rule In Georgia Requiring That Insurable Interest Claims Be Brought Exclusively By The Formal Court-Appointed Representative Of An Insured's Estate. ....................11

D. Even If The Insureds' Estates Are Also Real Parties In Interest, Count I Cannot Be Dismissed. ....................15

II. Plaintiffs' RICO Allegations Are Sufficient and Well-Plead. ....................19

A. Running A Human Life Wagering Enterprise Is Illegal Gambling In Violation Of § 1955....................19

B. Plaintiffs More Than Sufficiently Allege Mail And Wire Fraud In Violation Of §§ 1341, 1343....................24

1. Plaintiffs Allege The Particular Terms And Conditions Of The Financing Agreements That Were Deceptive And How Those Terms Were Used To Trick Them. ....................28

2. Plaintiffs Specifically Allege The Material SPIA Information That Was Concealed From Them. ....................32

3. Plaintiffs Meticulously Allege The Deception In The Annual Statement And Post-Death Communications. ....................35

4. Plaintiffs' Allegations On "Information and Belief" Relating To Eight Of The Insureds Is Proper. ....................37

C. Plaintiffs Have RICO Standing. ....................37

III. Defendants' Request For Dismissal With Prejudice Is Improper. ....................40

CONCLUSION ....................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akers v. Newby*,
2021 WL 7159936 (M.D. Fla. June 14, 2021) ....................28, 36

*Amin v. Mercedes-Benz USA*,
301 F. Supp. 3d 1277 (N.D. Ga. 2018)....................28

*Associated Dry Goods v. Towers Fin.*,
920 F.2d 1121 (2d Cir. 1990) ....................17

*Cammack v. Lewis*,
82 U.S. 643 (1872)....................12, 13

*Chapman v. Lipscomb-Ellis Co.*,
22 S.E.2d 393 (Ga. 1942) ....................12, 21

*Christenson v. Madson*,
149 N.W. 288 (Minn. 1914) ....................15

*Coastal Modular v. Laminators*,
635 F.2d 1102 (4th Cir. 1980) ....................18

*Crossman v. Am. Ins. Co.*,
164 N.W. 428 (Mich. 1917)....................23

*Crum v. Jackson Nat'l Life Ins.*,
880 S.E.2d 205 (Ga. 2022) ....................21

*Cundiff v. Cain*,
707 So.2d 187 (Miss. 1998)....................14

*Disabled in Action v. SEPTA*,
224 F.R.D. 601 (E.D. Pa. 2004)....................18

*Exch. Bank of Macon v. Loh*,
31 S.E. 459 (Ga. 1898) ....................13

*Farmer v. Mitchell*,
921 S.E.2d 482 (Ga. Ct. App. 2025)....................9

*First Am. Int'l Bank v. Community's Bank*,
771 F. Supp. 2d 276 (S.D.N.Y. 2011) ....................18

*Giron v. Zeytuna, Inc.*,
597 F. Supp. 3d 29 (D.D.C. 2022)....................5

*Goldston v. Bank of Am.*,
577 S.E.2d 864 (Ga. Ct. App. 2003)....................35

*Griffin v. McCoach*,
123 F.2d 550 (5th Cir. 1941) ....................14

*Hale v. Life Indem. & Inv.*,
68 N.W. 182 (Minn. 1896) ....................14

*Hanekom v. Kuchenbecker Exc.*,
2024 U.S. Dist. LEXIS 104379 (N.D. Iowa June 12, 2024) ....................38

*Harris v. Birnbaum*,
62 S.E.2d 204 (Ga. Ct. App. 1950)....................26

*Hogue v. Minn. Packing*,
60 N.W. 812 (Minn. 1894) ....................15

*Kramer v. Lockwood Pension Servs.*,
653 F. Supp. 2d 354 (S.D.N.Y. 2009) ....................14

*Langford v. Rite Aid of Ala.*,
231 F.3d 1308 (11th Cir. 2000) ....................27

*Lipari v. GE*,
2008 U.S. Dist. LEXIS 57527 (W.D. Mo. July 30, 2008) ....................39

*Lockheed Martin v. Boeing*,
357 F. Supp. 2d 1350 (M.D. Fla. 2005)....................26

*Lucas v. Lucas*,
946 F.2d 1318 (8th Cir. 1991) ....................5

*Marceau v. IBEW Local 1269*,
2006 U.S. Dist. LEXIS 47766 (D. Ariz. July 7, 2006)....................38

*McKiver v. Murphy-Brown*,
980 F.3d 937 (4th Cir. 2020) ....................17

*McRae v. Warmack*,
135 S.W. 807 (Ark. 1911)....................14

*Meyer v. Jinkosolar Holdings*,
761 F.3d 245 (2d Cir. 2014) ....................27

*Morris v. Georgia Loan, Sav. & Banking*,
34 S.E. 378 (Ga. 1899) ....................10, 12, 13

*Mut. Life Ins. v. Lane*,
151 F. 276 (11th Cir. 1907) ....................24

*Peel v. Reibel*,
286 N.W. 345 (Minn. 1939) ....................15

*Quillian v. Johnson*,
49 S.E. 801 (Ga. 1905) ....................13

*Saville v. Lee*,
158 S.E. 441 (Ga. Ct. App. 1931)....................12

*Sikes v. AT&T*,
179 F.R.D. 342 (S.D. Ga. 1998), *rev'd on other grounds*, 281 F.3d 1350 (11th Cir. 2022)....................22, 23

*Sowa v. Mercedes-Benz Grp.*,
764 F. Supp. 3d 1233 (N.D. Ga. 2024)....................28

*Sparkman v. State*,
434 S.E.2d 564 (Ga. Ct. App. 1993)....................22

*Steger v. GE*,
318 F.3d 1066 (11th Cir. 2003) ....................5

*Sun Life v. Wells Fargo*,
208 A.3d 839 (N.J. 2019) ....................23

*Turner v. Davidson*,
188 S.E. 828 (Ga. 1936) ....................7, 12, 13, 21

*Turner v. Trust Co. of Ga.*,
105 S.E.2d 22 (Ga. 1958) ....................9

*U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
290 F.3d 1301 (11th Cir. 2002) ....................37

*U.S. v. Binday*,
908 F. Supp. 2d 486 (S.D.N.Y. Dec. 10, 2012), *aff'd*, 804 F.3d 558
(2d Cir. 2015) ....................20

*U.S. v. Carpenter*,
190 F. Supp. 3d 260 (D. Conn. 2016) ....................20

*Uncommon Sense 1 v. MHI RJ Aviation*,
2024 U.S. Dist. LEXIS 87063 (N.D. W. Va. May 14, 2024) ....................17

*Union Fraternal League v. Walton*,
34 S.E. 317 (Ga. 1899) ....................21

*United States ex rel. Bibby v. Wells Fargo Bank, N.A.*,
165 F. Supp. 3d 1340 (N.D. Ga. 2015) ....................26

*VCA Cenvet v. Village Veterinary Ctrs.*,
2012 WL 3779101 (N.D. Ga. Aug. 31, 2012) ....................5, 6

*Wagner v. Nat'l Engraving*,
30 N.E.2d 750 (Ill. App. Ct. 1940) ....................14

*Warnock v. Davis*,
104 U.S. 775 (1881) ....................6, 12, 13, 24

*White v. Symerta Assigned Benefits*,
Case No. C20-1866-MJP (W.D. Wash. Aug. 5, 2021) ....................38

*Yaffa v. SunSouth Bank*,
2016 WL 10536038 (N.D. Fla. Sept. 15, 2016) ....................27

*Zurich Life Ins. v. Zoo Stage*,
2004 WL 7350684 (D. Ariz. May 26, 2004) ....................23

**Statutes**

A.R.S. §§ 13-3301 et seq. ....................23

18 U.S.C. § 1955 .......... 19, 22, 24

M.C.L. §§ 432.218, 750.301 .......... 23

N.J. Stat. §§ 2C:37-1 et seq. .......... 23

O.C.G.A. § 9-3-96 .......... 35

O.C.G.A § 16-12-20 .......... 23

O.C.G.A § 16-12-21 .......... 21

O.C.G.A. § 23-2-53 .......... 27

O.C.G.A. § 33-24-3 .......... 3, 21

O.C.G.A. § 53-12-240 .......... 27

O.C.G.A. § 53-12-246 .......... 27

**Other Authorities**

Couch on Insurance 3d § 41:9 (rev. ed. 2011) .......... 7, 13

Fed. R. Civ. P. 17 .......... 4, 5, 6, 9

Fed. R. Civ. P. 19 .......... 5, 6, 15, 16, 17, 18, 19

Fed. R. Civ. P. 9 .......... 25, 32, 37

4 Moore's Federal Practice—Civil § 17.10 .......... 9

4 Moore's Federal Practice—Civil § 19.03 .......... 16, 17

Restatement (Second) of Trusts § 282(2) (1959) .......... 9

## FACTS AND PROCEDURAL HISTORY

The Trust Beneficiaries (or "Plaintiffs") incorporate by reference their Second Amended Complaint ("SAC"), which details the ways in which Liberty and Wells Fargo operated an illegal human life wagering scheme through stranger-originated life insurance ("STOLI") policies. These policies were created on the lives of senior citizens ("Insureds"), not for their benefit, but to profit Liberty, which secured over 90% of each policy's death benefit before inception.

