**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

Brian Achenbach, et al.,

Plaintiffs,

v.

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, N.A.,

Defendants.

________________________________ **Case No. 1:23-cv-5483-MLB**

Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, N.A.,

Counterclaimants,

v.

Brian Achenbach, et al.,

Counterclaim-Defendants.

________________________________/

# DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR PARTIAL MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

*Attorneys for Defendants:*

Terry R. Weiss, Esq.
Ga. Bar No. 746495

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929

*Attorneys for Liberty:*

Joel Kurtzberg, Esq. (*pro hac vice*)
Thorn Rosenthal, Esq. (*pro hac vice*)
Lauren Perlgut, Esq. (*pro hac vice*)
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, NY 10005

*Attorneys for Wells Fargo:*

Jonathan P. Hersey, Esq. (*pro hac vice*)
**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, CA 92614

Clay J. Pierce, Esq. (*pro hac vice*)
Emily Burgess, Esq. (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas
New York, NY 10036

Julie R. Landy, Esq. (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center, 90 S. 7th Street
Minneapolis, Minnesota 55402

Elizabeth M. Casey, Esq. (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
One Logan Square, Suite 2000
Philadelphia, PA 19103

Kyle Darch, Esq. (*pro hac vice*)

**FAEGRE DRINKER BIDDLE & REATH LLP**
1144 Fifteenth St
Suite 3400
Denver, CO 80202

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................1

ARGUMENT ....................................................................................................3

I. Plaintiffs Have Not Demonstrated They Have Standing to Assert Insurable Interest Claims ....................................................................................3

A. Defendants Did Not Previously Make Their Standing Argument Before the District Court....................................................................4
B. Defendants' Standing Argument Was Not Waived. ............................4
C. Plaintiffs Do Not Cite Any Authority Showing that They, Rather than the Insureds' Estates, Are Entitled to Assert the Insurable Interest Claim.................................................................................................6
D. Defendants Would Be Subject to Potential Duplicative Liability If Plaintiffs' Insurable Interest Claims Were Allowed to Proceed ...........9

II. Plaintiffs Do Not Dispute that No Court or Authority Has *Ever* Found that STOLI Policies Constitute Criminal Gambling...............................................10

III. Plaintiffs Fail to State a RICO Claim Based on Mail and Wire Fraud.......14

A. Plaintiffs Cannot State a Mail and Wire Fraud Predicate Act Based on Statements Made to the Insureds ..................................................14
B. Plaintiffs' Theories of Liability Based on Purported Statements to Plaintiffs Are Not Cognizable Under RICO .....................................17

1. Plaintiffs Cannot Claim Material Omissions in Statements They Did Not Receive.........................................................................................17
2. The Annual Statements and Post-Death Communications Stemmed from Performance of the Financing Agreements...............................18
3. Plaintiffs Do Not Dispute that RICO Cannot Be Premised on Inflated or Improper Charges ......................................................................19
4. Plaintiffs' Claims That Contractual Terms Were Misrepresented as "Calculated" is Contradicted by the SAC ........................................21
5. Plaintiffs Do Not Allege a Duty of Disclosure to Plaintiffs Sufficient to Support an Omissions Claim .......................................................22

C. Plaintiffs Cannot Maintain Mail and Wire Fraud Claims for the Plaintiffs Affiliated with the "Stranger Insureds"..............................23

IV. Plaintiffs Do Not Allege RICO Standing for Either their Gambling or Mail and Wire Fraud Claims ....................24

CONCLUSION ....................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akers* v. *Newby*,
2021 WL 7159936 (M.D. Fla. June 14, 2021) ....................................16, 20, 21

*Belcher ex rel. Belcher* v. *Prudential Ins. Co. of Am.*,
158 F. Supp. 2d 777 (S.D. Ohio 2001)..........................................................9, 10

*Bischoff* v. *Osceola Cnty., Fla.*,
222 F.3d 874 (11th Cir. 2000)..................................................................................3

*Braswell Wood Co., Inc.* v. *Waste Away Grp., Inc.*,
2010 WL 3168125 (M.D. Ala. Aug. 10, 2010)..................................................20

*In re Checking Acct. Overdraft Litig.*,
797 F. Supp. 2d 1323 (S.D. Fla. 2011)...............................................................19

*Christenson* v. *Madson*,
149 N.W. 288 (Minn. 1914)......................................................................................7

*Commercial Union Assur. Co.* v. *Milken*,
17 F.3d 608 (2d Cir. 1994).......................................................................................25

*Crossman* v. *American Insurance Co. of Newark, N.J.*,
164 N.W. 428 (Mich. 1917) .......................................................................................13

*Davis* v. *Oasis Legal Fin. Operating Co., LLC*,
936 F.3d 1174 (11th Cir. 2019)...................................................................................12

*Epi-Use Sys. Ltd.* v. *Bi Brainz, LLC*,
2026 WL 100770 (11th Cir. Jan. 9, 2026) ..............................................................10

*Firestone* v. *Galbreath*,
976 F.2d 279 (6th Cir. 1992)..........................................................................................5

*Fukanova* v. *Mecerod*,
2010 WL 11505701 (N.D. Ga. Nov. 15, 2010).................................................5, 6

*Gasperoni* v. *Strauss*,
2020 WL 10320967 (M.D. Fla. Sept. 22, 2020) ..............................................23

*Hogue* v. *Minnesota Packing*,
60 N.W. 812 (Minn. 1894) ........ 7, 8

*Jeffress* v. *U.S. Bank Nat'l Ass'n*,
2014 WL 12481342 (N.D. Ga. Oct. 27, 2014) ........ 22

