**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Brian Achenbach, et al.,

Plaintiffs,

Case No. 1:23-cv-5483-MLB

v.

Liberty One Funding Trust, et al.,

Defendants.

______________________________/

**ORDER**

This case involves a life insurance funding program managed by Defendants Liberty One Funding Trust, Liberty Two Funding Trust, Wells Fargo Bank, N.A., and Wells Fargo Delaware Trust Company, N.A. Plaintiffs are family members of individuals who participated in the program. Plaintiffs sued Defendants, and Defendants move to dismiss some of the claims. (Dkts. 113, 122.)

## I. Background

Plaintiffs allege the Liberty One and Wells Fargo Defendants operated a human life wagering scheme by obtaining stranger-oriented life insurance ("STOLI") policies on the lives of senior citizens to enrich

themselves while providing little or no benefit to the insureds and their beneficiaries. (Dkt. 113 ¶¶ 3, 26, 33.) Defendant Wells Fargo Bank acted as a trustee for the trusts created for the realization of the life insurance policies. (*Id.* ¶ 35.) Liberty financed those policies on the lives of Plaintiffs' family members, referred to in the complaint as the "Insureds." (*Id.* ¶¶ 39, 50.)[1]

According to the complaint, Liberty and its agents "targeted" seniors who did not need life insurance, were not shopping for life insurance, and had no desire or ability to pay for life insurance. (*Id.* ¶ 52.) Liberty and its agents convinced those people to participate in its program by promising them they "would receive financial compensation of between 5% to 15% of a policy's face amount"—which Liberty and Wells Fargo referred to as an "upfront advance" or a "periodic advance"—and that a small portion of "each [p]olicy's death benefit would be paid to [the Insured's] families when they died." (*Id.* ¶¶ 54–55.) Liberty and Wells Fargo made these representations in marketing program materials that

[1] The allegations in the complaint don't draw much of a distinction between the two Liberty Defendants so, for the purposes of this order, neither does the Court. And, except where otherwise noted, the Court's use of "Wells Fargo" refers to both Wells Fargo Defendants.

they distributed to their agents and then to the Insureds by telephone, facsimile, email, and regular mail. (*Id.* ¶¶ 56-57.)

When potential Insureds agreed to participate, Liberty (or its agents) had them sign the program materials and financing agreements. (*Id.* ¶ 58.) The financing agreements explained the Insureds did not have to pay out-of-pocket costs and the Insured's families would receive "a net death benefit at the maturity of the polic[ies] after taking into account the [p]rogram financing costs, including what Liberty and Wells Fargo described as a so-called 'Maturity Date Payment.'" (*Id.* ¶¶ 60–61.) The financing agreements also "vaguely informed" the Insureds that Liberty would purchase a single premium immediate annuity ("SPIA") for each policy and would use payments from the SPIAs for the policy premiums and "periodic payments to the [Insureds.]" (*Id.* ¶ 62.)

When Liberty determined a potential Insured was suitable for its program, Liberty provided the Insured "non-negotiable boilerplate documents . . . [that] created multiple entities in Georgia," including an irrevocable trust and a limited liability company, both in the Insured's name. (*Id.* ¶ 71.) For each insured, Liberty named Wells Fargo Bank the trustee of the trust and the Insured's family member the beneficiary. (*Id.*

¶¶ 73, 83.) Liberty also made Wells Fargo Bank the manager of each LLC. (*Id.* ¶ 83.) The LLC then procured a life insurance policy on the Insured, creating "the false appearance of [an] insurable interest" because the LLC bore the Insured's name. (*Id.* ¶ 82.) Liberty controlled the policy because it controlled Wells Fargo Bank (the manager of the LLC and trustee of the trust), thus guaranteeing that Liberty—rather than the Insured's family—received the benefit of the policy as the lender of the financing program. (*Id.* ¶¶ 83, 100.) According to Plaintiffs, "[t]he purpose of these assignments was not to benefit the Insureds or the [t]rust [b]eneficiaries, but rather to ensure that Liberty had exclusive control over each of the [p]olicies from inception and would, therefore, receive the vast majority of the death benefits of the policies whenever the Insureds passed away, to the direct detriment of the [t]rust beneficiaries." (*Id.* ¶ 88.)