The scheme, known as the "Liberty Premium Finance Program," involved creating shell trusts and LLCs to disguise the true nature of the transactions. Wells Fargo, acting as trustee and manager, facilitated these operations, prioritizing Liberty's interests over those of the Insureds and the Trust Beneficiaries to whom Wells Fargo owed fiduciary duties as a matter of Georgia law.

Liberty and Wells Fargo's scheme began by having Insureds sign Financing Agreements that appeared as legitimate loans but were essentially purchase agreements ensuring the Enterprise's substantial share of the death benefits. Throughout the Insureds' lives, they and the Plaintiffs were kept in the dark about the true nature of these agreements, including most notably the fact that Defendants had secretly obtained over-sized annuities on each Insureds' life and that these annuities were generating massive, secret monthly profits that Defendants kept for themselves. The scheme culminated with regard to each respective transaction when

an Insured passed away. It was then that Defendants made additional fraudulent representations and omissions *to the Trust Beneficiaries*, and then that Defendants ultimately tricked these Plaintiffs out of millions of dollars of life insurance proceeds by falsely charging them for the costs of the annuities and imposing other fictional costs.

Liberty and Wells Fargo previously brought a motion to dismiss the Trust Beneficiaries' claims, which this Court largely rejected. Defendants' current effort to dismiss Plaintiffs' insurable interest and RICO claims must be denied.

## ARGUMENT

### I. Defendants Are Liable On The Trust Beneficiaries' Insurable Interest Claim, Count I, And Their "Standing" Argument Fails.

In arguing that the Trust Beneficiaries lack standing, Defendants make dispositive, binding admissions. First, Defendants admit that for over 150 years, the settled law in Georgia and elsewhere is that whenever an insurance company pays benefits under a life insurance policy that lacked insurable interest, the recipient of those proceeds cannot keep them. Br. at 1, 9.[1] Next, Defendants admit that if the Policies are deemed void *ab initio*, Georgia law requires Defendants to disgorge the entirety of the "policy proceeds." Br. at 9, 13. Finally, Defendants admit that even if Liberty could prove that it was a valid premium finance lender, Georgia has long

[1] All page pincites are to the page numbers applied by the Court's CM/ECF system.

provided that the insurable interest of a lender in the life of a debtor is limited by the amount of actual debt owed. Thus, any amounts a lender receives from a policy in "excess over the amount of indebtedness" must be paid as damages. Br. at 1, 9–12.

These admissions are significant because they prove that *liability* on Count I is not really in dispute, and that the only actual question is the amount of *damages* Defendants owe. That is because, in Count I, the Trust Beneficiaries allege two alternative insurable interest theories which entitle them to different amounts. First, they allege that Defendants must pay over the entirety of the Policies' benefits because the Policies were void under O.C.G.A. § 33-24-3(i), having been procured by Liberty and Wells Fargo and made payable to Liberty *prior* to the policies ever going into force. SAC ¶¶ 131–83. Alternatively, the Trust Beneficiaries allege that even if Liberty could be deemed a valid lender with a limited insurable interest, Defendants took far more from each Policy than any legitimate debt that was owed. Accordingly, and at a minimum, under this second alternative theory, Defendants are liable for the excess amounts they received from the Policies. SAC ¶ 183.

In connection with the second alternative theory of insurable interest damages, the Trust Beneficiaries specifically allege two ways in which Defendants harmed the Trust Beneficiaries when it came to computing the amounts that were owed to Liberty, as a purported creditor, when each Insured passed. First, the Trust Beneficiaries explain that Defendants concealed the fact that they had purchased

excessive annuities (“SPIAs”) on each Insured and that the undisclosed cost of the SPIAs were not only charged to the Trust Beneficiaries after the Insureds died, but that Defendants had been pocketing tens of thousands of dollars in excess SPIA payments every month, on the life of each and every Insured, for years. SAC ¶ 152. Second, Liberty’s purported “loans” were each larded with hundreds of thousands of dollars of undisclosed costs which, it turns out, were fictitious and did nothing but further line Defendants’ and their cohorts’ pockets, which manifested after the Insureds died, when Defendants improperly charged these phantom costs to the Trust Beneficiaries. SAC ¶ 153. Thus, even if Liberty can prove its assertion that it was a valid lender with a limited insurable interest in each Insureds’ life, Defendants directly harmed the Trust Beneficiaries by short-changing them and paying them far less than the amounts they were entitled to receive.

Realizing that they will be required to pay significant insurable interest damages in one form or another, Defendants raise what they call a “standing” argument, contending that whatever damages they owe in connection with Count I are only payable to the Insureds’ estates, and that the only parties with “standing” to sue them are the formally-appointed estate representatives. Although couched in terms of “standing,” what Defendants are really arguing is that the Trust Beneficiaries are not the real parties in interest under Federal Rule of Civil Procedure 17. In turn, Defendants contend that the Insureds’ estates are necessary and

indispensable parties who must be joined under Rule 19.[2] To be clear, Defendants are not challenging Article III subject matter jurisdiction, but rather merely arguing about who has the *capacity* to raise Count I as the real party in interest. *See Lucas v. Lucas*, 946 F.2d 1318, 1322 (8th Cir. 1991) (whether plaintiff was required to bring claims as executrix of husband's estate or could proceed "in her personal capacity" did not raise "a standing problem, but rather one of identifying whether the real party in interest is Mrs. Lucas as executrix, or Mrs. Lucas in her personal capacity).

### A. Defendants Already Lost The Same "Standing" Argument.

Defendants say they did not previously make this same argument in their initial motion to dismiss. If true, this argument was waived. *Steger v. GE*, 318 F.3d 1066, 1080 (11th Cir. 2003) (holding real party in interest/capacity objections are waivable); *VCA Cenvet v. Village Veterinary Ctrs.*, 2012 WL 3779101, at *5 (N.D.

---

[2] Defendants avoid mentioning Rules 17 and 19, but are invoking these rules. *See* Br. at 10 (arguing that dismissal of Count I is required "because the executors and/or authorized personal representatives [of the Insureds' estates] are indispensable parties" without whom Defendants "may be subject to potential duplicative liability. . . ."); *id.* at 21 (arguing that "the legally appointed executor and/or personal representative of each Insured's estate is a 'necessary party' whose absence deprives the [C]ourt of jurisdiction to hear the claim for that Insured" and that "[a]bsent joinder of the estates or personal representatives of the deceased [I]nsureds, Defendants could be subject to duplicative liability in future claims by the estates or personal representatives not present here."). Defendants thus bear the burden of proof. *Giron v. Zeytuna, Inc.*, 597 F. Supp. 3d 29, 42 (D.D.C. 2022).

Ga. Aug. 31, 2012) (same). But this argument was made in Defendants' initial motion to dismiss; it was rejected; and reargument should not be permitted.[3]

### B. The Trust Beneficiaries Are The Proper Insurable Interest Claimants And The Real Parties In Interest Under Rule 17.

Even if it is proper for Defendants to relitigate the same issue, their motion to dismiss Count I should be denied because, contrary to Defendants' argument, there is no bright-line rule providing that only an insured's formal estate, through a court-appointed estate representative, has the ability to bring an insurable interest claim. Br. at 9–10. Instead, the Georgia Supreme Court has long held that the proper insurable interest claimant in a case where the insurance company has paid the proceeds of a policy lacking insurable interest is based on the facts of each case,

---

[3] In its initial motion to dismiss, Wells Fargo (joined by Liberty) argued that "[Trust Beneficiaries] lack standing to assert the counterclaims" and cannot "bring claims on behalf of the Insureds' estates because they have not been appointed as legal representatives of the estates." (ECF 47-1 at 23) (emphasis added); *id*. at 23–26 (arguing that the insured's estates were the only parties with standing and that the Trust Beneficiaries' claims had to be dismissed because they were not being brought by the formally-appointed representatives of the estates); *id.* at n.4 (arguing that the Trust Beneficiaries' claims needed to be dismissed under Rule 19 for failure to join necessary and indispensable parties). Trust Beneficiaries directly responded to this argument. ECF 56 at 60. In their attempted appeal, Liberty and Wells Fargo told the Eleventh Circuit that "[t]he only parties that have standing to recover on Appellees' insurable interest claims are the representatives of the estates of the Insureds," based on *Warnock v. Davis*, 104 U.S. 775 (1881). They even argued that this Court had "failed to appreciate that the only basis upon which Appellees would have standing to state insurable interest or RICO claims is if they were personal representatives of the estates and hence bound by the arbitration clauses." Case No. 25-10467, ECF 27 at 42–55; *see also id*. at 42 (citing Wells Fargo's Mot. to Dismiss, ECF 47-1 at 24). The Court effectively rejected these arguments.

depending on who, in each case, is "lawfully entitled" to the proceeds. *See* Couch on Insurance 3d § 41:9 (rev. ed. 2011) (citing *Turner v. Davidson*, 188 S.E. 828, 830–31 (Ga. 1936) ("*Turner I*") for the rule that "[i]f a person to whom the proceeds of a policy are paid lacks an insurable interest and is therefore not entitled to the proceeds, he or she holds them as a trustee for the person lawfully entitled to them").