*Kelly* v. *Harris*,
331 F.3d 817 (11th Cir. 2003) ........ 3

*Kimball* v. *Fla. Bar*,
537 F.2d 1305 (5th Cir. 1976) ........ 10

*Kousisis* v. *United States*,
605 U.S. 114 (2025) ........ 16

*Lilliston* v. *Regions Bank*,
653 S.E.2d 306 (Ga. Ct. App. 2007) ........ 16

*Meyer* v. *Jinkosolar Holdings*,
761 F.3d 245 (2d Cir. 2014) ........ 16

*Moody* v. *Moody*,
613 S.W.3d 707 (Tex. App. 2020) ........ 5

*Morgan* v. *Mercedes-Benz U.S. Int'l, Inc.*,
2019 WL 718712 (N.D. Ala. Feb. 20, 2019) ........ 5

*Optimum Techs., Inc.* v. *Henkel Consumer Adhesives, Inc.*,
496 F.3d 1231 (11th Cir. 2007) ........ 16

*Orzel by Orzel* v. *Scott Drug Co.*,
537 N.W.2d 208 (Mich. 1995) ........ 13

*Peel* v. *Reibel*,
286 N.W. 345 (Minn. 1939) ........ 7

*Ray* v. *Spirit Airlines, Inc.*,
836 F.3d 1340 (11th Cir. 2016) ........ 25

*Riggins* v. *Polk Cnty.*,
2014 WL 3900266 (M.D. Fla. Aug. 8, 2014) ........ 3

*Saville* v. *Webb*,
2025 WL 2254239 (11th Cir. Aug. 7, 2025) ........ 24

*U.S. ex rel. Seal 1* v. *Lockheed Martin Corp.*,
429 F. App'x 818 (11th Cir. 2011) ........ 24

*Sikes* v. *AT&T*,
179 F.R.D. 342 (S.D. Ga. 1998) ........ 11

*Smith* v. *Dekalb Cnty. Jail*,
2014 WL 129509 (N.D. Ga. Jan. 14, 2014) ........ 21

*Sparkman* v. *State*,
434 S.E.2d 564 (Ga. Ct. App. 1993) ........ 11

*Stevenson* v. *Thornburgh*,
2024 WL 645187 (S.D.N.Y. Feb. 14, 2024) ........ 21

*Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*,
208 A.3d 839 (N.J. 2019) ........ 13

*Tilley* v. *Barrs*,
2009 WL 1241319 (M.D. Ga. May 4, 2009) ........ 9

*Turner* v. *Trust Co. of Georgia*,
105 S.E.2d 22 (Ga. 1958) ........ 8

*U.S.* v. *Hays*,
515 U.S. 737 (1995) ........ 3, 9

*United States* v. *Binday*,
908 F. Supp. 2d 485 (S.D.N.Y. 2012) ........ 11

*United States* v. *Carpenter*,
190 F. Supp. 3d 260 (D. Conn. 2016) ........ 11

*VCA Cenvet, Inc.* v. *Vill. Veterinary Ctrs., Inc.*,
2012 WL 3779101 (N.D. Ga. Aug. 31, 2012) ........ 6

*Warnock* v. *Davis*,
104 U.S. 775 (1881) ........ 12

*Wolff* v. *Cash 4 Titles*,
351 F.3d 1348 (11th Cir. 2003)....................5

*Yaffa* v. *SunSouth Bank*,
2016 WL 10536038 (N.D. Fla. Sept. 15, 2016)....................16

*Zurich Life Insurance Co. of America* v. *Zoo Stage, Inc.*,
2004 WL 7350684 (D. Ariz. May 26, 2004)....................13

**Statutes**

A.R.S. § 20-1104....................13

O.C.G.A. § 33-24-3....................12

Defendants hereby submit this consolidated Reply in response to Plaintiffs' Omnibus Response in Opposition to Defendants' Motion to Dismiss ("Response" or "Resp.") the Second Amended Complaint ("SAC").

**PRELIMINARY STATEMENT**

Plaintiffs' rights in this lawsuit, if any, derive solely from their status as designated "Trust Beneficiaries" under certain contractual documents. This Court, however, already has dismissed Plaintiffs' purported breach of contract claims. In their Response, Plaintiffs seek to bootstrap their insufficient contractual status into standing to assert an insurable interest claim. Defendants have cited nearly a dozen cases, including two from the United States Supreme Court and three from the Georgia Supreme Court, establishing that the Insureds' estates or personal representatives—not beneficiaries—are the parties entitled to assert the insurable interest claim. Plaintiffs have not cited a single case where anyone other than an estate or personal representative has recovered proceeds of a life insurance policy held by a third-party who lacked an insurable interest in some or all of such proceeds. None of the three Minnesota cases they cite is an exception to this or is inconsistent with the cases referenced above. Plaintiffs make no assertion in the SAC, or otherwise, that any of them are executors or personal representatives of the Insureds.

Plaintiffs concede that the estates or personal representatives are proper parties to assert the purported claim based on insufficient insurable interest. Resp.

at 12, 15. Plaintiffs do not and cannot contest that if Defendants were to be found liable to Plaintiffs, Defendants would be subject to the risk of duplicative liability to the estates or personal representatives. Exhibit M to the SAC in fact reflects exactly such a claim. In contrast, in the Rule 19 cases Plaintiffs cite, there were affirmative indications that the missing parties would not seek to separately assert claims. Plaintiffs here cannot be said to be prosecuting their purported claims on behalf of the estates or personal representatives. Accordingly, Plaintiffs' claims should be dismissed for failure to join indispensable parties.