In addition to the life insurance policies, Liberty had each Insured sign a blank SPIA application "before any of the details were filled out." (*Id.* ¶ 102.) Liberty and Wells Fargo then purchased "massive" SPIAs on the lives of each Insured. (*Id.* ¶ 106.) Each Insured's SPIA generated monthly payments greater than the monthly premiums needed for the

Insured's policy. (*Id.*) This allowed Liberty to keep any excess generated by the annuity payments. (*Id.* ¶¶ 104, 176.) Liberty and Wells Fargo "concealed from Plaintiffs the details about the SPIAs, including specifically how much they cost to begin with and the amount of monthly income they paid to Liberty." (*Id.* ¶ 101.)

Liberty and Wells Fargo provided annual statements to each Insured's LLC while that Insured remained alive. (*Id.* ¶ 109.) The annual statements identified the total amount Liberty was entitled to retain out of each policy's death benefit. (*Id.*) When an Insured died, Liberty and Wells Fargo had "post-death claim communications" with a so-called "calculation agent" about the respective amounts Liberty and the trust beneficiaries were entitled to be paid. (*Id.* ¶¶ 115–16.) Plaintiffs allege the representations made in the annual statements and post-death claim communications to the trust beneficiaries were knowingly false and materially incomplete. (*Id.* ¶ 118.) They allege Liberty and Wells Fargo falsely claimed the calculation agents had "calculated" the total amount Liberty would be paid under each policy (when it was a pre-set percentage of each death benefit that Liberty would receive regardless of Liberty's costs or when the Insured died), that

the total amount due to Liberty was accurate (when it was "massively inflated" to include both the cost of the SPIAs that Liberty had purchased without telling the trust beneficiaries and "phantom expenses" that Liberty and Wells Fargo included to enrich themselves), and that the small payouts made to the trust beneficiaries were proper (when they were "vastly understated" because they fraudulently charged the beneficiaries for the SPIAs and the phantom expenses). (*Id.*)

Plaintiffs sued Defendants in November 2023. (Dkt. 1-1.) After the Court granted Defendants' motion to dismiss in part (Dkts. 37, 63), Plaintiffs filed two additional complaints. The second amended complaint—the operative complaint—asserts a claim to declare the policies void *ab initio* as improper wagers on human lives (Count I), a claim for breach of trust against Wells Fargo Bank for breaching its obligations to the trust beneficiaries (Count II), and a civil RICO claim against all Defendants for running a STOLI and gambling enterprise that defrauded the Insureds and their families (Count III). (Dkt. 113.) Defendants move to dismiss Counts I and III. (Dkt. 122.) The Court held a hearing on July 22, 2026. (Dkts. 170, 173.)

## II. Standard of Review

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 667–78 (2009). A court may dismiss a pleading for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. At the stage of a motion to dismiss, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

Civil RICO claims are governed by a more exacting standard than that found in Rule 12(b)(6). *See* Fed. R. Civ. P. 9(b); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) ("[S]ubstantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard."). Rule 9(b) says "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud

or mistake." *See also Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007) ("Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity.").

## III. Discussion

### A. Insurable Interest Claim

In Count I, Plaintiffs allege Liberty and Wells Fargo "used" the Insureds to obtain policies that, from the beginning, guaranteed Liberty would receive 95% of the death benefits. (Dkt. 113 ¶ 136.) They say, however, that Liberty had no insurable interest, making the policies "pure wagers on the lives of the Insureds" and voidable under Georgia law. (*Id.* ¶ 147.) They claim they are entitled to either the policies' full death benefits or a greater share of the benefits. (*Id.* ¶¶ 182–83.)