Determining who are the proper insurable interest claimants in this case must be based upon an analysis of the at-issue transactions—which is something that Liberty and Wells Fargo avoid completely because the only conclusion to be reached pursuant to such an analysis is that the Trust Beneficiaries are the only possible legal representatives with standing in this case. To that end, as detailed in the SAC, and as admitted by Defendants, "[t]he transactions at issue were all structured similarly," (Br. at 12), and each used form documents, as follows:

- To create Policies on each Insured's life, Georgia limited liability companies ("LLCs") and Georgia trusts ("Irrevocable Trusts") were formed in each Insured's name. *Id.*

- Within the Irrevocable Trust agreements, the Insureds designated the Trust Beneficiaries as the beneficiaries of the Irrevocable Trusts. *Id.*

- The Irrevocable Trust agreements expressly provided that "all cash received as a distribution from the [LLCs] and not designated for any other purpose shall be distributed to the Beneficiary . . ." ECF 113-3 at § VI(a).

- The Irrevocable Trust agreements expressly provided that a Trust Protector would be appointed, and provided that such person had the "power" to change the beneficiary of each Irrevocable Trust, *but in no event could the beneficiary of the Irrevocable Trusts be* the Insureds or their spouses, or "*either of [their] estates*." *Id.* at § VII (emphasis added).

- The Irrevocable Trusts, acting through Wells Fargo as their trustee, became the sole members of the respective LLCs. SAC ¶¶ 82–83.
- The Irrevocable Trusts, as the LLCs' "Members," would "own no property other than [each LLC's] interest in [each] Policy," and the Irrevocable Trusts had a property interest in the property of the LLCs. ECF 113-4 at §§ 6.1, 6.2.
- The LLCs, through Wells Fargo as their Manager, became the purported debtors under supposed loans with Liberty (the "Financing Agreements"). ECF 113-6.
- The LLCs also became the named owners, beneficiaries, and payees of the respective Policies. SAC ¶¶ 82–83.
- The Insureds were not the debtors under the Financing Agreements; the Insureds owed no personal obligation to repay anything under those agreements; and those agreements were non-recourse to the Insureds. ECF 113-6.

This structure was pre-arranged and dictated by Liberty and Wells Fargo for every transaction, and is dispositive proof that the Trust Beneficiaries are the only possible insurable interest claimants in this case. That is because, on the face of the Irrevocable Trust agreements, all proceeds of the Policies were to flow through the LLCs to the Irrevocable Trusts, then to the Trust Beneficiaries.[4] In other words, it was the Trust Beneficiaries who not only possessed legal rights under the terms of the Irrevocable Trust agreements, but who were personally harmed when Defendants cheated them out of additional proceeds from the Policies—including by secretly charging the Trust Beneficiaries for the costs of over-sized SPIAs that benefitted Defendants and for hundreds of thousands of dollars of fake costs.

---

[4] This structure, however, was part of the STOLI scheme because it covered-up the reality that Liberty owned 90+% of each death benefit before inception of the Policies. SAC ¶¶ 71–79.

The Trust Beneficiaries are, therefore, the real parties in interest. *See* Fed. R. Civ. P. 17; 4 Moore's Federal Practice—Civil § 17.10 ("Real parties in interest are the persons or entities possessing the right or interest to be enforced through the litigation."). Because Wells Fargo, as the trustee of the Irrevocable Trusts has refused to act for the Trust Beneficiaries' interests, the Trust Beneficiaries can maintain this action in their own right. *Turner v. Trust Co. of Ga.*, 105 S.E.2d 22, 26 (Ga. 1958) ("There can be no serious question as to the right of the beneficiaries of a trust to apply to a court of equity to protect the trust property upon the refusal or failure of the trustee to do so."); *Farmer v. Mitchell*, 921 S.E.2d 482, 490 (Ga. Ct. App. 2025) (citing Restatement (Second) of Trusts § 282(2) (1959) ("If the trustee improperly refuses or neglects to bring an action against the third person, the beneficiary can maintain a suit in equity against the trustee and the third person.")).

Moreover, the standard transaction documents mandated by Defendants establish that the Insureds' estates are *not* the real parties in interest. The Irrevocable Trust agreements, for example, state that absent a determination by a CPA or lawyer that certain trust property was includible in each Insureds' gross estate, which never occurred, proceeds from the Policies were expressly excluded from the Insureds' estates and that Wells Fargo "*shall distribute all property remaining in th[e] [T]rust to the Beneficiar[ies]*." ECF 113-3 at § VIII(a) (emphasis added). So if the Policies are void, or alternatively, if Liberty had a limited insurable interest as a lender, the

proceeds that Defendants must turn over are payable to the Irrevocable Trusts, and thus to the Trust Beneficiaries—and expressly *not* to the Insureds' estates.

Another reason that the Trust Beneficiaries are the only proper insurable interest claimants is because of how Defendants will attempt to establish that insurable interest existed for each Policy. To that end, Defendants will contend that the Policies had insurable interest because, they allege, Liberty was a valid creditor of each LLC. In turn, Defendants will argue that each LLC had an insurable interest in each respective Insured because the Irrevocable Trusts were the sole members of the LLCs, and each Irrevocable Trust named the Insureds' family members (the Trust Beneficiaries/Plaintiff here) as beneficiaries.

Stated differently, Defendants will argue that the use of the very individuals who are the Trust Beneficiaries/Plaintiffs in this case is what supposedly gave each LLC an insurable interest, allowed Liberty to enter into purported loans with those LLCs, and allowed the LLCs to pledge the Policies to Liberty, as a supposed creditor. But in transactions where the party claiming insurable interest argues that its insurable interest is as a creditor, the law in Georgia and elsewhere is well-settled: the proper insurable interest claimant is "*[t]he legal representatives of the debtor*." *Morris v. Georgia Loan, Sav. & Banking*, 34 S.E. 378, 380 (Ga. 1899) (emphasis added). Here, the alleged debtors were the LLCs, not the Insureds individually. The member of each LLC was the respective Irrevocable Trust, and the Trust

Beneficiaries were the named beneficiaries of those Irrevocable Trusts. Thus, having been named as the beneficiaries of the Irrevocable Trusts—which were the members of the LLCs—the Trust Beneficiaries are the only identifiable parties who could bring this case because it is they who are the only possible legal representatives of the supposed debtors, the LLCs. And because Defendants will argue that the use of the Trust Beneficiaries individually is part of what created a valid insurable interest, it is those individuals that have the right to dispute that assertion.

### C. There Is No Rule In Georgia Requiring That Insurable Interest Claims Be Brought Exclusively By The Formal Court-Appointed Representative Of An Insured's Estate.

Instead of addressing the terms of the actual transactions in this case, Defendants' arguments are based on a high-level, incorrect interpretation of cases that involved different facts, and thus had different categories of insurable interest claimants. To be clear, the Trust Beneficiaries agree with Defendants that "it has been settled law for over 150 years" in Georgia that strangers who collect the proceeds of policies lacking insurable interest simply cannot be permitted to retain those proceeds. Br. at 17, 21. Indeed, the Georgia Supreme Court has put it this way: "It is contrary to public interest and against public policy to allow any one to retain the proceeds of a policy of insurance, though voluntarily paid by the insurance company, where the insurance was effected for his benefit upon the life of another,

in which he had no insurable interest . . . as this would encourage speculation upon the chances of human life . . . .” *Turner I*, 188 S.E. at 830–31 (citation omitted).

And the Trust Beneficiaries agree with Defendants that Georgia law on this issue has long been based on the United States Supreme Court’s pre-*Erie* decisions in cases such as *Cammack v. Lewis*, 82 U.S. 643 (1872) and *Warnock v. Davis*, 104 U.S. 775 (1881). But Defendants are simply wrong that any of the cases they cite—or any others of which the Trust Beneficiaries are aware—ever came close to holding that the only insurable interest claimant in every case is the court-appointed executor or personal representative of a formal estate.