As to RICO, Plaintiffs do not cite a single case where a party has been prosecuted criminally, let alone convicted, because it financed, or otherwise acquired some interest in, a life insurance policy lacking a sufficient insurable interest. The two cases cited by Plaintiffs both involved affirmative misrepresentations made in applications to insurance companies to fraudulently induce them to issue policies. Nothing of the sort is alleged here. To be sure, Plaintiffs liberally use the word "fraud" in their SAC and Response. Plaintiffs concede, however, that they received the amounts to which the Insureds agreed. Resp. at 30. Plaintiffs do not allege any basis for any duty to disclose assertedly omitted information regarding the calculation of a specific contractual term. Nor do Plaintiffs allege that the Insureds would have declined to participate in these profitable transactions had Defendants provided more information. Plaintiffs simply

are attempting to increase the amounts they previously received based on a doctrine that a party who receives life insurance proceeds in excess of their insurable interest holds the balance in favor of the estate or personal representatives of the insured. Whatever merit or lack thereof the purported insurable interest claim may have, this is a civil matter, not a sufficient predicate for a RICO claim.

## ARGUMENT

### I. Plaintiffs Have Not Demonstrated They Have Standing to Assert Insurable Interest Claims

Article III standing is jurisdictional and cannot be waived. *U.S.* v. *Hays*, 515 U.S. 737, 742 (1995); *Bischoff* v. *Osceola Cnty., Fla.*, 222 F.3d 874, 877-78 (11th Cir. 2000). The plaintiff bears the burden of proof and may assert a claim only if "he has suffered an injury in fact." *Id.* at 878; *Kelly* v. *Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003). "[A] plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Riggins* v. *Polk Cnty.*, 2014 WL 3900266, at *2 (M.D. Fla. Aug. 8, 2014). Plaintiffs, as indirect beneficiaries of insurance policies that they allege to be void *ab initio*, have no injury in fact. If the policies were void, Plaintiffs could have no interest therein, and the Court already has held that they lack standing to assert even breach of contract claims. In that case, any proceeds received by Defendants would inure to the benefit of the estates or personal representatives of the Insureds.

### A. Defendants Did Not Previously Make Their Standing Argument Before the District Court

Plaintiffs contend that Defendants previously argued lack of standing to assert the insurable interest claim in their initial motions to dismiss Plaintiffs' counterclaims, and that the argument "was rejected." Resp. at 5-6. Not so. Liberty did not raise the argument in the district court that only the Insureds' estates or personal representatives can challenge lack of insurable interest. ECF No. 46. And Wells Fargo argued that Plaintiffs could not bring claims on behalf of the estates—primarily relating to the asserted breach of contract claims—not that Plaintiffs did not have standing to assert insurable interest claims because only the estates could recover for such claims. ECF No. 47. Plaintiffs acknowledged as much in their reply in support of their motion to strike Liberty's appeal, describing Defendants' argument before the Eleventh Circuit that only the Insureds' estates can bring insurable interest claims as "an issue that was neither decided by the Court in the MTD Order . . . ." ECF No. 76 at 13. Plaintiffs' current position is belied by their prior admission.

### B. Defendants' Standing Argument Was Not Waived

Mischaracterizing Defendants' standing argument as a challenge to real party in interest or capacity, Plaintiffs assert that Defendants waived those defenses by not raising them in the initial motions to dismiss the Counterclaims. Resp. at 4-6.

However, even if Plaintiffs are correct (they are not), waiver is not appropriate here.

Plaintiffs are incorrect that Defendants' arguments relate to prudential, rather than constitutional, standing. Resp. at 4-5. *See Morgan* v. *Mercedes-Benz U.S. Int'l, Inc.*, 2019 WL 718712, at *1 (N.D. Ala. Feb. 20, 2019) ("Generally, prudential standing bars actions where a plaintiff is not the real party in interest."). "The requirement of injury to the complaining party stems from Article III, not from prudential principles." *Wolff* v. *Cash 4 Titles*, 351 F.3d 1348, 1357 (11th Cir. 2003).

Plaintiffs also are incorrect that the issue relates to Plaintiffs' capacity. Capacity to sue is "a party's personal right to litigate in a federal court." *Firestone* v. *Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992). "[A] party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Moody* v. *Moody*, 613 S.W.3d 707, 714 (Tex. App. 2020). Here, Plaintiffs have neither personal rights nor authority to act on behalf of the estates/representatives.

Even if the Court considers Defendants' challenge to be to capacity or real party in interest, however, Defendants have not waived the argument. A lack-of-capacity defense can be raised at any time in a litigation so long as doing so does not prejudice the plaintiff (*e.g.*, where the defense would delay proceedings or where defendant waits until after trial to assert the defense). *Fukanova* v. *Mecerod*, 2010 WL 11505701, at *10-11 (N.D. Ga. Nov. 15, 2010). A similar standard applies for

the real party in interest defense. *VCA Cenvet, Inc.* v. *Vill. Veterinary Ctrs., Inc.*, 2012 WL 3779101, at *5 n.6 (N.D. Ga. Aug. 31, 2012) (real party in interest defense need only be raised "reasonably promptly."). Plaintiffs have been on notice of Defendants' standing argument since the briefing to the Eleventh Circuit on April 7, 2025, before they even filed the first Amended Complaint, and Plaintiffs acknowledged that Defendants planned to assert such a defense in May 2025, prior to discovery commencing. Rosenthal Decl. Ex. 1; ECF No. 109-2. Indeed, Defendants have raised their objections as to Plaintiffs' standing at the first opportunity following their initial motion to dismiss that was limited to the grounds permitted by Georgia statute. And while allowing Defendants to raise this defense would not prejudice Plaintiffs, finding waiver would heavily prejudice Defendants—they would be forced to "defend an action that [Plaintiffs have] no authority to bring." *Fukanova*, 2010 WL 11505701, at *11.

### C. Plaintiffs Do Not Cite Any Authority Showing that They, Rather than the Insureds' Estates, Are Entitled to Assert the Insurable Interest Claim

Plaintiffs argue that Defendants' motion to dismiss Count I should be denied because there is no "bright-line rule" that only an insured's estate may bring an insurable interest claim. Resp. at 6. While Defendants cite nearly a dozen cases demonstrating that an estate or personal representative of an estate may bring insurable interest claims (MTD at 9-12), Plaintiffs fail to cite any authority to the

contrary. Rather, they claim that a determination of the proper insurable interest claimant in a case must be "based upon an analysis of the at-issue transactions"—an invented standard that Plaintiffs do not substantiate. Resp. at 7.