Defendants move to dismiss, arguing Plaintiffs lack standing. They say that, under United States Supreme Court and Georgia Supreme Court precedent, the executor of an estate or the legal representative "of an insured who was made the subject of a human life wagering policy is the proper party to recover the proceeds paid on that policy." (Dkt. 122-

29 at 17.)[2] They insist the legally appointed executor or personal representative of each insured is a necessary party whose absence deprives the Court of jurisdiction. (*Id.* at 21.)[3] As part of this, they insist Plaintiffs have no capacity as trust beneficiaries to sue on behalf of the Insureds' estates. (*Id.* at 22.)

Plaintiffs respond, arguing "there is no bright-line rule providing that only an insured's formal estate, through a court-appointed representative, has the ability to bring an insurable interest claim." (Dkt. 124 at 13.)[4] According to Plaintiffs, the documents establishing

---

[2] In their reply, Defendants contend Plaintiffs' inability to assert the insurable interest claims presents an Article III standing issue. (Dkt. 140 at 12.) In support, they argue Plaintiffs have no injury in fact because they have no interest in the insurance policies. (*Id.*) But, if Defendants took a greater portion of the life insurance benefits than they were entitled to take, that amount would go to Plaintiffs by operation of the LLC and trust agreements. (Dkt. 113 ¶¶ 160, 180.) So Plaintiffs have sufficiently alleged "a personal stake in the case" for Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

[3] Defendants do not expressly move to dismiss under Federal Rule of Civil Procedure 12(b)(7), which governs failure to join a party under Federal Rule 19.

[4] Plaintiffs also argued Defendants waived this argument by failing to raise it in their initial motions to dismiss. (Dkt. 124 at 5.) But those motions and their subsequent briefing mainly concerned whether applicable statutes required arbitration of this matter (and therefore the

each trust make clear the estates of the Insureds are not the proper parties to litigate this suit. (*Id.* at 16.) They say they are "the proper insurable interest claimants and the real parties in interest on Count I" and that, even if the estates were the real parties in interest, Defendants fail to establish that the estates actually exist and must be joined. (*Id.* at 23, 25.)

"Only a real party in interest has the capacity to bring a lawsuit." *Tennyson v. ASCAP*, 477 F. App'x 608, 610 (11th Cir. 2012) (citing Fed. R. Civ. P. 17(a), (b)).[5] "The capacity doctrine relates to the issue of a party's personal right to litigate in a federal court." *Id.* (citation omitted). "To determine if someone is a real party in interest, courts consider

Court's dismissal of this case). (Dkts. 46, 47.) Wells Fargo did briefly discuss this issue in its brief but argued Plaintiffs lacked *contractual* standing to assert a breach of contract claim against it. (Dkt. 47-1 at 18–21.) So it's plausible Wells Fargo—but not Liberty—waived this argument as to Plaintiffs' insurable interest claim. In any event, because a failure-to-join defense is not waivable and may be raised in a motion for judgment on the pleadings, the Court addresses the issue now. Fed. R. Civ. P. 12(h)(1), (2)(B).

[5] The Court recognizes that *Tennyson* and other unpublished cases cited herein are not binding, but cites them as instructive nonetheless. *Searcy v. R.J. Reynolds Tobacco Co.,* 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.")

whether a party possesses an enforceable right." *Garbiras v. Alex Logistics, Inc.*, 2025 WL 4060083, at *3 (N.D. Ga. Oct. 24, 2025).

Plaintiffs have plausibly alleged they have enforceable rights such that they are real parties in interest. *Garbiras*, 2025 WL 4060083, at *3. That's because "[i]f a person to whom the proceeds of a policy are paid lacks an insurable interest and is therefore not entitled to the proceeds, the person holds them as a trustee for the person lawfully entitled to them." Couch on Insurance 3d § 41:9 (2011) (citing *Turner v. Davidson*, 188 S.E. 828 (1936)). Plaintiffs have plausibly alleged that, by operation of the various agreements between the Insureds and Defendants, they are entitled to the life insurance proceeds under the policies. Plaintiffs' entire complaint is built around the core allegation that Defendants "induced" the Insureds to obtain the policies at issue by telling the Insured that "their families"—that is, Plaintiffs—"would receive 'a net death benefit'" when they died. (Dkt. 113 ¶ 61.) As part of this, they allege Defendants falsely represented to the Insureds that, after repaying loans obtain to finance the premiums, the remaining policy proceeds "would be paid to family members of the [Insureds], who would be designated as beneficiaries of the Irrevocable Trusts at the maturity of