Although it is true that *Cammack*, *Warnock*, and the other cases cited by Defendants were all recovery actions brought by insureds’ estates, none of those cases purported to create a rule that only an estate can bring such a claim. Rather, as Defendants admit when they cite Georgia Supreme Court cases on the issue, the phrase often used by courts is that the appropriate “legal representatives” in any particular case are entitled to recover any proceeds paid from a policy that was a mere wager. *Morris*, 34 S.E. at 380 (“[W]here the assignment [of a policy] is for the purpose of securing a creditor, although he is entitled to recover the face of the policy, he cannot hold what is not necessary for his indemnity. The legal representatives of the debtor will be entitled to the balance.”) (citation omitted); *Chapman v. Lipscomb-Ellis Co.*, 22 S.E.2d 393, 396 (Ga. 1942) (same); *Saville v.*

*Lee*, 158 S.E. 441, 442 (Ga. Ct. App. 1931) ("[W]here it appears as a matter of fact that the policy is held by a creditor merely as security for a debt of the insured, the creditor is entitled only to reimbursement, and is bound to account for the balance to the legal representative of the debtor."); Couch on Insurance 3d § 41:9 (rev. ed. 2011) (citing *Turner I* for the rule that wagering proceeds are held by recipient "as a trustee for the person lawfully entitled to them.").

In most of the cases cited by Defendants, the insured was personally indebted to a creditor who either took out or received an assignment of a policy on the insured's life—which is far different from the instant case, where Defendants admit that the Insureds were not the alleged borrowers under the Financing Agreements (the LLCs were) and that the Insureds personally owed nothing. In the other cases, there was no creditor relationship, but instead a direct agreement between the insured and the person who purchased a policy on his life.[5] Thus, in all of these cases, the only available party to bring an insurable interest claim was the insured's estate. None of those cases held, however, that the estate was the *only* possible claimant. Nor did any of those cases involve the type of multi-layered alleged debtor-creditor relationship that exists in the transactions at-issue in this case, including the use of

[5] *See Cammack*, 82 U.S. at 648 (insured personally owed preexisting debt); *Exch. Bank of Macon v. Loh*, 31 S.E. 459, 464–66 (Ga. 1898) (same); *Morris*, 34 S.E. at 378 (same); *Quillian v. Johnson*, 49 S.E. 801, 801 (Ga. 1905) (same); *Warnock*, 104 U.S. at 780–81 (insured consented to allow entity to procure a policy on his life).

LLCs or trusts. As such, none established a bright-line rule that only an insured's estate can pursue an insurable interest claim. Nor has any court that the Trust Beneficiaries are aware of ever held that when an irrevocable trust is used to procure a policy, the beneficiaries of that irrevocable trust lack the ability to challenge insurable interest and recover the proceeds of the wager—let alone where, as here, Defendants claim that an insurable interest existed through the very individuals who are the Trust Beneficiaries.

Defendants concede that the law in Georgia (that the recipients of STOLI proceeds cannot keep them) is based on "English authority" and pre-*Erie* United States Supreme Court decisions, and is the law in most states. Br. at 17–20. But in attempting to support their assertion that only estates can bring insurable interest claims, they cite a number of non-Georgia cases which, contrary to Defendants' arguments, also did not establish any bright-line standing/capacity rule, let alone one that applies in Georgia.[6]

---

[6] *See Cundiff v. Cain*, 707 So.2d 187, 188 (Miss. 1998) (applying Mississippi statute permitting claim to be brought by "executor or administrator"); *Wagner v. Nat'l Engraving*, 30 N.E.2d 750, 751 (Ill. App. Ct. 1940) (insured's estate was only party that asserted rights); *Hale v. Life Indem. & Inv.*, 68 N.W. 182, 185 (Minn. 1896) (claim by insured's executor because insured was personally indebted to alleged creditor); *McRae v. Warmack*, 135 S.W. 807, 808 (Ark. 1911) (interpleader action against alleged assignee of policy and insured's estate where no one else claimed an interest); *Griffin v. McCoach*, 123 F.2d 550, 551 (5th Cir. 1941) (insured's estate only party asserting right); *Kramer v. Lockwood Pension Servs.*, 653 F. Supp. 2d 354, 374 (S.D.N.Y. 2009) (applying New York statute permitting claim to be brought by "executor or administrator").

Regardless, courts throughout the country have long adjudicated insurable interest disputes seeking the recovery of wagering proceeds brought by claimants who were *not* the representatives of the insured's estate. *See Peel v. Reibel*, 286 N.W. 345, 346 (Minn. 1939) (insurable interest claim by Ida Nelson Peel individually); *Christenson v. Madson*, 149 N.W. 288, 289 (Minn. 1914) (claim for STOLI proceeds brought individually by insured's children, not his estate); *Hogue v. Minn. Packing*, 60 N.W. 812, 813 (Minn. 1894) (insurable interest claim brought individually by insured's wife).

In summary, while it is appropriate in certain cases for an estate, through a court-appointed administrator/representative, to bring an insurable interest claim for the recovery of wagering proceeds, there is no rule making this the only possible prosecution. Rather, the proper claimant in any particular case is fact-dependent, and here the Trust Beneficiaries are the proper claimants, not the Insureds' estates.

### D. Even If The Insureds' Estates Are Also Real Parties In Interest, Count I Cannot Be Dismissed.

For the reasons already stated, the Insureds' estates cannot be considered real parties in interest under the facts of these transactions. But even if they could, Defendants have failed entirely to establish that the estates are "required" under Rule 19, let alone that their absence is a basis for dismissal of Count I.

As noted, a defendant raising objections under Rules 17 and 19 bears the burden of proving that the plaintiff is not the real party in interest and that a non-

party is required to be joined. To establish the elements of Rule 19, Defendants needed to show, as a threshold matter, that the Insureds' estates actually exist, and thus are "person[s] who [are] subject to service of process." Fed. R. Civ. P. 19(a)(1). Defendants, however, do not even suggest that formal estates ever existed or are still in existence for each of the Insureds.

Had Defendants established the existence of missing parties capable of being sued, they then needed to satisfy one of the tests under Rule 19(a). *See* 4 Moore's Federal Practice—Civil § 19.03 (describing Rule 19(a) as setting forth three separate "tests" for determining if an absentee is a required party). Here, Defendants appear to rely exclusively on Rule 19(a)(1)(B)(ii), which provides that a missing party must be joined if "that *person claims an interest* relating to the subject of the action *and* is so situated that disposing of the action in the person's absence may . . . (ii) leave an existing party subject to a *substantial risk* of incurring double, multiple, or otherwise inconsistent obligations because of the interest." (emphasis added); Br. at 21 (Defendants asserting: "Absent joinder of the estates or personal representatives of the deceased insureds, Defendants could be subject to duplicative liability in future claims by the estates or personal representatives not present here.").[7]

[7] Defendants fail to cite Rule 19 but appear to invoke only Rule 19(a)(1)(B)(ii). Defendants have thus waived any argument the Insureds' estates are somehow required parties under Rule 19(a)(1)(A) or under Rule 19(a)(1)(B)(i), which provide separate tests that Defendants have failed to address.

Defendants fail to meet the basic elements of Rule 19(a)(1)(B)(ii), which requires a showing that the missing party actually "claims an interest" in the action. *See* 4 Moore's Federal Practice—Civil § 19.03 ("Although joinder is compelled under the 'multiple liability' clause to protect an extant party—not the absentee—from harm, the Rule requires that the *absentee* claim an interest in the subject matter of the pending case."); *see also McKiver v. Murphy-Brown,* 980 F.3d 937, 951 (4th Cir. 2020) (because absentee "did not seek to join the suit or otherwise 'claim[ ] an interest relating to the subject of an action," party seeking to invoke Rule 19(a) failed to meet its burden); *Uncommon Sense 1 v. MHI RJ Aviation*, 2024 U.S. Dist. LEXIS 87063, at *12 (N.D. W. Va. May 14, 2024) ("'An interest does not qualify under Rule 19(a)(1)(B) unless claimed.'") (citation omitted). Moreover, "it is the general rule that a court considering 'whether [an] absent person's interest in the litigation is sufficient to satisfy . . . the first sentence of Rule 19(a) . . . must base its decision on the pleadings as they appear at the time of the proposed joinder.'" *Associated Dry Goods v. Towers Fin.*, 920 F.2d 1121, 1124 (2d Cir. 1990).

Here, there is nothing within the SAC even remotely suggesting that the Insureds' purported estates have any interest in this case. Moreover, Defendants have failed to argue that any of the Insureds' purported estates have otherwise claimed an interest in this litigation—whether through the SAC or otherwise.