Plaintiffs principally rely on three Minnesota cases, none of which shows that any party other than an estate or personal representative of the insured has standing to recover policy benefits on the basis of lack of insurable interest. In *Peel* v. *Reibel*, 286 N.W. 345 (Minn. 1939), the court resolved a dispute between the recipient of a life insurance certificate from the deceased and the deceased's estate administrator. The court rejected the estate administrator's argument that the deceased's gift was invalid due to lack of insurable interest, holding that the absence of insurable interest was "immaterial." *Id.* at 346. In *Christenson* v. *Madson*, 149 N.W. 288 (Minn. 1914), the children of the deceased sued the deceased's fiancée, Madson. The children argued that Madson lacked an insurable interest in the policy, but the court concluded that insurable interest was irrelevant where, as here, the deceased insured his own life and appointed another, Madson, to receive the proceeds of the insurance. *Id.* at 289. In *Hogue* v. *Minnesota Packing*, 60 N.W. 812 (Minn. 1894), a widow sued to recover possession of a life insurance policy on her husband's life after her husband had assigned the policy to her without informing the insurer, as required by the policy's contractual stipulations, and subsequently pledged the policy to the defendant as collateral for his own debt. The court concluded that the policy's

assignment condition was for the insurer's benefit and could not be invoked by the creditor to defeat the widow's title. *Id.* at 813. None of these three cases held that a recipient of death benefits was not entitled to retain them due to lack of insurable interest. Nor did any of the courts address who would have been the proper party to recover the death benefits had the recipient not been entitled to them.

Plaintiffs also argue that because Wells Fargo, as the trustee for the estates, failed to assert the claims, the Trust Beneficiaries are entitled to do so on its behalf. But this argument incorrectly presupposes that the Trusts, rather than the Estates, may assert insurable interest claims. Moreover, Plaintiffs misapprehend *Turner* v. *Trust Co. of Georgia*, 105 S.E.2d 22 (Ga. 1958). Plaintiffs cite the case for the proposition that "[t]here can be no serious question as to the right of the beneficiaries of a trust to apply to a court of equity to protect the trust property upon the refusal or failure of the trustee to do so." *Id.* at 26. But in *Turner*, the court enjoined the trust beneficiaries from bringing their suit, concluding that when a trustee is acting within the scope of his powers under the trust agreement, courts generally will not intervene—"as to acts within the scope of [the trustee's] express or implied powers, [the beneficiaries] must suffer the consequences when they ultimately prove detrimental to the beneficiaries." *Id.* at 27.

**D. Defendants Would Be Subject to Potential Duplicative Liability If Plaintiffs' Insurable Interest Claims Were Allowed to Proceed**

The absence of Article III standing is constitutional and fatal to Plaintiffs' purported claims irrespective of Rules 17 and 19. The lack of Article III standing is a defense that is not waivable. *Hays*, 515 U.S. at 742.

Assuming *arguendo* that Rules 17 and 19 are relevant here, Defendants would be subject to the risk of duplicative liability to the Insureds' estates or their personal representatives were they to be found liable on the insurable interest claims to Plaintiffs. Plaintiffs are incorrect that "nothing within the SAC even remotely suggest[s] that the Insureds' purported estates have any interest in this case." Resp. at 17. Specifically, Exhibit M thereto is a letter regarding a dispute between Helen Wilkenfeld's estate and trust over the rightful ownership of the interest paid on her life insurance policy. The letter states: "[t]he Beneficiaries['] position is that *any interest paid on the Policy belongs solely to the Estate*." SAC Ex. M at 9 (emphasis supplied). The fact that the estates of the Insureds have previously asserted claims is an indication that they likely will continue to do so in the future.

"An absent claimant to a limited fund, such as the proceeds of an insurance policy, is ordinarily considered to be an indispensable party to litigation." *Belcher ex rel. Belcher* v. *Prudential Ins. Co. of Am.*, 158 F. Supp. 2d 777, 779 (S.D. Ohio 2001); *see also Tilley* v. *Barrs*, 2009 WL 1241319, at *2 (M.D. Ga. May 4, 2009)

(same). If this Court were to make a determination in favor of Plaintiffs and award them the proceeds under the Insureds' policies, the Insureds' estates could "file a competing action and obtain a declaration from another court that [they are] the proper beneficiar[ies]," subjecting Defendants to duplicative obligations. *Belcher*, 158 F. Supp. at 779. This is true even when the estates have not made a claim to the policy proceeds, as long as there is a "substantial potential" for them to do so. *Id.*

"A party does not waive the defense of failure to join an indispensable party by neglecting to raise it; an objection can be raised at any time." *Kimball* v. *Fla. Bar*, 537 F.2d 1305, 1307 (5th Cir. 1976); *Epi-Use Sys. Ltd.* v. *Bi Brainz, LLC*, 2026 WL 100770, at *3 (11th Cir. Jan. 9, 2026) (citing *Kimball* with approval).

## II. Plaintiffs Do Not Dispute that No Court or Authority Has *Ever* Found that STOLI Policies Constitute Criminal Gambling

In their moving brief, Defendants stated that they were not aware of any instance in any jurisdiction where a bank or other premium finance lender has been criminally convicted, or even prosecuted, based on an allegation that an insurance policy lacked an insurable interest. MTD at 18. Plaintiffs likewise point to none. Instead, Plaintiffs rely on inapposite cases convicting insurance brokers of fraud (but not gambling) and improperly conflate civil remedies and statements of public policy with criminality.