the policy." (*Id.* ¶ 40.) Plaintiffs have also plausibly alleged that, through the LLC and trust agreements, the Insureds designated Plaintiffs as the rightful and ultimate recipients of the life insurance payouts on their lives. (*Id* ¶¶ 47, 73.) In other words, the Insureds identified Plaintiffs as the people they wanted to benefit from the insurance policies they procured—not their estate or their legal representatives. Given that, if Liberty indeed lacked insurable interests when it procured the life insurance policies (and thus has no right to retain the proceeds) Plaintiffs would (likely) be entitled to the proceeds. (Dkt. 113 ¶ 79.)

None of the cases Defendants cite hold otherwise because they do not suggest a decedent's estate is the only or sole party that can challenge the legality of an insurance agreement. Defendants, for example, cite *Cammack v. Lewis,* 82 U.S. 643, 638–49 (1872) and *Warnock v. Davis*, 104 U.S. 775, 779 (1881). The plaintiffs in those cases challenged whether the defendants could retain the benefits of the decedents' life insurance policies when the life insurance policies were considered "wager policies." In both cases, the Supreme Court held that, in the event of a policy lacking an insurable interest, the insured's estate could recover any life insurance benefits after payment of a decedent's debt.

*Cammack*, 82 U.S. at 650 (administrator's receipt of portion of death benefit did not preclude her from seeking remainder from named beneficiary of insurance policy that lacked insurable interest, with beneficiary retaining only amount necessary to satisfy insured's debt); *Warnock*, 104 U.S. at 775 (administrator to recover amount collected from insurance company on policy lacking insurable interest less debt owed to named beneficiary). Neither case examined the issue of whether the insured's estate was the proper party to bring the claim, let alone the only party that could do so. That issue never arose. The respective plaintiffs just so happened to be the administrators of the estates. *Cammack*, 82 U.S. at 649; *Warnock*, 104 U.S. at 775. Those cases certainly do not hold that a deceased insured's estate is the only party that may raise an insurable interest claim.

Neither did the Georgia Supreme Court in the cases Defendants cite. *Morris v. Ga. Loan, Sav., & Banking Co.,* for example, considered whether a creditor could recover the face amount of a life insurance policy if that amount exceeded the decedent's debt to the creditor. 34 S.E. 378, 378 (Ga. 1899). The Georgia Supreme Court merely held that, once the creditor recovers the amount of the debt owed, "[t]he *legal representatives*

of [the decedent] will be entitled to the [remaining] balance." *Id.* at 380 (emphasis added). It reached the same conclusion in *Exh. Bank of Macon v. Loh*, 31 S.E. 459, 462 (Ga. 1898). Again, the plaintiffs in those cases just so happened to be the insureds' legal representatives. The Georgia Supreme Court, however, never considered—let alone held—that they were the only proper plaintiffs to assert such a claim.

Defendants' 19th-century cases do not stand for the hard and fast proposition they assert. And Defendants fail to provide any case holding that the estate of an insured is the *only* proper party to challenge the lack of an insurable interest in a life insurance policy.

As an alternative argument, Defendants contend that, if the Court allows Plaintiffs to pursue these claims, they "could be subject to duplicative liability in future claims by the estates or personal representatives not present here." (Dkt. 122-29 at 21.) But they have failed to identify any estate or representative of any Insured that is interested in pursuing a claim. That dooms Defendants' motion to dismiss for failure to join the estates. *See Kojancie v. Gabriel*, 2009 WL 2385993, at * 5 (W.D. Pa. Aug. 3, 2009) (denying a defendant's motion to dismiss for failure to join an allegedly indispensable party when no

evidence suggests that party existed). If discovery uncovers any such estates, Defendants may seek relief under Rule 12 as to that party.[6] Fed. R. Civ. P. 12(h)(2) (allowing a party to file a motion for judgment on the pleadings on a party's failure to join a party required by Federal Rule 19(b)). Until then, Defendants' hypothetical concern warrants no greater action.