Rule 19(a)(1)(B)(ii) also required Defendants to establish that they face a "substantial risk" of liability, not merely a hypothetical risk. Defendants don't even attempt to argue there is any "substantial risk" of duplicative liability. Instead, in boilerplate fashion with no evidentiary support, they claim they "*could be* subject to duplicative liability." Br. at 21 (emphasis added). This is patently insufficient. *See Coastal Modular v. Laminators*, 635 F.2d 1102, 1108 (4th Cir. 1980) (bald assertion of substantial risk of multiple obligations if absentee insufficient because defendant "could only theorize the possibility that the [absentee] would institute suit against it. Nothing before the court suggested a substantial likelihood of such a suit."); *First Am. Int'l Bank v. Community's Bank*, 771 F. Supp. 2d 276, 284 (S.D.N.Y. 2011) ("TCB has not shown a 'substantial risk' of inconsistent obligations . . . ."); *Disabled in Action v. SEPTA*, 224 F.R.D. 601, 606 (E.D. Pa. 2004) (defendant failed to show "substantial," rather than merely hypothetical, risk).

* * *

In summary, the Trust Beneficiaries are the proper insurable interest claimants and the real parties in interest on Count I. Even if the Insureds' estates were also real parties in interest, Defendants have failed to establish that the Insureds' estates (even if they each exist) are required to be joined under Rule 19(a). Defendants also fail to explain why Count I could be dismissed even if the Insureds' estates were required parties, which would be subject to the elements of Rule 19(b), and only if joinder of

the estates (if required) were not "feasible." Even then, dismissal under Rule 19(b) is a drastic remedy subject to a separate analysis, based on in principles of "equity and good conscience," including whether a court can address any issues through "protective provisions in the judgment," "shaping the relief," or "other measures." *Id*. Accordingly, Defendants' motion to dismiss Count I must be denied.

## II. Plaintiffs' RICO Allegations Are Sufficient and Well-Plead.

On RICO, Defendants do not challenge that Plaintiffs have adequately alleged the existence of an enterprise, the use of the mails and wires, a pattern of racketeering activity, or that the predicate acts were related and continuous. Instead, Defendants argue the alleged predicate acts are insufficient and that Plaintiffs lack standing. These arguments fail.

### A. Running A Human Life Wagering Enterprise Is Illegal Gambling In Violation Of § 1955.

Section 1955 prohibits illegal gambling and makes it a crime for anyone who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." 18 U.S.C. § 1955. An "illegal gambling business" is defined in § 1955 as a gambling business that is in violation of the law of a State in which it is conducted. The SAC details how Defendants and the Enterprise orchestrated and profited from a large-scale human life wager scheme for more than twenty years, and how these activities violated the anti-gambling statutes of Georgia and other affected states where the Insureds lived. SAC ¶¶ 33–130, 205–226.

Defendants' lead argument (Br. at 25–29) to avoid RICO is based on their attempt to dispute the facts in the SAC. Instead of assuming for purposes of their motion to dismiss that they were operating a STOLI ring, Defendants claim they ran a valid "premium financing program," and thus argue that these supposedly lawful activities can't give rise to RICO. This argument is of no consequence, however, because the facts in the SAC are assumed true for purposes of Defendants' motion—and there is no doubt that Defendants ran a massive human life wagering operation.

Defendants next say that imposing liability on STOLI operators would improperly expand RICO, but there are multiple cases where STOLI promoters have been criminally prosecuted and convicted of crimes, including mail and wire fraud, for peddling purported "premium finance" programs that were actually STOLI programs. *See, e.g.*, *U.S. v. Carpenter*, 190 F. Supp. 3d 260, 282, 287, 297–301 (D. Conn. 2016) (convicting defendant of dozens of counts of mail and wire fraud for aiding "development and execution" of a "STOLI" program that was marketed as "premium financing" with intent to induce the "issu[ance] of STOLI policies" using "misrepresentations concealing the true nature" of the policies); *U.S. v. Binday*, 908 F. Supp. 2d 486, (S.D.N.Y. Dec. 10, 2012), *aff'd*, 804 F.3d 558, 579 (2d Cir. 2015) (upholding defendant's conviction and 14-year sentence for dozens of counts of mail and wire fraud where he induced issuance of STOLI policies by concealing the true owner, misrepresenting policies true nature, and concealing the fact "hedge funds

investing in the STOLI policies were betting that the value of the policies would exceed the premiums," which "induce[d] a counterparty to enter a transaction without the relevant facts necessary to make an informed economic decision").

More importantly, Georgia, whose gambling statute Defendants say is the only one that applies, makes it illegal to gamble. *See* O.C.G.A § 16-12-21. And, of course, Georgia's insurable interest statute prohibits human life *wagering* and was enacted with the sole purpose of distinguishing between valid policies and illegal *wagers*. O.C.G.A. § 33-24-3; *Crum v. Jackson Nat'l Life Ins.*, 880 S.E.2d 205, 208 (Ga. 2022); *see also Union Fraternal League v. Walton*, 34 S.E. 317, 319 (Ga. 1899) ("[T]he essential point is that the transaction be bona fide, and not merely a cover for obtaining *wagering* or merely speculative insurance, and a device to evade the law.") (emphasis added and citations omitted); *Turner I*, 188 S.E. at 830–31 (where, "contemporaneous with its issuance" a policy is assigned to assignee, who then maintains the policy for his own profit, the assignment "is purely speculative on the part of the assignee, entered upon by him as a *wagering* interest," and is "obnoxious to the law, as violative of a sound public policy, and should not be sustained.") (emphasis added and citations omitted); *Chapman*, 22 S.E.2d at 396, 398 (one cannot create the false appearance of insurable interest "as a cloak or cover for a mere *wagering* contract") (emphasis added).

Stated differently, because wagering on human life by taking out policies lacking insurable interest is a well-recognized form of gambling that is a crime in Georgia and elsewhere, there is no bona fide dispute that such human life wagering is a sufficient act to subject its perpetrators to liability under Section 1955, and Defendants' attempt to portray their activities as lawful misses the point. *Sikes v. AT&T*, 179 F.R.D. 342, 356 (S.D. Ga. 1998) (rejecting defendant's argument that it cannot be held liable under RICO for illegal gambling because it "is not in the business of gambling" since the statute "does not require proof that a RICO defendant is solely, or even primarily, engaged 'in the business of gambling'") (citation omitted), *rev'd on other grounds*, 281 F.3d 1350 (11th Cir. 2022); *Sparkman v. State*, 434 S.E.2d 564, 565 (Ga. Ct. App. 1993) (affirming defendants' convictions of 34 counts of commercial gambling and one count of violating Georgia's RICO statute). Indeed, the Trust Beneficiaries allege with great specificity the illegal "gambling business" Liberty, Wells Fargo, and their cohorts operated, and it would defy common sense to conclude that other types of gambling (illegal poker, for instance) can subject one to RICO liability, but gambling on human life cannot.

In addition, Defendants did not merely violate Georgia's anti-gambling statute and prohibitions on human life wagering, but Defendants also violated the anti-gambling statutes of other states where the Insureds' lived, including Arizona, Michigan, and New Jersey. SAC ¶ 217. Each of these states have especially broad

anti-gambling statutes. *See* A.R.S. §§ 13-3301 et seq.; M.C.L. §§ 432.218, 750.301; N.J. Stat. §§ 2C:37-1 et seq.; *Sun Life v. Wells Fargo*, 208 A.3d 839, 853 (N.J. 2019) (holding STOLI policy void *ab initio* and agreeing with the reasoning of the New Jersey Division of Banking and Insurance that "[a]bsent an insurable interest, . . . a life insurance policy is a 'pure gamble' in violation of N.J.S.A. 17B:24-1.1 and 'the anti-gambling provisions of both the New Jersey Constitution and New Jersey statutes'"); *Crossman v. Am. Ins. Co.*, 164 N.W. 428, 429 (Mich. 1917) ("Policies of insurance founded upon mere hope and expectation and without some interest in the property, or the life insured, are objectionable as a species of gambling, and so have been called wagering policies."); *Zurich Life Ins. v. Zoo Stage*, 2004 WL 7350684, at *1 (D. Ariz. May 26, 2004) ("A beneficiary's lack of an insurable interest in the insured's life renders a life insurance policy void for being an illegal wagering contract.") (citing 3 Couch on Insurance 3d § 41:2, at 41-7); *see also Sikes*, 179 F.R.D. at 348 (recognizing "that a gambling business violates RICO if it violates the gaming laws of any state in which the gambling business is conducted").

Defendants attempt to avoid these anti-wagering statutes by arguing that life insurance contracts are excluded from the definition of "bet" or "gambling." *See* O.C.G.A § 16-12-20; A.R.S. §§ 13-3301(6). But Defendants misunderstand a critical point. These statutes exclude only *legitimate* life insurance contracts from their definitions of "gambling" or "bet." The difference between legitimate policies and

mere wagers is whether there was insurable interest, so policies lacking insurable interest—and which have always been recognized as gambling contracts on the lives of the insureds—are included in and prohibited by these anti-gambling statues. *See*. *e.g.*, *Warnock*, 104 U.S. at 779 (holding a policy for *legitimate* insurance purposes will "take the contract out of the class of wager policies"); *Mut. Life Ins. v. Lane*, 151 F. 276, 284 (11th Cir. 1907) (quoting *Warnock*).