First, Plaintiffs argue their novel reading of Section 1955 would not

improperly expand RICO liability because, in certain cases, "STOLI promoters [were] criminally prosecuted and convicted of crimes, including mail and wire fraud[.]" Resp. at 20. But the cases Plaintiffs cite did not hold individuals or entities liable for gambling. Instead, those cases involved misrepresentations made to life insurance providers on policy applications. *See United States* v. *Carpenter*, 190 F. Supp. 3d 260, 297 (D. Conn. 2016) (defendant schemed to defraud life insurance carriers "by using misrepresentations to induce them to issue STOLI policies"); *United States* v. *Binday*, 908 F. Supp. 2d 485, 488 (S.D.N.Y. 2012) (defendants made "false representations on applications for universal life insurance policies").

Second, Plaintiffs likewise offer no support for their arguments that STOLI arrangements violate Georgia's criminal gambling statute. Resp. at 21-22. The two cases they cite, *Sikes* v. *AT&T*, 179 F.R.D. 342 (S.D. Ga. 1998) and *Sparkman* v. *State*, 434 S.E.2d 564 (Ga. Ct. App. 1993), have nothing to do with life insurance policies or insurable interest.[1] Plaintiffs' argument thus amounts to nothing more than their own wishful thinking that "it would defy common sense to conclude that other types of

---

[1] In *Sikes*, AT&T operated answering machines and approved a game called "Let's Make a Deal" where people would call in and win a prize behind a select door while AT&T collected phone charges. 179 F.R.D. at 345. In *Sparkman*, the defendants helped place bets "on a three-digit number with the winning combination of numbers derived from selected digits within the total stocks and bonds closing figures of the New York Stock Exchange." 434 S.E.2d at 566.

gambling (illegal poker, for instance) can subject one to RICO liability, but gambling on human life cannot." Resp. at 22. If this were true, surely one of the dozens of state statutes relating to insurable interest would assess criminal penalties; Plaintiffs point to none. O.C.G.A. § 33-24-3 is part of Georgia's civil Insurance Code and does not assess any criminal penalties. Instead, "[i]n the case of a void contract, the insurer shall not be liable on the contract but shall be liable to repay to the person or persons who have paid the premiums all premium payments without interest." *Id.*

As noted in the motion to dismiss, Georgia and other states' gambling statutes exclude life insurance contracts from the definition of "bet" or "gambling." Plaintiffs argue without support that such exclusions should apply only to "legitimate life insurance contracts." Resp. at 23. The sole case they cite, *Warnock* v. *Davis*, 104 U.S. 775 (1881) (Resp. at 24), does not speak to any criminal gambling statute, but states only that STOLI policies "are, therefore, independently of any statute on the subject, condemned, as being against public policy." 104 U.S. at 779. Of course, a violation of public policy is not the same thing as a criminal act. *Davis* v. *Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174, 1183 (11th Cir. 2019) (a contractual provision may be void on public policy grounds even absent a "literal[] conflict" with Georgia law).

Third, as argued in Defendants' motion, Plaintiffs' reliance on the anti-gambling statutes of Arizona, Michigan, and New Jersey is misplaced. First,

Plaintiffs point to no allegations suggesting Defendants engaged in any gambling activity in Arizona, Michigan, and New Jersey. Plaintiffs argue only that some Insureds lived in Arizona and Michigan at the time of their deaths, Resp. at 22, which is irrelevant because insurable interest is evaluated at the time a transaction is entered. SAC ¶ 22. Second, Plaintiffs' authorities do not support that a STOLI arrangement is criminal gambling in any of those states. In *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 208 A.3d 839 (N.J. 2019), the New Jersey Supreme Court did not find that financing a policy lacking an insurable interest could form the basis of criminal liability. The statutes at issue in the case related only to civil consequences for gambling. *See id.* at 849 (citing N.J.S.A. 2A:40-1 and N.J.S.A. 2A:40-3). In *Crossman* v. *American Insurance Co. of Newark, N.J.*, 164 N.W. 428, 430 (Mich. 1917), the court merely observed that STOLI arrangements "have been treated as illegal in this country." Of course, the words "criminal" and "illegal" are not synonymous. *Orzel by Orzel* v. *Scott Drug Co.*, 537 N.W.2d 208, 214 (Mich. 1995). And in *Zurich Life Insurance Co. of America* v. *Zoo Stage, Inc.*, 2004 WL 7350684, at *1 (D. Ariz. May 26, 2004), the court found only that a "key man" life insurance policy was void for lack of insurable interest under Arizona's specific insurable-interest statute (A.R.S. § 20-1104); the case does not address Arizona's criminal gambling statutes.

## III. Plaintiffs Fail to State a RICO Claim Based on Mail and Wire Fraud

Plaintiffs do not dispute that the Insureds were told exactly how much money the Trust Beneficiaries would receive, that the Insureds agreed in writing to those amounts, nor that the Trust Beneficiaries received substantially those amounts. MTD at 21-22; Resp. at 30 ("Defendants charged the Trust Beneficiaries the set amount that was listed in the Financing Agreements at the outset . . . .").

### A. Plaintiffs Cannot State a Mail and Wire Fraud Predicate Act Based on Statements Made to the Insureds

In their Response, Plaintiffs largely abandon RICO claims stemming from Defendants' communications with the Insureds (including the Financing Agreements themselves), and instead argue that "the RICO violations here are ultimately based on how those terms [of the Financing Agreements] were operationalized years later when Defendants used them to deprive the Trust Beneficiaries of policy proceeds." Resp. at 29. The 50 pages of alleged "Predicate Acts" in Appendix 3 to the SAC all pertain to post-transaction communications, long after anyone was induced to do anything by Defendants' alleged conduct.

However, Plaintiffs still argue that two terms of the Financing Agreements—the "Total Amount Due" ("TAD") and the "Maturity Date Payment" ("MDP")—were misleading because Defendants "omitt[ed] the critical fact that the Trust Beneficiaries were paying the secret cost of the SPIAs as well as massive phantom

costs." *Id.* at 29-30, 33. But this purported omission is belied by the documents appended to the SAC.