By operation of the contracts Defendants drafted and provided to the Insureds, Plaintiffs obtained an interest in the insurance policies at issue. And not just any right, a right to the proceeds of those policies after payment of any debts to Defendants. That gives them the right to sue for the benefits they claim to have been denied.[7]

---

[6] It's doubtful Defendants would face duplicative liability because the trust agreements explicitly provide that the beneficiaries (not the estates) receive the trust property unless an accountant or attorney establishes otherwise. (Dkt. 113-3 at 7–8.) But this is an issue for another day.

[7] This is consistent with the Court's previous determination that Plaintiffs are "entitled to challenge [the insurance policies] as illegal and void" because they are the "alleged beneficiaries of those [policies]." (Dkt. 63 at 28.)

### B. RICO Claim

Count III of Plaintiffs' complaint alleges Defendants violated and conspired to violate the federal RICO statute, 18 U.S.C. § 1962(c) and (d). (Dkt. 113 ¶ 208.) To plead a successful RICO claim, Plaintiffs must allege "a RICO enterprise and a pattern of racketeering activity." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). A pattern of racketeering activity requires Plaintiffs to allege, among other things, that Defendants committed two or more predicate acts in a manner that demonstrates criminal conduct of a continuing nature. *Id.*[8] Plaintiffs allege Defendants "commit[ed] a pattern of acts in connection with an illegal gambling and human life wagering scheme" and "commit[ed] a pattern of acts of wire fraud and mail fraud." (*Id.* ¶¶ 216–17.) Defendants move to dismiss, arguing these allegations don't plausibly allege a pattern of racketeering activity.

[8] Plaintiffs must also allege Defendants committed the predicate acts within a ten-year time span, and that the acts were related to one another. *Jackson*, 372 F.3d at 1264.

### 1. Gambling as Racketeering Activity

The RICO statute defines racketeering activity to include gambling in violation of state law and running an illegal gambling business under federal law. *See* 18 U.S.C. § 1961(1). The federal gambling statute, 18 U.S.C. § 1955(b)(1)(i), makes it illegal to run a gambling business in violation of state law. So, to allege a pattern of racketeering activity involving gambling, Plaintiffs must plausibly allege Defendants violated some state's criminal gambling statute. To meet this burden, they say Defendants violated the anti-gambling statutes of Georgia, New Jersey, Michigan, and Arizona because the life insurance policies constituted "illegally gambling on the lives of the Insureds." (*Id.* ¶¶ 217, 223.)[9]

Defendants argue none of Plaintiffs' allegations amount to a violation of a criminal gambling statute. (Dkt. 122-29 at 26–27.) They say they know of no "instance in any jurisdiction where a commercial bank or other premium finance lender has been convicted, or even prosecuted [under a gambling statute] . . . based on an allegation that a

[9] The complaint does not allege Defendants violated Georgia's anti-gambling statute. But Defendants insist it's the only jurisdiction that matters for Plaintiffs' claims. (Dkt. 122-29 at 27.) Plaintiffs engage in that discussion in their response brief, so the Court addresses it.

financed life insurance policy lacked an insurable interest." (*Id.* at 26.) Plaintiffs point to no such prosecution but still insist "wagering on human life by taking out policies lacking insurable interest is a well-recognized form of gambling that is a crime in Georgia and elsewhere[.]" (Dkt. 124 at 29.)