In summary, if, as alleged, the transactions here are shown to have involved human life wagering (i.e., policies lacking insurable interest), then Defendants were engaged in illegal gambling proscribed by the laws of Georgia and the states of residence of the Insureds. Accordingly, the Trust Beneficiaries' Section 1955 claim cannot be dismissed.

### B. Plaintiffs More Than Sufficiently Allege Mail And Wire Fraud In Violation Of §§ 1341, 1343.

Defendants' attack on the Trust Beneficiaries' separate mail and wire fraud RICO claim ignores the detailed allegations in the SAC in order to paint the picture that these claims are not pled with adequate specificity. But Defendants know exactly what is being alleged because the SAC explains in great detail how Defendants used interstate wires and mails to execute a fraudulent scheme by inducing seniors into the Program, concealing key economic terms, siphoning the life insurance proceeds and the benefits of the SPIAs *from the Trust Beneficiaries*,

secretly *charging the Trust Beneficiaries* for the cost of the SPIAs, and fraudulently *charging the Trust Beneficiaries* other phantom expenses. SAC ¶¶ 33–130.

Plaintiffs specifically allege that Defendants began their mail and wire fraud campaign in the early 2000s by developing and then transmitting Program Materials and Financing Agreements to solicit the Insureds' participation. *Id.* ¶¶ 38–39, 49–64, 89–100. Plaintiffs further allege, with specificity, that Defendants later sent Annual Statements and Post-Death Communications *to the Trust Beneficiaries* in furtherance of the fraud, and it was those later acts that culminated in the diversion of millions of dollars *from the Trust Beneficiaries*. *Id.* ¶¶ 109–122. In short, the SAC alleges a coherent scheme: Seniors were induced with promises of compensation, while Defendants concealed critical SPIA details—including costs, monthly payments, and Defendants' retention of excess SPIA cash—and embedded undisclosed fees and expenses that ultimately siphoned funds *from the Trust Beneficiaries*. This fraudulent course of conduct culminated post-death when Defendants used Calculation and Instruction Letters *to short-change the Trust Beneficiaries* and to take a large portion of the death benefits for themselves after, *inter alia*, having misapplied the SPIA benefits for years. *Id.* ¶¶ 111–122.

These allegations easily meet Rule 9(b) by detailing the dates, amounts, senders, recipients, mediums, and the "what" and "why" of the fraud, including the exemplar Wilkenfeld transaction and the cited appendices detailing the Annual

Statements and Post-Death Communications directed to each of the Trust Beneficiaries. *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1345 (N.D. Ga. 2015). The Trust Beneficiaries' many detailed allegations reveal two types of fraud: actual material misrepresentations, and material omissions and half-truths. *Lockheed Martin v. Boeing*, 357 F. Supp. 2d 1350, 1372–73 (M.D. Fla. 2005) (holding the mail or wire fraud statutes are satisfied where the plaintiff shows a scheme to defraud through either material misrepresentations, or the omission or concealment of material facts). Defendants' assertion that Plaintiffs merely recast breach-of-contract claims fails because the Plaintiffs allege a long-running fraudulent scheme that culminated in post-death diversions of proceeds *from the Trust Beneficiaries*, not a dispute over contract performance. SAC ¶¶ 33–130.

Plaintiffs also specifically allege a duty to disclose information about the SPIAs and other aspects of the fraudulent scheme based on the fact that Wells Fargo was the trustee of the very Irrevocable Trusts that named the Trust Beneficiaries. Wells Fargo thus owed them fiduciary duties, including the duty of disclosure, as a matter of Georgia law and statute.[8] SAC ¶ 117 (citing *Harris v. Birnbaum*, 62 S.E.2d

[8] Wells Fargo simultaneously served as Trustee of the Irrevocable Trusts, Manager of the LLCs, Georgia Trustee of Liberty One and Liberty Two, Statutory Trustee of Liberty, Trustee of the SPIA Trusts, and Securities Intermediary—consolidating all information regarding the SPIAs, the Policies, the Total Amount Due, the Maturity Date Payment, and the calculations. And yet, while knowing the Insureds and Trust Beneficiaries lacked that information, it concealed those details. In contravention of its fiduciary duties to the Trust Beneficiaries, Wells Fargo perpetrated the scheme,

204, 207 (Ga. Ct. App. 1950)); ¶ 185 (citing O.C.G.A. §§ 53-12-240 ("[T]rustee shall administer the trust in good faith . . . ."); 53-12-246 (trustee owes beneficiaries "[d]uty to avoid conflict of interest" and "shall administer the trust solely in the interests of the beneficiaries")); O.C.G.A. § 23-2-53 ("Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties . . . ."). This is easily enough to give rise to RICO trustee liability by omission. *See Langford v. Rite Aid of Ala.*, 231 F.3d 1308, 1312–13 (11th Cir. 2000) (mail and wire fraud liability for omission or concealment easily satisfied based on fiduciary duty).

Moreover, the SAC allegations are also sufficient to find that Liberty itself owed its own duty of disclosure because, under Georgia law, one who speaks on an issue in part is required to tell the whole truth. *See Yaffa v. SunSouth Bank*, 2016 WL 10536038, *7 (N.D. Fla. Sept. 15, 2016) ("[A] duty to disclose the whole truth also arises when a party undertakes to answer inquiries, and nondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact.") (quotation and citation omitted); *Meyer v. Jinkosolar Holdings*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks

misrepresented the Total Amount Due, submitted claims, received the death benefits, and executed transfers to Liberty according to the false Post-Death Communications. SAC ¶¶ 11, 99–130.

on an issue or topic, there is a duty to tell the whole truth . . . [e]ven when there is no existing independent duty to disclose information . . . .") (citation omitted). As alleged in the SAC—and as Liberty admits—Liberty itself mentioned the SPIAs, but *always* intentionally omitted the key details and thus actively misled not only the Insureds at the outset of these fraudulent transactions, but the Trust Beneficiaries both before and after the Insureds died when Liberty and Wells Fargo induced them into allowing Liberty to pocket 90%+ of the policies' death benefits.[9] *Akers v. Newby*, 2021 WL 7159936, at *3 (M.D. Fla. June 14, 2021).

Accordingly, Plaintiffs' mail and wire fraud is adequately pled, including that Defendants had a duty of disclosure.

#### 1. Plaintiffs Allege The Particular Terms And Conditions Of The Financing Agreements That Were Deceptive And How Those Terms Were Used To Trick Them.

Defendants next nit-pick certain of Plaintiffs' allegations, claiming that any fraud "based on the terms and conditions of the Financing Agreements" fails because Plaintiffs are supposedly pointing to disclosures made to the Insureds, and because the Plaintiffs supposedly do not identify deceptive terms. Defendants are incorrect.

---

[9] Even if there were any factual question that Defendants had a duty of disclosure, this issue could not be decided against the Trust Beneficiaries on a motion to dismiss because the SAC allegations must be accepted as true, and the Trust Beneficiaries have alleged this duty in a variety of ways. *See Sowa v. Mercedes-Benz Grp.*, 764 F. Supp. 3d 1233, 1282–83 (N.D. Ga. 2024) (citing *Amin v. Mercedes-Benz USA*, 301 F. Supp. 3d 1277, 1296 (N.D. Ga. 2018)).

First, although part of the mail and wire fraud in this case involved the communication of false and misleading terms to the Insureds, including in the Financing Agreements, the RICO violations here are ultimately based on how those terms were operationalized years later when Defendants used them to deprive the Trust Beneficiaries of policy proceeds. This happened through the Annual Statements and Post-Death Communications, which misrepresented and concealed how the Total Amount Due would be calculated and paid, and omitted the critical fact that the Total Amount Due included charging the Trust Beneficiaries for SPIAs and other costs, and thereby deceived the Trust Beneficiaries into permitting the diversion of policy proceeds. SAC ¶¶ 108–122. Merely because these terms were initially provided to the Insureds as part of contracts does not mean that Defendants could use these terms years later to deceive the Trust Beneficiaries, who themselves weren't parties to those agreements.

Second, the Trust Beneficiaries plainly identify the deceptive features of the Financing Agreements—the preset Total Amount Due, Maturity Date Payment, embedding of SPIA costs and phantom expenses—and the SAC explains how they were deceptive, providing dates, amounts, communications, and actors, including the exemplar Wilkenfeld transaction and the cited appendices detailing the Annual Statements and Post-Death Communications directed to each of the Plaintiffs. SAC ¶¶ 94–122, 149–153.