The TAD and MDP figures were disclosed to the Insureds in detailed tables and formulas, and the Financing Agreements provided the formula relationship between the TAD and MDP. MTD at 25, 34; SAC Ex. F at App'x D; Resp. at 28.[2] Moreover, Exhibit B to the SAC, alleged to be marketing materials provided to all the Insureds, provided the following calculation illustration:

> 3. The Projected Maturity Date Payments are funds due to the Lender to recover costs of the Program, such as the purchase of SPIAs. This amount is expected to decline over time as those costs are amortized over the term of the financing.

SAC ¶ 59, Ex. B at 19. Read together, these disclosures make clear that the MDP and TAD amounts factored in program costs, including "the purchase of SPIAs."

Even if the terms had not been disclosed or defined, however, Plaintiffs have not sufficiently alleged, as they must, that any purported omission was material, nor that there was a duty to disclose any further detail. As to materiality, Plaintiffs argue that while the Insureds were apprised of the SPIAs, Liberty concealed details "including the cost of the SPIAs [and] how much the SPIAs generated each month in excess cashflow." Resp. at 33. But Plaintiffs have no response to the fact that the

---

[2] Defendants did not "admit that they failed to disclose how the Total Amount Due and Maturity Date Payment was calculated," as Plaintiffs contend, Resp. at 35, but stated that Defendants had no obligation to make such disclosures. MTD at 23.

Insureds, with full knowledge that they were applying for SPIAs and full knowledge that the unamortized SPIA cost was part of the Maturity Date Payment, still chose to enter these profitable financing transactions absent the assertedly omitted information. MTD at 30-31; *Kousisis* v. *United States,* 605 U.S. 114, 131 (2025) (material facts are those "a reasonable person would attach importance to [] in deciding how to proceed.").

Moreover, Plaintiffs have not alleged that Defendants had any duty of disclosure to the Insureds, who were counterparties to financial transactions with Liberty. SAC ¶¶ 117, 189; MTD at 23. Nor could they. "Absent a confidential relationship, no duty to disclose exists between parties engaged in arms-length business transactions." *Lilliston* v. *Regions Bank*, 653 S.E.2d 306, 309 (Ga. Ct. App. 2007); *see also Optimum Techs., Inc.* v. *Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1249 (11th Cir. 2007) (same). Instead, Plaintiffs argue that "one who speaks on an issue in part is required to tell the whole truth." Resp. at 27. But the cases they cite are easily distinguishable. *Meyer* v. *Jinkosolar Holdings,* 761 F.3d 245 (2d Cir. 2014) involved securities fraud. *Akers* v. *Newby*, 2021 WL 7159936, at *3 (M.D. Fla. June 14, 2021) related to misrepresentations rather than omissions. *Yaffa* v. *SunSouth Bank,* 2016 WL 10536038, at *2 (N.D. Fla. Sept. 15, 2016) involved real estate transactions that both parties agreed "were riddled with fraud," where the alleged omissions were integral to the transaction and impacted its integrity.

### B. Plaintiffs' Theories of Liability Based on Purported Statements to Plaintiffs Are Not Cognizable Under RICO

#### 1. Plaintiffs Cannot Claim Material Omissions in Statements They Did Not Receive

The Response confirms Defendants' argument that "Plaintiffs point to no actionable misstatements or omissions of material information made . . . ***directly to the Plaintiffs***." MTD at 21 (emphasis added). Plaintiffs contend that the communications to themselves are identified in the Appendices to the Complaint, Resp. at 29, but an examination of those documents reflects that they were sent to the Insureds and entities administering Liberty, with just one Plaintiff receiving such documents. *See* SAC Exs. J-O (sample communications), App'x 3 (chart describing recipients of communications), ¶ 115 (alleging that post-death calculation was sent "***without any disclosure to the Trust Beneficiaries***") (emphasis added). The remaining 70 Plaintiffs offer nothing more than generalized allegations that they received misleading communications from Defendants, and such generalized allegations do not satisfy Rule 9(b). Resp. at 25 (citing SAC ¶¶ 109-22).

**Annual Statements**: The Financing Agreements required Liberty to provide the LLCs with an annual letter setting forth what the TAD would have been if the Insured passed away that year. SAC Ex. F § 1.08. The letters were sent to the Insureds directly and to Wells Fargo as manager of the LLCs, and copied the protectors of the Trusts. *See* SAC Exs. J, K, L, App'x 3. Indeed, with one exception,

George Wilson, no Plaintiff was copied on the Annual Statements attached to or described in the exhibits or appendices to the SAC. *Id.* Mr. Wilson was copied on certain communications as a Trust Protector, and he is not alleged to be a Trust Beneficiary. SAC ¶ 4(i).

**Post-Death Communications**: The same is true for the "Post-Death Communications," which were sent from Credit Suisse to Park Venture Advisors, LLC (a servicer affiliated with Liberty), Wells Fargo as trustee for Liberty, counsel for Wells Fargo, and Wells Fargo as manager of the LLCs. SAC Exs. M, N, App'x 3. Plaintiffs have not made any particularized showing of such communications being transmitted to any of the 71 Plaintiffs besides George Wilson. *Id.*

Where Plaintiffs were not even sent such communications, Plaintiffs cannot allege with particularity that they were deceived by them.