Like the parties, the Court has found no case in Georgia or anywhere finding a bank or finance lender criminally liable for gambling because of a life insurance policy lacking an insurable interest. While Plaintiffs cite a handful of cases describing such a policy as "a mere wager[,]" none of those cases suggest the policy violates Georgia's—or any state's—gambling statute. *See Crum v. Jackson Nat. Life Ins. Co.*, 880 S.E.2d 205, 208 (Ga. 2022) (noting statutory requirement of insurable interest was intended to prevent wagering on human lives but not finding such an insurance policy would violate Georgia's gambling statute); *Union v. Fraternal League v. Walton*, 34 S.E. 317, 319 (Ga. 1899) (explaining an individual may insure his life provided that the policy is not "a mere wagering contract" but not finding such a contract would violate Georgia's gambling statute); *Turner v. Davidson*, 188 S.E.2d 828, 830 (Ga. 1936) (noting life insurance policy lacking insurable interest is

"obnoxious to the law" and "violative of sound public policy" but not violative of Georgia's gambling statute); *Chapman v. Lipscomb-Ellis Co.*, 22 S.E.2d 393, 398 (Ga. 1942) (holding a policy is valid if there was insurable interest in the inception of the policy and need not exist until insured's death but not finding a policy lacking insurable interest would violate Georgia's gambling statute). And the two cases Plaintiffs cite involving gambling convictions—*Sikes v. AT&T*, 179 F.R.D. 34 (S.D. Ga. 1998), and *Sparkman v. State*, 434 S.E.2d 564 (Ga. Ct. App. 1993)—don't concern life insurance policies.

Defendants' alleged conduct also do not violate the plain text of Georgia's gambling statute, which says someone commits the crime of gambling when he or she makes a bet upon the "partial or final result" of any game or contest, the performance of any participant in a game or contest, the "result" of any political nomination or election, or "any game played with cards, dice, or balls." O.C.G.A. § 16-12-21. Likewise, a person violates Georgia's commercial gambling statute when he or she operates a gambling place, receives or records a bet, "sells chances upon . . . the result of . . . any game," sets up or promotes any lottery, conducts a bingo game without a license, or contracts for an "option to

buy or sell contracts" for any commodity, security, or stock with the intent that the contract will be settled by the payment of a difference in price rather than the delivery of the property at issue. O.C.G.A. § 16-12-22. The Court cannot reasonably infer from any allegation in the complaint that Defendants violated either of Georgia's anti-gambling statutes.

Defendants argue the Arizona, Michigan, and New Jersey anti-gambling statutes are irrelevant. (Dkt. 122-29 at 27.) Plaintiffs insist they are because some of the Insureds lived in those states. (Dkt. 124 at 29.) Indeed, the complaint alleges Insureds Frank Cerie and Gilbert Roonie lived in Arizona and Michigan but lacks a similar allegation for an Insured who lived in New Jersey. (Dkt. 113 ¶ 4.) Those allegations allow the Court to reasonably infer Defendants conducted business in Arizona and Michigan by targeting Cerie and Roonie as potential policy holders and obtaining signatures on the various agreements for the life insurance policy while Cerie and Roonie lived in those states. *See* 18 U.S.C. § 1955(b)(1)(i) ("[I]llegal gambling business means a gambling business which . . . is a violation of the law of the State . . . in which it is conducted[.]"). So, those states' anti-gambling laws could be relevant to Plaintiffs' RICO claim.

Still, Plaintiffs' RICO claim based on Arizona and Michigan gambling statutes fail for the same reason their claim based on the Georgia statute does: Plaintiffs offer no case suggesting a financial institution could be liable for violating either state's criminal gambling statute by obtaining policies in which they lack an insurable interest. While the court in *Zurich Life Ins. Co. of Am. v. Zoo Stage, Inc.*, 2004 WL 7350684, at *1 (D. Ariz. May 26, 2004), characterized an insurance policy lacking an insurable interest as an "illegal wagering contract[,]" the case concerned whether a corporation had an insurable interest in the life of an insured, not whether the corporation had violated Arizona's gambling statute. Similarly, the court in *Crossman v. Am. Ins. Co. of Newark*, 164, N.W. 428, 429 (Mich. 1917), stated that life insurance policies without insurable interests "have been treated as illegal in this country" because they are "species of gambling" and "contraven[e] public policy." Again nothing suggests the court (in 1917) used the term "gambling" in terms of the state's current criminal statute. To characterize something as an "illegal wagering contract" or "gambling" is not the same as concluding that thing violates a specific gambling statute.