Defendants attempt to excuse their lies by arguing that they paid out what they promised through the Total Amount Due, and claim that any dispute over whether the transactions were loans cannot support mail fraud. But in so arguing, Defendants confirm that they knowingly and actually lied about the true nature of the Program and ultimately misled the Trust Beneficiaries as to what was included in the Total Amount Due, omitting the critical fact that the Trust Beneficiaries were paying the secret cost of the SPIAs as well as massive phantom costs. Indeed, the fact that Defendants charged the Trust Beneficiaries the set amount that was listed in the Financing Agreements at the outset proves that Defendants were wagering on human life (having guaranteed Liberty a set death benefit percentage before inception) and that Defendants ultimately operationalized their STOLI fraud through the Total Amount Due and Maturity Date Payment. Defendants' effort to assert that their transactions were valid loans is irrelevant because the facts of the SAC are assumed (and, in fact, are) true, and it will be up to Defendants to convince a jury that these were mere loans, not human life wagering transactions.

The Wilkenfeld transaction exemplifies the fraud: effective December 3, 2004, through the Total Amount Due, Liberty guaranteed itself $5,701,375 of a $6 million death benefit—over 95%—much of it through the vaguely described Maturity Date Payment without disclosing that the Maturity Date Payment was primarily comprised of the SPIA costs. SAC ¶¶ 94–122, 149–153.

The Annual Statements and Post-Death Communications are the fraudulent presentations that operationalized those deceptive terms and conditions and are pled with particularity. SAC ¶¶ 108–130, 211, 214, 223. The Annual Statements, including the July 9, 2009 statement concerning Wilkenfeld and later iterations, reported the Total Amount Due to Liberty (e.g., $5,692,000 if death occurred at the 72nd month), but were materially false and incomplete because they falsely represented that the Total Amount Due had been calculated, when in fact it was a preset amount that secretly included the full SPIA costs and phantom expenses, while understating the Trust Beneficiaries' net payout. The Post-Death Communications likewise exemplify the fraudulent implementation of those terms: concerning Wilkenfeld: On April 28, 2011, Liberty and Wells Fargo's cohort Credit Suisse as "Calculation Agent" informed Liberty and Wells Fargo that Total Amount Due was $5,735,030.95 with only $308,000 to the Trust Beneficiaries; then, on May 3 and May 12, 2011, Wells Fargo's Instruction Letters directed transfer of $5,735,030.95 to Liberty. SAC ¶¶ 110–122. These communications deceived the Trust Beneficiaries into allowing Wells Fargo to divert proceeds to Liberty, and the SAC alleges the resulting harm with specificity (e.g., $5,735,030.95 taken from a $6 million policy). *Id.*

In short, Plaintiffs do not recast breach of contract claims. Instead, they expressly identify false and deceptive terms within the Financing Agreements that

were ultimately operationalized against them, including the lies about the SPIAs; the purposes, meaning, and operation of the Total Amount Due and Maturity Date Payment terms; and the lies about other costs that were charged to the Trust Beneficiaries after the Insureds died. The SAC pleads all of this with specificity, including by identifying when and how additional misrepresentations about these terms were communicated to Plaintiffs via Annual Statements and Post-Death Claim Communications. The SAC thus easily satisfies Rule 9(b). SAC ¶¶ 100–122.

#### 2. Plaintiffs Specifically Allege The Material SPIA Information That Was Concealed From Them.

Defendants contend (Br. at 28) that the SPIAs were "not relevant," were not kept secret in general, and that the SPIAs were merely part of Defendants' "back-end financial arrangements" such that the Insureds and Trust Beneficiaries were "not entitled to receive" information about the details of the SPIAs.

Defendants make this materiality assertion because they have been forced to admit that although they vaguely mentioned SPIAs multiple times, they actively concealed the SPIA details from the Insureds and from the Trust Beneficiaries. Indeed, although Defendants try to understate the facts, they openly concede (Br. at 31) that "the precise amounts of the SPIA payments were not necessarily known to the Insureds." And they admit the Maturity Date Payment and Total Amount Due secretly included the SPIA costs charged to the Trust Beneficiaries. (Br. at 31, admitting the Maturity Date Payment had a "relationship" to the "cost of the SPIA").

In other words, the SPIAs were obviously critical to these transactions and, as Defendants admit, were material to how Defendants charged the Total Amount Due and thus how Defendants secretly passed on the SPIA costs to the Trust Beneficiaries, while secretly keeping the SPIA profits for themselves. Calling the SPIAs "not relevant" makes no sense, and it ignores the detailed allegations of the SAC. SAC ¶¶ 44–48, 62, 100–130; Br. at 12–13, 36–40.

Nor is there any support for Defendants' assertion that the SPIAs were not material merely because Defendants had the Insureds sign blank applications. This was done to keep the Insureds in the dark about the SPIAs (SAC ¶¶ 102–106), and the fact that Defendants admit this occurred is dispositive proof of Defendants' deceit.

In short, the SAC alleges (and Defendants actually admit) that the SPIAs were a material part of these transactions, but that Defendants intentionally concealed what was really happening, including the cost of the SPIAs, how much the SPIAs generated each month in excess cashflow, and the fact that the SPIAs would be charged to the Trust Beneficiaries through the Maturity Date Payment and Total Amount Due. How these lies and omissions were operationalized to harm the Trust Beneficiaries is detailed in the SAC, including through the example Wilkenfeld transaction. There, discovery has revealed a SPIA for Wilkenfeld with a premium of $4,515,000 generating $74,458.45 in monthly payments—exceeding the roughly

$43,000 in premiums required on the life insurance policy—information not disclosed to the Insureds or Trust Beneficiaries. These undisclosed amounts directly impacted the Total Amount Due and the net proceeds to the Trust Beneficiaries, confirming the SPIAs' materiality to the transactions.

Moreover, it is evidence of their fraud that Defendants chose to tell the Insureds about the existence of the SPIAs, but intentionally omitted all of the key details. Indeed, because the Defendants chose to disclose some information concerning the SPIAs, they were required to make full and accurate disclosures of the SPIA details. *See supra* at 27–28. In particular, Wells Fargo, who knew all the SPIA details served as trustee to the Trust Beneficiaries and owed them fiduciary obligations, was unquestionably required by statute to disclose the details of the SPIAs to the Trust Beneficiaries. *See supra* at 26–27.

Defendants' assertion that "the full cost of the annuities was borne by Liberty" is contradicted by Liberty's admission (Br. at 31) that the Maturity Date Payments included the "cost of the SPIA[s]" and Plaintiffs' allegations that the cost of the SPIAs was charged to the Irrevocable Trusts/LLCs and thus to the Trust Beneficiaries, while the Enterprise kept excess SPIA income without crediting it.

Nor is there any merit to Defendants' argument that claims arising from the SPIAs are time-barred. Defendants fail to point to any statute of limitations, and are wrong when they attempt to cabin Plaintiffs' claims as relating only to

misrepresentations and omissions made at the time the SPIA applications were signed. As explained, the culmination of Defendants' mail and wire fraud happened after the Insureds' died, in Post-Death Communications to the Trust Beneficiaries when Plaintiffs were fraudulently charged the costs of the SPIAs despite the fact that Wells Fargo—a fiduciary to the Trust Beneficiaries—knew the truth yet concealed what was happening. It is black-letter law in Georgia that "the sun never sets on fraud" and "if a defendant is guilty of fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of plaintiff's discovery of the fraud." *Goldston v. Bank of Am.*, 577 S.E.2d 864, 868 (Ga. Ct. App. 2003) (citing O.C.G.A. § 9-3-96) (reversing the trial court's decision granting a bank-trustee's motion to dismiss the beneficiary's claims because the bank-trustee's failure to reveal information was fraud which tolled the statute of limitations).

#### 3. Plaintiffs Meticulously Allege The Deception In The Annual Statement And Post-Death Communications.

Defendants admit that they failed to disclose how the Total Amount Due and Maturity Date Payment was calculated (or even if there was a calculation), yet take the position they had no duty to explain those calculations. Br. at 23, 33–36. That concession underscores Plaintiffs' theory: Defendants concealed material information, even as they sent Annual Statements and Post-Death Communications.

As Plaintiffs allege, the Annual Statements falsely described the Total Amount Due as a calculated figure when, in reality, it was a preset percentage that secretly incorporated the cost of massive SPIAs (through the Maturity Date Payment) and phantom expenses, thereby materially reducing the Trust Beneficiaries' proceeds. SAC ¶ 118. That is classic deception and a concrete property deprivation, not a mere overcharge.

Defendants' assertion that the Annual Statements were "purely informational" fails because the statements were integral to executing and enforcing the scheme by repeatedly conditioning the Trust Beneficiaries to accept the preset Total Amount Due and by setting expectations for the amounts Liberty would take at death. The Wilkenfeld example shows Defendants using the mails/wires to circulate a $5,692,000 "Total Amount Due" that mirrored Appendix D's preset percentage—confirming the misrepresentation that the figure was calculated rather than preloaded with undisclosed fees and SPIA costs.