### 2. The Annual Statements and Post-Death Communications Stemmed from Performance of the Financing Agreements

Even if Plaintiffs had received the Annual Statements and Post-Death Communications, such communications arose from performance of the Financing Agreements, and the purported omissions and misrepresentations therein likewise relate to operation of the Financing Agreements. Indeed, Plaintiffs concede ***five times*** that the Annual Statements and Post-Death Communications "operationalize" the terms of the Financing Agreement. Resp. at 29, 30, 31, 32, 33. This means that

the Annual Statements and Post-Death Communications put the contractual terms "into effect."[3] Specifically, Plaintiffs contend that the communications "misrepresented and concealed how the [TAD] would be calculated and paid, and omitted the critical fact that the [TAD] included charging the Trust Beneficiaries for SPIAs and other costs . . . ." Resp. at 29. The TAD, however, was defined and agreed to in the Financing Agreements. SAC Ex. F § 1.08.

Plaintiffs argue that "[m]erely because these terms were initially provided to the Insureds as part of contracts does not mean that Defendants could use these terms years later to deceive the Trust Beneficiaries, who themselves weren't parties to those agreements." Resp. at 29. But Plaintiffs cite no authority for their position and fail to grapple with Defendants' authorities that RICO cannot stem from contract disputes. MTD at 25. *See also In re Checking Acct. Overdraft Litig.*, 797 F. Supp. 2d 1323, 1332 (S.D. Fla. 2011) ("Plaintiffs should not be permitted to alchemize their claims for breach of contract into ones for civil RICO conspiracy.").

**3. Plaintiffs Do Not Dispute that RICO Cannot Be Premised on Inflated or Improper Charges**

Additionally, Plaintiffs do not dispute that mere allegations of inflated or improper charges are insufficient to state a claim under RICO in the Eleventh

[3] Oxford English Dictionary, "Operationalize," OED Online (Oxford Univ. Press.), https://www.oed.com/search.

Circuit. MTD at 36; Resp. at 35-36. But that is the core of Plaintiffs' argument. *See* Resp. at 25 ("Defendants used Calculation and Instruction Letters *to short-change the Trust Beneficiaries* and to take a large portion of the death benefits for themselves . . . .") (emphasis in original); *id*. at 31.

Plaintiffs respond that the alleged conduct was "aimed at extracting property through lies, not mere price disputes." Resp. at 36. But the same types of allegations were dismissed in *Braswell Wood Co., Inc.* v. *Waste Away Grp., Inc.*, 2010 WL 3168125 (M.D. Ala. Aug. 10, 2010) as insufficient to state a RICO claim. There, the defendants allegedly made "material misrepresentations in form invoices, contracts and letters which [were] sent to customers" and "misrepresent[ed] the nature and purpose of the improper fees." *Id*. at *2. The court explained, "Whether those amounts were appropriate or correct under the contract was another matter, but every incipient billing dispute is not a 'misrepresentation' from the time a bill is mailed to a customer, even if the customer ultimately prevails on the merits of the dispute." *Id*. at *4. Indeed, the court emphasized that "to hold that a wrongfully charged fee constitutes, in itself, a misrepresentation, would be to broaden the word's meaning, and the reach of RICO, past the point of meaning."

Plaintiffs' sole citation, to *Akers* v. *Newby*, 2021 WL 7159936, at *3 (M.D. Fla. June 14, 2021), does not hold to the contrary. In *Akers*, the court sustained RICO claims alleging specific misstatements to the plaintiffs of the amount that they

owed, which caused the plaintiffs to pay higher amounts. *Id.* *Akers* distinguished the situation, as is the case here, where the charges at issue "were possible via the terms of the contract." *Id.* at *3 n.1 (citing *Braswell*, 2010 WL 3168125).

**4. Plaintiffs' Claims That Contractual Terms Were Misrepresented as "Calculated" is Contradicted by the SAC**

Finally, Plaintiffs argue that the Annual Statements "were materially false and incomplete because they falsely represented that the Total Amount Due had been calculated, when in fact it was a preset amount . . . ." Resp. at 36; SAC ¶ 118, Ex. K. Even assuming the word "calculation" would be materially misleading if an agreed pre-set percentage was applied, Plaintiffs have admitted that was not the case. Plaintiffs allege that Credit Suisse acted as a "Calculation Agent" that "*calculated* the 'Total Amount Due' under the Financing Agreements using the fraudulent charges and payment formula." SAC ¶ 211 (emphasis supplied). Thus, the Court may disregard the argument that the TAD was "misrepresented" as "calculated." *See Smith* v. *Dekalb Cnty. Jail,* 2014 WL 129509, at *2 (N.D. Ga. Jan. 14, 2014) (contradictory allegations failed to plausibly allege a claim); *Stevenson* v. *Thornburgh*, 2024 WL 645187, at *13 (S.D.N.Y. Feb. 14, 2024) (inconsistencies in a plaintiff's submissions "cannot be ignored" and "[c]ontradictory factual allegations . . . are indicative of a failure to plead a plausible [RICO] claim").

**5. Plaintiffs Do Not Allege a Duty of Disclosure to Plaintiffs Sufficient to Support an Omissions Claim**

Plaintiffs have not alleged that Liberty had any duty of disclosure to Plaintiffs. And Plaintiffs have not pointed to any statements from Liberty to Plaintiffs in which Liberty spoke a half-truth. Resp. at 27-28.