Michigan's gambling statute prohibits "taking, receiving, or accepting any money with the agreement that any money will be paid or delivered to any person where the payment or delivery is alleged to be contingent upon the happening of any event not known by the parties to be certain." MICH. COMP. LAWS § 750.301 (cleaned up).[10] The Court is not persuaded Defendants violated this statute because the life insurance policies required payment upon the insureds' deaths, events certain to occur. Arizona, on the other hand, defines gambling as

> one act of risking or giving something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event but does not include bona fide business transactions that are valid under the laws of contracts including contracts for the purchase or sale at a future date of securities or commodities, contracts of indemnity or guarantee, life, health, or accident insurance[.]

ARIZ. REV. STAT. ANN. § 13-3301. In other words, the statute excludes bona fide life insurance contracts. The Court does not read that exclusion

[10] Plaintiffs also contend Defendants violated MICH. COMP. LAWS § 432.218, (Dkt. 124 at 30), but that statute generally concerns running a gambling operation without a license, influencing individuals or entities affiliated with a gambling operation, and card counting. Absent any allegation or explanation for how Defendants' life insurance financing program violated any provision of this statute, the Court is not convinced Defendants violated it.

to mean contracts lacking an insurable interest violate the gambling statute. And Plaintiffs cite no case suggesting this exclusion was intended to criminalize otherwise legitimately issued policies rendered void simply for the absence of an insurable interest.

In the absence of a single gambling prosecution for the conduct alleged and without more than dicta describing life insurance policies lacking an insurable interest as a "wager," an "illegal wager," or "gambling," the Court concludes Plaintiffs have not plausibly alleged Defendants' life insurance financing program violated the Georgia, Arizona, or Michigan criminal statutes. The Court thus concludes Plaintiffs have not plausibly alleged a pattern of racketeering activity involving illegal gambling.

**2. Mail/Wire Fraud as Racketeering Activity**

Plaintiffs allege Defendants committed mail and wire fraud by transmitting the terms of the program materials and financing agreements via telephone, facsimile, email, regular mail, and other common carriers. (Dkt. 113 ¶ 56-57, 216.) They say Defendants omitted key terms from these documents, including the amount of excess annuities Liberty would receive. (*Id.* ¶¶ 214, 222.)

The RICO statute defines racketeering activity to include federal mail and wire fraud violations. *See* 18 U.S.C. § 1961(1). Those crimes require that a defendant "(1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or causes the use of mails or wires for the purpose of executing the scheme or artifice." *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011). The scheme to defraud "requires proof of a material misrepresentation or the omission or concealment of a material fact calculated to deceive another out of money or property." *Id.*; *see also Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud [and] wire fraud . . . statutes."). A misrepresentation or omission is material "if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." *Id.* at 1239. "[M]ateriality asks whether the misrepresentation constituted an inducement or motive to enter into a transaction." *Kousisis v. United States*, 605 U.S. 114, 131 (2025) (citation omitted and modified).

Defendants mainly argue Plaintiffs "point to no actionable misstatements or omissions of material information" because they provided each Insured "the material provisions of the transactions: what

they would themselves pay (in most cases, nothing), the amounts of the insurance policies, and what their respective beneficiaries were expected to receive." (Dkt. 122-29 at 29–30, 33–34.) The Court disagrees. Plaintiffs allege that, through the program materials, Defendants "induced" the Insured to enter into the various agreements "with the promise of financial compensation" for themselves and their families; "promoted their Program as a legitimate premium financing program where money would be borrowed to pay premiums on a life insurance policy on the life of each Insured" when that was not true; and "made it appear on paper that . . . the death benefit of any Policy would flow through to the Trust Beneficiaries" when that "was a fiction" because Defendants used the various documents to "give Liberty ownership and control of the Policies and their death benefits." (Dkt. 113 ¶¶ 55–56, 61, 64, 82, 87.) Defendants' argument thus ignores Plaintiffs' core allegation: that Defendants failed to disclose the sham nature of the insurance policies, not as a vehicle to benefit the Insureds and their chosen beneficiaries but to benefit themselves.