The Eleventh Circuit "overcharge" cases Defendants cite do not apply where, as here, Plaintiffs allege deceptive communications that concealed the methodology, mislabeled preset percentages as calculations, and hid component costs and phantom charges—conduct aimed at extracting property through lies, not mere price disputes. That is actionable fraud in the obtaining of money via deceitful communications. *Akers v. Newby*, 2021 WL 7159936, at *3 (M.D. Fla. June 14, 2021).

Plaintiffs specifically and plausibly allege that Defendants used the Annual Statements and Post-Death Communications to misrepresent preset, inflated "Total Amount Due" figures as calculated amounts, conceal SPIA costs and phantom expenses, and thereby defraud Trust Beneficiaries of millions—conduct executed and concealed by Wells Fargo in multiple fiduciary capacities. SAC ¶¶ 108–122.

#### 4. Plaintiffs' Allegations On "Information and Belief" Relating To Eight Of The Insureds Is Proper.

Defendants argue that because Plaintiffs allege "on information and belief" a Policy was taken out on the lives of eight of the Insureds, the Court must dismiss their RICO claims. Br. at 44. But this Court already rejected Defendants' argument with respect to four of the same Insureds, *see* MTD Order at 27–28, and Plaintiffs have *not* alleged on information and belief "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002). Rather, Rule 9(b) is met because Plaintiffs allege in great detail the specifics of Defendants' fraudulent conduct with regard to each of the eight Insureds. *See* SAC ¶¶ 33–130.

### C. Plaintiffs Have RICO Standing.

Ignoring the allegations in the SAC, Defendants contend that the Trust Beneficiaries weren't harmed by Defendants' illegal gambling. They also assert that there was no mail or wire fraud because the underlying Financing Agreements were entered into by the Insureds, not the Trust Beneficiaries, so the Trust Beneficiaries

lack standing to rely on misrepresentations in those agreements as a part of their mail and wire fraud theory. These arguments have no merit.

First, the SAC alleges in great detail the ways in which the Trust Beneficiaries suffered "concrete financial losses" in the form of lost proceeds equal to the entire death benefit received by Defendants (minus any amounts previously received by the Insureds or Plaintiffs) or, alternatively, amounts Defendants retained over any insurable interest Liberty as a purported creditor. *Hanekom v. Kuchenbecker Exc.*, 2024 U.S. Dist. LEXIS 104379, at *18 (N.D. Iowa June 12, 2024) (injury requirement satisfied where plaintiff alleged defendant "engaged in a conspiracy directed at him that resulted in him being underpaid"); *Marceau v. IBEW Local 1269*, 2006 U.S. Dist. LEXIS 47766, at *30 (D. Ariz. July 7, 2006) (RICO injury satisfied based on reduced and lost compensation); *White v. Symerta Assigned Benefits*, Case No. C20-1866-MJP at 17, 18-20 (W.D. Wash. Aug. 5, 2021) (rejecting Defendants' RICO injury arguments because Plaintiffs had "a property interest in their future payments" and "[w]hile it is true the sums were not determined, the right themselves were not speculative, and giving them up for less than they are worth is concrete financial loss.").

Defendants say there would have been no loss in the absence of them having taken out the Policies, and are effectively arguing that they were allowed to commit fraud because they created a STOLI scheme that generated Policies that only existed

for their own pecuniary gain. This makes no sense, would allow fraudsters to avoid RICO liability in a whole host of situations, and would rewrite the law on RICO's injury requirement, which merely requires injuries that are not speculative. *Lipari v. GE*, 2008 U.S. Dist. LEXIS 57527, at *8–10 (W.D. Mo. July 30, 2008).

Second, the SAC goes far beyond merely alleging RICO based on interactions between the Insureds and Defendants via the Financing Agreements. As discussed above and shown in the SAC, there were many false and deceptive communications to the Trust Beneficiaries, including allegations that the Trust Beneficiaries relied on these misrepresentations and would not have agreed to the Total Amount Due figures had they known the truth. *See, e.g.*, SAC ¶ 118 ("Liberty and Wells Fargo, for itself and on behalf of Liberty, falsely represent *to the Trust Beneficiaries* that . . ."); ¶ 120 ("*Trust Beneficiaries* did, in fact, *reasonably rely* on Wells Fargo to provide them with accurate, complete information, and the *Trust Beneficiaries were directly harmed* by Defendants' false representations . . . ."); ¶ 198 ("Wells Fargo actively misrepresented *to the Trust Beneficiaries* the amount that were payable . . ."); ¶ 201 ("[Wells Fargo] ultimately with[eld] *from the Trust Beneficiaries* the proper amount of the death benefits *that should have been paid to the Trust Beneficiaries*."); ¶ 48 (same); ¶ 223 ("Liberty and Wells Fargo intended to commit the predicate acts . . . through *intentional misrepresentations and omissions made to the Trust Beneficiaries* . . .") (emphasis added throughout).

Plaintiffs thus seek recovery of misappropriated death benefits wrongfully routed to Liberty via a comprehensive fraud scheme—misrepresentations, concealments, fiduciary breaches, and manipulative post-death calculations and instructions—that induced reliance and caused a concrete diversion of death benefits. SAC ¶¶ 119-121; *see also* SAC ¶¶ 33–130. These allegations are more than sufficient to defeat Defendants' argument that the case is merely about expected contractual returns or that Plaintiffs have failed to allege deprivation of property caused by fraud.

**III. Defendants' Request For Dismissal With Prejudice Is Improper.**

Defendants' request for dismissal with prejudice rests on the assertion that Plaintiffs have twice amended yet failed to cure deficiencies, but the SAC adds substantial factual detail supporting Count I's insurable-interest theory and Count III's RICO allegations. Defendants' reliance on *Eiber Radiology* does not warrant with-prejudice dismissal here, where Plaintiffs have augmented their claims and the Court has not found futility as to Counts I and III. At most, any perceived shortfall in the SAC should result in dismissal with leave to amend, not the extraordinary remedy of dismissal with prejudice.

## CONCLUSION

For all of these reasons, Defendants' motion to dismiss Counts I and III should be denied.

Respectfully submitted this 12th day of January, 2026.

*/s/ Chase A. Howard*
Chase A. Howard, Esq. (*pro hac vice*)
Michael J. Miller, Esq. (*pro hac vice*)
Gregory J. Star, Esq. (*pro hac vice*)
Alex H. Hayden, Esq. (*pro hac vice*)
Victoria G. Mazzola, Esq. (*pro hac vice*)
Justin K. Risser, Esq. (*pro hac vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: 215-665-2147
chasehoward@cozen.com
mjmiller@cozen.com
gstar@cozen.com
ahayden@cozen.com
vmazzola@cozen.com
jrisser@cozen.com

*/s/ Danielle Corin Le Jeune*
Danielle Corin Le Jeune, Esq.
Georgia Bar No. 134222
Saskia H. Olczak, Esq.
Georgia Bar No. 686983
COZEN O'CONNOR
1230 Peachtree Street, N.E.
The Promenade, Suite 400
Atlanta, Georgia 30309
Tel: (404) 572-2050
DLeJeune@cozen.com
solczak@cozen.com

*Attorneys for Plaintiffs.*

CERTIFICATION: The above-signed counsel hereby certifies that this document was prepared in Times New Roman 14-point font with 1 inch margins in accordance with LR 5.1, N.D. Ga.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Brian Achenbach, et al.,

Plaintiffs,

v.

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Defendants.

**Case No. 1:23-cv-5483-MLB**

---

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A.,

Counterclaimants,

v.

Brian Achenbach, et al.,

Counterclaim-Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2026, I served the foregoing **PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system and via email to the following attorneys of record:

Terry R. Weiss, Esq.
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-3929
trweiss@duanemorris.com
*Attorneys for Plaintiffs/Counterclaim-Defendants*

Thorn Rosenthal, Esq.
Lauren Perlgut, Esq.
Joel Kurtzberg, Esq.
Margaret Barone, Esq.
Cahill Gordon & Reindel LLP
32 Old Slip
New York, NY 10005
trosenthal@cahill.com

Jonathan P. Hersey
K&L Gates LLP
1 Park Plaza
12th Floor
Irvine, CA 92614
jonathan.hersey@klgates.com
*Attorney for Plaintiffs/Counterclaim-Defendants Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company*

lperlgut@cahill.com
jkurtzberg@cahill.com
mbarone@cahill.com
*Attorneys for Plaintiffs/Counterclaim-Defendants Liberty One Funding Trust and Liberty Two Funding Trust*

This 12th day of January, 2026.

*/s/ Chase A. Howard*
Chase A. Howard, Esq.