As to Wells Fargo, Plaintiffs contend that they have sufficiently alleged a duty to disclose information about the SPIAs and aspects of the Financing Agreements based on the fact that "Wells Fargo was the trustee of the . . . Irrevocable Trusts." Resp. at 26. A trustee owes a duty to the trust's beneficiary to "administer the trust in good faith, in accordance with its provisions and purposes." *Jeffress* v. *U.S. Bank Nat'l Ass'n*, 2014 WL 12481342, at *2 (N.D. Ga. Oct. 27, 2014), *report and recommendation adopted*, 2014 WL 12521299 (N.D. Ga. Nov. 14, 2014). Here, the purpose of the Irrevocable Trusts was to carry out the Financing Agreements and all related agreements. SAC Ex. C at Item III(a) ("[T]he sole and exclusive purpose of this trust is to own the limited liability company member interest . . . . Accordingly, the Trustee is hereby directed to become the sole member of the Company, to execute and deliver the Operating Agreement and to cause the trust to perform all of its obligations thereunder . . . ."), Ex. D ¶ 2 ("The sole and exclusive purpose of the Company is to enter into and perform its obligations under that certain 'Liberty Premium Finance Program Financing Agreement' . . . .). Additionally, a

trustee can act in multiple capacities without breaching its fiduciary duties where the trust instrument expressly permits a trustee to serve in multiple capacities. *Gasperoni* v. *Strauss*, 2020 WL 10320967, at *5 (M.D. Fla. Sept. 22, 2020). The Irrevocable Trusts explicitly allow the Trustee to serve in multiple capacities. SAC Ex. C at IV(a) ("I acknowledge that the Person serving as Trustee of this trust . . . may also serve in any one or more of the following capacities. . . I hereby acknowledge the potential conflict of interest between the Trustee's acting as Trustee and the Trustee's acting in other such capacities, consent to the Trustee's serving in any or all such capacities, and . . . waive any potential conflict of interest the Trustee may have as a result serving in such capacities.")

### C. Plaintiffs Cannot Maintain Mail and Wire Fraud Claims for the Plaintiffs Affiliated with the "Stranger Insureds"

For eight insureds whose participation in the Liberty program is alleged only on information and belief, Plaintiffs point to no communications whatsoever to those insureds[4] or the Plaintiffs associated with them. Resp. at 37. Plaintiffs cannot state wire fraud-based RICO claims without particularized allegations of the "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; [and] (3) the content and manner in which these

[4] Louis Feldman, Jay Grimm, Sr., Sylvia Hankin, Abraham Malnik, Paul Sifen, Harry Phillips, Camillus Theodore DeCinces, and Alfred Dudley.

statements misled the Plaintiffs." *Saville* v. *Webb*, 2025 WL 2254239, at *6 (11th Cir. Aug. 7, 2025).

Plaintiffs' primary response is that "this Court already rejected Defendants' argument with respect to four of the same Insureds, *see* MTD Order at 27-28." Resp. at 37. That Order, however, did not address whether pleading on information and belief without identifying any specific communications satisfied Rule 9(b)'s particularity requirements. ECF No. 63 at 27-28. *See also U.S. ex rel. Seal 1* v. *Lockheed Martin Corp.*, 429 F. App'x 818, 821 (11th Cir. 2011) (affirming dismissal under Rule 9(b) where complaint's broad "on information and belief" allegations failed to identify "a single specific false statement").

## IV. Plaintiffs Do Not Allege RICO Standing for Either Their Gambling or Mail and Wire Fraud Claims

Plaintiffs' RICO claim based on illegal "gambling" is premised on the concept that the Policies lacked insurable interest at the time they were entered into by the Insureds. As described above and in the MTD, if Plaintiffs are correct that the Insureds' policies lacked insurable interest (which Defendants dispute), the correct remedy is to unwind the transactions and for the insurance proceeds, net of advances (including those for premiums paid and appropriate interest), to be paid to the Insureds' estates. However, "compensation under RICO § 1964(c) for injury to property must, under the familiar rule of law, place appellants in the same position

they would have been in but for the illegal conduct." *Commercial Union Assur. Co.* v. *Milken*, 17 F.3d 608, 612 (2d Cir. 1994). Plaintiffs do not and cannot allege that the Insureds or Plaintiffs are worse off as a result of these profitable transactions.

Finally, Plaintiffs do not dispute that they must specifically allege "that they would have acted differently" absent the fraud. *Ray* v. *Spirit Airlines, Inc.*, 836 F.3d 1340, 1351 (11th Cir. 2016). Plaintiffs argue only that they "would not have agreed to the [TAD] figures had they known the truth." Resp. at 39. However, Plaintiffs' hypothetical "non-agreement" could have been resolved only by a claim by the estates for breach of contract and/or lack of insurable interest, which has never been asserted. This Court already has held that "the agreements expressly preclude assignment and disclaim any third-party beneficiaries." ECF No. 63 at 14.

## CONCLUSION

By the time they amended their Complaint for the second time, Plaintiffs had the opportunity to incorporate deposition testimony and thousands of documents produced by the parties and non-parties. Yet Plaintiffs have not cured and cannot cure the legal deficiencies in their claims. The first and third claims of the SAC should be dismissed with prejudice.

January 30, 2026

/s/ *Terry R. Weiss*
Terry R. Weiss, Esq.
Ga. Bar No. 746495

trweiss@duanemorris.com

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)

*Attorneys for Defendants*

Joel Kurtzberg, Esq. (*pro hac vice*)
jkurtzberg@cahill.com
Thorn Rosenthal, Esq. (*pro hac vice*)
trosenthal@cahill.com
Lauren Perlgut, Esq. (*pro hac vice*)
LPerlgut@cahill.com

**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Liberty*

Jonathan P. Hersey, Esq. (*pro hac vice*)
jonathan.hersey@klgates.com
**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, CA 92614
(949) 253-0900

Clay J. Pierce (*pro hac vice*)
Emily Burgess (*pro hac vice*)
Elizabeth M. Casey (*pro hac vice*)
Julie Landy (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas
New York, NY 10036
(212) 248-3186

Kyle Darch (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1144 Fifteenth St
Suite 3400
Denver, CO 80202

*Attorneys for Wells Fargo*

## CERTIFICATION

The above-signed counsel hereby certifies that this document was prepared in Times New Roman 14-point font with 1 inch margins in accordance with L.R. 5.1, N.D. Ga.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT** upon all parties to this matter by electronically filing a copy of same with the Court's electronic filing system, which will automatically send an electronic copy to all counsel of record.

This 30th day of January, 2026.

*/s/ Terry R. Weiss*
Terry R. Weiss, Esq.
Ga. Bar No. 746495