Defendants also argue Plaintiffs have not sufficiently alleged the materiality of Defendants' misstatements in the program materials. But

Plaintiffs allege Defendants "induce[d]" the Insureds into entering into the various agreements "with the promise of financial compensation and were told, through written disclosures, that their families (i.e., the Trust Beneficiaries in this case) would receive 'a net death benefit at the maturity of the policy after taking into account the Program financing costs,'" when, in fact "the purpose of [the assignments and other documents] was not to benefit the Insureds or the Trust Beneficiaries, but rather to ensure that Liberty had exclusive control over each of the Policies from inception and would, therefore, receive the vast majority of the death benefits of the Policies whenever the Insureds passed away, to the direct detriment of the Trust Beneficiaries." (*Id.* ¶¶ 61, 88.) The Court concludes Plaintiffs plausibly allege reliance and inducement, at least sufficient to survive dismissal.[11] *See United States v. Detling*, 2019

---

[11] Defendants also argue the complaint's allegations do not satisfy the heightened pleading standard required for fraud claims. (Dkt. 122-29 at 32–33.) But, as discussed above, Plaintiffs' allegations "identif[y] the who, what, when, where, and how of the fraud alleged." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022). They've sufficiently alleged Liberty and Wells Fargo were the ones that made misrepresentations, the misrepresentations were made through the program materials and financing agreements at the time the Insureds signed up for the program, and the misrepresentations concerned the key details of the program (as outlined in the complaint).

WL 3006623, at *6 (N.D. Ga. Apr. 30, 2019) ("[T]he materiality of any alleged misrepresentation should be decided at trial.").

Defendants also argue any omission regarding the SPIAs cannot support Plaintiffs' wire fraud claim because that "information was not relevant to the Insureds' financing transactions." (Dkt. 122-29 at 36.) Plaintiffs say their wire fraud allegations are sufficient because they "specifically allege a duty [on Defendants] to disclose information about the SPIAs and other aspects of the fraudulent scheme." (Dkt. 124 at 33.) But missing from their argument is any explanation about why details about the SPIAs are the type of information that "give rise to RICO trustee liability by omission." (*Id.* at 34.) The Court does not decide that issue now because it finds sufficient Plaintiffs' allegations regarding the other misrepresentations in the program materials and financing agreements.

Finally, Plaintiffs allege Defendants "sent annual statements and post-death communications to the Trust Beneficiaries in furtherance of the fraud." (Dkt. 124 at 32.) They refer to Appendix 3 of their complaint, labeled "Select Predicate Acts," alleging Defendants "have committed thousands of predicate acts of wire and mail fraud," and identifying

annual statements and other "[e]mails and mailings [Defendants sent] by wire and mail." (Dkt. 113-18.) Plaintiffs, however, do not refer to those items—directly, indirectly, generally, or referentially—in their specific wire fraud allegation. (Dkt. 113 ¶ 216.)[12] And, in the body of the complaint, they do not specifically allege Defendants sent annual statements and post-death communications via interstate wires. The Court doubts Plaintiffs can add so many core allegations through Appendix 3. But the Court also need not decide that issue—or whether Plaintiffs could use this evidence at trial or summary judgment to sustain their RICO claim—because Plaintiffs' allegations about the program materials and financing agreements are sufficient to maintain their wire fraud predicate act allegations and, thus, their RICO claim.

## IV. Conclusion

The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. 122). The Court **DISMISSES**

[12] Plaintiffs refer to the annual statements and post-death communications in another paragraph of the RICO claim. (Dkt. 113 ¶ 223.) But they don't tie that to a pattern of racketeering activity through mail fraud. Plaintiffs should consider whether its current allegations are sufficient to rely on these items to sustain their RICO claims going forward or whether they need to amend their allegations.

portions of Plaintiffs' RICO claim (Count III) based on the predicated acts of gambling, but their RICO claim based on wire and mail fraud may proceed.

**SO ORDERED** this 24th day of September, 2026.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE